# ATTACHMENT B

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| EDWARD BANKS, *et al.,* | |
| Plaintiffs, | |
| v. | No. 1:20-cv-849 (CKK) |
| QUINCY BOOTH, in his official capacity as Director of the District of Columbia Department of Corrections, *et al.,* | |
| Defendants. | |

**REPORT SUBMITTED BY *AMICUS CURIAE* PURSUANT
TO SEPTEMBER 16, 2020 ORDER**

**(Table of Contents, Report Narrative, Index to Exhibits, Appendix A Exhibits 1A – 6 and
Appendix B Exhibit 1)**

**December 11, 2020**

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................2

II.     METHODOLOGY ................................................................................3

III.    BACKGROUND ...................................................................................5

      A.  Population .................................................................................5
      B.  Single versus Double Celling.................................................7
      C.  Operations in Response to the Pandemic..............................9
      D.  Staffing...................................................................................10
      E.  Support from the DOH............................................................11

IV.     FINDINGS............................................................................................11

    **Requirement One**...............................................................................11

      A.  The Sick Call Process ...........................................................12
      B.  Sick Call Data .......................................................................16
        1.  Sick Call at the CDF.......................................................18
           Table One:  Summary of Length of Time to be Seen By A
           Provider At CDF.............................................................20
        2.  Sick Call at the CTF .......................................................20
           Table Two:  Summary of Length of Time to be Seen By A
           Provider At CTF .............................................................21
      C.  Conclusion, Requirement One ................................................22

    **Requirement Two**...............................................................................23

      A.  Efforts to Promote Social Distancing.....................................23
      B.  Conclusion, Requirement Two ...............................................27

    **Requirement Three**............................................................................28

      A.  The Environmental Health and Safety Vendor and
          Contract Cleaning Services....................................................28
      B.  Hiring Registered Sanitarian..................................................31
      C.  Access to Cleaning Materials and Related Training..............33

    **Requirement Four**.............................................................................34

    **Requirement Five**..............................................................................35

      A.  Attorney-Initiated Legal Calls ..............................................35
      B.  Inmate-Initiated Legal Calls .................................................38
      C.  Conclusion, Requirement Five...............................................39

**Requirement Six**..................................................................................................39

      A.  Testing of Newly Admitted Inmates........................................................40
      B.  Testing of Inmates Transferred to Saint Elizabeths Hospital .................41
      C.  Testing of Inmates Transferred to Federal Correctional Facilities .........42
      D.  Testing of Cellmates of Inmates Who Test Positive...............................43
      E.  Testing of Inmates Who Report COVID-19 Symptoms .........................44
      F.  Timeliness of Testing Results..................................................................46
      G.  Conclusion, Requirement Six ..................................................................46

V.      CONCLUSION.......................................................................................................47

Index to Exhibits ....................................................................................... Index-1

APPENDIX A
      Exhibits IA – 6

APPENDIX B
      App. B, Ex. 1

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

EDWARD BANKS, *et al.,*

Plaintiffs,

v.                                                    No. 1:20-cv-849 (CKK)

QUINCY BOOTH, in his official capacity
as Director of the District of Columbia
Department of Corrections, *et al.,*

Defendants.

**REPORT SUBMITTED BY *AMICUS CURIAE* PURSUANT
TO SEPTEMBER 16, 2020 ORDER**

Pursuant to the September 1 , 2020 Order issued in the above-captioned matter, (D t.

Nos. 12 , 12 ),[1] a    ,   race M.   opes and Mar    ordan,[2] submit the follo  in  report for

consideration by the Court and the Parties.

_____

[1] The Court amended the initial order issued on September 1 , 2020 to clarify the date by   hich *a*        ere
re  uired to be in their revie . The amended order re  uired *a*       to provide the Parties and the Court   ith an oral
report no later than October  1, 2020 and a   ritten report no later than November 1 , 2020.  Thereafter, on October
2 , 2020 a Second Amended Order Appointin  Amicus   as entered (D t No. 129),   hich   as identical in all
respects to the prior order e cept, upon re uest of the *a*      and   ith the consent of the Parties, it chan ed the date
of the oral report from October  1, 2020, (  hich   as a Saturday), to November 9, 2020, and the date for the   ritten
report from November 1 , 2020 to November 20, 2020. (D t No. 129).  The Court  ranted a consent motion to
further enlar e the filin  deadline for the   ritten report to December 11, 2020, (D t. No. 1 2), to afford *a*
sufficient time to complete additional unanticipated assessment activities. (D t. No. 1  ).
[2] *err M. . tr t  l a*, C.A. No. 1 19-8  (D.C. Super. Ct.) is a class action la  suit related to the
conditions of confinement and treatment in the District of Columbia s  uvenile  ustice system.   race M.   opes has
served as the court-appointed Special Arbiter in this la  suit and Mar    ordan has   or ed and collaborated   ith her
on monitorin  and reportin  on the District  overnment s compliance   ith the remedial orders issued in the case.
The plaintiff class is represented by multiple attorneys, includin  counsel from the District of Columbia Public
Defender Service and the District of Columbia defendants are represented by counsel from the District of
Columbia s Office of the Attorney  eneral.  Pursuant to a Settlement A  reement approved by the Superior Court in
 uly 2020, durin  a hearin  conducted on December 1, 2020, the presidin   ud e in *err M.* indicated that he found
the conditions established by the Settlement A  reement had been satisfied and that he   ould be issuin  a
termination order later in the month.  One of the conditions established by the Settlement A  reement re  uired the
District of Columbia s Mayor to issue a Mayoral Order establishin  the Office of Independent  uvenile  ustice
 acilities Oversi ht.  A second condition re  uired the Mayor to appoint Mar    ordan as the E  ecutive Director of

**I   INTRODUCTION**

This is the third report submitted by *a*      in this case.            ere initially appointed in an order issued on April 9, 2020, (D  t No.   4 ), to provide specific information to the Court re ardin  medical services and environmental health and hy  iene related to CO   ID-19, the disease caused by SARS-Co   -2, the novel coronavirus, at t  o detention facilities operated by the District of Columbia Department of Corrections (  DOC  ), the Central Detention   acility (  CD   ) and the Correctional Treatment   acility (  CT   ).  Pursuant to that order, *a* provided information to the Court and Parties durin  an April 1 , 2020 teleconference and in a   ritten report submitted on April 18, 2020 (D  t. No. 4 ).  One day later, on April 19, 2020, the Court issued an order  rantin  the Plaintiffs  re uest for a Temporary Restrainin  Order (  TRO  ) and re uirin  the Defendants to ta  e certain specified actions (D  t. No. 48).  Thereafter, in an order issued on April 28, 2020 (D  t. No.   2), *a*          ere appointed for the second time, to provide information to the Court re ardin  certain matters related to the TRO.    ollo  in  issuance of the April 28, 2020 order, *a*       provided an oral report to the Court and Parties on May 11, 2020, and submitted a    ritten report on May 20, 2020 (D  t. No.    ).

On   une 18, 2020, the Court issued a preliminary in unction in this case (D  t. Nos. 99, 100).  The preliminary in unction re uires the Defendants to ta  e certain specified actions,   hich are described more fully in the ne  t sections of this report, related to the follo  in  si  conditions of confinement:  medical care  social distancin   environmental health and safety  conditions in isolation units  access to le  al calls  and testin  for CO   ID-19.            ere appointed for the

---

this oversi  ht office.  As re  uired by the Settlement A  reement, these Mayoral Orders    ill become effective upon the issuance of the termination order.  At that time Mr.  ordan   ill become a District  overnment employee,   ith uni  ue authority and independence, for a three-year term sub ect to removal only for cause.  The Court and counsel for the Parties in the instant case, includin  counsel for the United States, have been apprised of these circumstances.  In response, all counsel indicated that there are no ob ections to Mr.  ordan s participation as an *a*      in this matter.

2

third time on September 1 , 2020 (D t. Nos. 12 , 12 ), to provide information to the Court and the Parties re ardin the Defendants compliance ith the une 18, 2020 preliminary in unction.

Pursuant to the September 1 , 2020 Order, *a* provided an oral report to the Court and the Parties durin a hearin conducted by telephone on November 9, 2020. Durin that proceedin , the Court re uested that in their ritten report *a* address certain matters hich ere not initially contemplated by the September 1 , 2020 Order, and also provide additional details related to some of the matters that ere the sub ect of the November 9, 2020 oral report.

This report summari es *a* November 9, 2020 presentation and includes the supplemental information *a* ere as ed to address. In addition, this report e plains the methodolo y *a* relied upon to conduct their assessment, describes relevant bac round data re ardin the facilities sub ect to the assessment, and presents updated information concernin identified cases of CO ID-19 at both the CD and CT .

The Defendants have continued to cooperate fully ith *a* re uests for information. As a eneral matter, DOC and contract staff at every level have made substantial efforts to respond to *a* re uests promptly. reco ni e and appreciate the efforts the Defendants have continued to ma e to facilitate their revie .

## II METHODOLO Y

ollo in the issuance of the September 1 , 2020 order, *a* conducted unannounced and unescorted site visits on multiple shifts on October 22, 2 , 29, November 1 and December 2, 2020 at the CD , and on October 2 and November 2, 2020 at the CT . Durin the course of these site visits, *a* visited eneral population, ma imum and medium security housin units as ell as housin units desi nated for enhanced monitorin , inta e, special mana ement, and for inmates ith mental health needs. A total of 18 housin units ere visited, some on multiple

occasions on different days or shifts (NO-1, SO-1, NO- , SO- , NW-2, NW- , SW- , SW-2, SO-2, C2A, C4C, SMUB, E2A, E4A, E4B, D A, D4B, C2B).  Observations in housin  units included cells, dayrooms and case mana  er s offices.  At both facilities, medical units, administrative offices, and visitor entry areas   ere visited.  In addition, the case mana  ement suite,   here many le  al calls are conducted, as    ell as the videoconferencin   and visitation areas that are used at the CD   for attorney-client videoconferences and meetin  s,    ere visited.

Structured in-person and or telephone intervie   s   ere conducted    ith members of the DOC e  ecutive mana  ement team, includin   the DOC Deputy Directors of Administration, Operations, Pro  rams and Case Mana  ement, and Professional Development and Colle  e and Career Readiness  the Audit and Compliance Mana  er  the Sanitation Inspection Specialist  the DOC Medical Director   members of the Correctional Health Pro  ram at Unity Health Care, Inc. ( Unity ),   includin   the Medical Director, Dental Director, Mental Health Director,   ead Dentist, Director of Nursin  , and other health care staff  the CD   and CT   Warden and the Deputy Wardens assi  ned to each facility  maintenance supervisors and staff  records office staff  and do  ens of correctional officers and supervisory correctional staff assi  ned to various posts throu  hout the facilities.  In-person intervie   s   ere also conducted    ith appro  imately 80 inmates at both facilities.  At the re  uest of the DOC Medical Director, *a*       also intervie   ed an epidemiolo  ist under contract    ith the D.C. Department of Health ( DOH ), assi  ned to provide support to the DOC and several other District a  encies durin   the pandemic.[4]

In addition to the information collected durin   site visits and from intervie   s, *a* re  uested and continued to receive access from the DOC to the electronic health records

---

Unity provides medical services on a contractual basis to inmates at the CD   and CT  .

[4]  At the re  uest of the DOH   eneral Counsel, this intervie     as conducted    ith counsel present.  It    as the only intervie    conducted durin   the assessment in the presence of counsel.

4

( EHR ) of inmates confined at the CD  and CT  .   Revie   and analysis of samples from these records has been conducted and the results are presented herein.  The follo   in   data for both facilities   ere also obtained from the DOC or Unity and analy ed:

- Daily census data, includin  inmate housin  assi nments for the period  une 18, 2020 to October  1, 2020
- Data related to admissions and len th of stay for the period  une 18, 2020 to October  1, 2020
- Data related to releases and transfers for the period  une 18, 2020 to October  1, 2020
- Date related to inmate le al status for the period  une 18, 2020 to October  1, 2020
- Sic   call re uests and related lo s for the period  une 18, 2020 to October  1, 2020
- Data related to all CO  ID-19 tests conducted on inmates throu h December 1, 2020  and
- Data related to DOC correctional staffin  levels.

## III  BAC    ROUND

Since the issuance of *a*        May 2020 report, there have been a number of chan es in population levels, housin  practices, housin  unit operations, staffin  levels, and the support the DOC receives from the DOH.  Each of these topics is addressed belo  .

### A  Pop lation

On  une 18, 2020, the day the Court issued the preliminary in unction, the combined population of the CD  and the CT    as 1,249 inmates.   The Defendants subse uently reported to the Court that as of  une 29, 2020, the combined population of the CD  and CT    as 1,2 1.  Over the four-and-a-half months bet  een the issuance of the preliminary in unction and October

---

The team *a*      assembled for this sta e of their   or  included t o additional members.  The ma ority of case record revie s  ere conducted by  anet Maher, an attorney   ho has e tensive e perience in   or in  in institutional and healthcare settin s.  Ms. Maher headed the Office of Corporation Counsel s Mental Health Division from 1992 to 2000,   or ed as Deputy   eneral Counsel and Chief of Staff for the District s Child and   amily Services A ency from 2000 to 200  and as DO  Compliance Officer at Saint Eli abeths Hospital from 200  to 2014.   rom 201   to her retirement in 201  , she headed the Hospital s Performance Improvement Department.  She also has provided consultative services to the Maryland and Pennsylvania behavioral health systems and to the Office of the Special Arbiter in *err M.  .    tr t     l    a*, C.A. No. 1 19-8  (D.C. Super Ct.)  Case records   ere also revie ed by  ulia Cade, a senior parale al   ith substantial e perience in similar institutional conte ts.

Durin  the November 9, 2020 hearin , *a*      incorrectly reported that the lo est population count bet een  une 18, 2020 and October  1, 2020   as 1,2 4.  Ho  ever, upon further revie  , 1,248 inmates on  une 18, 2020, the day the preliminary in unction   as issued, represented the lo est population count for the period.

Notice of Compliance   ith the Court s Preliminary In unction (D  t. No. 101) at  .

1, 2020, the population of the t o facilities increased by 19 percent to 1,48 inmates. Based on an analysis of data submitted by the Defendants, this as driven primarily by increases in the number of inmates confined on pretrial felony char es and to a lesser e tent by increases in the number of parole violators and pretrial misdemeanants confined at the CD and the CT .[8]

Because population increases in secure facilities are driven by either increases in the number of admissions, increases in the amount of time admitted inmates remain incarcerated, or a combination of the t o, *a* analy ed admission and len th of stay trends of inmates housed at the CD and the CT , by le al status. The analysis revealed that after une 18, 2020, admission rates increased each month throu h September 2020, then decreased some hat in October 2020.[9] There ere increases in admission rates for all three cohorts ( *.e.,* pretrial felons, parole violators, and pretrial misdemeanants) that drove the population increase. or pretrial felons, the number of admissions per month as si nificantly hi her in Au ust, September, and October 2020 than in the second half of une and in uly 2020.[10] Amon parole violators, after relatively fe admissions in the second half of une, admissions increased in uly and to a lesser e tent in Au ust, but then nearly doubled bet een Au ust and September from to 118, before droppin some hat in October to 8 .[11] inally, amon pretrial misdemeanants, there ere

---

[8] E . 1A, Chart, Combined Population of CD and CT , by Day and e al Status, une 18 - October 1, 2020 E . 1B, Table, Combined Population of CD and CT , by Status and Day, une 18 - October 1, 2020. Durin this period, the population of pretrial felons increased by 1 inmates, from 48 to 4 the population of parole violators increased by inmates, from 88 to 1 1 and the population of pretrial misdemeanants increased by 8 inmates, from 8 to 10 . The Appendi to this report is divided into t o parts. Appendi A hereinafter App. A contains the e hibits that are cited in this report. Some of the e hibits in App. A have been redacted, as appropriate, for filin in the public record. The updated CDC uidelines are contained in Appendi B hereinafter App. B . Unless desi nated by a citation to App. B, all citations to the e hibits included in the Appendi refer to App. A.

[9] E . 1C, Table, Admission to CD and CT , by Status and Month, une 18, 2020 - October 1, 2020. Monthly admissions in Au ust ere 2 percent hi her than in uly, and monthly admissions in September ere 21 percent hi her than Au ust. Althou h admissions dropped by 1 percent durin October relative to the prior month, admission levels ere still hi her than uly and Au ust.

[10] *d.*

[11] *d.*

increases in admissions in Au ust and September before admissions dropped some  hat in October.[12]

The avera e len th of stay amon  all inmates housed at the CD  and CT  increased bet  een  une 18 and October  1, 2020, albeit only sli  htly, by appro  imately four percent.[1] Amon  the three cohorts that primarily accounted for the increases in population, the chan  es in len  ths of stay varied.  The avera e len th of stay amon  pretrial felons increased by appro  imately ei  ht percent bet  een  une 18 and October  1, 2020.   or pretrial misdemeanants, the avera e len th of stay increased by substantially more over the same period, appro  imately  1 percent, from 4  days to  days.  In contrast, amon  parole violators the avera e len th of stay dropped by appro  imately 28 percent over the same period.

**B  Sin  le vers  s Do  ble Cellin**

also analy  ed sin  le versus double cellin  practices at each facility durin  the period  une 18 to October  1, 2020. As *a*  previously reported, the CD  contains 18 housin units, most  ith 80 cells.[14]  Over the period revie  ed, the CD  s population ran  ed from a lo of 819 inmates to a hi  h of 1,0 9 inmates.  While there are over 1, 00 cells at the CD  , over the period analy  ed the avera e daily percenta  e of inmates housed in sin  le cells  as 8  percent ( .e., 1  percent of inmates had cellmates).

The double cellin  practices at the CD  ere at least in part attributable to closed housin  units and cells on open housin  units that  ere ta  en out of service due to maintenance issues.  Durin  *a*  site visits in October and early November 2020, five housin  units  ere

---

[12]   *d.*

[13]  E  . 1D, Table,  Avera  e  en  th of Stay of Inmates Housed at CD   and CT  , by Status and Month,   une 18, 2020 - October  1, 2020.

[14]   *ee  e  rt  tted  r ae  r  a t t  r l  ,  e  t  rder*, filed May 20, 2020  hereinafter *Ma  ,  e  rt*  at 4-  for a more complete description of the CD  .

closed, but durin  *a*        most recent site visit to the CD   on December 2, 2020, only t   o

housin   units   ere closed: NO-2[1] and SE-1.[1]   A       observed numerous cells that    ere

unoccupied on housin   units   ith double-celled inmates.  Maintenance and correctional staff

reported that unoccupied cells    ere out of service in some instances because the metal bun  s in

the cells   ere dama  ed.           ere told that in other instances the cells    ere unoccupied

because of plumbin   problems.  CD   staff reported that on November   0, 2020, appro  imately

4   cells on open housin   units    ere out of service.[1]

At the CD  , *a*       additionally analy  ed sin  le versus double cellin   practices in SO-2,

the Inta  e unit.  E  cept for inmates    ith acute mental health issues,    ho are transferred to SO-  ,

and   omen,   ho are admitted at the CT  , the Defendants report that ne    inta  es are housed on

SO-2 until they are medically cleared follo   in   CO   ID-19 testin  .  Bet   een   une 18 and

October   1, 2020, the population of SO-2 ran  ed from a lo    of 44 inmates to a hi  h of 111

inmates.  The avera  e daily percenta  e of inmates housed in sin  le cells on that unit    as

percent, lo   er than the percenta  e of inmates housed on sin  le cells on non-Inta  e housin   units.

Durin   *a*        December 2, 2020 site visit, the population of SO-2    as    .  At that time,

inmates    ere double celled ( .*e.,* occupyin   18 cells)   hile 22 cells    ere unoccupied.

At the CT  , there are 2   housin   units, includin   the infirmary.[18]  Durin   *a*        most

recent site visit to the CT   on November 2, 2020, seven housin   units    ere closed.  The CT

houses si  nificantly fe   er inmates than the CD  .  Bet   een   une 18 and October   1, 2020, the

---

[1]   NO-2 is desi  nated to house inmates    ho test positive for CO   ID-19.
[1]   SE-1   as closed because it    as bein   used for stora  e.  CD   mana  ement reported that they are considerin
openin   the housin   unit as part of a plan to enable them to eventually open a second Inta  e housin   unit else   here
in the facility.
[1]        attempted to obtain records reflectin   the number of cells out of service daily  ho   ever, neither of the t   o
CD   administrative units that *a*       ere told maintain these data ( .*e.,* Maintenance and   Countboo   ),   ere able to
provide precise information.
[18]   *ee* May 20, 2020 Report at   -   for a more complete description of the CT   facility.

facility population ran ed from a lo   of   0 inmates to a hi h of 4 4 inmates and durin   that period, it   as rare for inmates to have a cellmate.  Department of Corrections records indicate that the avera e daily percenta e of inmates housed in sin le cells at the CT   durin   this period   as 99 percent.

### C   Operations in Response to the Pandemic

Both the CD   and CT   have continued to implement a 2  -hour per day loc do  n.  In effect, this means that most inmates remain in their cells e  cept for one hour per day    hen they are released to sho   er, ma  e personal telephone calls,    atch television, sit in the day room, and  or ma  e use of small recreation areas   ithin the housin   units.[19]  Inmates assi  ned to se  re  ation units are loc  ed do  n for 24 hours per day on   ee  ends.

Be  innin   in the fall, the DOC has made tablets available to inmates that they can use in their cells.  There are t   o types of tablets, one    ith paid content that includes entertainment options such as videos and   ames and another    ith free educational content.  As e  plained belo  , the tablets include educational materials related to CO   ID-19 and also can be used for attorney-client communications. [20]

Durin   a        prior site visits in April and May 2020, the DOC had desi  nated numerous housin   units at both facilities as   uarantine or isolation units.  In contrast, durin   site visits conducted from late October to early December 2020, there    ere no isolation or   uarantine housin   units at the CT   due to the absence of   no  n or suspected CO   ID-19 cases.  At the CD  , there    as briefly an isolation unit in November after an inmate tested positive upon admission and another housin   unit    as   uarantined after a reported e  posure to t   o staff

---

[19]  Inmates in many CT   housin   units also spend out-of-cell time heatin   meals in micro  ave ovens.
[20]   ee    ra 2 and   8-  9.

members   ho tested positive for CO  ID-19.[21]  In addition to  uarantine and isolation units, the DOC also established  enhanced monitorin   housin   units at both facilities for inmates   ho return from in-person court appearances or face-to-face visits   ith an attorney.  Inmates housed on enhanced monitorin   units have their temperature chec  ed by medical staff daily for up to a 14-day period.

### D  Staffin

previously reported that the lar  e number of correctional staff unavailable for duty, includin   staff   ho   ere not available for reasons related to CO  ID-19, had a si  nificant impact on facility operations.[22]              comparison of correctional staffin   levels from mid-May to staffin   levels in early December 2020 indicates that the number of staff available to   or remains virtually unchan  ed.

previously reported that as of May 9, 2020, the DOC had a total of 994 funded correctional officer positions.[2]   Of that total,   1 positions   ere vacant, five percent.  Moreover, an additional 1  0 filled positions, 1   percent,   ere encumbered by correctional officers   ho   ere on unavailable for duty status.  Thus, 22 percent of the funded correctional complement   as either vacant or not   or in  .

obtained updated data related to the correctional staffin   complement from December 2020.  As of December 1, 2020, the DOC had a total of 1,014 funded correctional positions, 20 more funded positions than on May 9, 2020.  DOC mana  ement reported that as of December  , 2020, 110 positions   ere vacant, 11 percent, and an additional 1     staff in filled

---

[21]  All of the inmates on the  uarantined housin   unit   ere tested for CO  ID-19 and none tested positive.
[22]  *ee Ma  ,     e  rt* at  -8  *e  rt      tted              r ae   r  a t t   r l ,        rder*, filed April 19, 2020  hereinafter   *r l       e  rt* at 21.
[2]  *Ma       e  rt* at  .  The total included 844 correctional officer positions, 9   lead correctional officer positions, and     supervisory correctional officer positions.

correctional positions, 1  percent,   ere unavailable for duty.  Thus,    hile the number of staff

  ho    ere unavailable for duty decreased, an increase in the number of staff vacancies left the

si  e of the available    or  force essentially the same as it    as in May.[24]

### E   S  pport from the DOH

Startin   at some point in   une 2020, a nurse    or  in     ith the DOH be  an providin

health education related to CO   ID-19 to DOC staff and conductin    audits, at times on a    ee  ly

basis, related to the use of personal protective e  uipment (  PPE  ) at both the CD    and CT  .

Unity and DOC mana  ers report that they have been re  ularly briefed on the audit findin  s and

recommendations.  In early Au  ust 2020, an epidemiolo  ist under contract    ith the DOH be  an

to visit the CD    and CT    to ensure appropriate monitorin   of CO   ID-19 positive cases and the

related submission of data to public health officials  provide consultation on   uarantine, isolation

and testin   practices  and confer    ith Unity  s medical director on treatment in individual cases.

By all accounts, this increase in DOH support has served as a very helpful resource to both DOC

and Unity mana  ers.

## I    FINDIN  S

This section summari  es *a*       findin  s re  ardin   the Defendants  performance relative

to each of the si   re  uirements related to conditions of confinement addressed by the   une 18,

2020 preliminary in  unction.

**Re    irement One**

**Defendants  shall  implement a medical care s  stem on    eneral pop  lation
  nits that ens  res inmates receive attention from a medical provider    ithin
2   ho  rs of reportin   health iss  es   If this s  stem contin  es to   se sic    call
slips, Defendants shall ens  re that inmates have consistent and immediate
access to s  ch sic    call slips and that said slips are collected at re    lar
intervals**

---

[24]  *ee    ra* at 2  -2   for additional information.

The DOC and Unity have added resources to enhance the sic call system at the CD and CT. The evidence sho s that for the most part, the Defendants are no providin inmates at the CD and CT ith consistent access to sic call slips and they are collected at re ular intervals ho ever, inmates are not consistently seen by a medical provider ithin 24 hours of reportin health issues in a si nificant percenta e of cases. These findin s are described belo .

**A  The Sic  Call Process**

The DOC relies on a sic call system on eneral population housin units[2] to ensure that inmates receive attention from a medical provider ithin 24 hours of reportin a health issue.[2] The Defendants have increased staffin for health services and made several modifications to the business process related to sic call re uests in response to this re uirement.

The DOC s contract ith Unity Health Care, Inc. as modified to add fundin for the hirin of t o additional nurse practitioners or physician assistants and t o medical assistants for the period May 18 throu h September 0, 2020.[2] The contract modification includes t o contract line items to e tend the contract for t o additional time periods sub ect to fundin availability: from October 1, 2020 to anuary 1,2021 and from ebruary 1, 2021 to April 14, 2021. Subse uent to September 0, 2020, the increased staffin levels authori ed by the modification have remained in effect.[28]

---

[2] As a noted durin the November 9, 2020 hearin , a interpret eneral population units in this conte t to mean housin units that have not been desi nated as uarantine or isolation units.

[2] Inmates can also access medical care throu h the ur ent care and chronic care clinics.

[2] E . 2A, Amendment of Solicitation Modification of Contract Number CW 88 8, effective May 18, 2020. The contract modification as si ned by a Unity representative on une 2, 2020 and by a District overnment contractin officer on Au ust 11, 2020.

[28] re uested that DOC mana ement produce documentation supportin the e ercise of the option for the additional period that be an on October 1, 2020, and reflectin the associated availability of fundin . Accordin to DOC mana ement, the a ency intends to maintain fundin to support the modification throu hout both additional periods specified in the contract modification, fundin is available, and there is no need for supplemental documentation reflectin the e ercise of the additional period and the availability of fundin .

Interviews with Unity staff indicate that this modification was intended to strengthen the business process related to sick call by adding clerical staff to collect and track sick call requests obtained from the housing units on a more frequent basis and by increasing the number of clinicians available to deliver medical services.[29]  Under this new system, which was implemented on June 2 , 2020, inmates are expected to continue to obtain sick call request forms from the correctional staff, and fill them out by entering their name, date of birth, DCDC number, housing unit, cell number, the date, and information about the nature of their request.[0]  The June 2020 revisions to the form add certain specific COVID-19 symptoms and inmates are asked to check all that apply to them.[1]  The revised form does not provide a prompt for inmates to indicate the time the request was made or for medical staff to note the time the request was received.

Inmates are instructed to continue to place the sick call request forms in the secure collection boxes that are maintained on the housing units.  As part of the new business process the Defendants have implemented, medical assistants at each facility pick up the forms twice daily from each housing unit, generally in the early morning and mid-day.  The medical assistants count the forms as they retrieve them and manually record the total number of slips they have collected in a handwritten log before leaving each housing unit.  After the medical assistant has retrieved the request forms, a member of the correctional staff assigned to the

---

[29] Unity managers report that they began piloting this new process on May 18, 2020.
[0] Ex. 2B, sample revised Sick Call Form used at CDF and CTF. Inmates are expected to check one of the following boxes: I wish to be seen at sick call, dental treatment, mental health or other.
[1] The symptoms listed on the revised sick call request form are fever, coughing, difficulty breathing shortness of breath, headache body ache and upset stomach. *Id.*  In an effort to make the forms more readily identifiable, DOC and Unity managers report that the correctional staff have been instructed to print the forms on pink paper. observations indicate that while use of the revised forms is widespread, inmates also submit sick call requests using a variety of documents, including the previous version of the sick call request forms, random sheets of paper, and by filling out inmate request slips, which are intended for initiating case management and other administrative requests.  *See* Ex. 2C, Inmate Request Slip, for a copy of the form used at both facilities to make requests that are processed by case management staff.

1

housing unit examines the interior of the box and documents that there are no sick call request forms remaining in the box.

In contrast to previous site visits, sick call request forms were available on most of the housing units visited before the November 9, 2020 hearing. In fact, of the 1 housing units visited up to the time of the hearing, the forms were available on every unit other than NO-1, a high security housing unit and except for inmates confined on NO-1, inmates at both the CD and CT did not report difficulty accessing the sick call forms. During a subsequent site visit conducted on December 2, 2020, the forms were available on NO-1. Moreover, logs and interviews with correctional officers, inmates, medical providers, and medical assistants establish that as a general matter sick call request forms have been picked up twice daily from the housing units at both facilities since June 2 , 2020. [2]

After sick call request forms are picked up from all housing units in the morning and mid-day, the medical assistant assigned to each facility transfers the tally for each housing unit into an electronic database. The sick call requests are then triaged for urgency by a charge nurse. If the request is deemed urgent, the inmate is expected to be brought to the urgent care clinic. If the charge nurse determines the request is routine, inmates whose sick call request forms are picked up in the morning are expected to be scheduled for a same-day sick call appointment. If the sick call form was collected mid-day, the inmate is expected to be scheduled for a next-day sick call appointment.

According to Unity's mental health manager, sick call requests for mental health services are initially triaged by medical staff. Any that are deemed urgent are hand delivered to mental health staff for immediate attention. Inmates who submit requests that are not identified as

---

[2] At the CT , in an effort to ensure access to health services, medical providers all the tiers of both special management units on a daily basis.

14

ur ent are e pected to be seen by a mental health provider ithin 24 hours.

If a sic call re uest indicates the inmate has a dental problem *a d* is in pain or has s ellin or other indication of a possible infection, the char e nurse is e pected to schedule the inmate to be seen by a medical provider on either an ur ent basis or the ne t day at sic call. If there is no indication of pain, s ellin or other indication of a possible infection, the sic call re uest is e pected to be referred to the dental pro ram for follo up as either a Priority One, T o or Three. Priority One is limited to patients ho have indicated on their sic call re uest form that they are in pain or have s ellin or some other indication of infection. It is anticipated that they ill be seen by a medical provider ur ently or ithin 24 hours and seen by a dental provider ithin seven days. Priority T o is identified ith routine dental problems and no apparent pain. These patients are not seen by a medical provider but are scheduled to be seen by a dental provider. Priority Three includes re uests for procedures such as routine cleanin , and li e Priority T o, these patients are not seen by a medical provider, but are scheduled to be seen by a dental provider.

Unity and DOC mana ers have informed *a* that there have been discussions about usin the ne ly adopted educational tablets as a supplemental method ( *.e.,* it ould not replace hard copy forms) throu h hich inmates could directly submit sic call re uests to the health care staff. They have described a system in hich an inmate could complete an electronic sic call re uest form on the tablet and transmit it electronically to a desi nated electronic inbo available only to medical staff. Department of Corrections mana ement has reported that the sic call re uest form has been di iti ed for use on the educational tablets. As of December 2, 2020, the electronic sic call form submission process had not been implemented.

1

intervie ed numerous inmates at the CD  and CT  re ardin  sic  call and access to medical care.  In contrast to earlier site visits, inmates  enerally had positive impressions of the sic  call process and asserted that they e pected that if they submitted a sic  call re uest form they  ould be seen by a medical provider timely.

## B  Sic  Call Data

In order to assess the Defendants  performance relative to the 24-hour re uirement, *a* selected a sample of 92 sic  call re uests submitted by inmates confined at the CD  and CT  bet een  une 18, 2020 and October  1, 2020.   The sample  as selected from the ori inal hard copies of the sic  call re uest forms that are submitted by inmates.  To test the completeness of the data source provided by the Defendants ( .e.,  hether all sic  call forms submitted by inmates durin  this period  ere produced for revie ), *a*   compared the number of forms produced by the Defendants from  uly 2020 at the CD   ith the total number of sic  call re uests for the same month documented in the spreadsheet maintained by the medical assistants  ho pic  up the sic  call re uests at the CD  . [4]   or the month of  uly 2020, the spreadsheet  enerated by the medical assistant assi ned to the CD  indicated that a total of 1  8 sic  call re uests  ere submitted by inmates  by comparison, the Defendants produced for revie   by *a*   a total of 1,1 9 hard copies of sic  call re uests at the CD  for the same period.   ere not able to reconcile this discrepancy.

dre  separate samples of sic  call re uests from the CD  and CT .  Because medical, dental, and mental health sic  call re uest forms are stored separately after they are

---

Durin  the November 9, 2020 hearin  *a*   e plained that they had conducted a revie  of a sample of sic  call re uests based on  hat they believed  ere all sic  call re uest forms submitted by inmates bet een  une 18 and October  1, 2020. Ho ever, *a*   later learned that the sic  call re uests from  hich they dre  the sample  ere not all sic  call re uests that  ere submitted by inmates, but rather a sample selected by Unity staff.  Thus, a ne  sample  as selected by *a*  .

[4]  *ee  ra* at 1 -14 for a more detailed description.

triaged by the charge nurse, and because some inmates reported delays in responses to sick call requests concerning dental and mental health services, AG structured a sampling methodology that ensured sick call requests of all three types were included in the sample. In total, 91 sick call requests were reviewed from the CDC and 41 sick call requests were reviewed from the CTF. The samples from both facilities were structured to include sick call requests from every month in the review period.

Because sick call request forms include recorded dates, but not times, it was not possible to calculate the number of elapsed hours between an inmate reporting health issues and the inmate receiving attention from a medical provider. For this reason, AG analyzed the data at the most specific time interval possible given the available data sources: the number of elapsed days between an inmate reporting health issues and the inmate receiving attention from a medical provider. AG used the date recorded by the inmate on the sick call request form as the basis for the calculation of the number of elapsed days between an inmate reporting a health issue and receiving attention from a provider.[8] On 21 of the 92 sick call request forms in the sample, 23 percent, medical staff added a notation that the date recorded by the inmate was the wrong date. In certain cases, the reason for the notation was clear (e.g., the date recorded by the

---

The volume of requests for dental and mental health care is much smaller by comparison to requests for medical care. In order to ensure a sufficient number of sick call requests for dental and mental health care were included in the analysis, AG established a minimum number of each type to include in the sample.

The difference in the sample sizes was principally attributable to the fact that the Defendants produced three mental health sick call requests from the CTF during the review period, all of which were included in the sample. At the CDC, the Defendants produced a larger number of mental health sick call requests and AG selected a sample of 11 mental health sick call requests from that facility.

Dates are generally recorded in two places on sick call request forms. First, there is a field labelled Date echa for the inmate to record the date s he fills out the sick call request form. Second, medical staff typically stamp each form with a Received stamp and generally, but not always, handwrite a date under the stamp. There is a third field in a portion of the form designated for the medical provider to fill out that also includes a date and a time field however, these fields were not completed in any of the sampled forms AG reviewed. However, the EHR provides a record of the date and time of any clinical encounters between inmates and medical providers.

[8] During the sample selection process, AG observed a significant number of sick call requests with no date recorded by the inmate. These forms were excluded from the sample because they would not allow AG to make any findings regarding timeliness.

inmate    as a month *a ter* medical staff collected the form)  ho   ever, in most other cases, there

as a difference of one or t   o days bet   een the date recorded by the inmate and the date

recorded as received by medical staff.  In these cases, the basis for the      ron   date   notation   as

not evident.

### 1   Sic   Call at the CDF

sample of sic   call re   uests submitted at the CD    included 2   re   uests for

medical care, 1   re   uests for dental care, and 11 re   uests for mental health care. [9]

analysis indicates that for all cate   ories of sic   call re   uests combined, in 22 of   0 sic   call

re   uests, 44 percent, inmates    ere seen by a medical provider on the day they submitted their

sic   call re   uest or the ne   t day.  An additional three sic   call re   uests, si   percent,    ere for

medication refills and the prescriptions    ere refilled the day after the sic   call re   uest    as

submitted    ithout the inmate seein   a medical provider.

Amon   the 24 re   uests for medical care, 1   re   uests made by inmates (includin   the

three prescriptions that    ere timely filled    ithout the inmate havin   to see a provider),   1

percent, received attention from a medical provider    ithin one day of the submission of the sic

call re   uest.[40]  Amon   the remainin   seven sic   call re   uests for medical care, five of the

inmates    ere seen bet   een t   o and five days follo   in   submission of the sic   call re   uest

form and t   o    ere seen more than five days follo   in   the submission of the re   uest form.

Althou   h the sample of sic   call re   uests *a*       analy   ed included re   uests for dental and

mental health services, the sample si   es for those sub   roups    ere not lar   e enou   h to reach

---

[9]  One sic   call re   uest for medical care    as e   cluded from the sample because the date recorded by the inmate    as
subse   uent to the date medical staff collected the form.

[40]     ourteen of the 1   patients    ere seen by a provider    ithin one day.  In the other three instances, the inmate
re   uested prescription refills for s   in cream, eye ointment and nasal spray, respectively, and a provider ordered the
refill    ithin one day    ithout seein   the inmate.

meaning ful conclusions about the timeliness of provider responses to those subcategories of requests. However, because a number of inmates AG interviewed complained about delays in responses to sick call requests for mental health and dental services, AG reviewed the EHR related to 15 sick call requests for dental services and 11 sick call requests for mental health services at the CDF. The findings from those reviews are summarized below.

As explained above, sick call requests for dental services are triaged and requests that reflect pain, swelling, or another indication of a possible infection are expected to be seen by a medical provider within one day, or sooner if indicated.[41] Among the 15 sick call requests for dental care in the CDF sample, three inmates were seen by a sick call provider the day they submitted the request or the next day.[42] Among the remaining 12 sick call requests for dental care that did not result in a timely provider visit, seven requests included reference to a chipped or broken tooth, cavity, toothache, or a non-specific reference to wisdom tooth. None of the inmates associated with these latter categories of requests were seen by a provider within one day of submitting their sick call request. In the remaining five instances, the sick call request forms referenced the need for a dental cleaning, filling, or simply stated dental.

Among the 11 sick call requests for mental health services in the CDF sample, the inmates associated with four requests were seen the day the request was submitted or the subsequent day. In the remaining seven instances, the inmate was seen anywhere from two to six days after requesting services. The table below summarizes the timeliness of sick call services at the CDF.

---

[41] *Supra* at 1 . While inmates who indicate pain or swelling are assigned priority for services, the form does not ask if the inmate is experiencing dental pain or swelling, but leaves it up to the inmate to specify these symptoms.
[42] Only one of these three sick call requests included a description by the inmate indicating any pain or swelling.

| TYPE OF SERVICE REQUESTED | 1 day of request | 2 days of request | More than days of request | Not Seen by Provider |
|---|---|---|---|---|
| MEDICAL | 1 | | 2 | 0 |
| DENTAL | | | 4 | 4[44] |
| MENTAL HEALTH | 4 | | 1 | 0 |
| COMBINED | 24 | 14 | 8 | 4 |

TABLE ONE   SUMMARY OF LENGTH OF TIME TO BE SEEN BY PROVIDER AT CDF

2   Sick Call at the CTF

At the CTF, a sample included 2 requests for medical care, 1 requests for dental care, two requests for mental health care, and one request for both medical and mental health care.   analysis indicates that at the CTF, for 2 of all 41 of the sick call requests, percent, inmates received attention from a medical provider on the day they submitted their sick call request or the following day. Among the 2 requests seeking medical care, inmates associated with 1 requests, 0 percent, were seen by aa medical provider within one day of the submission of the sick call request inmates associated with six requests, 24 percent, were seen between two and five days of the submission of the request and inmates associated with four requests, 1 percent, were seen anywhere from six to 20 days after the submission date noted by the inmate on the request form.

---

[4]  One of the five inmates did not appear for his appointment, which was scheduled for 24 days after the sick call request was submitted.

[44]  One of the four inmates was not seen within three weeks of his sick call request and two inmates were not seen within two months of their sick call requests as of December 1, 2020. The remaining inmate was released   days after his request without being seen.

Thirteen of the 41 requests in the sample were for dental services.  Seven of those requests resulted in inmates being seen by a medical provider within one day after the request was submitted.[4]  Among the remaining six requests for dental care, one request referenced dental pain and the inmate was not seen until three days after the request was submitted, three requested dental cleanings and two were non-specific requests for dental services.

Among the three sick call requests for mental health care,[4] one resulted in an inmate being seen the day after the sick call request was submitted.  The inmates associated with the other two requests received attention from a provider two days and four days, respectively, after the request was submitted.

The table below summarizes the distribution of time between the submission of sick call request forms and inmates being seen by a provider at the CTF:

| TABLE TWO  SUMMARY OF LENGTH OF TIME TO BE SEEN BY PROVIDER AT CTF | | | | |
|---|---|---|---|---|
| TYPE OF SERVICE REQUESTED | 1 Day of Request | 2  Days of Request | More Than  Days of Request | Not Seen by Provider |
| MEDICAL | 1 | | 4 | 0 |
| DENTAL | | 4 | 2 | 0 |
| MENTAL HEALTH | 1 | 1 | 0 | 0 |
| MEDICAL AND MENTAL HEALTH | 0 | 1 | 0 | 0 |
| COMBINED | 2 | 12 | | 0 |

---

[4]  Six of those seven sick call request forms included a specific description indicating pain, swelling or a broken or eroding tooth.

[4]  One of the three was the sick call request that also included a request for medical care.

21

### C. Conclusion, Requirement One

The Defendants have invested additional resources in the sick call process by augmenting staffing in order to collect sick call request forms twice daily and increase the number of providers available to assess and treat inmates at sick call. Inmates generally had positive impressions of medical staff responses to sick call requests for medical services; however, inmates reported delays accessing dental and mental health services through the sick call system.

These reports are generally consistent with the sample reviewed by *a*. At the CD, 1 percent of sick call requests for medical services resulted in inmates being seen within one day and at the CT, 1 percent were seen within one day. recognize that there is some inherent margin of error in these calculations for several reasons. First, the timeliness of the responses to many sick call requests could not be calculated because in identifying a sample, *a* determined that a significant number of inmates did not record a date (or time) on the sick call request forms they submitted and therefore these forms were automatically excluded from the sample since timeliness could not be determined. Second, none of the sick call request forms included the time of submission and, as noted above, the form does not prompt inmates to record the time of submission. Finally, it is possible that submission dates recorded on some sick call request forms are incorrect. Medical staff at times include a notation stating that the wrong date was entered by the inmate on the request form. However, it was not possible for *a* to assess the accuracy of the submission date inmates recorded on the request forms nor the accuracy of the staff's wrong date designation.[4]

---

[4] An advantage of an electronic sick call request submission process would be that it would include data regarding the date and time of each sick call request submission, which could serve as an audit trail. This would also eliminate the need for inmates to rely on correctional officers to provide sick call request forms. For some inmates, however, the use of tablets to complete an electronic form could present a barrier to submission.

Additionally,        did not revie   lar e enou h samples to reach conclusions about the timeliness of responses to re uests for sic   call related to dental and mental health needs. Ho  ever, there is some indication that at least    ith respect to dental services, there are delays in inmates accessin  timely services.  The dental sic   call re uest system is desi ned so that inmates e periencin  pain, s  ellin , or other si ns of infection are seen    ithin 24 hours, but in the absence any indications of these symptoms, inmates are not scheduled to be seen on sic   call. If inmates are una  are of the decision rules adopted by medical staff, inmates    ho do have ur ent dental problems may submit a sic  call re uest for dental services    ithout includin  the appropriate information to be seen timely.

**Re    irement T  o**

**Defendants  shall  compl    ith District of Col  mbia and Centers for
Disease Control re   lations on social distancin   in DOC facilities
Defendants shall address challen  es   hich have prevented the implementation of
social distancin  incl  din  b  t not limited to lac  of ed  cation and staffin
shorta  es  Defendants shall provide the Co  rt an  pdate on their
improvements to enforcin  social distancin  b     UNE 2  , 2020**

As e  plained belo  , the Defendants have continued to promote social distancin , but on oin  limitations are evident.  The a  ency has bene unable to increase the complement of staff that is available for duty.  These matters are e  plained belo  .

**A   Efforts to Promote Social Distancin**

Current CDC    uidelines applicable to detention and correctional facilities recommend implementation of   social distancin  strate ies to increase the physical space bet  een incarcerated detained persons (ideally   feet bet  een all individuals, re ardless of symptoms), and to minimi e mi in  of individuals from different housin  units. [48]  District of Columbia

---

[48]   ee App. B, E  . 1, Interim   uidance on Mana  ement of Coronavirus Disease 2019 (CO  ID-19) in Correctional and Detention  acilities, updated December   , 2020, https:          .cdc.  ov coronavirus 2019- ncov community correction-detention inde  .html,

regulations related to social distancing in the context of the current pandemic are consistent with this guidance.[49]

The DOC has continued to implement strategies intended to reduce both the number of different inmates who come into contact with one another (*e.g.*, by reducing opportunities for inmates from different housing units to interact with one another) and the number of inmates who interact with one another at any given time (*e.g.*, by reducing out-of-cell time). As noted above,[0] at both the CDF and CTF, the DOC has continued to implement a medical lockdown, during which inmates are allowed out of their cells one hour per day in small groups.[1] Department of Corrections managers and staff report that they limit the number of inmates out of their cells at one time in each housing unit to a maximum of six inmates in addition to four inmates on work detail, who are responsible for certain cleaning duties throughout the day.[2]

During site visits, *a* observed variability in the number of inmates out of their cells at any time, ranging from one inmate to as many as 1 inmates. When inmates were out of their cells, social distancing practices were not consistent. Often *a* observed inmates congregate in small groups to talk, sometimes while not wearing a mask properly covering their noses and mouths. At other times inmates who were in common areas would communicate with inmates inside of cells through the pass through slot on the cell door, often while in close proximity and while not wearing a mask properly covering both their noses and mouths.

---

[49] On November 1, 2020, a asked counsel for both parties to identify the D.C. regulations that would fall within the scope of this requirement. were informed by the Defendants that on March 1, 2020, the Department of Health issued Emergency Rule-making to order persons to stay at home due to the pandemic. The regulation included this definition of social distancing requirements: Social Distancing Requirements means maintaining at least six ( ) foot social distancing from other individuals. D.C. Reg. 829- 8 (Apr , 2020) (amending 22B DCMR Sections 220 and 229.1). Mayor s Order 2020-0 ( une 19, 2020) adopts this definition as ell. Mayor s Order 2020-0 at Section II. 1.

[0] ra at 9.

[1] Inmates confined on se re ation housing units are locked down for 24 hours on ee end days.

[2] The cleaning activities performed by the inmate or details supplement the cleaning performed by the contractors who perform daily cleaning on the housing units.

DOC executive staff and other managers have informed *amici* that they expect correctional officers to enforce social distancing requirements or potentially be subject to personnel action. They have explained that a Correctional Surveillance Center Team ("CSC Team") monitors video feeds from both facilities around the clock. Team members are responsible for, among other matters, reporting to DOC executives if social distancing on housing units is not being enforced. *Amici* visited the CSC Team video monitoring center. According to CSC Team staff, the CSC Team was instructed in March or April 2020 to monitor video feeds and identify instances of inmates not wearing masks and/or not properly social distancing and for staff not wearing masks, shields, or enforcing social distancing requirements. CSC Team staff reported that violations of these COVID-19-related mitigation requirements are frequent and that the CSC Team may see as many as 100 examples per shift. Information provided to *amici* by the DOC Deputy Director of Operations, to whom the CSC Team reports, indicates that between April and November 29, 2020, approximately 4 disciplinary actions were taken against staff for violations of COVID-19 requirements, 84 percent of which were based on CSC Team observations.³ While less frequent than among inmates, during recent site visits *amici* observed correctional staff at times not wearing required masks and/or face shields on housing units and not maintaining social distances among themselves and when interacting with inmates and other non-correctional DOC staff.⁴

The DOC has taken steps to provide additional educational materials to inmates regarding COVID-19 and the importance of social distancing. Signage has been placed throughout both

---

³ *amici* received a summary of the DOC's analysis of the data, but not the underlying data itself and thus *amici* did not independently analyze this data.

⁴ For example, at one point during a site visit, *amici* observed correctional officers respond to a medical emergency. A sergeant who responded to the emergency, entered the housing unit without a face shield. He was offered a shield by a colleague, but he refused to wear it.

2

facilities remindin  inmates and staff to remain at least si  feet apart.  Additionally, DOC e ecutive staff report that be innin  in March 2020, educational materials are distributed to every inmate s cell every Wednesday and those materials at times include information related to CO ID-19.

More recently, startin  at the end of September 2020, the DOC  idely distributed electronic tablets intended for educational purposes to inmates at the CD  and CT .  Distribution of the tablets is e pected to be completed by December 14, 2020.  The tablets,  hich are available to all inmates e cept those on inta e or se re ation status, may be used daily bet een 9:00 a.m. and 11:00 p.m.  Amon  other content, the tablets include educational materials re ardin  CO ID-19, includin  a  Quic  uide to CO ID-19,  a  Response to CO ID-19: Survival  uide,  and instructions on  Wearin  Personal Protection E uipment.

inally,  ith respect to staffin , since *a*  last report in May 2020, the DOC received authori ation and fundin  for 20 additional correctional officer positions  ho ever, as e plained above, [8] as of December 1, 2020, the si e of the correctional  or force that is available for duty has remained essentially unchan ed.  While the number of staff on unavailable for duty status decreased by  , from 1 0 to 1  staff unavailable bet een May 9 and December 1, 2020, the number of vacant positions increased by  9, from  1 to 110 position. [9]  Conse uently, the number of staff available for duty remained virtually unchan ed.  The chart belo  compares staffin  levels on May 9 and December 1, 2020.

---

E . A,  Quic  uide to CO ID-19.
E . B,  Response to CO ID Survival  uide.
E . C,  Wearin  Personal Protective E uipment.
[8]  *ra* at 2 -2 .
[9]  T enty of the  9 positions  ere ne ly authori ed positions in fiscal year 2021,  hich be an on October 1, 2020.

2



**Total  Authorized and Funded Correctional Staffing Complement
May 9, 2020 and December 1, 2020**

994 Total Positions — 5/9/20: Vacant 51, Filled Not Available for Duty 170, Filled Available for Duty 773

1014 Total Positions — 12/1/20: Vacant 110, Filled Not Available for Duty 133, Filled Available for Duty 771

Legend: ■ Filled, Available for Duty   ■ Filled, Not Availale for Duty   ■ Vacant

**B   Concl  sion, Re    irement T   o**

Since the issuance of the preliminary in unction, the DOC has continued to adopt operational practices to encoura e social distancin .  These practices have resulted in substantial restrictions in the time inmates spend out of their cells.  While fe   er inmates are out of their cells at any time than they    ould other   ise be in the absence of the out-of-cell time restrictions, inmates    ho are out of their cells often do not maintain si   feet of social distance.           also observed staff members not maintainin   social distance on housin   units and else   here throu  hout both facilities.  Personal protective e  uipment, includin   mas  s for every inmate,    as    idely available and    ith fe    e ceptions inmates donned mas  s.    re  uently, ho   ever, mas  s    ere not properly coverin   both the inmates   noses and mouths.  Althou  h *a*       observed some staff not    earin   appropriate PPE, these incidents    ere infre  uent.

2

As part of their effort to miti ate the spread of CO  ID-19, the DOC has made

educational materials available to inmates in both hardcopy format and, more recently,

electronically on ne   educational tablets that have been   idely distributed to inmates at both

facilities.  Staffin   limitations have persisted, creatin   challen es that impede miti ation efforts.

### Re    irement Three

**Defendants shall contin  e the services of their ne   l   contracted
environmental health and safet   vendor  Defendants shall f  rther
contin  e their contract to provide CO   ID 1   cleanin   services on
the sec  re and non sec  re sides of the DOC facilit  , incl  din   the
common areas of all ho  sin     nits  Defendants shall f  rther contin  e
their efforts to hire a re  istered sanitarian  Defendants shall ens  re
that inmates have access to the necessar   materials to clean their cells,
incl  din   cleanin   sol  tions   hich protect a ainst CO   ID 1   and
ade   ate cleanin   textiles and tools  Defendants shall f  rther ens  re
that DOC staff and inmates are informed of and trained on the proper
techni   es for mixin   and preparin   cleanin   sol  tions as necessar
Defendants shall provide the Co  rt an   pdate on their improvements to
sanitation b     UNE 2  , 2020**

The Defendants  implementation of the re  irements related  to environmental health and

safety is described belo  .

### A  The Environmental Health and Safet    endor and Contract Cleanin   Services

The DOC s contract for environmental health and safety services be  an in May 2020 and

included an initial term of three months,    ith three one-month options to e  tend. [0]  The contract

included the services of a sanitarian.  In mid-Au  ust 2020, the Defendants e  ercised an option

to e  tend the contract throu  h October   1, 2020, at    hich point the contract e  pired. [1]

Durin   the term of the contract, a sanitarian employed by the vendor developed a

cleanin   and disinfectin   protocol [2] to provide   uidance to the cleanin   companies that the

---

[0]   *ee Ma      ,       e  rt*, E  . 10 for a copy of the contractual a  reement the Defendants entered for
environmental health-related services.
[1]  E  . 4A, Au  ust 18, 2020 Modification of Contract CW82    , e  tendin   the contract period to October   1, 2020).
[2]  E  . 4B,  SARS-Co  -2 (CO   ID-19) Disinfection and Cleanin   Protocols.

DOC contracted with in response to the April 19, 2020 Temporary Restraining Order ("TRO"), (Dkt. No. 48),[63] and later conducted site visits to monitor implementation of cleaning practices at the CDF and CTF. The vendor issued a total of four inspection reports, two in July 2020,[64] one in September 2020, and one in October 2020.

Department of Corrections management informed amici that the vendor's services were not extended beyond October 1, 2020 because the agency anticipated the environmental health and safety services provided by the vendor would be performed by a soon-to-be-hired DOC employee who would perform job duties associated with a sanitarian position. As discussed below, the individual the Defendants hired to provide these services was not a registered sanitarian and did not have the training, experience or credentials to perform the same functions that were performed by the contracted sanitarian. In response to the concerns raised about this matter at the November 9, 2020 hearing, DOC management recently informed amici that the agency has decided to contract with the environmental health and safety vendor whose contract expired on October 1, 2020 and reinstitute its efforts to hire a registered sanitarian. On December 11, 2020, the filing date of this report, the Defendants submitted documentation to amici indicating they had entered into a contract with the vendor for a three-month period, with

---

[63] An Amended Order filed on April 19, 2020 corrected an error in the initial Order that was issued. The error was based on a typographical error in amici initial April 2020 report, which amici corrected. The Amended Order addressed professional cleaning services on the secure side of the facility, and in relevant part states: "In addition to engaging a sanitarian, the defendants shall consider contracting for professional cleaning services on the secure side of the facility, at least until a sanitarian is hired to bolster the existing environmental health and safety program at both facilities." (Dkt. No. 50).

[64] Ex. 4C, Onsite Audit Inspection Report, Environmental Conditions Inspection for SARS-Cov-2 (COVID-19) Disinfection and Cleaning Protocols, dated July 2020; Ex. 4D, Follow-Up Onsite Audit Inspection Report, Environmental Conditions Inspection for SARS-Cov-2 (COVID-19) Disinfection and Cleaning Protocols, dated July 2x, 2020. Although these reports and the two subsequent reports are all labelled "Draft," DOC representatives informed amici that they are all considered final versions of the reports.
Ex. 4E, Follow-Up Onsite Audit Inspection Report No. 2, Environmental Conditions Inspection for SARS-Cov-2 (COVID-19) Disinfection and Cleaning Protocols, dated September 2020.
Ex. 4x, Follow-Up Onsite Audit Inspection Report No. x, Environmental Conditions Inspection for SARS-Cov-2 (COVID-19) Disinfection and Cleaning Protocols, dated October x0, 2020.

three one-month option periods.  The Defendants report that the vendor intends to schedule an inspection before December 2, 2020.

The Defendants continued the contracts for cleaning services on the secure and non-secure sides of the CDF and CTF, including common areas of the housing units.  Since executing the contracts on an emergency basis in May 2020 for an initial three-month period, the Defendants have extended the contracts repeatedly for short periods, typically for one to three months at a time.  In a November 2, 2020 e-mail communication to a DOC executive, the Chief Procurement Officer at the D.C. Department of General Services, the agency responsible for contracting on behalf of the DOC for cleaning services at the CDF and CTF, approved extension of the DOC cleaning contracts to February 2021, stating his office would work with its Budget Team to ensure funding is secured to ensure compliance with the Court Order.[8]  In addition, he stated that the contracts should be reviewed in January 2021 to ensure that the Court Order is still valid and if so he may need to prepare a competitive solicitation in January if he must continue the contract beyond February 2021.[9]

The cleaning contractors at the CDF and CTF are expected to follow the disinfection and cleaning protocols developed by the DOC's environmental health and safety vendor.  The contractors were observed and evaluated by the DOC's contracted sanitarian on multiple occasions between July and October 2020.  Based on *a* interviews and observations, it appears that by and large the contractors clean all of the requisite areas of the facilities every day.  Common areas and public spaces on both the secure and non-secure sides of the facilities

---

One of the two cleaning contractors the DOC engaged was replaced.  *See* Ex. 4G, Modification of Contract DCAM-20-NC-EM-0089C, extending the performance period for the new cleaning contractor (at the CDF) through February 28, 2021; Ex. 4H, Modification of Contract DCAM-20-NC-EM-0089B, extending the term of the cleaning contractor (at the CTF) through February 28, 2021.

[8] Ex. 4I, November 2, 2020 e-mail correspondence from George Lewis to Wsitana Stewart-Ponder.

[9] *Id.*

appeared noticeably cleaner than *a*       observed durin   previous site visits at both the CD   and the CT  .  Department of Corrections mana  ers and staff also reported a consistent improvement in facility cleanliness attributable to the contract cleanin   teams.

### B   Hirin   Re  istered Sanitarian

The Defendants posted a position vacancy announcement for a   sanitation inspection specialist  on si   dates bet   een May 21 and October   , 2020. [0]  The   ualifications and educational re  uirements for the posted position do not meet the eli  ibility re  uirements to sit for the re  istered sanitarian e  amination administered by the relevant credentialin   body. [1] Department of Corrections mana  ement has informed *a*       that the a  ency elected to post a sanitation inspection specialist vacancy rather than a sanitarian position vacancy in order to e  pedite the hirin   process.  Accordin   to DOC mana  ement, because the sanitarian position did not already e  ist, additional administrative   or     ould be re  uired to develop a  ob description and classify the position and these activities    ould delay fillin   the vacancy.

A revie   of publicly available information concernin   District of Columbia   overnment employees indicates that as of September   0, 2020, there    ere      District employees    ith the title   sanitarian,    4 of   hom    or  ed for the Department of Health, and t   o of   hom    or  ed for the Department of Youth Rehabilitation Services and the Child and   amily Services A  ency, respectively.  Additionally, *a*       found a Department of Health  ob vacancy announcement for a sanitarian position that    as posted in   anuary 2020 [2] ho   ever,

---

[0]  E  . 4  , Sanitarian Inspection Specialist  ob description and vacancy announcement posted on the follo   in   dates: May 21, 2020   une 1  , 2020   uly  , 2020   uly  1, 2020  September 18, 2020  and September 29, 2020

[1]  The National Environmental Health Association is the credentialin   or  ani  ation for sanitarians.   *ee* E  . 4K,  NEHA Re  istered Environmental Health Specialist Re  istered Sanitarian (REHS RS) Candidate Information Brochure   at 1-   for the eli  ibility re  uirements to sit for the REHS RS credentials e  am.

[2]  E  . 4  , Sanitarian  ob description and vacancy announcement posted on   anuary  , 2020.

1

the eli ibility re uirements for that position also  ere inconsistent  ith the re uirements set by the National Environmental Health Association for re istered sanitarians.

Department of Corrections representatives stated that after serially postin  the  ob openin  for the sanitation inspection specialist and conductin  outreach to public health net or s, the a ency did not receive any applications from re istered sanitarians from amon those applicants  ho  ualified for the position.  Ultimately, the DOC hired a candidate from the pool of applicants  ho  as a 1 -year supervisory employee of the a ency  ithout a bac round in environmental health and safety.  This individual be an  or in  as the sanitation inspection specialist on November 9, 2020.

intervie  ed the ne  ly hired sanitation inspection specialist and that person s supervisor.  The supervisor developed trainin  materials that have been provided to the ne employee. [4]  Both the supervisor and the employee stated that trainin  has be un and has included online course  or , studyin  American Public Health Association Standards for Health Services in Correctional Institutions, and on-the- ob trainin  t ice per  ee  conducted by a District employee  ho oversees environmental health and safety pro rams in the District of Columbia s t  o secure  uvenile facilities.   The on-the- ob trainin  is anticipated to continue for up to t  o months.

As noted above, follo in  the November 9, 2020 hearin , DOC mana ement informed a  that the a ency intends to post a position vacancy for a re istered sanitarian.  Accordin

---

are E . 4K,  ra note  1  t  E . 4 , supra  te  2.
[4]  E . 4M,  Trainin  Plan for DOC Sanitarian.
Those facilities are operated by the District of Columbia Department of Youth Rehabilitation Services.  The individual conductin  the on-the- ob trainin  has the  sanitarian  ob title.

2

to DOC mana ement, as of December 9, 2020, a ob description had been developed and as bein revie ed by staff in the District of Columbia s Office of Human Resources.

### C   Access to Cleanin   Materials and Related Trainin

There as a si nificant improvement in inmate access to appropriate materials to clean their cells since *a* prior site visits.  The Defendants no provide inmates ith a pero ide-based cleanin and disinfectin solution and clean microfiber cloths are delivered to housin units t ice daily.  At the CD , inmates and staff reported that they are re uired to clean their cells ith these materials in the mornin at the start of the shift.  At the CT , inmates reported that they had access to bottles of pero ide solution and microfiber cloths hen they ere allo ed out of their cells. observed that an appropriate supply of clean microfiber cloths and bottles of pero ide solution ere available on every housin unit visited and inmates and staff consistently reported that they had access to the clean cloths and solution on a daily basis.

The pero ide solution is purchased by the DOC in a concentrated and hi hly corrosive form.  It is mi ed by desi nated environmental officers prior to its distribution to housin units.  The dilution of the concentrated form of the solution is performed by a machine pro rammed to add a specified amount of ater in order to dilute the solution to levels prescribed by the manufacturer.

DOC mana ers, detail inmates, and some housin unit staff have reported that inmate detail or ers and correctional officers assi ned to the housin units have been trained on cleanin protocols.  The trainin , hich as conducted by the DOC Compliance and Revie

---

E . 4N, Position Description (Draft) for Environmental Sanitarian CS 1801-12.

Office,  as based on the cleanin  protocols developed by the contracted environmental health and safety vendor.

**Re  irement Fo  r**

**Defendants shall ens  re that conditions in isolation   nits are non p  nitive This incl  des ens  rin   reliable and re    lar access to le  al calls, personal telephone calls, dail   sho  ers, and clean clothin   and clean linens to all inmates on isolation stat  s  Defendants shall provide the Co  rt an   pdate on their improvements to conditions in isolation cells b     UNE 2  , 2020**

Since   une 18, 2020,   hen the preliminary in  unction   as issued, there have been no isolation units in operation at the CT    ho   ever, an isolation unit has operated on a limited basis at the CD   durin   this period.

As e  plained in more detail belo   in the narrative related to testin  re  uirements,   a total of 11 inmates tested positive for CO   ID-19 at the CD   bet  een   une 18, 2020 and December 1, 2020.  All but one of these cases    ere identified as a result of testin   conducted at the time of admission, and the last one appears to have been the result of a ne   ly admitted inmate   ith CO   ID-19   ho   as placed on the mental health unit upon admission and infected another inmate. [8]  DOC records indicate that upon receipt of a positive test result, each member of this cohort    as transferred to NO-2, the unit at the CD   desi  nated for inmates on medical isolation status.

Since the time that the preliminary in  unction    as issued, there have been a limited number of inmates on isolation status.  Unli  e the conditions that    ere evident before the temporary restrainin   order    as issued, it appears that inmates on isolation status are able to ma  e personal telephone calls, ta  e daily sho  ers, and receive clean clothin   and clean linens

---

*ra* at   9 - 4  .
[8]  This matter is addressed    *ra* at 41.

on a    ee ly basis. [9]  There is, ho   ever, some very limited evidence indicatin   that inmates on isolation status may not have access to confidential le  al calls.[80]

### Re    irement Five

**Defendants shall ens  re that all inmates have access to confidential, nmonitored le  al calls of a d  ration s  fficient to disc  ss le  al matters Insofar as inmates   access to confidential,   nmonitored le  al calls is reliant on the   se of ne   technolo    , Defendants shall s  iftl   implement the   se of s  ch technolo**

In the conte  t of this re  uirement, t  o different cate  ories of le  al calls should be considered:  attorney-initiated le  al calls and inmate-initiated le  al calls.  The various processes and practices applicable to each cate  ory are discussed separately belo   .

### A   Attorne   Initiated Le  al Calls

Currently, pursuant to a process initiated in April 2020 in response to the pandemic, an attorney can re  uest a le  al call   ith a client confined at the CD   or the CT   by sendin   an email to the DOC case mana  ement office.  DOC case mana  ement staff report that these calls,    hich are referred to as   emer  ency   le  al calls, are   enerally scheduled for a   0-minute period, but the duration may be e  tended for up to one hour or more if the attorney re  uests additional time.[81]  After submittin   a re  uest, attorneys are advised of the day they    ill receive a le  al call from the client but not the precise time that the client    ill contact them.

Reports from DOC mana  ement related to the volume of attorney-initiated emer  ency le  al calls indicate that a hi  h number of le  al calls are processed on a monthly basis at both

---

[9]   ere only able to intervie   one inmate   ho   as recently on isolation status.  Based on this intervie   and discussion   ith medical, correctional and mana  ement staff, it appears that since the preliminary in unction   as issued, in the limited instances in    hich an isolation unit has been operated at the CD  , inmates have had access to personal telephone calls, daily sho  ers, clean clothin   and clean linens.

[80] One inmate on isolation status reported that    hile he    as able to spea   by telephone to his la  yer in the case mana  er s office, a correctional officer remained in the office durin   the telephone call.

[81]   ere told that the re  uest for additional time must be made in the initial email.

the CDF and CTF.[82]  Between April 20, 2020 and October 1 , 2020, DOC management reports that case managers were responsible for facilitating 8, 02 emergency legal calls.[8] During this period, DOC management reports that the average daily volume of emergency legal call requests per month ranged from a low of 0 calls to a high of 8 calls, and the average number of case managers who were present at both facilities to facilitate these calls during this period was 1 .[84]

Each housing unit has an assigned case manager.  Many case managers are assigned to cover multiple housing units.  As of early November 2020, the DOC had a total of   funded case manager positions, nine of which were vacant.  Pursuant to the emergency call request process initiated in April 2020, each   ee day morning case managers receive a list of emergency legal calls that they are assigned to facilitate that day.  Case management staff report that most if not all of their   or days are devoted to facilitating attorney-initiated emergency legal calls.  As a result, they are unable to regularly perform many of their other job duties,[8] including the timely processing of inmate-initiated requests for legal calls, which are described in more detail below.[8]

---

[82] E . A, chart submitted by DOC Director of Programs and Case Management, Legal Calls, Emergency Calls to Private and Public Attorneys, April 20 - October 1 , 2020 (shown in for the 10-day period between April 20 and 0, 2020, attorneys requested 448 legal calls of which 8 were completed for the month of May 2020, attorneys requested 1,28 legal calls of which 1,0  were completed for the month of June 2020, attorneys requested 1, 0 legal calls of which 1, 41 were completed for the month of July, 2020 attorneys requested 1, 2 legal calls of which 1,410 were completed for the month of August 2020, attorneys requested 1,41 legal calls of which 1, 1 were completed for the month of September 2020, attorneys requested 1, 2 legal calls of which 1, 4 were completed and for the 1 -day period between October 1 and 1 , 2020, attorneys requested 8 1 legal calls of which 89 were completed).

[8] E . B, Legal Calls Cont., Number of Emergency Legal Calls Requested by Public and Private Attorneys, April 20 - October 1 , 2020 (stating, *inter al a*, that of the 8,  emergency legal calls requested during this period, 8, 02 were the responsibility of case managers).

[84] *Id.*

[8] In addition to legal calls, case managers are responsible for inmate classification, reclassification, and facilitating various types of inmate requests for records and services.

[8] *Tra* at 8 - 9.

In instances in which attorneys contact the DOC case management office to request a legal call, the calls are conducted in one of the following ways at both the CDF and CTF: 1) in the case manager's office with the case manager present 2) in the inmate's cell using a cellular telephone and ) in an empty cell on the housing unit using a cellular telephone. At the CDF, these legal calls are also conducted in an office in the facility's case management suite.[87] received some conflicting information about whether case managers are present when a legal call is conducted in a case manager's office. However, most of the inmates and case managers interviewed confirmed that the case manager is present in the office when these calls are conducted, which is consistent with the observations that *a* have made.

As of mid-November 2020, attorney-initiated emergency legal calls were being conducted via cell phone in individual cells at both the CDF and CTF.[88] Department of Corrections managers report that the introduction of the cell phones and handsets initially presented connectivity and other challenges that have largely been overcome. For the most part, inmates and staff report that the use of the cell phones in individual cells affords inmates the opportunity to speak in a confidential setting with their attorneys.[89]

Attorneys can also request to speak to their clients at the CDF and CTF via

---

[87] During an interview *a* conducted in the case management suite, an inmate was observed sitting in the doorway of an open office reportedly speaking to his attorney within audible distance of correctional and case management staff.

[88] The Defendants purchased 0 cell phone and 10 wireless handsets for this purpose on May 1, 2020. All equipment has been delivered. *See* Ex. C, Order Confirmation, First Net, Order No. 8 40299 (cell phones) Ex. D, Proof of Delivery, Vendor Acknowledgement Acceptance Form, September 0, 2020 (wireless handsets). Records related to the delivery of the cell phones and the order for the handsets were requested but not available. According to case management supervisors and staff, as of mid-November 2020, nine cell phones were available for use (six at the CDF and three at the CTF). In addition, seven wireless handsets and nine non-wireless handsets were also available. Department of Corrections management reports that the remaining 41 cell phones will be deployed after the Defendants receive the supplies necessary to secure them in locked boxes. Department of Corrections staff report that the boxes, which are used for the nine phones that are in use, are intended to ensure that the cell phones are not damaged or used for unauthorized purposes.

[89] Some inmates reported that they could be overheard by inmates confined in adjacent cells when speaking from their closed cells.

videoconference.  These conferences are scheduled for a specific   ee day time period by staff

in the DOC   eneral Counsel s Office.  The Defendants report that bet  een May 18, 2020 and

October   1, 2020, the    eneral Counsel s Office coordinated a total of 1,209 videoconferences

for inmates at the CD   and CT .  Desi  nated correctional staff have been trained to help

inmates use the videoconference technolo  y.         have observed and participated in these

videoconferences,   hich are conducted under conditions that promote the confidentiality of

attorney-client communications.[90]

### B   Inmate Initiated Le  al Calls

Inmates at the CD   and CT   can initiate le  al calls   ith their attorneys by submittin

an oral or    ritten re  uest to the case mana  er assi  ned to their housin   unit.[91]  Inmates

reported substantial delays receivin   responses to these re  uests.   i  e the attorney-initiated

le  al calls, these calls can be conducted in the case mana  er s office    ith the case mana  er

present or in a cell on the housin   unit.  In addition, inmates can ma  e free le  al calls to their

attorneys durin   the one-hour daily recreation period, usin   the phones mounted on the    alls

in the day rooms.[92]  While the DOC reports that these calls are unmonitored, they are not

confidential.

The DOC Office of    eneral Counsel reports that inmates at the CD   have been able to

ma  e confidential and free le  al calls from their cells usin   tablets provided by the vendor that

---

[90]  In instances in   hich counsel re  uires a client to revie   documents or other materials, they are able to do so on a confidential basis durin   the videoconference.  Additionally, DOC staff report that attorneys can send documents to case mana  ers and the    eneral Counsel s Office for transmission to inmates for revie  .

[91]  See E  . 2C,    *ra* note   1, Sample Inmate Re  uest Slip.  Inmates can obtain these forms,   hich are used to re  uest le  al calls, amon   other re  uests, from correctional staff and case mana  ers.  After the forms are filled out, inmates are re  uired to place them in a bo     here they are pic  ed up periodically by the case mana  ement staff. Some of the case mana  ers *a*      intervie  ed reported that they had difficulty   eepin   up   ith these re  uest forms.

[92]  Defendants report that these calls are free and unmonitored as lon   as the attorney s name and telephone number have been appropriately re  istered in the system.

8

provides telephone services at the CD .[9]  Bet een une 18 and December , 2020, the

 eneral Counsel s Office reports that  4 le al calls  ere made usin  these tablets at the

CD . In addition to telephone communications, inmates can use the DOC-issued educational

tablets to communicate  ith their attorneys usin  a confidential electronic messa in

platform.  As of November  0, 2020, DOC mana ement reports that 18  inmates and 1

attorneys have used the messa in  platform.

### C  Concl sion, Re  irement Five

The Defendants have made a substantial investment in ne  technolo y to address the

attorney-client communication challen es that have emer ed as a result of the pandemic.  In

addition, they have repurposed space in different parts of the CD  and CT  in order to

accommodate confidential attorney-client videoconferences.  Moreover, in an effort to ensure

the technolo y is used appropriately, correctional staff assi ned to ne ly created

videoconferencin  posts have received trainin  on s ills that  ere not contemplated by their

 ob descriptions.   inally, case mana ement  ob responsibilities have been restructured in

order to prioriti e the volume of attorney-client telephone and video communications

associated, at least in part,  ith the reported and substantial decrease in attorney visits to the

CD  and CT .

### Re  irement Six

> **Finall , the Co rt notes that Defendants have increased testin  for**
> **CO ID 1 , no  testin an  resident to be transferred to Saint Eli abeths**
> **Hospital or to a federal correctional facilit   Defendants also test an**

---

[9]  Unli e the educational tablets provided to inmates by the DOC, the tablets provided by the vendor contain paid
content.  The tablets furnish inmates at the CD   ith the ability to ma e telephone calls to the same approved
contacts they are allo ed to contact from the telephones in the dayrooms, includin  their attorneys.  Currently, these
tablets are only available in limited  uantities at both facilities.  Ho ever, althou h inmates at the CT  also have
access to these tablets, they cannot use the telephonic functionality because a different vendor has the contract for
telephone services at the CT  and these services are currently unavailable under that contract.

9

> **cell mate of an inmate who tests positive and all new residents upon intake. Defendants continue to test those inmates who report positive for COVID-19 symptoms. The Court ORDERS that Defendants continue implementing this increased testing. The Court further ORDERS that Defendants update the Court on any changes to the testing protocol at DOC facilities, including the further testing of asymptomatic inmates.**

The Defendants report that they administer COVID-19 tests to inmates in the following circumstances: upon admission; prior to certain transports, including transports to court; if inmates are symptomatic; and, to any cellmate of an inmate who tests positive for COVID-19. In addition to inmate testing, DOC representatives also reported that beginning in October 2020, the Department of Health began making COVID-19 testing available to DOC staff on-site every two weeks. The testing was made available during hours that included the morning shift change to maximize the number of staff who could take advantage of the testing.

### A. Testing of Newly Admitted Inmates

For newly admitted inmates, the Defendants report that their protocol is to administer a rapid COVID-19 test and a lab test simultaneously to each inmate upon intake.[94] An additional lab test is administered to each inmate at least seven days later[95] while the inmate remains housed in the Intake unit.[96] Once cleared by medical staff, inmates may be moved from the Intake unit into other housing units. If an inmate tests positive for COVID-19, they are transferred to housing units designated for inmates on isolation status.

---

[94] The lab test reportedly has a higher sensitivity in detecting SARS-Cov-2; however, results take longer to process. Thus, a rapid test is administered at the same time and the test results are available shortly after the test is administered. If the rapid test returns a positive test result, the inmate is isolated sooner than s/he would otherwise be if a lab test alone were administered. Inmates who refuse testing at the time of admission are cell restricted until medical staff clear them.

[95] This process is intended to identify inmates who may have been COVID-19 positive upon admission, but who were still in an incubation period with viral levels that were too low to detect at the time of the initial test administrations.

[96] Inmates with acute mental health needs are moved to a specialized unit and do not remain on the Intake unit. Women are admitted at the CTF.

obtained CO ID-19 testin data throu h November 0, 2020 from Unity representatives ho maintain clinical testin data. Accordin to that data, over the 1 days bet een une 18, 2020 and November 0, 2020, the Defendants administered 2, 1 tests to inmates, an avera e of 1 . tests per day. Additionally, tests ere administered on 91 percent of the days durin the period.

The testin records indicate that there ere a total of 11 positive tests durin the period, four in uly, t o in Au ust, four in September, none in October, and one in November. All ere at the CD . Ten of the 11 positive tests ere detected by a CO ID-19 test administered upon admission to the facility. Of those 10 inmates testin positive, nine ere housed in SO-2 initially, the Inta e unit, or ere immediately placed in the isolation unit, NO-2, before spendin a ni ht in SO-2. The 10th case involved an inmate ho as placed on the mental health unit, SO- , upon admission. When his initial test result came bac positive, he as moved to the isolation unit.

The final positive case as not a ne admission, but rather involved an inmate ho as housed on the mental health unit for an e tended period. He as housed on the mental health unit durin the period hen the ne ly admitted inmate referred to above ( .e., the 10th positive case) tested positive. The day after the ne ly admitted inmate received his positive test result, the entire mental health unit as tested. One inmate on the unit as confirmed positive four days later and he as transferred to the isolation unit.

**B   Testin   of Inmates Transferred to Saint Eli abeths Hospital**

obtained data re ardin all transfers to Saint Eli abeths Hospital for the period une 18 to October 1, 2020. There ere a total of 24 transfers to that facility.[9]

---

[9]   Accordin to DOC staff, inmates may be transferred to Saint Eli abeths either as a permanent placement or on a temporary basis pendin a mental health assessment.

intervie ed DOC and Unity representatives re ardin  the prerelease and CO ID-19 testin

processes applicable to inmates released to Saint Eli abeths.

Accordin  to Unity representatives, inmates  ho are released to Saint Eli abeths are

tested for CO ID-19 in advance of their transfer if Unity staff are notified in advance of the

transfer.  Unity and DOC records office staff reported, ho ever, that they often are not

notified in advance of an inmate transfer to Saint Eli abeths.          cross referenced the

names of the 24 inmates  ho  ere transferred to Saint Eli abeths durin  the revie  period

 ith CO ID-19 testin  data.  T enty t o of the 24 transferred inmates  ere tested for

CO ID-19  hile in DOC custody *at    e     t* prior to their transfer to Saint Eli abeths

ho ever, in most cases the testin    as not conducted in close temporal pro imity to the

transfer.  Department of Corrections records indicate that seven of the 20 inmates  ere tested

 ithin the  ee  prior to the transfer  four additional inmates  ere transferred bet een one and

t o  ee s prior to the transfer  and the remainin  11 inmates  ere tested bet een 24 and 128

days prior to the transfer to Saint Eli abeths.  T o inmates transferred to Saint Eli abeths

durin  the revie  period  ere not tested at all prior to the transfer.

**C  Testin  of Inmates Transferred to Federal Correctional Facilities**

obtained data re ardin  all transfers to the United States Marshals Service for

the period  une 18 to October  1, 2020:  There  ere a total of 1   transfers.

intervie ed Unity staff re ardin  CO ID-19 testin  practices prior to inmate transfers to

federal facilities, includin  Unity staff involved in the health clearance process for inmates

 ho are released to the custody of the Marshals Service.  Accordin  to Unity staff, there is a

defined process established by the Marshals Service for releasin  inmates to their custody,

 hich Unity follo s. Unity staff are re uired to complete a  Prisoner in Transit Medical

42

Summary   form for each inmate scheduled to be transferred.[98]   Unity staff e  plained that at some point in early 2020, a ne   section, Section  ,  Mandatory Symptom Screenin   for CO  ID-19 Prior to Departure   rom   acility,   as added to the form.  This ne   section includes a record of the inmate s temperature, three screenin   uestions, and criteria for a   certifyin   health authority   to medically clear the inmate for transfer.  The form does not re  uire a CO  ID-19 test prior to release and Unity staff stated that in practice, they complete the form for each inmate released to the Marshals Service, but do not complete a CO  ID-19 test as a matter of course.  Unity representatives clarified that if a re  uest is made to administer a CO  ID-19 test (e.  ., by the facility to   hich the inmate   ill be transferred), they   ill conduct the test.

cross referenced a random sample of   of the 1   inmates transferred to the Marshals Service bet  een   une 18 and October   1, 2020   ith CO  ID-19 testin   data. T  enty-one inmates received a CO  ID-19 test at some point prior to their release to the custody of the Marshals Service and 12 inmates did not.  Amon   this cohort, three inmates received a CO  ID-19 test   ithin the month prior to their release (ran  in   from 14 days to 28 days prior to release) and the remainin   18 inmates received a test more than one month prior to their release (ran  in   from   days to 181 days).

**D  Testin   of Cellmates of Inmates   ho Test Positive**

As noted above, the Defendants report that cellmates of all inmates   ho test positive for CO  ID-19 are tested.  Of the 11 inmates   ho tested positive for CO  ID-19 bet  een   une 18 and October   1, 2020, one inmate had a cellmate.  The t  o inmates   ere housed in a cell in the Inta  e unit.  Testin   records indicate that the cellmate of the inmate   ho tested positive

---

[98] E  .  ,  Prisoner in Transit Medical Summary   redacted .  This form is referred to as   orm   .

4

was tested the same day his cellmate received a positive test result and his test result was negative.

### E. Testing of Inmates who Report COVID-19 Symptoms

Finally, *a* reviewed a sample of 49 sick call requests submitted between June 18 and October 1, 2020 that reflected reported symptoms consistent with COVID-19 symptoms identified by CDC guidelines and/or reflected in Unity's reported symptom-based testing practices.[99] Forty-three of the sick call requests were submitted by inmates confined at the CDF and six were submitted by inmates confined at the CTF. Because 1 of the sick call request forms did not include the date the inmate submitted the form, they were excluded from the analysis.

Among the remaining sick call requests in the sample, 2 were from the CDF and four were from the CTF. Fourteen of the inmates who submitted the sick call requests, 9 percent, were tested for COVID-19 at some point after they submitted their sick call request. Five of the 14 tests were administered within two days of the submission of the sick call request and one was administered five days after the submission of the sick call request.[100] The remaining eight tests were administered between 20 and 2 days after the sick call requests were submitted. There is no indication in the EHR maintained for these inmates that these eight tests were administered in response to the sick call requests that reported COVID-19 symptoms. Among the 22 inmates who were not tested after reporting symptoms, 1

---

[99] *ee* App. B, E. 1, supra note 49 ("Symptoms of COVID-19 include cough, shortness of breath or difficulty breathing, fever, chills, muscle pain, sore throat, and new loss of taste or smell. Other less common symptoms have been reported, including nausea and vomiting.") Symptoms noted in the sampled sick call requests included, but were not limited to, the following: coughing, shortness of breath/difficulty breathing, fever, nausea, vomiting, loss of appetite, headache and/or body aches, chills, and sore throat. Inmate requests for COVID-19 tests were also included in the sample.

[100] Three sick call forms explicitly included a request for a COVID-19 test: one reported shortness of breath, one reported upset stomach and vomiting, and one reported nausea and loss of appetite.

received a COVID-19 test at some earlier point in their confinement and five were not tested for COVID-19 during their confinement.

        interviewed Unity's Medical Director regarding clinical expectations for testing inmates who report symptoms consistent with COVID-19. The director pointed out that there are some cases in which there are sound medical explanations for the symptoms the inmate is experiencing consistent with something other than COVID-19.[101] The director also acknowledged that providers have some clinical discretion in deciding when to administer a COVID-19 test to inmates reporting COVID-19 symptoms, but she indicated that if there is no obvious or clear explanation for the symptoms, a COVID-19 test should be administered.

        did not assess the clinical decisions made by providers with respect to administering COVID-19 tests for reportedly symptomatic inmates, which seemed beyond the scope of this appointment and would have required consultation with a medical expert. A review of the EHR maintained for inmates in the sample shows that in six cases, the inmate reported during the sick call visit that the COVID-19-like symptoms reflected on the sick call request form was resolved and in five other cases the inmate reported that s he had requested to be seen in sick call for other reasons despite noting symptoms of COVID-19 on the sick call request form.[102] The review of the sampled cases also show various diagnoses reached following the sick call visit, such as asthma, constipation, allergies sinusitis, and acid reflux gastrointestinal reflux disease. In none of these cases, was there documentation in the EHR that COVID-19 was suspected but testing was not done.

---

[101] The director cited as examples inmates diagnosed with Crohn's disease reporting gastrointestinal symptoms and inmates diagnosed with asthma reporting a cough. In cases such as these, a provider might conclude the symptoms were related to the diagnosed chronic condition rather than COVID-19.
[102] These other reasons included requests for foot cream, medicine for heartburn or treatment for constipation.

4

**F   Timeliness of Testin   Res  lts**

Durin   the November 9, 2020 hearin  , the Plaintiffs in  uired   hether *a*        ere
a   are of any delays in receivin   testin   results from laboratories.          have revie   ed the
available data re  ardin   elapsed days from test administration to receipt of testin   results.
Amon   the 2,   1 tests administered bet   een   une 18 and October   1, 2020, data   ere
available for   9 percent of the test results.  Be  innin   in Au  ust 2020, the date test results
  ere received   as recorded much less fre  uently than durin     une and   uly 2020.             ere
not able to determine   hether the tests   ith data sufficient to calculate the number of elapsed
days bet   een test administration and receipt of testin   results (  *.e.,* the   9 percent)   ere
representative of test processin   times in   eneral.  With that caveat, in the months of October
and November 2020, 9   percent of the tests for   hich a calculation could be made resulted in
test results that   ere returned   ithin four days of the test administration.[10]

**Concl  sion, Re    irement Six**

Since the issuance of the preliminary in  unction, the DOC has administered over 2,  00
CO   ID-19 tests to inmates at the CD   and CT  , over 1   tests per day.  The a  ency  s testin
protocols pay particular emphasis to identifyin   and containin   any inmates   ith CO   ID-19
before they interact   ith the   eneral population and have an opportunity to communicate the
virus to other inmates or staff.  Since the issuance of the preliminary in  unction, 10 of the 11
inmates   ho tested positive for CO   ID-19   ere discovered durin   routine inta  e testin   and
the 11th case, caused by a ne   ly admitted inmate  s placement on the mental health unit,   as

---

[10]      or reference, there   as sufficient data for 149 of the 1,002 tests administered in those t  o months.  Thirty-three
of the tests   ere administered t  o days before the data   as provided to *a*         and the results of those tests   ere still
pendin  .

4

uic ly contained because of the inta e testin . In the one case in  hich an inmate  ho tested positive for CO ID-19 had a cellmate, the cellmate  as also tested.

The evidence indicates that the DOC does not as a matter of  eneral practice test inmates  ho are transferred to Saint Eli abeths Hospital.  Medical staff indicate they often are not informed that an inmate  ill be transferred to Saint Eli abeths in advance.  The data also indicate that the DOC does not routinely test inmates  ho are transferred to federal correctional facilities.  Medical staff e plained that they follo  the procedure established by the Marshals Service.

 inally, a revie  of a sample of sic  call re uests that included symptoms consistent  ith CO ID-19 revealed that most inmates  ere not tested for CO ID-19 in response to the sic  call re uest.  Unity medical staff e plained that there is clinical  ud ement involved in decidin   hether to administer a CO ID-19 test to an inmate.   did not assess those decisions.

**CONCLUSION**

 are available to ans er any  uestions the Court or the Parties have about the matters addressed in this report.

Respectfully submitted,

 s  race M.  opes
*r ae*
 race M.  opes
Bar No.  8 0
E ecutive Director
Risin  for ustice
901 4th Street, N.W., Suite  000
Washin ton, D.C. 20001
202- 0 -2224
 mlopes @risin for ustice.or

4

Mar    ordan
mar    mar   ordan.consultin
1220 19th Street, N.W.
Suite   00
Washin  ton, D.C.  200
December 11, 2020                    202- 2 -    2
Washin  ton, D.C.

48

REPORT SUBMITTED BY *AMICUS CURIAE* PURSUANT
TO SEPTEMBER 16, 2020 ORDER

**Index to Exhibits**

**APPENDI   A**

Exhibit 1A       Chart, Combined Population of CDF and CTF, by Day and Legal Status, June 18, 2020 – October 31, 2020

Exhibit 1B       Table, Combined Population of CDF and CTF, by Status and Day, June 18, 2020 – October 31, 2020

Exhibit 1C       Table, Admissions to CDF and CTF, by Status and Month, June 18, 2020 – October 31, 2020

Exhibit 1D       Table, Average Length of Stay of Inmates Housed at CDF and CTF, by Status and Month, June 18, 2020 – October 31, 2020

Exhibit 2A       May 18, 2020 Modification of Contract CW68868

Exhibit 2B       Sick Call Request Form

Exhibit 2C       Inmate Request Slip

Exhibit 3A       Quick Guide to COVID-19

Exhibit 3B       Response to COVID Survival Guide

Exhibit 3C       Wearing Personal Protective Equipment

Exhibit 4A       August 18, 2020 Modification of Contract CW82753

Exhibit 4B       SARS-CoV-2 (COVID-19) Disinfection and Cleaning Protocols

Exhibit 4C       Onsite Audit Inspection Report, Environmental Conditions Inspection for SARS-CoV-2 (COVID-19) Disinfection and Cleaning Protocols, dated July 2020

Exhibit 4D       Follow-Up Onsite Audit Inspection Report, Environmental Conditions Inspection for SARS-CoV-2 (COVID-19) Disinfection and Cleaning Protocols, dated July 23, 2020

Exhibit 4E       Follow-Up Onsite Audit Inspection Report No. 2, Environmental Conditions Inspection for SARS-CoV-2 (COVID-19) Disinfection and Cleaning Protocols, dated September 2020

Exhibit 4F         Follow-Up Onsite Audit Inspection Report No. 3, Environmental Conditions
                   Inspection for SARS-CoV-2 (COVID-19) Disinfection and Cleaning Protocols,
                   dated October 30, 2020

Exhibit 4G         Modification of Contract DCAM-20-NC-EM-0079C

Exhibit 4H         Modification of Contract DCAM-20-NC-EM-0079B

Exhibit 4I         November 23, 2020 e-mail from George Lewis to Gitana Stewart-Ponder

Exhibit 4J         Sanitarian Inspection Specialist, job description and vacancy announcement

Exhibit 4K         NEHA Registered Environmental Health Specialist/Registered Sanitarian
                   (REHS/RS) Candidate Information Brochure

Exhibit 4L         Sanitarian Job Description and Vacancy Announcement

Exhibit 4M         Training Plan for DOC Sanitarian

Exhibit 4N         Draft Position Description, Environmental Sanitarian CS-1801-12

Exhibit 5A         Chart, Legal Calls, Emergency Calls to Private and Public Attorneys, April 20 - October
                   15, 2020

Exhibit 5B         Chart, Legal Calls Cont., Number of Emergency Legal Calls Requested by Public and
                   Private Attorneys, April 20 - October 15, 2020

Exhibit 5C         Order Confirmation, First Net, Order No. 587640299 (cell phones)

Exhibit 5D         Proof of Delivery, Technomic, RTS No. 100561 (wireless handsets)

Exhibit 6          Prisoner in Transit Form, Redacted


**APPENDI   B**

App. B, Ex. 1      Center for Disease Control, Interim Guidance on Management of Coronavirus
                   Disease 2019 (COVID-19) in Correctional and Detention Facilities, Updated
                   December 3, 2020

# APPENDI   A

**Ex  1A**



**Ex 1B**

**Combined Population of CDF and CTF, by Status and Month**
**June 18, 2020 - October 31, 2020**

| Distinct Count of DCDC Row Labels | Fugitive | Sentenced Misdemeanor | Other | Writ or Hold | Sentenced Felon | Pretrial Misdemeanor | Parole Violator | Hold for Transfer | Pretrial Felony | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **2020** | | | | | | | | | | |
| **Jun** | | | | | | | | | | |
| 6/18/2020 | | 3 | 2 | 94 | 72 | 68 | 88 | 440 | 482 | 1249 |
| 6/19/2020 | | 3 | 2 | 94 | 72 | 67 | 88 | 440 | 487 | 1253 |
| 6/20/2020 | | 3 | 2 | 94 | 73 | 66 | 89 | 440 | 488 | 1255 |
| 6/21/2020 | | 3 | 2 | 94 | 73 | 66 | 90 | 440 | 488 | 1256 |
| 6/22/2020 | | 3 | 2 | 94 | 73 | 66 | 90 | 440 | 488 | 1256 |
| 6/23/2020 | | 3 | 2 | 94 | 73 | 67 | 91 | 439 | 490 | 1259 |
| 6/24/2020 | | 3 | 2 | 94 | 73 | 67 | 92 | 439 | 492 | 1262 |
| 6/25/2020 | | 3 | 1 | 94 | 74 | 66 | 91 | 439 | 491 | 1259 |
| 6/26/2020 | | 3 | 1 | 93 | 74 | 66 | 90 | 437 | 492 | 1256 |
| 6/27/2020 | | 4 | | 93 | 75 | 65 | 91 | 436 | 493 | 1257 |
| 6/28/2020 | | 4 | | 93 | 75 | 67 | 91 | 437 | 497 | 1264 |
| 6/29/2020 | | 4 | | 93 | 75 | 67 | 91 | 437 | 497 | 1264 |
| 6/30/2020 | | 4 | 1 | 93 | 74 | 67 | 93 | 435 | 495 | 1262 |
| **Jul** | | | | | | | | | | |
| 7/1/2020 | | 4 | | 93 | 75 | 67 | 92 | 434 | 494 | 1259 |
| 7/2/2020 | | 4 | | 93 | 75 | 67 | 92 | 434 | 495 | 1260 |
| 7/3/2020 | | 4 | | 93 | 75 | 62 | 90 | 433 | 497 | 1254 |
| 7/4/2020 | | 4 | | 93 | 75 | 63 | 90 | 434 | 500 | 1259 |
| 7/5/2020 | | 4 | | 93 | 75 | 63 | 91 | 434 | 501 | 1261 |
| 7/6/2020 | | 4 | | 93 | 75 | 63 | 91 | 434 | 501 | 1261 |
| 7/7/2020 | | 4 | 2 | 93 | 75 | 64 | 92 | 434 | 501 | 1265 |
| 7/8/2020 | | 4 | 1 | 93 | 74 | 62 | 94 | 434 | 505 | 1267 |
| 7/9/2020 | | 4 | 1 | 93 | 75 | 63 | 91 | 435 | 502 | 1264 |
| 7/10/2020 | | 5 | 2 | 93 | 72 | 61 | 91 | 435 | 504 | 1263 |
| 7/11/2020 | | 6 | 2 | 92 | 72 | 62 | 92 | 433 | 504 | 1263 |
| 7/12/2020 | | 6 | 2 | 92 | 72 | 63 | 92 | 433 | 506 | 1266 |
| 7/13/2020 | | 6 | 2 | 92 | 72 | 63 | 92 | 433 | 506 | 1266 |
| 7/14/2020 | | 6 | 2 | 92 | 73 | 65 | 90 | 432 | 511 | 1271 |
| 7/15/2020 | | 5 | 4 | 91 | 72 | 64 | 96 | 431 | 511 | 1274 |
| 7/16/2020 | | 5 | 3 | 90 | 72 | 64 | 96 | 431 | 514 | 1275 |
| 7/17/2020 | | 5 | 4 | 90 | 72 | 62 | 98 | 430 | 520 | 1281 |
| 7/18/2020 | | 4 | 3 | 90 | 71 | 62 | 105 | 431 | 517 | 1283 |
| 7/19/2020 | | 4 | 3 | 90 | 71 | 65 | 106 | 431 | 519 | 1289 |
| 7/20/2020 | | 4 | 3 | 90 | 71 | 65 | 106 | 431 | 519 | 1289 |
| 7/21/2020 | | 4 | 1 | 91 | 71 | 69 | 100 | 432 | 518 | 1286 |
| 7/22/2020 | | 5 | 1 | 92 | 71 | 68 | 105 | 430 | 520 | 1292 |
| 7/23/2020 | | 4 | 1 | 90 | 71 | 67 | 106 | 431 | 518 | 1288 |
| 7/24/2020 | | 4 | 1 | 90 | 73 | 68 | 103 | 430 | 519 | 1288 |
| 7/25/2020 | | 4 | 1 | 89 | 74 | 70 | 104 | 429 | 524 | 1295 |
| 7/26/2020 | | 4 | 2 | 89 | 74 | 74 | 105 | 429 | 528 | 1305 |
| 7/27/2020 | | 4 | 2 | 89 | 74 | 74 | 105 | 429 | 528 | 1305 |
| 7/28/2020 | | 4 | 1 | 89 | 74 | 73 | 100 | 429 | 532 | 1302 |
| 7/29/2020 | | 6 | 1 | 87 | 75 | 72 | 103 | 428 | 532 | 1304 |
| 7/30/2020 | | 6 | 1 | 86 | 75 | 75 | 103 | 426 | 535 | 1307 |
| 7/31/2020 | | 6 | 2 | 86 | 73 | 76 | 108 | 428 | 533 | 1312 |
| **Aug** | | | | | | | | | | |
| 8/1/2020 | | 6 | 4 | 86 | 72 | 76 | 106 | 427 | 532 | 1309 |
| 8/2/2020 | | 6 | 2 | 86 | 72 | 80 | 108 | 426 | 534 | 1314 |
| 8/3/2020 | | 6 | 2 | 86 | 72 | 80 | 108 | 426 | 534 | 1314 |
| 8/4/2020 | | 6 | 1 | 86 | 67 | 81 | 109 | 427 | 538 | 1315 |
| 8/5/2020 | | 6 | | 86 | 68 | 79 | 105 | 425 | 534 | 1303 |
| 8/6/2020 | | 6 | | 86 | 68 | 79 | 110 | 426 | 535 | 1310 |
| 8/7/2020 | | 6 | | 86 | 68 | 78 | 101 | 426 | 536 | 1301 |
| 8/8/2020 | | 7 | 1 | 84 | 69 | 77 | 105 | 431 | 537 | 1311 |
| 8/9/2020 | | 7 | 1 | 84 | 70 | 78 | 105 | 432 | 539 | 1316 |
| 8/10/2020 | | 7 | 1 | 84 | 70 | 78 | 105 | 432 | 539 | 1316 |
| 8/11/2020 | | 7 | | 84 | 70 | 81 | 103 | 431 | 542 | 1318 |
| 8/12/2020 | | 7 | | 88 | 70 | 81 | 103 | 432 | 542 | 1323 |
| 8/13/2020 | | 7 | 1 | 87 | 70 | 84 | 102 | 434 | 539 | 1324 |
| 8/14/2020 | | 10 | | 87 | 72 | 83 | 101 | 441 | 543 | 1337 |
| 8/15/2020 | | 10 | 2 | 87 | 72 | 85 | 101 | 438 | 544 | 1339 |
| 8/16/2020 | | 10 | 2 | 87 | 72 | 86 | 102 | 440 | 547 | 1346 |
| 8/17/2020 | | 10 | 2 | 87 | 72 | 86 | 102 | 440 | 547 | 1346 |
| 8/18/2020 | | 11 | | 87 | 72 | 84 | 108 | 436 | 547 | 1345 |
| 8/19/2020 | | 11 | 1 | 87 | 72 | 82 | 113 | 434 | 546 | 1346 |
| 8/20/2020 | 1 | 11 | 1 | 87 | 73 | 82 | 112 | 432 | 550 | 1349 |
| 8/21/2020 | | 11 | 1 | 87 | 73 | 78 | 114 | 431 | 557 | 1352 |
| 8/22/2020 | | 10 | 1 | 87 | 71 | 80 | 114 | 432 | 558 | 1353 |
| 8/23/2020 | | 10 | 2 | 87 | 71 | 82 | 115 | 432 | 558 | 1357 |
| 8/24/2020 | | 10 | 2 | 87 | 71 | 82 | 115 | 432 | 558 | 1357 |
| 8/25/2020 | | 10 | 2 | 87 | 67 | 85 | 119 | 431 | 564 | 1365 |

**Combined Population of CDF and CTF, by Status and Month**
**June 18, 2020 - October 31, 2020**

| Row Labels | Fugitive | Sentenced Misdemeanor | Other | Writ or Hold | Sentenced Felon | Pretrial Misdemeanor | Parole Violator | Hold for Transfer | Pretrial Felony | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 8/26/2020 | | 10 | 1 | 85 | 66 | 88 | 117 | 434 | 563 | 1364 |
| 8/27/2020 | | 10 | | 85 | 67 | 88 | 119 | 431 | 567 | 1367 |
| 8/28/2020 | | 10 | | 85 | 67 | 90 | 123 | 432 | 564 | 1371 |
| 8/29/2020 | | 9 | 1 | 84 | 68 | 90 | 122 | 432 | 567 | 1373 |
| 8/30/2020 | | 9 | 1 | 84 | 68 | 91 | 122 | 432 | 571 | 1378 |
| 8/31/2020 | | 9 | 1 | 84 | 68 | 91 | 122 | 432 | 571 | 1378 |
| **Sep** | | | | | | | | | | |
| 9/1/2020 | | 8 | | 81 | 67 | 97 | 114 | 432 | 576 | 1375 |
| 9/2/2020 | | 8 | 2 | 80 | 69 | 97 | 125 | 432 | 576 | 1389 |
| 9/3/2020 | | 8 | | 80 | 70 | 100 | 133 | 434 | 574 | 1399 |
| 9/4/2020 | | 6 | | 80 | 65 | 103 | 128 | 438 | 582 | 1402 |
| 9/5/2020 | | 6 | 1 | 80 | 66 | 104 | 126 | 439 | 576 | 1398 |
| 9/6/2020 | | 6 | 1 | 80 | 66 | 108 | 131 | 442 | 578 | 1412 |
| 9/7/2020 | | 6 | 2 | 80 | 66 | 108 | 131 | 442 | 578 | 1413 |
| 9/8/2020 | | 6 | 1 | 80 | 66 | 110 | 135 | 445 | 579 | 1422 |
| 9/9/2020 | | 8 | 1 | 80 | 63 | 110 | 130 | 448 | 579 | 1419 |
| 9/10/2020 | | 8 | 1 | 78 | 65 | 112 | 133 | 446 | 573 | 1416 |
| 9/11/2020 | | 8 | 1 | 78 | 63 | 110 | 129 | 447 | 579 | 1415 |
| 9/12/2020 | | 8 | | 78 | 63 | 110 | 130 | 444 | 582 | 1415 |
| 9/13/2020 | | 8 | | 78 | 63 | 114 | 133 | 444 | 586 | 1426 |
| 9/14/2020 | | 8 | | 78 | 63 | 114 | 133 | 444 | 586 | 1426 |
| 9/15/2020 | | 8 | | 78 | 64 | 115 | 135 | 445 | 584 | 1429 |
| 9/16/2020 | | 8 | | 78 | 65 | 112 | 137 | 448 | 584 | 1432 |
| 9/17/2020 | | 8 | 1 | 78 | 61 | 112 | 140 | 450 | 591 | 1441 |
| 9/18/2020 | | 8 | | 78 | 64 | 110 | 138 | 452 | 583 | 1433 |
| 9/19/2020 | | 10 | 1 | 78 | 65 | 109 | 134 | 447 | 588 | 1432 |
| 9/20/2020 | | 10 | 1 | 78 | 65 | 110 | 134 | 445 | 596 | 1439 |
| 9/21/2020 | | 10 | 2 | 78 | 65 | 110 | 134 | 445 | 596 | 1440 |
| 9/22/2020 | | 12 | 2 | 77 | 65 | 112 | 134 | 445 | 591 | 1438 |
| 9/23/2020 | | 11 | 3 | 77 | 66 | 106 | 129 | 448 | 591 | 1431 |
| 9/24/2020 | | 11 | 1 | 78 | 67 | 109 | 127 | 447 | 592 | 1432 |
| 9/25/2020 | | 10 | | 78 | 63 | 111 | 131 | 448 | 595 | 1436 |
| 9/26/2020 | | 9 | 1 | 75 | 65 | 114 | 131 | 449 | 593 | 1437 |
| 9/27/2020 | | 9 | 1 | 75 | 65 | 114 | 130 | 452 | 595 | 1441 |
| 9/28/2020 | | 9 | | 75 | 65 | 114 | 130 | 452 | 595 | 1440 |
| 9/29/2020 | | 10 | 1 | 75 | 67 | 115 | 129 | 451 | 596 | 1444 |
| 9/30/2020 | | 10 | | 75 | 68 | 112 | 137 | 447 | 601 | 1450 |
| **Oct** | | | | | | | | | | |
| 10/1/2020 | | 10 | 1 | 75 | 63 | 113 | 143 | 451 | 600 | 1456 |
| 10/2/2020 | | 10 | 1 | 74 | 61 | 112 | 133 | 452 | 594 | 1437 |
| 10/3/2020 | | 9 | 1 | 74 | 62 | 113 | 134 | 452 | 595 | 1440 |
| 10/4/2020 | | 9 | 1 | 74 | 62 | 116 | 136 | 452 | 600 | 1450 |
| 10/5/2020 | | 9 | 1 | 74 | 62 | 116 | 136 | 452 | 600 | 1450 |
| 10/6/2020 | | 9 | 1 | 75 | 62 | 117 | 128 | 441 | 614 | 1447 |
| 10/7/2020 | | 11 | 1 | 73 | 64 | 113 | 133 | 433 | 607 | 1435 |
| 10/8/2020 | | 11 | | 73 | 64 | 115 | 134 | 435 | 607 | 1439 |
| 10/9/2020 | | 10 | | 73 | 61 | 117 | 136 | 435 | 617 | 1449 |
| 10/10/2020 | | 10 | 3 | 72 | 64 | 117 | 133 | 434 | 615 | 1448 |
| 10/11/2020 | | 10 | 3 | 72 | 64 | 117 | 134 | 434 | 618 | 1452 |
| 10/12/2020 | | 10 | 3 | 72 | 64 | 117 | 134 | 434 | 618 | 1452 |
| 10/13/2020 | | 10 | 4 | 72 | 64 | 119 | 135 | 434 | 623 | 1461 |
| 10/14/2020 | | 12 | 2 | 71 | 59 | 116 | 137 | 433 | 633 | 1463 |
| 10/15/2020 | | 13 | 4 | 71 | 61 | 118 | 137 | 434 | 626 | 1464 |
| 10/16/2020 | | 13 | 2 | 71 | 61 | 115 | 135 | 431 | 633 | 1461 |
| 10/17/2020 | | 12 | 4 | 71 | 62 | 113 | 136 | 434 | 624 | 1456 |
| 10/18/2020 | | 12 | 4 | 71 | 62 | 115 | 136 | 434 | 627 | 1461 |
| 10/19/2020 | | 12 | 4 | 71 | 62 | 115 | 136 | 434 | 627 | 1461 |
| 10/20/2020 | | 12 | 4 | 71 | 63 | 117 | 141 | 436 | 626 | 1470 |
| 10/21/2020 | | 14 | 3 | 71 | 63 | 110 | 142 | 437 | 625 | 1465 |
| 10/22/2020 | | 14 | 4 | 71 | 60 | 110 | 142 | 436 | 630 | 1467 |
| 10/23/2020 | | 14 | 2 | 71 | 62 | 110 | 144 | 437 | 628 | 1468 |
| 10/24/2020 | | 12 | 2 | 71 | 62 | 109 | 146 | 437 | 633 | 1472 |
| 10/25/2020 | | 12 | 2 | 71 | 63 | 110 | 145 | 440 | 635 | 1478 |
| 10/26/2020 | | 12 | 2 | 71 | 63 | 110 | 145 | 440 | 635 | 1478 |
| 10/27/2020 | | 11 | 2 | 71 | 62 | 114 | 149 | 440 | 638 | 1487 |
| 10/28/2020 | | 12 | 1 | 71 | 63 | 111 | 147 | 434 | 645 | 1484 |
| 10/29/2020 | | 14 | 3 | 72 | 62 | 106 | 145 | 434 | 650 | 1486 |
| 10/30/2020 | | 14 | 3 | 71 | 63 | 105 | 150 | 434 | 647 | 1487 |
| 10/31/2020 | | 15 | 2 | 71 | 65 | 106 | 151 | 433 | 644 | 1487 |

**Ex  1C**

**Admissions to CDF and CTF, by Status and Month**
**June 18, 2020 - October 31, 2020**

| Distinct Count of DCDC Row Labels | Column Labels Pretrial Felony | Parole Violator | Pretrial Misdemeanor | Hold for Transfer | Other | Sentenced Felon | Sentenced Misdemeanant | Writ or Hold | Fugitive | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **2020** | | | | | | | | | | |
| Jun 18 - 30 | 20 | 22 | 9 | 3 | 1 | | 2 | | | 51 |
| Jul | 74 | 80 | 41 | 14 | 13 | 4 | 6 | 1 | | 199 |
| Aug | 109 | 63 | 52 | 31 | 10 | 13 | 7 | 5 | 1 | 246 |
| Sep | 94 | 118 | 56 | 55 | 15 | 9 | 4 | 1 | | 314 |
| Oct | 113 | 83 | 46 | 39 | 15 | 4 | 6 | | | 287 |
| **Grand Total** | **409** | **337** | **198** | **139** | **54** | **30** | **25** | **7** | **1** | **1044** |

**Ex  1D**

**Average Length of Stay of Inmates Housed at CDF and CTF, by Status and Month**
**June 18, 2020 - October 31, 2020**

| Average of LOS Row Labels | Column Labels Pretrial Felony | Parole Violator | Pretrial Misdemeanor | Hold for Transfer | Other | Sentenced Felon | Sentenced Misdemeanant | Writ or Hold | Fugitive | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **2020** | | | | | | | | | | |
| Jun 18 - 20 | 273 | 158 | 47 | 333 | 132 | 407 | 128 | 446 | | 294 |
| Jul | 281 | 151 | 52 | 354 | 146 | 409 | 130 | 472 | | 304 |
| Aug | 286 | 133 | 50 | 371 | 36 | 433 | 102 | 505 | 1 | 307 |
| Sep | 291 | 112 | 51 | 375 | 38 | 459 | 123 | 533 | | 302 |
| Oct | 296 | 119 | 62 | 379 | 25 | 438 | 103 | 556 | | 303 |
| **Grand Total** | 288 | 129 | 54 | 366 | 68 | 431 | 112 | 506 | 1 | 303 |

**Ex 2A**

| AMENDMENT OF SOLICITATION / MODIFICATION OF CONTRACT | | 1. Contract Number | Page of Pages | |
|---|---|---|---|---|
| | | CW68868 | 1 | 2 |

| 2. Amendment/Modification Number | 3. Effective Date | 4. Requisition/Purchase Request No. | |
|---|---|---|---|
| M0006 | May 18, 2020 | | Comprehensive Medical Services for DOC |

| 6. Issued by: Peter Kern               Code | 7. Administered by (If other than line 6) |
|---|---|
| Office of Contracting and Procurement<br>441 4th Street, NW  Suite 330 South<br>Washington, DC  20001 | Department of Corrections<br>2000 14th St. NW 7th Floor<br>Washington, DC 20009 |

| 8. Name and Address of Contractor (No. street, city, county, state and zip code) | | |
|---|---|---|
| Unity Health Care, Inc.<br>1100 New Jersey Ave SE, Suite 500<br>Washington DC 20003<br>Office: 202-715-7900<br>Attn.: Vincent A. Keane<br>vkeane@unityhealthcare.org | | 9A. Amendment of Solicitation No. |
| | | 9B. Dated (See Item 11) |
| | X | 10A. Modification of Contract/Order No.<br>CW68868 |
| Code                     Facility | | 10B. Dated (See Item 13)<br>04/05/2019 |

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

☐ The above numbered solicitation is amended as set forth in item 14.  The hour and date specified for receipt of Offers ☐ is extended. ☐ is not extended.
Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:
 (a) By completing Items 8 and 15, and returning _____ copies of the amendment: (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) BY separate letter or fax which includes a reference to the solicitation and amendment number.  FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER.  If by virtue of this amendment you desire to change an offer already submitted, such may be made by letter or fax, provided each letter or telegram makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

| 12. Accounting and Appropriation Data (If Required) |
|---|

**13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS ,**
**IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14**

| | A.  This change order is issued pursuant to (Specify Authority): 27 DCMR, Chapter 36, Contract Modifications<br>     The changes set forth in Item 14 are made in the contract/order no. in item 10A. |
|---|---|
| | B.  The above numbered contract/order is modified to reflect the administrative changes (such as changes in paying office, appropriation data etc.) set forth in item 14, pursuant to the authority of 27 DCMR, Chapter 36, Section 3601.2. |
| | C. This supplemental agreement is entered into pursuant to authority of: |
| x | D. Other (Specify type of modification and authority) ) 27 DCMR, Chapter 36 Sections 3601(a) negotiated adjustment and f3603.1 change order clause. |

**E. IMPORTANT:**      Contractor ☐ is not      ☒ is required to sign this document

14. Description of Amendment/Modification (Organized by UCF Section headings, including solicitation/contract subject matter where feasible.)

This modification is in response to the COVID-19 emergency at the DC Department of Corrections Central Detention Facility and the Correctional Treatment Facility. Mod M0006 adds one CLIN funding NTE $428,672.00 for two Medical Assistant Positions and two Nurse Practioners (NP) or Physician Assistants (PA) from 05/18/2020 through 09/30/2020 and two Option Contract Line Items (CLINs) (see page 1 of this Mod), which are subject to the availability of funds. The modification is authorized and executed through WebEOC-8076716.

For this Modification only, Unity Health Care, Inc. shall submit invoices directly to Dr. Beth Jordan at beth.jordan@dc.gov and to Deborah J. White at deborahj.white@dc.gov. These invoices shall not be applied to the existing purchase order but to the purchase order specifically designated for WebEOC-8076716. All other billing shall continue as specified in the contract.

**All other terms and conditions remain unchanged.**

Except as provided herein, all terms and conditions of the document is referenced in Item 9A or 10A remain unchanged and in full force and effect.

| 15A. Name and Title of Signer (Type or print)<br>Vincent A. Keane | 16A. Name of Contracting Officer<br><br>Deborah J. White | |
|---|---|---|
| 15B. *Vincent A Keane*<br>(Signature of person authorized to sign) | 15C. Date Signed<br>June 2, 2020 | 16B. District of Columbia<br>*Deborah J White*<br>(Signature of Contracting Officer) | 16C. Date Signed<br>08/11/2020 |

| | | 1. Contract Number | Page of Pages | |
|---|---|---|---|---|
| **AMENDMENT OF SOLICITATION / MODIFICATION OF CONTRACT** | | CW68868 | 2 | 2 |

Mod M0006 adds the following Option CLIN pricing to Section B.3.2.1 Requirements, in B.3.2 Option Year One, in response to COVID-19 and WebEOC-8076716 approval:

| Contract Line Item No. (CLIN) | Labor Category | Hourly Labor Rate* | Estimated Labor Hours | Total Amount |
|---|---|---|---|---|
| **CLIN 1010 For the Time Period 05/18/2020 to 09/302020** | | | | |
| CLIN 1010A C.3.36 | 2 Medical Assistants (MA) at 1,088 labor hours each. | $ 65.00 | 2,176 | $   141,440.00 |
| CLIN 1010B C.3.36 | 2 Nurse Practitioners (NPs) or 2 Physician Assistants (PAs) at 1,088 labor hours each. | $132.00 | 2,176 | $   287,232.00 |
| **Total CLIN 1010 Not-to-Exceed** | | | | **$   428,672.00** |
| | | | | |
| **CLIN 1011 For the Time Period 10/01/2020 to 01/31/2021** | | | | |
| Option CLIN 1011A C.3.36 | 2 Medical Assistants (MA) at 984 labor hours each. | $ 65.00 | 1,968 | $   127,920.00 |
| Option CLIN 1011B C.3.36 | 2 Nurse Practitioners (NPs) or 2 Physician Assistants (PAs) at 984 labor hours each. | $132.00 | 1,968 | $   259,776.00 |
| **Total CLIN 1011 Not-to-Exceed** | | | | **$   387,696.00** |
| | | | | |
| **CLIN 1012 For the Time Period 02/01/2021 to 04/14/2021** | | | | |
| Option CLIN 1012A C.3.36 | 2 Medical Assistants (MA) at 584 labor hours each. | $ 65.00 | 1,168 | $    75,920.00 |
| Option  CLIN 10121B C.3.36 | 2 Nurse Practitioners (NPs) or 2 Physician Assistants (PAs) at 584 labor hours each. | $132.00 | 1,168 | $   154,176.00 |
| **Total CLIN 1011 Not-to-Exceed** | | | | **$   230,096.00** |
| | | | | |
| **Grand Total Not-to-Exceed Amount** | | | | **$ 1,046,464.00** |

*The fixed hourly rates shall be fully loaded and include wages, benefits, overhead, general and admnistrative expenses and profit.

**Ex  2B**

BS 6001.I

## DC Department of Corrections
## Sick Call Request Form

Name/Nombre: _____

Date of Birth/Fecha de Nacimiento: [  ] [  ] [  ]

DCDC# [  ]   Housing Unit/Unidad [  ]   Cell/Celda # [  ]

*(handwritten in left margin: 10/23/20  SD-1  SD)*

Check only one box per slip                Marque solo una casilla por papelata

| | | |
|---|---|---|
| | I wish to be seen at Sick Call | Yo deseo el visto por el doctor |
| | Dental Treatment | Tratamiento Dental |
| | Mental Health | Salud Mental |
| | Other | Otro |

I have (check all that apply)                Tengo (marque todo lo que corresponda)

| | | |
|---|---|---|
| | A fever | Una fiebre |
| | Coughing | Tos |
| | Difficulty breathing/ shortness of breath | Dificultad para respirar/ falta de aliento |
| | Headache/Body Ache | Dolor de cabeza o dolor corporal |
| | Upset stomach | Dolor de barriga |

Comments/Comentarios

| |
|---|
| |
| |

For any emergency ask the officer to call the medical unit.
Para cualquier emergencia, pidale al oficial que llame al medico de turno.

_____

Patient Signature/Firma del paciente                Date/Fecha
_____

Medical Provider   _____

Date _____   Time _____ [  ] am [  ] pm

**Ex  2C**

PP 4030.1
Attachment B

### DISTRICT OF COLUMBIA
### DEPARTMENT OF CORRECTIONS

INMATE REQUEST SLIP

DATE _____

NAME _____ DCDC_____UNIT_____CELL_____

PLEASE CHECK ( ) FOR THE SERVICES YOU ARE IN NEED OF

{ } RECORDS OFFICE                         { } CASE MANAGER
{ } CHAPLAINS OFFICE                      { } INMATE CLOTHING
{ } FINANCIAL ACCOUNT BALANCE      { } LEGAL CALL
{ } INMATE PROPERTY                      { } NOTARY
{ } FACE SHEET (UNAVAILABLE IF YOUR SENTENCE IS OVER 1 YEAR)   { } LAW LIBRARY
{ } OTHER

PLEASE EXPLAIN THE NATURE OF YOUR REQUEST BELOW

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

OFFICIAL/CASE MANAGER COMMENTS

_____
_____
_____
_____

DATE: _____  STAFF SIGNATURE:_____

**Ex   A**

**What is a novel coronavirus?** A novel coronavirus is a new coronavirus that has not been previously identified. The virus causing coronavirus disease 2019 (COVID-19), is not the same as the coronaviruses that commonly circulate among humans and cause mild illness, like the common cold.

**Why is the disease called coronavirus disease 2019, COVID-19?** On February 11, 2020 the World Health Organization (WHO) announced an official name for the disease that is causing the 2019 novel coronavirus outbreak, first identified in Wuhan China. The new name of this disease is coronavirus disease 2019, abbreviated as COVID-19. In COVID-19, 'CO' stands for 'corona,' 'VI' for 'virus,' and 'D' for disease. Formerly, this disease was referred to as "2019 novel coronavirus" or "2019-nCoV".

There are many types of human coronaviruses including some that commonly cause mild upper-respiratory tract illnesses. COVID-19 is a new disease, caused by a novel (or new) coronavirus that has not previously been seen in humans. The name of this disease was selected following WHO best practice for naming of new human infectious diseases.

**What's the source of the virus?** COVID-19 is caused by a coronavirus called SARS-CoV-2. Coronaviruses are a large family of viruses that are common in people and may different species of animals, including camels, cattle, cats, and bats.  Rarely, animal coronaviruses can infect people and then spread between people. This occurred with MERS-CoV and SARS-CoV, and now with the virus that causes COVID-19. The SARS-CoV-2 virus is a betacoronavirus, like MERS CoV and SARS CoV  All three of these viruses have their origins in bats  The sequences from U.S. patients are similar to the one that China initially posted, suggesting a likely single, recent emergence of this virus from an animal reservoir  However, the exact source of this virus is unknown

**How does the virus spread?** The virus that causes COVID 19 is thought to spread mainly from person to person, mainly through respiratory droplets produced when an infected person coughs or sneezes. These droplets can land in the mouths or noses of people who are nearby or possibly be inhaled into the lungs  Spread is more likely when people are in close contact with one another (within about 6 feet).

COVID 19 seems to be spreading easily and sustainably in the community ("community spread") in many affected geographic areas. Community spread means people have been infected with the virus in an area, including some who are not sure how or where they became infected

**Why are we seeing a rise in cases?** The number of cases of COVID-19 being reported in the United States is rising due to increased laboratory testing and reporting across the country. The growing number of cases in part reflects the rapid spread of COVID-19 as many U.S. states and territories experience community spread. More detailed and accurate data will allow us to better understand and track the size and scope of the outbreak and strengthen prevention and response efforts.

**Can someone who has had COVID-19 spread illness to others?** The virus that causes COVID-19 is spreading from person-to-person. People are thought to be most contagious when they are symptomatic (the sickest). That is why CDC recommends that these patients be isolated either in the hospital or at home (depending on how sick they are) until they are better and no longer pose a risk of infecting others. More recently the virus has also been detected in asymptomatic persons.

How long someone is actively sick can vary so the decision on when to release someone from isolation is made using a test-based or non-test-based strategy (i.e. time since illness started and time since recovery) in consultation with state and local public health officials. The decision involves considering the specifics of each situation, including disease severity, illness signs and symptoms, and the results of laboratory testing for that patient. Someone who has been released from isolation is not considered to pose a risk of infection to others.

**Can someone who has been quarantined for COVID-19 spread the illness to others?** Quarantine means separating a person or group of people who have been exposed to a contagious disease but have not developed illness (symptoms) from others who have not been exposed, in order to prevent the possible spread of that disease. Quarantine is usually established for the incubation period of the communicable disease, which is the

span of time during which people have developed illness after exposure. For COVID-19, the period of quarantine is 14 days from the last date of exposure because the incubation period for this virus is 2 to 14 days. Someone who has been released from COVID-19 quarantine is not considered a risk for spreading the virus to others because they have not developed illness during the incubation period.

**Can I get sick with COVID-19 if it's on food?** Based on information about this novel coronavirus thus far, it seems unlikely that COVID-19 can be transmitted through food – additional investigation is needed.

**Will warm weather stop the outbreak of COVID-19?** It is not yet known whether weather and temperature affect the spread of COVID-19. Some other viruses, like those that cause the common cold and flu, spread more during cold weather months but that does not mean it is impossible to become sick with these viruses during other months.  There is much more to learn about the transmissibility, severity, and other features associated with COVID-19 and investigations are ongoing.

**What are the symptoms and complications that COVID-19 can cause?** Current symptoms reported for patients with COVID-19 have included mild to severe respiratory illness with fever[1], cough, and difficulty breathing.

**If I recovered from COVID-19, will I be immune to it?** CDC and partners are investigating to determine if you can get sick with COVID-19 more than once. At this time, we are not sure if you can become re-infected. Until we know more, continue to take steps to protect yourself and others.

**Who is at higher risk for serious illness from COVID-19?** COVID-19 is a new disease and there is limited information regarding risk factors for severe disease. Based on currently available information and clinical expertise, **older adults** and **people of any age who have serious underlying medical conditions** might be at higher risk for severe illness from COVID-19. Based on what we know now, those at high-risk for severe illness from COVID-19 are:

- People aged 65 years and older
- People who live in a nursing home or long-term care facility

People of all ages with underlying medical conditions, particularly if not well controlled, including:
- People with chronic lung disease or moderate to severe asthma
- People who have serious heart conditions
- People who are immunocompromised
- People with severe obesity (body mass index [BMI] $\geq$40)
- People with diabetes
- People with chronic kidney disease undergoing dialysis
- People with liver disease

**What kind of tesng is being used t  o diagnose if I have COVID-19?** There are actually many tests being used to diagnose COVID-19 that the U.S. Food & Drug Administration (FDA) has authorized for use during the current emergency. All of these diagnostic tests identify the virus in samples from the respiratory system, such as from nasal or nasopharyngeal swabs.

## CDC Guidelines on How to Protect Yourself and Others

# Know how it spreads

There is currently no vaccine to prevent coronavirus disease 2019 (COVID-19).

**The best way to prevent illness is to avoid being exposed to this virus.**

The virus is thought to spread mainly from person-to-person:

- Between people who are in close contact with one another (within about 6 feet).
- Through respiratory droplets produced when an infected person coughs, sneezes or talks.
- These droplets can land in the mouths or noses of people who are nearby or possibly be inhaled into the lungs.
- Some recent studies have suggested that COVID-19 may be spread by people who are not showing symptoms.

# Clean your hands often

- Wash your hands often with soap and water for at least 20 seconds especially after you have been in a public place, or after blowing your nose, coughing, or sneezing.
- If soap and water are not readily available, **use a hand sanitizer that contains at least 60% alcohol.** Cover all surfaces of your hands and rub them together until they feel dry.
- **Avoid touching your eyes, nose, and mouth** with unwashed hands.

# Avoid close contact

- Avoid close contact with people who are sick.
- Put **distance between yourself and other people, at least 6 feet when possible**(social distancing)
- Remember that some people without symptoms may be able to spread virus.

# Cover your mouth and nose with a cloth face cover when around others

- You could spread COVID-19 to others even if you do not feel sick.
- Everyone should wear a cloth face cover when they have to go out in public (cloth face coverings should not be placed on anyone who has trouble breathing, or is unconscious, incapacitated or otherwise unable to remove the mask without assistance).
- The cloth face cover is meant to protect other people in case you are infected.
- Do NOT use a facemask meant for a healthcare worker.
- Continue to keep about 6 feet between yourself and others. The cloth face cover is not a substitute for **social distancing.**

# Cover coughs and sneezes

CDC Guidelines on How to Protect Yourself and Others

- If you are in a private setting and do not have on your cloth face covering, remember to always cover your mouth and nose with a tissue when you cough or sneeze or use the inside of your elbow.
- Throw used tissues in the trash.
- Immediately **wash your hands** with soap and water for at least 20 seconds. If soap and water are not readily available, clean your hands with a hand sanitizer that contains at least 60% alcohol.

## Clean and disinfect●

- Clean AND disinfect frequently touched surfaces daily. This includes tables, doorknobs, light switches, countertops, handles, desks, phones, keyboards, toilets, faucets, and sinks.
- **If surfaces are dirty, clean them.** Use detergent or soap and water prior to disinfection.

# Definitions:

**Medical Isolation**—Medical isolation refers to confining a confirmed or suspected COVID-19 case (ideally to a single cell with solid walls and a solid door that closes), to prevent contact with others and to reduce the risk of transmission. Medical isolation ends when the individual meets pre-established clinical and/or testing criteria for release from isolation, in consultation with clinical providers and public health officials. In this context, isolation does NOT refer to punitive isolation for behavioral infractions within the custodial setting.

**Quarantine**—Quarantine refers to the practice of confining individuals who have had close contact with
a COVID-19 case to determine whether they develop symptoms of the disease. Quarantine for COVID-19 should last for a period of 14 days. Ideally, each quarantined individual would be quarantined in a single cell with solid walls and a solid door that closes. If symptoms develop during the 14-day period, the individual should be placed undermedical isolation and evaluated for COVID-19. If symptoms do not develop, movement restrictions can be lifted, and the individual can return to their previous residency status within the facility

**Social Distancing**—Social distancing is the practice of increasing the space between individuals and decreasing the frequency of contact to reduce the risk of spreading a disease (ideally to maintain at least 6 feet between all individuals, even those who are asymptomatic). Social distancing strategies can be applied on an individual level (e g , avoiding physical contact), a group level (e.g., canceling group activities where individuals will be in close contact), and an operational level (e g , rearranging chairs in the dining hall to increase distance between them) Although social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of respiratory diseases such as COVID 19

## Verbal Screening &Temperature Check Protocols for Incarcerated/Detained Persons, Staff, & Visitors

CDC guidance recommends verbal screening and temperature checks for incarcerated/detained persons, staff, volunteers, and visitors who enter correctional and detention facilities, as well as incarcerated/detained persons who are transferred to another facility or released from custody. Below, verbal screening questions for COVID-19 symptoms and contact with known cases, and a safe temperature check procedure are detailed.

√ **Verbal screening for symptoms of COVID-19 and contact with COVID-19 cases should include the following questions:**

1. *Today or in the past 24 hours, have you had any of the following symptoms? Fever, felt feverish, or had chills? Cough? Difficulty breathing?*
2. *In the past 14 days, have you had contact with a person known to be infected with the novel coronavirus (COVID-19)?*

**√ The following is a protocol for medical providers to safely check an individual's temperature:**

- Perform hand hygiene
- Put on a face mask, eye protection (goggles or disposable face shield that fully covers the front and sides of the face), gown/coveralls, and a single pair of disposable gloves
- Check individual's temperature
- If performing a temperature check on multiple individuals, ensure that a clean pair of gloves is used for each individual and that the thermometer has been thoroughly cleaned in between each check. If disposable or non-contact thermometers are used and the screener did not have physical contact with an individual, gloves do not need to be changed before the next check. If non-contact thermometers are used, they should be cleaned routinely as recommended by CDC for infection control.
- Remove and discard PPE and perform hand hygiene

**Ex   B**

# Tapping into our inner Strength…

# A survivor's guide to getting through the Covid-19 Crisis

## Introduction

**Covid-19** is a virus that has spread around the world. It has impacted every area of our daily lives.  Businesses have shut their doors, people have been asked to "shelter in place," many people have become unemployed, and the government has been issuing subsidy checks to citizens just to help people get through their financial crises.

*Everyone* is under stress.  As so often happens, people are rallying, trying to help one another and giving lifestyle "tips" or writing self-help manuals about staying healthy.  These include advice for being healthy during Covid-19, as well as staying emotionally and spiritually well when there is such disruption in our lives.

Unfortunately, these resources don't tend to address the needs of those of us in community living situations, such as jails or prisons, mental health facilities, long term rest-homes, shelters, etc. These settings present a variety of challenges, such as lack of personal space and privacy, rules limiting personal freedom, and lack of easy access to basic needs, such as running water or the ability to distance yourself from others.

> *"I have a cell mate, so it is hard to get time alone in my room. Sometimes, when I'm feeling stressed, I go take a shower just so I can be alone for a few minutes and take time to do some breathing exercises that help me feel better."*

If you are currently in this situation, this manual is for you and it's written by people that have lived in these kinds of environments!!!  This information is also meant to provide information to people who may not have access to the daily news about the new coronavirus.  Included is a section on the different ways we may be experiencing stress related to all the life changes caused by the virus.  Strategies to stay well- physically, emotionally, intellectually and spiritually – in

1

challenging environments are also included.  Lastly, there's a section to inspire you to use your wisdom and survival skills to share with others that are living in the same situation right now. This is called "peer support" and it is powerful!  Peer support, or helping one another, can be lifesaving at times like these... It helps people we connect with and ourselves as well.  With this guide, we honor your inner survivor and value your willingness to be of service to others.

## Responding to Covid-19

These are difficult times for everyone.  COVID-19 has impacted all of us in many ways.   This can be especially difficult for those of us who don't have a strong network of support or who are isolated in jails, prisons, mental health facilities, shelters or living on the streets.  Because of Covid-19 people, activities and resources that usually support our health may have been removed or changed in significant ways.   Fortunately, you are a survivor and this guide is designed to remind you of all the ways you have survived and thrived through other difficult life situations.  With this in mind, this guide asks you to share your skills with others around you by using what you learn to help them through this tough time. Together, you are NOT alone… you are simply people together, going through a difficult time and relying on each other's strength, kindness and skills to continue your journey of wellness! Let's start by sharing some basic information about COVID-19 and the way it may be impacting our bodies…

## What is Covid-19?

COVID-19 (also called "*Coronavirus 2019*") is a virus that is transmitted from person to person:



- o   when people who are in close contact with one another within about 6 feet or less.
- o   through respiratory droplets that pop out when an infected person coughs, sneezes or is simply speaking.
- o   when these droplets land in the mouths, eyes or noses of people who are nearby or when they're inhaled into the lungs.

2

# It's NEW!!

The Covid-19 virus is called a "novel" or "new" coronavirus.  ***This means that humans don't have any immunity (natural disease protection) and there are no treatments or vaccines for it.*** Scientists have been able to create a test that can determine if someone has the virus but the tests aren't widely available yet.  That's one of the reasons why this virus is so different and so dangerous.  It can spread from person to person easily. Some people get really sick or die because there isn't any treatment available.

Of course, medical hospitals can treat the symptoms that develop, like pneumonia and other life-threatening lung diseases.  But if too many people get really sick at the same time, we don't have enough hospital beds and equipment needed for that kind of resource demand.  Right now, the effort is to **SLOW** the spread so hospitals can manage the people that are already sick with the virus.

## Why the Big Deal?

The "social isolation" (staying in your living quarters) has been important because the virus has some sneaky ways that lead to it spreading easily:

⇒ People can carry the virus and spread it to others without having any symptoms themselves.  Any of us could be a silent carrier, infecting others without even knowing it. This is called being "asymptomatic".

⇒ Also, people who get sick may have been carrying and spreading the virus for up to two weeks before showing symptoms.

This is why there are such dramatic efforts to keep people apart and "social distance."

3

## Some Quick Facts and Myth Busters

Here are some quick facts and myth busters from the Center for Disease Control (CDC).

Because the virus first emerged in China, rumors started that this was an Asian or Chinese



**FACT 1** Diseases can make anyone sick regardless of their race or ethnicity.

People of Asian descent, including Chinese Americans, are not more likely to get COVID-19 than any other American. Help stop fear by letting people know that being of Asian descent does not increase the chance of getting or spreading COVID-19.

disease.  Like all viruses, Covid-19 doesn't discriminate.  The coronavirus is called a "pandemic" because it's now a world-wide illness that has infected about 3 ½ million people as of this writing. This number continues to increase every day.

Exposure to people with Covid-19 increases your risk of getting sick with the virus.  But for some people, the impact of the virus is more likely to be deadly.  People at greater risk are:



**FACT 2** Some people are at increased risk of getting COVID-19.

People who have been in close contact with a person known to have COVID-19 or people who live in or have recently been in an area with ongoing spread are at an increased risk of exposure.

⇒ People over 65 years old

⇒ Strong bodies can probably fight off the virus so people will get sick but recover. However, people with weak bodies or immune systems can get deathly ill. People who have pre-existing illnesses, especially lung conditions, heart conditions, diabetes, etc. are especially vulnerable.

Since we can have the virus before we actually get any symptoms, it's suggested that people

**FACT 3** Someone who has completed quarantine or has been released from isolation does not pose a risk of infection to other people.

For up-to-date information, visit CDC's coronavirus disease 2019 web page.

"quarantine" or isolate themselves for two weeks after they know they've been exposed to someone with the virus. This is to slow down the spread.  As of right now, with what the experts have learned about the disease so far, it's believed that if a person who was exposed hasn't gotten any

4

symptoms within two weeks, he or she wasn't infected and is safe to go back out into the community.

The symptoms of Covid-19 are very similar to other common illnesses, like the yearly FLU.  If you have any of these symptoms, tell the correctional staff or another service provider where you are housed.  Testing is usually available to those with symptoms and you can find out if you do or don't have the virus.  If you're in a living situation where you don't have quick access to medical support but think you might have the virus, it's probably best to assume you do and take precautions to minimize spreading the illness to others.  These are discussed below.

> **FACT 4** You can help stop COVID-19 by knowing the signs and symptoms:
>
> - Fever
> - Cough
> - Shortness of breath
>
> Seek medical advice if you
>
> - Develop symptoms
>
> AND
>
> - Have been in close contact with a person known to have COVID-19 or if you live in or have recently been in an area with ongoing spread of COVID-19.

There is currently no vaccine to prevent the 2019 coronavirus disease (COVID-19).  *The best way to prevent illness is to avoid being exposed to this virus if it's possible.*  Of course, for most people total isolation from others isn't possible. For people currently in jails, mental health institutions or other residential facilities, isolation can be more challenging.  However, there are some precautions and recommended strategies that can help you minimize your chances of getting the virus.

> **FACT 5** There are simple things you can do to help keep yourself and others healthy.

## RECOMMENDED STRATEGIES



*Washing your hands with soap for at least 20 seconds is recommended because soap is a great virus killer*!  The virus often gets into our bodies by traveling from our hands to our nose, mouth or eyes when we touch our face. It can also get inside our bodies when we breathe.  So, the more you wash your hands, the more likely you are to kill any of the virus

5

germs you are exposed to during the day. If soap isn't available, using a **hand sanitizer** with at least 60% alcohol can also help. Be sure to cover all surfaces of your hands and rub them together until the hand sanitizer fully covers both hands and they feel dry.

**Avoiding close contact** with others when possible is important, especially with people who are sick.  A good way to help is putting **distance between yourself and other people (at least 6 ft),** which can lessen your chance of getting the virus. This is particularly important for people who are at higher risk of getting very sick (see below).



**Wearing a face mask is important to help minimize the chance that *you* will infect other people.**  The Covid-19 virus is so dangerous because you can have it and spread it to others without having any symptoms at all. Facemasks provide a barrier for the nose and mouth to either transmit droplets or receive them… It's protection for everyone!

## THINGS YOU CAN DO ANYWHERE

Some people don't have the ability to follow the CDC recommendations because of the imitations of homelessness, or living in medical or penal institutions.  Here are some other ways to keep yourself and others safe.

**Can't Wash Your Hands Often? Try these things you can do anywhere:**

Hand washing decreases the risk of carrying the virus from surfaces you touched to your eyes, nose and mouth.  We tend to touch our faces, a lot – way more than we may realize – and this is one of the quickest routes for the virus to carry from person to person.  If you can't wash your hands often, you can still:

- **Try to limit how many surfaces you touch**.  Things like door handles, counters and other smooth surfaces can hold the virus for several days.
- **Use your sleeve over your hands.**   When you go through doors or gates or when you pick up something from a counter, use an article of clothing like your sleeve to cover your hand.

6

- **Try to keep your hands away from your face.** This sounds simple, but it's really hard. Try to pay attention for just 15 minutes and you'll see how many times your hand goes to your face. If you can't wash your hands, keeping your hands from your face will greatly increase your safety.

- **Cover your mouth and nose with your shirt.** When you're in shared spaces where you can't keep at least 6 feet between you and others, you might want to pull up your shirt or clothing up over your face to cover your mouth and nose like a mask.

- **Cough or sneeze into your inner arm or clothing.** When you cough or sneeze, use the inner space of your elbow or a piece of clothing rather than covering your mouth with your hands. If you use tissue, throw it away as soon you're done. Don't save it.

- **Turn your head and cover your mouth.** If someone else is coughing or sneezing in your presence, try to turn your head away from the person. Stay turned away for about 30 seconds if you can. You can also use a piece of clothing to cover your mouth.

**Live in Close Contact With Others? Try these things when you can't socially distance:** You may not have the option of keeping a good distance between you and others in your living situation. If this is your situation, try this option:

- **If you share a room or cell,** you might want to determine an imaginary line in the room where each of you has your own space. You can even put something on the floor to remind both of you about the line, such as a piece of clothing, a sock, a sheet, etc.

**THINGS YOU CAN EXPECT FROM STAFF:**

- If you're in a residential living situation and everyone is on lock-down, then you're only exposed to each other. If you've been on lock-down for two weeks and no one has gotten sick, you're probably pretty safe.

- **If staff are coming in and out, it's important that they should be using safety practices like wearing masks and washing their hands so they don't bring the virus into your living setting. This will help to make sure you're safe!**

- If you're in a jail or prison, you should know that they've temporarily stopped all transfers of people from other jails and prisons, trying to decrease any spread.

7

If you're concerned that the staff around you are not following safety protocols to keep you healthy, you have the right to reach out to the unit supervisor. To 'advocate' means that you speak up for your rights. Filling out a grievance form or talking to a floor supervisor is a way to make sure your concerns about your health are heard.

If you feel empowered in your setting, you might also suggest some safety practices that are being currently used in other institutions.  You can also use your voice to highlight some examples of great practices other places are doing to effectively handle this crisis in outside hospitals, jails, etc.


Testing is slowly becoming more available to people beyond those who are already showing symptoms. There are groups of scientists who are working every day to try to create medications to lessen the symptoms of COVID-19, others are working to create a vaccine.  Like you, everyone is trying their best to slow the spread by practicing what's in this manual.

These practices are important because our actions help keep the virus from infecting those who are most vulnerable. These are people who are older and have already have serious medical conditions, such as COPD, diabetes, heart conditions, HIV, immunity illnesses, etc.

## How Might Covid-19 Affect Us?

**STRESS** is a natural response to uncertainty and disruption, and so in this time when our entire way of life has been disrupted, everyone everywhere is feeling some level of stress.

We each experience stress in our own unique ways.  As we grow up, we learn how to respond to challenges by watching those around us for cues of what is and isn't acceptable.  In addition, our bodies have natural defense system that sends a signal when things are out of sync with our body and mind so we can react to keep ourselves safe.  Think about what happens when you startle a dog or cat.  Their first reaction is to get into a defensive posture and hiss or bark. In an instant, they're ready to protect themselves.  Humans are much the same way.  We also get flooded with chemicals, like adrenaline, that assist our minds and bodies to prepare to combat danger.

8

**Our Internal Alarm:** Those of us who have grown up in homes with violence, abuse or neglect may have had our "danger" alert activated many times.  After too many alerts over time, parts of our system can get worn out and broken.  For some of us, the "alarm bell" goes off often, even when there's not any danger.  For example, our alarm bell may signal a five-alarm fire, when the



situation is really only a small amount of smoke. In these cases, our bodies are flooded with overwhelming amounts of "fight or flight" chemicals.  We're getting ready for a battle that doesn't exist.  For others, the alarm bell might fail to ring when needed, leaving us vulnerable and unprepared to address a danger that may exist.

**Our Response to Danger:** While some of us respond to our internal alarm by going into a "fight" stance, others of us may respond in the opposite way by "freezing" or "checking out." This is known as dissociating and is an automatic biological response.   In the same way a deer freezes in the middle of the road in fear when a car approaches, we sometimes go into a freeze mode.  This can lead to brain fog, an inability to speak or speak clearly, feeling stuck in place and unable to move, or spacing out.  The spacing out or dissociating can be mild or more extreme. It can include a complete memory loss of the time that passes like a blackout.  Here's another way to look at it, graphically:

## FLIPPING OUR LID
Make a fist with your thumb tucked inside your fingers. This is a hand model of our brain.





### THUMB
In this hand model, our fingers represent where our emotions
and memories live. The thumb is called the Limbic System and it is where our Fight, Flight, Freeze reactions to danger are triggered.

### FINGERS
In this hand model, our fingers represent our Rational Brain.  When our rational brain is activated, we are able to think, reason and make decisions about how we are going to respond to danger.  As in the image above, it covers our Limbic System (thumb) and we use it to think through situations.

9

However, at times when our Limbic System (thumb) is really activated, it can cause us to "flip our lid," and our rational brain (fingers) can be taken over by our emotions. When the Rational Brain loses control of emotions, we can't think clearly.

> *To "un-flip" our lids, we can use the strategies included in this manual to help us feel grounded, calm our bodies and mind, and feel more empowered to make good decisions.*

## Distress: What YOU Might Be Experiencing

Experts agree that a core component of stress is the perception of threat and danger. Ironically, our "stress" system is meant to protect us when we're in danger but it can sometimes work against us.  When we're stressed, we tend to experience distress in our most vulnerable personal areas. This may be physical, emotional, intellectual and/or spiritual vulnerability.

## Outward Signs of Distress:

Often, when we experience distress it shows up in our behavior.  It's important to understand and know when our own behavior is a signal that we may be experiencing physical, emotional, intellectual or spiritual distress. Some "behavioral cues" include:

- Repeating old habits or patterns:  Do you find that you are tempted to start smoking cigarettes, even though you quit years ago?  Picking up old habits as a way to cope is very common and could be a signal to you that you are distressed.
- Lashing out, yelling or throwing things:  When our internal distress levels reach a boiling point, we may be tempted to release stress tension out of frustration.  This may be a warning sign that it's time to relieve our stress in healthier ways.
- Pacing, leg shaking, or wringing our hands:  Sometimes when our nervous system needs to release tension, it does so through our body.  Be aware of these stress signals.

**As you read these examples, think about circumstances you've been thinking about or feeling over the past few days or weeks.**

10

# Physical Distress



Imagine you're walking down the street.  When you turn the corner, you see a lion staring at you.  Right away, your body starts pumping out chemicals that will allow you to do what's needed to survive if the lion attacks.  That's really helpful when there's a lion but not so good when we're worried about things going on around us, like COVID-19.  Our brains all have the same stress reaction to any kind of "danger" and all those neurochemicals can cause all sorts of physical discomforts. This includes:

- sweaty palms
- heart fluttering (palpitations)
- shortness of breath
- dizziness or headaches
- tingling in fingers or toes
- aches and pains (old injuries will often ache again !!)
- muscle tension
- restlessness
- digestive issues like diarrhea or constipation
- nausea



**CAUTION!**
Sometimes we may think that our physical discomforts are caused by stress, but they can actually be physical symptoms of COVID-19. Before you assume it's stress, have it checked out! If you have ANY of the following symptoms, please tell the staff where you currently reside!

- cough
- difficulty breathing
- fever
- chills
- muscle pain
- sore throat
- persistent pain or pressure in the chest
- Being flushed (lacking of color) in the lips or face



**Think about your body, describe the physical sensations have you been experiencing over the past few weeks.**

11

 ## One strategy: Breathing

**Why this may help:**

Normally, we breathe very shallowly, up in our chests. Learning to breathe down into our stomachs first helps us naturally calm down. It also brings more oxygen into our body and brain, which helps us think more clearly. Belly breathing before a stressful situation can be very helpful. Here is what you do:

⇒ First, breathe as you normally do
⇒ What parts of your body move as you breathe? Notice what it feels like
⇒ Now, sit and place your hand on your stomach
⇒ With your mouth closed, breathe in for four seconds or until you feel your whole chest fill with air all the way down to your belly
⇒ Hold in the air for four seconds
⇒ Slowly blow all the air out of your lungs until it's all gone
⇒ Try this three or four times!

 Did you notice anything different about how you feel?

## Intellectual Distress

When our inner sensors tell us that something isn't right and we may be in danger, our brains work differently. We can think of our brains as being three brains in one. Part of our brain is automatically dedicated to our survival. It runs our heart, our breathing, etc. A second part of our brain is called our "emotional brain." This part of the brain rules our emotions and holds our memories. Sometimes our emotions will have words connected to them and sometimes they're just feelings with no words. Our third brain is where we do the complex thinking needed for decision making, using judgment, navigating social relationships, etc. It's this third brain that we rely on most to guide us through the complex nature of living with others in the world. However, in times of stress, our third brain steps aside a bit to allow the survival brain to be more in charge. This can lead to thinking problems, including:

- difficulty concentrating
- difficulty with decision making

- retaining information
- hard time processing information
- less patience with others
- more difficulty managing relationships that are complicated

 **Think about your** OWN THINKING **lately. What kinds of thoughts have felt challenging?**

## One strategy: Sphere of Influence

**Why this may help:**

We all would like to think that we have good control over a lot of things.  We Don't!! We have even LESS control when we're in places where others make the majority of the rules, such as jails, prisons, mental health facilities, residential settings, etc.

For those of us with trauma histories, it can feel really scary to lose our inner sense of control.  A lot of times though, our distress isn't about the realities around us. It's more about our own inner confusion, and where we do and don't have control.  Trying to be in control of those



things over which we have no power can lead to inner turmoil.  One way to help ourselves in this situation is to figure out what we DO and DON'T have control over.  The exercise below may help to decrease some of our inner racing thoughts or obsessive concerns. Instructions are on the page after the Sphere of Control model...

13



**Instructions:**

1. Take a moment to consider all the things that are contributing to you feeling overwhelmed, e.g. limited time to yourself, ongoing worry about someone you care about, feeling tired, you don't feel well, etc.  If it helps, quickly scribble your thoughts on a piece of paper.

2. Add each 'Overwhelm Item' to your Spheres of Influence in the following way:

14

- If you have COMPLETE CONTROL over the item (i.e., you can resolve it on your own without needing anyone else's help or input), write it down in the first circle labeled "WITHIN MY CONTROL"

- If you have PARTIAL CONTROL or can INFLUENCE the item (i.e., you can resolve part of the item or influence the outcome through your actions or behavior), write this item in the second circle labeled "I CAN INFLUENCE."

- If the item is COMPLETELY OUTSIDE of your control or influence (i.e., there is nothing you could do or say that could directly impact this item), write this item OUTSIDE in the area labeled "EVERYTHING ELSE..."

- If you think of other things that are overwhelming you as you do this exercise, add those into your Sphere of Influence as above.

From your "Spheres of Influence" that you created:

⇒ FOR the items you have CONTROL over, TAKE ACTION (however small) on at least ONE as soon as possible – it will help you feel better.

⇒ FOR the items you have PARTIAL CONTROL or INFLUENCE over, write down the steps you can take and when you might be able to do that.

⇒ Finally (and most importantly) **LET GO of EVERYTHING ELSE!**  Strikethrough each of these items on your "Spheres of Influence."  If you can't control or influence it, then it's a waste of your precious energy to even think about it.

Here's a familiar quote that may help.  (Feel free to replace the word "God" with what is appropriate to your beliefs!!):



## Emotional Distress

For the general public, the mental health effects of COVID-19 are as important to address as the physical health effects. For the one in five who already have mental health challenges, the emotional impact of being physically ill can be even greater. Those of us that are separated from friends and family due to being in jails, prisons, hospitals, shelters or other facilities, may be feeling additional levels of emotional disconnection and distress during these times.  As a result, you may be feeling:

15

- Constant worry or anxiety
- Overwhelmed/Stressed
- Difficulty relaxing
- Confusion
- Sense of being overwhelmed
- Feeling powerless
- Mood swings
- Feelings of hopelessness
- Irritability or short temper
- Fear and worry about your own health and the health of your loved ones
- Changes in sleep or eating patterns
- Difficulty sleeping or concentrating
- Worsening of chronic health problems
- Worsening of mental health conditions
- Increased use of alcohol, tobacco or other drugs



**Think about your** OWN **Emotions.  What kinds of emotions have you been feeling?  Have you noticed other things that let you know that you're feeling emotional stress?**

## One strategy: Journaling



**Why this may help:**

Thinking while you write often has this magical quality of clarifying your thoughts.  Research has shown that spending time to write out our thoughts or feelings - the essence of journaling - can help with clearing out our thoughts, which leads to better decision making.  Personal writing can also help with coping, especially during stressful events like dealing with COVID-19. Writing can also help relieve anxiety and boost immune cell activity.

**Writing can help you control your thoughts.**  Getting thoughts from the inside of your mind to paper can help you tap into what lies beneath - what is important to you, what is really fueling the distress and potential ways you may want to move forward.

**Journaling Exercise - The 5 Minute Journal**

People have been journaling for centuries! What's in a journal can vary dramatically from person-to-person.  What you may find useful in a journal is personal and unique to you.  The

16

hard part of learning if or how journaling may feel helpful is simply getting started if you haven't journaled before.

Perhaps the best way to try it out is to start small and just focus on your thoughts.

**Directions:**

- Put aside 5 minutes each morning and evening to journal your thoughts.
- Start your journaling each morning and evening answering these two simple questions:
    - What am I feeling right now?
    - Do I know why?
- Write down any thoughts/feelings that come to your mind.  (Just write them down without thinking about them or judging them - Write them down as they come to you.)
- Keep writing for 5 minutes.  If you want to stop, stop.  If you want to keep writing and add other themes to your writing, feel free to do that.

Your journaling is not replaying your history. It's reflecting you.  It's you working through your problems. It's you figuring things out and clearing your head. Write about the frustrating people you encountered today. Write about comments that bother you or a news headline that made you angry. You can write about the emotional wounds you still think about from your childhood or the person who didn't treat you right as an adult. Write about terrible experiences that happened to you. You can journal about a parent who was just a little too busy, a little too critical or a little too tied up dealing with their own issues instead of being what we needed. The sources of anxiety or worry, the frustrations that routinely pop up at the worst times, the reasons you have trouble staying in relationships, whatever problem you are dealing with—take them to your journal! You'll be shocked by how good you feel after writing out some of the thoughts locked in your mind.

*Leave Your Destructive Thoughts In Your Journal*

## Spiritual Distress

Our spiritual wellbeing is important to our physical and emotional wellbeing.  When we're feeling stressed, there's a good chance that our spirit may be as negatively impacted as our body

17

and mind.  This is true whether you meet your spiritual needs through religious participation or any other ways, such as being outside, meditating, etc.  In these times, it's common to experience spiritual exhaustion with the following feeling or thoughts:

- A weariness of the heart
- A sinking feeling that nothing really matters
- Questioning beliefs that were once unquestionable, like "Does God even exist?"
- Wondering about the meaning or purpose of your life
- Wondering about your own value in the world
- A sense of deep grieving

Spirituality is often a sense of connection to a bigger picture. It's often individually defined and gives meaning and purpose to a person's life.



**Think about your** OWN **spiritual center.  What questions are you asking yourself that indicate that your spirit is feeling overwhelmed?**

## One strategy: Filling Your Heart

**Why this may help:**

"Heart weariness" can leave us feeling empty, drained, or exhausted.  When we feel it can seem like it's hard to defend yourself. Feeling defenseless can make our negative self-thoughts seem truer than they really are.  Sometimes, the only way to quiet those voices that bring us to darkness and despair is to intentionally sit down and think about those things which are meaningful to us, and have a "heart-warming" effect on how we feel.

**Instructions:**  On the next page, there's a heart, waiting to be filled.  Take some time, maybe close your eyes and start to think about those things that bring you joy in life.  Here are some general ideas:

- People you hope to see or talk to when lock-downs and other restrictions are lifted
- People you love and feel committed to, even if your efforts have to be delayed due to incarceration or temporary emotional struggles in your relationships, etc.
- Things you've done that your proud of
- Your hopes and dreams for the future
- Places you've been or activities that bring you peace

18

- Some people like to imagine the ocean, the mountains or some other special trip you'd like to take;

**And remember...you deserve to feel OK!!**

**Fill Your Heart**



19

# Self-Help Strategies

There are many self-help strategies available to help people deal with the physical, emotional, intellectual and spiritual impacts of living through Covid-19.  These are mostly for people with easy access to support networks that have the freedom to make choices about where they want to go and when. Most also have the resources to get books, movies and other distractions to help them cope with this time of uncertainty.  Many people don't have these luxuries right now and this section is for people who find themselves facing limits due to imprisonment, living in group homes, residential facilities or mental health institutions.  These strategies will also be divided into the categories of:

> ⇒ Strategies to help with physical distress
>
> ⇒ Strategies to help with emotional distress
>
> ⇒ Strategies to help with intellectual distress
>
> ⇒ Strategies to help with spiritual distress

## STRATEGIES TO SUPPORT GREATER PHYSICAL WELLBEING

**Why breathing may help:**

Breathing is often a way to trigger our own internal "relaxation response."  The great thing about breathing is that we do it all the time and we can do it anywhere.  The way we breathe, though, can either add to our sense of stress or diminish it by triggering our "fight or flight" response.  When we feel stressed, we often "shallow breathe."  This can make you feel light-headed, dizzy or other physical discomforts.  Deep breathing on the other hand can often center us and help us feel more grounded.  For some people breathing exercises can actually cause greater anxiety, so always trust your own response.  If you're feeling more anxious after deep breathing, stop and try something else!!

Post-traumatic stress can affect the way you breathe. Holding your breath, as well as breathing rapidly or shallowly can sometimes lead to increased anxiety.  Awareness and controlling of the quality of our breathing can have several positive effects. Slowing and deepening how we breathe allows for an adequate intake of oxygen and output of carbon dioxide. Both are necessary for our physical well-being. Conscious breathing during times of distress can allow us

20

to release muscular and emotional tension, which reduces our level of distress. Focusing awareness on your breathing can shift your thoughts away from non-productive or negative thinking and bring us fully back into the present.

On the next few pages, there are a variety of breathing exercises.  Try some of them out and see if they're helpful for you!

## A simple deep breathing exercise…

**Breathe in through your nose, counting silently** 1, 2, 3, 4 as you slowly inhale.

**Breathe out through your mouth, counting silently** 1, 2, 3, 4, 5, 6, 7, 8 as you slowly exhale.

**Repeat this kind of breathing and counting two more times.**



**Note how this makes you feel:**

*(You might want to try it a few times before deciding for sure if this is helpful or not.  The first time or two can feel awkward because it's something new. But by the third time, you should have a pretty clear idea how you feel during or after deep breathing exercises.)*

## Belly Breathing

Normally, we breathe very shallowly, up in our chests. Learning to breathe down into our stomachs naturally helps calm us down. It also brings more oxygen into our body and brain, which helps us think more clearly. Belly breathing before a stressful situation can be very helpful. Here is what you do:

⇒ First, breathe as you normally breathe....
⇒ What parts of your body move as you breathe? What rises or moves? Notice what it feels like to breathe normally.
⇒ Now, sit and place your hand on your stomach.
⇒ With your mouth closed, breathe in for four seconds or until you feel your whole chest fill with air all the way down to your belly
⇒ Hold in the air for four seconds.
⇒ Slowly blow all the air out until it's all gone.
⇒ Try this three or four times and see if you feel a little more relaxed than you did before.

21

 **Note how this makes you feel:**

*(You might want to try it a few times before deciding for sure if this is helpful or not.  The first time or two can feel awkward because it's something new.  By the third time you should have a pretty clear idea how you feel during or after deep breathing exercises.)*

## 90 SECOND STRESS BREAK

**1ST 30 SECONDS:**
Notice your breathing.
See if you can inhale longer than you exhale.

**2ND 30 SECONDS:**
Keep breathing slowly.
Notice any muscles in your body that are tense.
On each exhale, see if you can relax the tense places.

**LAST 30 SECONDS:**
Keep breathing slowly.
With each breath, say something positive to yourself, such as:
"I got this." "Keep going." "I can do this."
When the 90 seconds are up, go about your day!

 **Note how this makes you feel:**

*(Again, you might want to try it a few times before deciding for sure if breathing exercises are helpful or not.  The first time or two can feel awkward because it's something new.  But by the third time, you should have a pretty clear idea how you feel during or after deep breathing exercises.)*

### *HERE'S ANOTHER ONE TO TRY:*

22





**Note how this makes you feel:**

*(Again, you might want to try it a few times before deciding for sure if this is helpful or not. The first time or two can feel awkward because it's something new. But by the third time, you should have a pretty clear idea how you feel during or after deep breathing exercises.)*

## STRATEGIES TO SUPPORT GREATER EMOTIONAL WELLBEING

**Why using your senses helps:**

Often, emotional distress comes from getting caught up in our "emotional brain." When we're caught in our emotional brain, we're often disconnected from our thinking brain that helps us to understand our emotions or cope without emotions. Using our senses can help us tap back into our healthy brain to help us think clearly about the emotions that may be overwhelming us.

## Our five Senses

This technique will take you through your five senses to help remind you of the present. This is a calming technique that can help you get through tough or stressful situations.

23

**Take a deep breath to begin.**

 **LOOK:**

Look around for five things that you can see and say them to yourself in your mind. For example, you could say, "I see the chair. I see the cup. I see the picture frame...."

 **FEEL:**

Pay attention to your body and think of four things that you can feel and say them quietly in your mind. For example, you could say, "I feel my feet in my socks, my hands in my lap, the hair on the back of my neck, and the chair I am sitting on."

 **LISTEN**:
Listen for three sounds. It could be the sound of cars outside, the sound of a clock ticking, or the sound of your stomach rumbling. Say the three things to yourself in your mind.

**SMELL:**
Name two things you can smell. If you can't smell anything, then just think of and imagine your two favorite smells.

 **TASTE:**
Say one thing you can taste. It may be the toothpaste from brushing your teeth or your tongue in your mouth. If you can't taste anything, then think of your favorite things to taste.

*The Spirit of*
PEER
***Mutual…Equal…***
***Been There Too…You're Not Alone!***
SUPPORT
***Lend a Hand, Prop Up, Encourage,***
***Assist, Be a Source of Strength & Comfort***

Peer-to-peer support is all around us! It has been around since the dawn of time.  As people, we are hardwired to **CONNECT.**  It's in our DNA….  In times of stress and distress, we tend to feel comforted most by those who can say, "Yes…I've been there, too. You're not alone."  Likewise, if we've been through something ourselves, we often feel a special compassion for those

24

struggling with problems that we've also faced and may even have the urge to reach out a helping hand.

Sharing your story can help individuals or groups of people. It's good to share your personal story but make sure that the information you share is safe. Sometimes people take our personal information and use it against us. Unless you don't mind others outside of your peer relationship knowing, only share your experiences if you know that the person you're trying to help will keep it confidential.

> *Toni Sorenson is a well-known author who talks about 'strength from struggles. She says that walking a mile in someone else's shoes isn't as much about the physical walk or the actual shoes. Ms. Sorenson describes it is the ability to think like the other person thinks, feel what they feel, and understand why they act a certain way or are in a certain situation. Every step is about "empathy" or having experienced how another person has lived and understanding their struggles.*

Here are a few examples empathy and understanding:

- A first-time mom gets support at church from another mom with several children.

- A person hears that his co-worker lost his son in a car accident.  He reaches out to the person because he also lost a child and wants to offer support.

- Someone that just had a heart attack, receives support and "lessons" learned from another person that recovered from a heart attack a year earlier.

- A widow turns to another man for support that lost his wife too. The amazing thing about people is that, even when we're struggling, we reach out and care about others.  As humans we can actually get pleasure from helping others.

25



*"Connection is the energy that exists
between people when they feel seen,
heard and valued; when they can
give and receive without judgment;
and when they derive sustenance
and strength from the relationship."*
*Brene Brown*

---

**Did You Know?**

Peer support can be formal, such as Certified Peer Specialists who work in our mental health, substance use and judicial systems. The good thing is you don't have to be a Certified Peer Specialists to provide peer support to another person. As a matter of fact, peer-to-peer relationships existed way before peer support became "formal" in professional settings with specialty trained Certified Peer Specialists.

---

What we know is that reaching out to others makes **US** feel better and can help **US** cope better with our own stress. In peer support we understand each other because although everyone has their own unique stories, we have similar experiences that can create a bond that allows us to learn together, figure out how to change the way we do things and the way we think, and figure out how to move forward in our lives.

26

# EXPERTS BY EXPERIENCE: THE POWER OF SHARED EXPERIENCE



In many professional settings, people are called "experts" due to their educational background, or years working in a profession.  In peer support, we are sometimes referred to as "Experts by Experience" because our knowledge and wisdom comes from surviving difficult situations.

Consider experiences you may have had such as incarceration, hospitalization, gang involvement, substance use, homelessness, and suicide attempts. Imagine what it would be like to receive support from someone else that has similar experiences.  You may already know some of these people where you currently are living… Perhaps YOU are that person that reaches out when new people come around.  These are examples of peer support and have proven to be an incredibly effective way to support, connect and heal together!

The irony is that it's sometimes you that feels better when you support others!

> *"Peer Support is different from the support you get from counselors, doctors and case managers. It is more than just being friends. In Peer Support you understand each other because although everyone has their own unique stories, you have similar experiences that can create a bond that allows you to learn together, figure out how to change the way you do things and the way you think, and to figure out how to move forward in your lives. By sharing your experiences and building trust in each other, you learn to go forward in new ways that move you away from seeing yourself as "mentally ill" and the limitations of such a view. In Peer Support, you can safely try out new ideas and new ways of being through "learning" rather than a "treatment.""*
>
> *Mary Ellen Copeland*

27

## WHAT IS PEER SUPPORT?

Broadly defined, "peer support" refers to a process through which people who share common experiences or face similar challenges come together as equals to give and receive help based on the knowledge that comes through shared experiences (Riessman, 1989). A "peer" is an equal or someone with whom we share social and lifestyle similarities. "Support" expresses the kind of deeply felt empathy, encouragement, and assistance that people with shared experiences can offer one another within a reciprocal relationship.

Broken down to its simplest description, peer support is using your own personal experiences to provide support, guidance, and mentoring to those who are experiencing difficulties similar to your own.

**Receiving and offering support can increase our awareness and give us the strength and**  **courage to get through difficult circumstances like COVID-19.  However, to offer support, we have to understand how each person's definition of support varies.  Let's start with your experience:**

*In your personal experiences, how would you have defined support?*

*What types of relationships have been supportive in your life or recovery?  What made them supportive?*

*What types of relationships were unsupportive?  Why?*

*How could you find out what support means or "looks like" to your roommate, cell mate or someone that is around you right now? What could you do to provide support to your cellmate or someone else? How would you bring up the discussion in this kind of situation.*

**Peer to Peer Relationships: The Foundation**
**Healing and Recovery**

28

*We are survivors! People that have been through some of life's most difficult situations know all about healing and recovery.  We are living examples of both and so in our peer relationships, we believe and share that healing and recovery is possible for everyone.  We support the health and wellness of others in all of our relationships.*

**Mutuality**

*We believe in mutual, equal and shared power. We do not attempt to have power over others. In peer-to-peer relationships, we are equal and do not attempt to advise or have authority over the other person in the relationship.  Instead, we recognize that mutual relationships can be healing to both individuals. Sharing this quality in a relationship can make the other person feel safe to share, which makes it easier help them.*

**Hope**

*We inspire hope, courage and/or confidence in others. Hope is a vital component of wellness. Without hope, why would anyone try to improve his/her situation or live his/her life? Hopelessness keeps people in a dark place with no plans or energy to move forward. In peer relationships, we serve as a living example of hope. Our lived experience and resilience demonstrate to others the hope of recovery or living a better life!*

**Empowerment**

We seek to bring out the power within the other person by encouraging him/her to develop solutions to their own challenges and have the confidence in themselves to make decisions. We do that by supporting people to "find" and "use" their voice, to discover who they are and who they want to be, and by exploring all of their options, without judgement, shame, blame or guilt.

29

## PEER SUPPORT: WHAT WE DON'T DO

1. **We do not label a person or diagnose them!**

   It is important to remember that, although we may share similar experiences with others, the treatment, approaches, medications, diagnosis, etc. that we experienced may not work for another person. Every person is unique and there is a lot that goes into clinical treatment. Therefore, if a person is receiving treatment, our role is to support them and to be educated about their treatment options. By doing this we can help them make informed decisions and be prepared to discuss any concerns they may have with their doctor or treatment provider.

2. **We are not their parent!**

   There is a difference between offering peer support and telling people what to do, or imposing rules or consequences on their personal choices.  Remember, we are equal partners in the relationship and as such, we share with and learn from one another.

3. **We NEVER offer advice!**

   There is a difference between offering support, sharing experience and giving advice. People seldom take advice. This is especially so when they don't have the same resources we have. Our role is to support people to find their own solutions, not have the answers to all of their personal challenges. There is a skill to offering support without giving advice and it's one that can be practiced and learned over time.



THE DIFFERENCE BETWEEN
SUForm SUPPORT AND ADVICE?

...POWER

Peer Supporters, know your role

30

## PEER SUPPORT: WHAT IS OUR ROLE?

- **We serve as a resource:**

We offer our experience and "lessons learned" to be a resource to others

- **We offer support:**

We offer support by being present, providing encouragement, giving assistance, comfort and listening without advising and without judgement.

- **We serve as a coach:**

Take a moment to reflect on the meaning that "coach" has for you; what do coaches do and what are the qualities of an effective coach? A peer relationship serves a similar role by using their experience, skills and information to guide people through difficult situations and celebrate successes.

- **We are partners together:**

We seek to truly understand others where they are, and offer the type of support they are requesting without judgment, labels, assumptions or biases. In a partnership, we both contribute to the relationship without asserting control over the other. Partners are "in this together" and our partnership can enhance the partner's wellness as well as yours. A partner doesn't walk in front of you and pull, nor do they walk behind you and push. Instead, they walk side-by-side, shoulder-to-shoulder, participating, engaging, and discussing together.



31

## PEER SUPPORT: WHAT WE DO!

**We accept the person where they are!**

This means it's important to understand that who the person is at the moment is not who the person may be in the future. Offering help or assistance to someone and judging them by one moment in their life will often make them NOT want to come to you for help.

**We are friends who remember that we were once where they were and may be again!**

Friends understand that we sometimes make mistakes in life but with help we apologize and correct our mistakes to be better for ourselves and other people in our lives. Mistakes are how we learn to be better people because we learn from our mistakes.

**We use non-judgmental listening!**

Non-judgmental listening is about trying to really understand the other person. As the listener, we should put our own views aside and try not to get distracted by our personal thoughts and feelings.

## What is NON-JUDGMENTAL LISTENING?

**We should show an attitude of acceptance and genuine empathy:**
When we genuinely care about a person, we are more interested all of them. If we love a person when they're doing well, then certainly we can love a person when they make mistakes! Talking about problems is good but it feels great to know someone cares enough to genuinely listen.

**We use our body language and verbal skills to show that we're listening to hear with genuine interest; not to defend or judge:**
If you're only listening to defend yourself or half-way paying attention, this can be hurtful. Even if the person doesn't say anything, over time you will find that the person no longer wants you to help them. Can you remember a time when you needed help and people didn't listen or were distracted while you were talking to them? If they were playing on their cell phone or paying attention to other people, did you feel like they care?

**We maintain a positive body language. Even when the person says something that's shocking or could be interpreted as hurtful:**

32

This means that we turn off electronics or go to an area where the TV is not so loud. Turn your body towards the person and ask questions if you don't understand. Be sure your tone of voice and facial expressions are showing positive support.

**We recognize cultural differences and help based on who the person is, not who we want them to be:**
Sometimes it helps when people know that you're not judging them or where they were raised. Problems don't care about culture or ethnicity and when we're genuinely listening to help, neither should we.

# It's okay to have conflict!

Conflict can feel hurtful but the truth is that conflict is sometimes necessary. Conflict can tell us where things aren't working well. This can be in a relationship or within ourselves.  It may help to think of conflict as a cut on our skin. We know where to clean it and even if it's uncomfortable while it's healing, we know that our injury will heal. Conflict is the same except it's an emotional hurt instead of a physical hurt. Cleaning emotional hurts can be done by using some of the tips in this manual. You can talk to someone. You can journal or you can share your story with someone else. As long as you don't keep it to yourself, conflict can't hurt you.

33

**Ex   C**



When putting on gloves, wash your hands, pull gloves on, placing over the cuffs of your shirt or medical gown if applicable. The CDC recommends removing gloves if they become torn, damaged, or soiled. Perform hand hygiene before putting on new gloves. To remove gloves:



To remove a mask, untie the bottom then the top ties, or if the mask has elastic bands, remove the mask by grasping the elastic loops (not the cloth or paper of the mask), remove from face, and discard. Avoid touching the front of the mask as you discard. Wash your hands when you're done!

  

Donning, cuffing, and disposing of face masks and gloves



**Ex    A**

| AMENDMENT OF SOLICITATION / MODIFICATION OF CONTRACT | | | 1. Contract Number CW82753 | Page of Pages | |
|---|---|---|---|---|---|
| | | | | 1 | 1 |
| 2. Amendment/Modification Number M01 | 3. Effective Date August 18, 2020 | 4. Requisition/Purchase Request No. | 5. Solicitation Caption Environmental Conditions Inspection | | |
| 6. Issued by:                                    Code | | 7. Administered by (If other than line 6) | | | |
| Office of Contracting and Procurement Public Works Cluster 2000 14th Street, NW, 6th Floor Washington, DC 20009 | | Department of Corrections 2000 14th Street NW 7th Floor Washington, DC 20024 | | | |

| 8. Name and Address of Contractor (No. street, city, county, state and zip code) Potomac-Hudson Engineering, Inc 77 Upper Rock, Suite 302 Rockville, MD  20850 | | 9A. Amendment of Solicitation No. |
|---|---|---|
| | | 9B. Dated (See Item 11) |
| | | 10A. Modification of Contract/Order No. |
| | X | CW82753 |
| Code                      Facility | | 10B. Dated (See Item 13) May 18, 2020 |

| 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS |
|---|
| ☐ The above numbered solicitation is amended as set forth in item 14. The hour and date specified for receipt of Offers ☐ is extended. ☐ is not extended. Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning _____ copies of the amendment: (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) BY separate letter or fax which includes a reference to the solicitation and amendment number.  FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER.  If by virtue of this amendment you desire to change an offer already submitted, such may be made by letter or fax, provided each letter or telegram makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified. |

| 12. Accounting and Appropriation Data (If Required) |
|---|

| 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACT/ORDERS , IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14 | |
|---|---|
| | A.  This change order is issued pursuant to (Specify Authority):  27 DCMR, Chapter 36, Contract Modifications      The changes set forth in Item 14 are made in the contract/order no. in item 10A. |
| | B. The above numbered contract/order is modified to reflect the administrative changes (such as changes in paying office, appropriation data etc.) set forth in item 14, pursuant to the authority of 27 DCMR, Chapter 36, Section 3601.2. |
| | C. This supplemental agreement is entered into pursuant to authority of: |
| X | D. Other (Specify type of modification and authority) |

| E. IMPORTANT:    Contractor ☒ is not    ☐ is required to sign this document and return __ copies to the issuing office. |
|---|

14. Description of Amendment/Modification (Organized by UCF Section headings, including solicitation/contract subject matter where feasible.)

Task Order No.: CW82753 is hereby modified as follows:

  A.    The Government of the District of Columbia hereby exercises the option period through October 31, 2020.
         The extension is at no additional cost to the District.

| Except as provided herein, all terms and conditions of the document is referenced in Item 9A or 10A remain unchanged and in full force and effect. | | |
|---|---|---|
| | 16A. Name of Contracting Officer Courtney B. Lattimore | |
| | 16B. District of Columbia (Signature of Contracting Officer) | 16C. Date Signed 8/17/2020 |

**Ex   B**

# SARS-CoV-2 (COVID-19) DISINFECTION AND CLEANING PROTOCOLS

**PROJECT LOCATION:**          **DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS**

**CLEANING CONTRACTORS:**      **SPECTRUM MANAGEMENT, LLC and ROCK SOLID DISTRICT GROUP, LLC**

## 1.0 Introduction

In January 2020, a novel virus, SARS-CoV-2, was identified as the cause of an outbreak of viral pneumonia in Wuhan, China and subsequently led to the world-wide spread of coronavirus disease 2019 (COVID-19). COVID-19 is primarily transmitted via person-to-person contact; however, surface contamination is also known to be a concern with the spread of the virus. The virus is mainly spread through respiratory droplets produced when an infected person coughs or sneezes. These droplets can land on people who are nearby (within 6 feet). It may also be possible for a person to contract SARS-CoV-2 by touching a contaminated surface or object and then touching their own mouth, nose, or eyes.

The purpose of this Protocol is to provide guidance on proper disinfection practices and personal protective equipment (PPE) requirements. Frequent, effective, and safe cleaning and disinfecting procedures can prevent the spread of disease to Department of Corrections (DOC) inmates, staff, and visitors. Cleaning crews should clean and disinfect all identified areas, focusing especially on frequently touched surfaces.

The procedures described in this Protocol shall be executed by the current contractors, Spectrum Management, LLC (Spectrum), and Rock Solid District Group, LLC (Rock Solid), with oversight by Potomac-Hudson Engineering, Inc. (PHE).

## 2.0 Implementation

### 2.1 Overview

The procedures described in the Protocol comply with or exceed the United States Centers for Disease Control and Prevention's (CDC's) recommended practices in response to the COVID-19 pandemic. It is important to note that the cleaning and disinfection procedures described herein cannot remove **ALL** viral particles from surfaces; however, following these procedures will substantially decrease the number on surfaces and thereby reduce the risk of infection and spreading.

### 2.2 Employee Screening

As part of existing entry procedures, all Spectrum and Rock Solid employees shall undergo a temperature check prior to each day's work for signs of possible COVID-19 infection before being allowed to enter the facility. This is currently being conducted for all DOC employees, visitors, contractors, and any other visitors to the facility.  Persons who screen positive, defined as having a temperature of 100.4 degrees Fahrenheit or greater will return to their vehicle.

1

**2.3 General Procedures**

i. The Spectrum and Rock Solid crew leaders shall meet at the beginning of each work day with the DOC point of contact for the facility(ies) to be cleaned to discuss the areas to be cleaned on that day and to coordinate the movement of cleaning crew staff through the facility.

ii. Whenever possible, personnel shall attempt to wait at least 24 hours to enter an area or room previously occupied by an individual known to be infected with SARS-CoV-2. The National Institute of Health (NIH) has determined that the virus can remain active in the air for up to 3 hours and for up to 2 to 3 days on surfaces; however, some organizations have cautioned that the virus can remain active on surfaces for even longer periods of time.

iii. If surfaces are visibly dirty, they shall be cleaned using a detergent or soap and water prior to disinfection. If a surface or object has been soiled with blood or other bodily fluids, initially treat the area with a 10 percent bleach solution; then proceed to disinfecting the area for COVID-19.

iv. The product to be used for COVID-19 disinfecting is *Ecolab Peroxide Multi Surface Cleaner and Disinfectant*. (A copy of the Safety Data Sheet [SDS] for this product is included in **Attachment A**). The product, as purchased, contains 8 percent hydrogen peroxide and has a pH of 0.5 – 1.5 (extremely corrosive) and will be provided by the DOC. Use of the product may generate irritating vapors and is corrosive to the eyes and skin. Avoid using in small spaces with limited air exchange. Avoid touching any areas of your face while cleaning to prevent contact with the disinfecting compound and potential virus.

v. An alternate product, *Xpress Detergent Disinfectant*, may also be used.  This product will typically be used by Spectrum personnel in the fogging machine.  An SDS for this product is also included int **Attachment A**.

vi. Spectrum and Rock Solid shall use the designated product in accordance with the manufacturer's instructions (mixed at 6 ounces per gallon), to include ensuring the required 45-second contact time of the wet disinfectant is met. The PHE industrial hygienist(s) shall conduct random observations/inspections of disinfectant use to verify that the product is used properly, and the designated contact time is met.

vii. When mixing disinfectant, personnel shall wear eye and face protection, to include goggles, face shields, or equivalent PPE.  Likewise, similar protection shall be used during fogging activities.

viii. In order to ensure that the correct contact time is met, contractor personnel will apply rag/cloth soaked with the Ecolab Peroxide Multi Surface Cleaner and Disinfectant dilute mixture and liberally wipe the cloth on all applicable surfaces to ensure complete coverage.  The entire surface shall be kept visibly wet for at least 45 seconds.  Once the contact time has been achieved, the surface may be wiped down with a dry rag or allowed to air dry, depending on the location and amount of traffic in a given area

**2.4 Disinfecting Procedures**

i. Cleaning/disinfecting shall focus on all high-touch surfaces and areas, to include but not be limited to: desks, computer mouses and keyboards, phones, lockers, cubbies, window sills and counter tops, doors, frames, doorknobs and push bars, elevator buttons, light switches, handrails, bathroom floors, faucet handles, toilet handles, toilet stall door locks, towel

2

dispensers and hand driers, showers, kitchen areas, cafeterias, office common areas, nursing stations, and other rooms. An alcohol solution shall be used for all electronics. These services shall be carried out in accordance with the CDC's *Coronavirus Disease 2019 (COVID-19) Environmental Cleaning and Disinfection Recommendations* without restriction.

ii. Ventilate the rooms/spaces prior to and during cleaning/disinfecting. If ventilation through open windows is not possible, use a high-volume, high efficiency particulate air (HEPA) filter system to remove airborne particles from the air during cleaning. Temporarily increase the cleaning area's humidity to approximately 50 percent relative humidity (RH), if possible.

iii. Prior to disinfecting, Spectrum and Rock Solid shall perform general cleaning, removing dirt and debris using the *Ecolab Orange Force Multi Surface Cleaner and Degreaser*, to include floor mopping. Clean all dust from horizontal surfaces with a towel dampened with the cleaner/degreaser to minimize re-aerosolization of settled contaminated dust and particles. Use a slow, smooth wiping action and change out or wet clean the towel on a regular basis to minimize re-aerosolization of collected dust and particulates.

iv. Dry sweeping with a typical straw or push-broom is not permitted.  Instead, use of an electrostatic broom or brush (e.g., Swiffer Sweeper or equivalent) is permitted to remove dust and dirt particles prior to wet mopping.

v. When mopping, ensure the floor surfaces that are disinfected stay wet for at least 45 seconds. Frequently re-wet the mop head to ensure a thorough soaking of the floor.  Consider changing mop water at least once per day, and ensure designated mops are used for bathrooms and that these mops are not used elsewhere.  Ensure that all stairwells in the housing units are mopped as well.

vi. Pay special attention to window ledges and other commonly dusty surfaces.  Also pay special attention to frequently touched surfaces, such as railings, ledges, and countertops.  Ensure that glass surfaces (e.g., windows, mirrors) are also disinfected.

vii. Disinfect **ALL** vertical surfaces to a height of at least 6 feet above the floor, including but not limited to walls, windows, columns, doors, rails, etc.

viii. As part of this protocol, it is strongly recommended that the contractor clean and disinfect heating, ventilation, and air conditioning (HVAC) supply and exhaust grills/diffusers, including removal of caked-on debris, dust, grease, etc.  This will likely require the use of a ladder as these features are typically located at ceiling level.

ix. Disinfect floors by mopping with *Ecolab Peroxide Multi Surface Cleaner and Disinfectant* (this is the second round of mopping). Avoid aerosolizing the dirty cleaning liquid by using steady and sweeping mop swipes and careful, deliberate mop head squeezes.

x. Restrooms shall receive special attention due to the tendency of the SARS-CoV-2 virus to bioaccumulate within feces, vomit, sputum, and urine. Clean any surfaces that have visible blood, stool, or body fluids.

xi. Trash liners shall be removed, and the trash receptacles disinfected. After air drying of the trash receptacles, a new liner shall be inserted in each receptacle.

xii. Following disinfecting, the DOC representative shall identify areas for fogging. Fogging shall be accomplished using ultra-low-volume foggers (a sprayer shall not be used as a substitute for a fogger) to ensure that all surfaces are adequately saturated. In general, fogging of walls shall be

3

applied to a height of 6 feet. When fogging, employees shall wear a full-face respirator equipped with organic vapor and acid gas cartridges. Access to the areas in which fogging is conducted shall be limited until the fogging aerosols have settled.

xiii.  For soft (porous) surfaces such as carpeted floors, rugs, and drapes, remove visible contamination if present, and clean with appropriate cleaners indicated for use on these surfaces. If the items can be laundered, launder items in accordance with the manufacturer's instructions using the warmest appropriate water setting for the items and then dry items completely. Otherwise, use products with the U.S. Environmental Protection Agency (USEPA)-approved emerging viral pathogens claims that are suitable for porous surfaces.

xiv.  Vacuum carpeting and other fabrics with vacuums equipped with HEPA filtration systems. Take appropriate precautions when changing the vacuum HEPA or pre-filter to minimize exposures to airborne dusts.

xv.  Although the procedures described herein are designed for Spectrum and Rock Solid, ensure that any other entity performing disinfectant cleaning at the facilities (e.g., Summit in the dining rooms or the inmate cleaning detail) are following these procedures as well or are following equivalent procedures.

## 2.5 Employee Safety

i.  Spectrum and Rock Solid employees shall complete the appropriate training, to include COVID-19 awareness, hazard communication (with specific attention on the hazards of the cleaners and disinfectants to be used), and bloodborne pathogens exposure control.

ii.  Protection from potential viral infection from skin contact and aerosol inhalation is required through the use of PPE and hand washing. The minimal level of PPE for workers performing the decontamination and disinfection includes a face mask and nitrile gloves.  Additional PPE shall be permitted as desired, to include half-mask or full-face negative pressure respirators with dual P-100 organic vapor and acid gas cartridges and full-body Tyvek coveralls (with shoe coverings). Gloves may be sealed to the coveralls with duct tape for additional protection, and replaced immediately if punctured or torn. Crew members shall inspect each other to verify that the PPE is donned correctly prior to beginning work. Cleaning employees shall be reminded to avoid touching any unprotected parts of the face. Employees shall wear goggles  while transferring and/or diluting the *Ecolab Peroxide Multi Surface Cleaner and Disinfectant*, and while emptying buckets*.* Employees shall be medically approved, trained, and properly fit-tested to wear the respective respirators.

iii.  If any breaches should occur in the PPE or if contact with unprotected skin occurs, the following steps must be followed:
   a.  immediately stop work;
   b.  remove the damaged PPE;
   c.  wash the skin with soap and warm water (if soap and water are not available, use an alcohol-based hand sanitizer that contains 60 to-95 percent alcohol); and
   d.  report the breach to the crew leader.

iv.  Extension cords for portable electrical equipment will be protected by ground fault circuit interrupters (GFCI).

4

v.    Slip hazards are a potential concern due to the wet application (mopping of floors). Non-slip shoes shall be worn.

## 3.0 Quality Control and Oversight

The PHE industrial hygienist (or designated DC DOC employee) shall conduct random observations/inspections of wiped/mopped/fogged areas and document that the required contact time for the disinfectant (45 seconds) was achieved. The form in *Attachment B* may be used for this purpose, if desired.

**ATTACHMENT A – SAFETY DATA SHEETS (SDSs)**

**ATTACHMENT B – INDUSTRIAL HYGIENIST OBSERVATION LOG**

| Industrial Hygienist | |
| --- | --- |
| Date | |
| Facility | |

**Surface Cleaning Observation**

| Location | Adequate | Deficient |
| --- | --- | --- |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**Disinfectant Contact Time Observation**

| Location | Time Applied | Minutes Until Dry |
| --- | --- | --- |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

7

**Ex   C**



# ONSITE AUDIT INSPECTION REPORT
## ENVIRONMENTAL CONDITIONS INSPECTION FOR SARS-CoV-2 (COVID-19) DISINFECTION AND CLEANING PROTOCOLS

## DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS (DC DOC), CENTRAL DETENTION FACILITY (CDF) AND CORRECTIONAL TREATMENT FACILITY (CTF)

## JULY 2020

### *DRAFT*

**Prepared for**
**District of Columbia Department of Corrections**
**2000 14th Street NW, 7th Floor**
**Washington, DC 20009**

**Prepared by**
**Potomac-Hudson Engineering, Inc.**
**77 Upper Rock Circle, Suite 302, Rockville, MD, 20850**

**GSA Contract No. 7QRAA18D0074**
**Task Order No. CW82753**

## INTRODUCTION

In January 2020, a novel virus, SARS-CoV-2, was identified as the cause of an outbreak of viral pneumonia in Wuhan, China and subsequently led to the world-wide spread of coronavirus disease 2019 (COVID-19). COVID-19 is primarily transmitted via person-to-person contact; however, surface contamination is also known to be a concern with the spread of the virus. The virus is mainly spread through respiratory droplets produced when an infected person coughs or sneezes. These droplets can land on people who are nearby (within 6 feet). It may also be possible for a person to contract SARS-CoV-2 by touching a contaminated surface or object and then touching their own mouth, nose, or eyes.

In May 2020, the District of Columbia Department of Corrections (DC DOC) contracted Potomac-Hudson Engineering, Inc. (PHE) to develop a cleaning and disinfection protocol specific to COVID-19 to be used by DC DOC cleaning contractors. The purpose of this protocol is to provide guidance on proper disinfection practices and personal protective equipment (PPE) requirements. Frequent, effective, and safe cleaning and disinfecting procedures can prevent the spread of disease to Department of Corrections (DOC) inmates, staff, and visitors.  PHE provided a draft protocol to DC DOC on June 15, 2020, and the procedures described in the protocol were subsequently implemented later that week.

## AUDIT OVERVIEW

### SCOPE

PHE was tasked with inspecting the cleaning procedures used by two independent contractors at two DC DOC facilities after implementation of the procedures described in the Draft Protocol. PHE performed these inspections on June 29 and July 1, 2020. This report documents observed deviations, omissions, inconsistencies, and deficiencies, along with corrective action recommendations.

#### CENTRAL DETENTION FACILITY

On June 29, 2020, PHE inspected implementation of the cleaning procedures of Rock Solid District Group, LLC at the DC DOC's Central Detention Facility (CDF).  An In-Brief Meeting was held prior to the inspection and was attended by:

- Ms. Gitana Stewart-Ponder (DOC)
- Ms. Gloria Robertson (DOC)
- Sgt. D. Worthan (DOC)
- Mr. Christopher Rua (PHE)
- Mr. Gary Morris (PHE)

At the conclusion of the inspection, an Out-Brief Meeting was held.  This meeting was attended by:

- Mr. Lennard Johnson, Warden (DOC)
- Ms. Kathy Landerkin Deputy Warden (DOC)
- Ms. Rena Myles (DOC)
- Ms. Gloria Roberts (DOC)
- Ms. Gitana Stewart-Ponder (DOC) (via telephone)
- Mr. Christopher Rua (PHE)
- Mr. Gary Morris (PHE)



**CORRECTIONAL TREATMENT FACILITY**

On July 1, 2020, PHE inspected the cleaning procedures of Spectrum Management, LLC at the DC DOC's Correctional Treatment Facility (CTF).  An Out-Brief Meeting was held at the conclusion of the inspection and was attended by:

- Ms. Gloria Robertson (DOC)
- Ms. Jackie Smith (DOC)
- Ms. Florinda Eaglin (DOC)
- Mr. Christopher Rua (PHE)
- Mr. Gary Morris (PHE)

## DRAFT SUMMARY OF FINDINGS

*Table 1* summarizes findings observed during the June 29 and July 1, 2020 onsite inspections.  The table also provides recommended actions to correct the findings.

Following the table is a brief Action Plan with recommendations for implementing the corrective actions identified in *Table 1*.



| TABLE 1. FINDINGS FOR DC DOC FACILITIES (CDF AND CTF) ||
| SUMMARY OF FINDING | RECOMMENDED CORRECTIVE ACTION |
| --- | --- |
| **CENTRAL DETENTION FACILITY (CDF)/ROCK SOLID MANAGEMENT** ||
| The contractor did not consistently allow for the 45-second minimum contact time required for the hydrogen peroxide-based disinfectant (*Ecolab Peroxide Multi Surface Cleaner and Disinfectant*) being used.  In several instances, a surface was wiped with a dry rag immediately after spray application of the disinfectant.  In other instances, only a portion of a surface was sprayed wet and allowed for a 45-second contact time.  The disinfectant was then wiped with a dry rag such that the unsprayed portion of the surface was not allotted adequate contact time with the disinfectant. | Sufficiently spraying to adequately wet and entire surface such as a table or wall is extremely difficult and time-consuming.  It is recommended that the contractor apply a towel sufficiently wetted with the disinfectant to all surfaces in lieu of spraying.  After adequate contact time (45 seconds) has been achieved, the surfaces should then be wiped dry with a dry rag or are allowed to air-dry, as appropriate in a given area.  This will further ensure that the entire surface is adequately wetted for the duration of the required contact time. |
| The contractor did not consistently allow for adequate wetting of the floor during mopping.  On several occasions it was observed that a wet mop was used for an overly extensive period of time before being re-wetted.  This resulted in portions of the floor being inadequately damped with a sufficient amount of disinfectant to ensure a 45 second contact time. | Ensure that mops are frequently wetted in the slop bucket during floor mopping.  Consider requiring the contractor to provide additional mop buckets and dollies so that each person mopping has access to their own dolly that can be toted along with them as they mop.  Based on site observations, there was an insufficient number of mop dollies.  This required the dollies to remain in a centralized position and discouraged floor cleaners from more frequently wetting their mop heads.<br><br>Additionally, the mop buckets themselves, which have their own sets of wheels on them, should be removed from the dollies and transported with those mopping the floors. |
| The contractor did not consistently disinfect all walls or other vertical surfaces to a height of 6 feet above the floor.  While adequate disinfection of these surfaces was observed being performed in common areas, it was not being done in other areas (bathrooms, offices, and other non-communal spaces). | Ensure that the contractor is aware that ALL vertical surfaces (walls, windows, columns, doors, rails, etc.) must be properly disinfected from the floor to a height of six feet, including adequate contact time. |
| The contractor dry-swept all floors prior to disinfection in contradiction to the cleaning protocols.  Dry sweeping can cause virus present on the floor to become airborne for several hours, increasing the contact and inhalation risk it presents. | The facility has ordered dusting brooms (e.g., Swifter Sweepers or equivalent) which use electrostatic forces to attract and remove dirt and dust, to replace the current dry sweeping brooms.  This will be implemented as soon as they arrive.<br><br>Ensure the contractor uses a slow, smooth wiping action and change out or clean the dust broom pads/heads on a regular basis to maximize the effectiveness of the brooms to collect as much dust and dirt particulates as possible. |



| TABLE 1. FINDINGS FOR DC DOC FACILITIES (CDF AND CTF) | |
|---|---|
| **SUMMARY OF FINDING** | **RECOMMENDED CORRECTIVE ACTION** |
| Currently, the cleaning contractor is only responsible for disinfecting the floor and doorknobs/door handles in the basement.  Although DOC staff are responsible for the remaining areas, it is unclear if they know all the surfaces they need to clean and/or if they are aware of the proper contact time for the disinfectant. | Ensure that staff cleaning personnel are familiar with and are properly implementing the cleaning protocols currently being provided to the third-party contractors. |
| The contractor was observed cleaning windows, mirrors, and other glass surfaces with an ammonium-based window cleaner (Ecolab Oasis 255SF Industrial Window Cleaner) as opposed to an EPA-registered product approved for COVID-19. | Test the hydrogen peroxide-based disinfectant on glass surfaces.  If acceptable, consider using the disinfectant on these surfaces instead of, or in addition to, traditional window cleaning chemicals. |
| In some cases, contractor personnel was observed cleaning doorknobs, door handles, and other frequently-touched surfaces with a hand sanitizer.  While this is technically sufficient for disinfection, it is not be applied consistently in all areas and the proper contact time may or may not be properly implemented. | Ensure that all chemicals and cleaning procedures are consistently applied throughout the facility.  If hand sanitizer is to be used on a regular basis for these surfaces, they should be documented in the cleaning protocol. |
| The contractor (Summit) that currently provides food service duties in the cafeteria is solely responsible for cleaning and disinfecting that area of the facility.  It is not known if they are aware of or are following the proper protocols for disinfection in a manner consistent with the other areas of the facility. | Ensure that Summit is performing proper disinfection in a manner that is consistent with or exceeds the procedures being used elsewhere at the facility. |
| **CONDITIONAL TREATMENT FACILITY (CTF)/SPECTRUM MANAGEMENT** | |
| The contractor did not consistently allow for the 45-second minimum contact time required for the hydrogen peroxide-based disinfectant (*Ecolab Peroxide Multi Surface Cleaner and Disinfectant*) being used.  In several instances, a surface was wiped with a dry rag immediately after spray application of the disinfectant.  In other instances, only a portion of a surface was sprayed wet and allowed for a 45-second contact time.  The disinfectant was then wiped with a dry rag such that the unsprayed portion of the surface was not allotted adequate contact time with the disinfectant.<br><br>Although this contractor (Spectrum) generally applied greater volumes of the disinfectant with the sprayers in a given area as compared to Rock Solid, it was still observed to be insufficient. | Sufficiently spraying to adequately wet and entire surface such as a table or wall is extremely difficult and time-consuming.  It is recommended that the contractor apply a towel sufficiently wetted with the disinfectant to all surfaces in lieu of spraying.  After adequate contact time (45 seconds) has been achieved, the surfaces should then be wiped dry with a dry rag or be allowed to air-dry, as appropriate in a given area.  This will further ensure that the entire surface is adequately wetted for the duration of the required contact time. |



**DC Department of Corrections**
**July 2020**

**Environmental Conditions Inspection**
**Draft Onsite Audit Inspection Report**

| TABLE 1. FINDINGS FOR DC DOC FACILITIES (CDF AND CTF) | |
|---|---|
| **SUMMARY OF FINDING** | **RECOMMENDED CORRECTIVE ACTION** |
| The contractor did not consistently disinfect all walls or other vertical surfaces to a height of 6 feet above the floor.  While adequate disinfection of these surfaces was observed being performed in common areas, it was not being done in other areas (bathrooms, offices, and other non-communal spaces). | Ensure that the contractor is aware that ALL vertical surfaces (walls, windows, columns, doors, rails, etc.) must be properly disinfected from the floor to a height of six feet, including adequate contact time. |
| The contractor dry-swept all floors prior to disinfection in contradiction to the cleaning protocols.  Dry sweeping can cause virus present on the floor to become airborne for several hours, increasing the contact and inhalation risk it presents. | The facility has ordered dusting brooms (e.g., Swifter Sweepers or equivalent) which use electrostatic forces to attract and remove dirt and dust, to replace the current dry sweeping brooms.  This will be implemented as soon as they arrive. <br><br> Ensure that the contractor uses a slow, smooth wiping action and change out or clean the dust broom pads/heads on a regular basis to maximize the effectiveness of the brooms to collect as much dust and dirt particulates as possible. |
| The contractor was not always performing its duties in a consistent manner. The following observations were made: <br> • Some of the grated stairwells in the housing areas were mopped, while others were not. <br> • In one area, contractor personnel were using hand sanitizer to disinfect doorknobs, door handles, and phones.  However, in other areas, the peroxide disinfectant was used. <br> • In the 96 Medical Area, the contractor did not clean the area between the gates and the elevators.  However, this area was cleaned in the 82 Medical Area. | The following recommendations are made: <br> • Ensure that all stairwells in the housing units are mopped. <br> • Since different disinfectants require different contact times (depending on the active ingredients), ensure that the contractor is consistent in what they use.  The contact time for ethanol (5 minutes) is much greater than that for peroxide (45 seconds). <br> • Ensure that the contractor is clear on what areas are considered within their scope of work and which areas are not and ensure that they clean and disinfect all of the areas for which they are responsible. |
| The contractor was observed mixing and handling both the concentrated form of the peroxide disinfectant as well as the diluted form.  In its concentrated form, the disinfectant has a pH of less than 2 and is extremely corrosive.  Even in its diluted form, the disinfectant is still corrosive and presents danger to users.  Contractor personnel were not wearing certain personal protective equipment (PPE) while performing these tasks. <br><br> The contractor was also observed using the fogging unit without eye protection. | It is recommended that the personnel handling and mixing the disinfectant in the mixing room wear goggles and/or face shield to protect their eyes and face.  Consider also requiring longer gloves that cover exposed skin between hands and sleeves. <br><br> Consider requiring the contractor to where eye protection during fogging. |

Potomac-Hudson Engineering, Inc
Page 6



| TABLE 1. FINDINGS FOR DC DOC FACILITIES (CDF AND CTF) ||
|---|---|
| **SUMMARY OF FINDING** | **RECOMMENDED CORRECTIVE ACTION** |
| The following POSITIVE observations were made with respect to Spectrum during the site inspection:<br><br>• Personnel changed out mop water and/or mop heads at certain times throughout the day.<br>• The peroxide disinfectant was used on windows, mirrors, and other glass surfaces in lieu of a typical glass cleaner.<br>• The walls in the bathrooms were scrubbed with a hard-bristled mop. | Consider instructing Rock Solid personnel to follow some of these procedures as well. |



## CORRECTIVE ACTION PLAN

PHE has developed a brief corrective action plan (CAP) as part of this document.  A CAP is a step-by-step plan of action that is developed to achieve targeted outcomes for resolution of identified errors in an effort to:

- Identify the most cost-effective actions that can be implemented to correct error causes
- Develop and implement a plan of action to improve processes or methods so that outcomes are more effective and efficient
- Achieve measurable improvement in the highest priority areas
- Eliminate repeated deficient practices

### UPDATED PROTOCOL

As the first step in this CAP, PHE has prepared an updated COVID-19 Disinfection and Cleaning Protocol to help guide the cleaning contractors (see **Appendix A**).  The protocol has been improved to focus on and address observed contractor deficiencies.  The update also revises some of the procedural language to more closely reflect site conditions, based on observations made during the site visit and conversations with both contractor and DOC personnel.

Specific items added to the protocol to correct deficiencies include:

- Added emphasis on thoroughly wetting the floors during mopping.  The updates include requiring the contractors to remove mop buckets from the carts and/or providing additional carts with mop buckets to be available.
- Removing spray bottle application of the disinfectant as an option and requiring that wet cloths be used to more thoroughly wet each surface and ensure full contact time is met across the entire surface.
- Indicating that dry-sweeping is only permissible if an electrostatic broom or brush is used to collect dust and dirt with minimal aerosolization.
- Re-emphasizing that ALL vertical surfaces must be disinfected, with specific examples.
- Adding additional PPE requirements when working in the mixing room.

### DISCUSSIONS WITH CONTRACTORS

The findings made by PHE should be discussed directly with supervisors for each cleaning contractor, including potentially sharing this document with them.  Each of the deficiencies should be identified, and the recommendations for correction should be explored.  It is possible that the contractors may identify and suggest other corrective measures as alternatives to those suggested in this document.  As long as the same goal is reached, any alternative or additional procedures can be implemented as well.

When providing the updated protocol, DOC should specifically point out those items which have changed from the draft protocol and ensure that the contractors understand all of their responsibilities and expectations.

### PERIODIC RE-INSPECTIONS

As part of the existing scope of work, PHE is scheduled to conduct up two (2) follow up monthly site inspections to ensure that the contractors are adhering to the recommended protocols and that noted deficiencies have been corrected.  As part of these follow-up inspections, PHE will hold a short, informal out-brief at the end of each day to discuss any findings or other observations made, and present options for correction.



PHE also recommends that DOC personnel perform additional inspections, as needed, based on the results of the PHE follow-up inspections, if deficiencies continue to be identified.

## EFFECTIVENESS EVALUATION

The DOC will continue to check the temperature of personnel arriving onsite and require face masks for the foreseeable future.  The DOC will also continue to perform voluntary testing of individuals onsite (both employees and inmates) every two weeks.  As the year continues on, it is likely that additional waves or peaks may be observed throughout the region.  DOC should closely monitor the number of persons onsite testing positive during these times to evaluate the effectiveness of all current procedures, including cleaning and disinfection.  Changes should be made, as applicable and appropriate, to ensure that each facility is doing as much as possible to protect all personnel from the virus.



*This page intentionally blank.*



**APPENDIX A**

**SARS-CoV-2 (COVID-19) DISINFECTION AND CLEANING PROTOCOLS**



## SARS-CoV-2 (COVID-19) DISINFECTION AND CLEANING PROTOCOLS

**PROJECT LOCATION:**          **DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS**

**CLEANING CONTRACTORS:**       **SPECTRUM MANAGEMENT, LLC and ROCK SOLID DISTRICT GROUP, LLC**

### 1.0 Introduction

In January 2020, a novel virus, SARS-CoV-2, was identified as the cause of an outbreak of viral pneumonia in Wuhan, China and subsequently led to the world-wide spread of coronavirus disease 2019 (COVID-19). COVID-19 is primarily transmitted via person-to-person contact; however, surface contamination is also known to be a concern with the spread of the virus. The virus is mainly spread through respiratory droplets produced when an infected person coughs or sneezes. These droplets can land on people who are nearby (within 6 feet). It may also be possible for a person to contract SARS-CoV-2 by touching a contaminated surface or object and then touching their own mouth, nose, or eyes.

The purpose of this Protocol is to provide guidance on proper disinfection practices and personal protective equipment (PPE) requirements. Frequent, effective, and safe cleaning and disinfecting procedures can prevent the spread of disease to Department of Corrections (DOC) inmates, staff, and visitors. Cleaning crews should clean and disinfect all identified areas, focusing especially on frequently touched surfaces.

The procedures described in this Protocol shall be executed by the current contractors, Spectrum Management, LLC (Spectrum), and Rock Solid District Group, LLC (Rock Solid), with oversight by Potomac-Hudson Engineering, Inc. (PHE).

### 2.0 Implementation

#### 2.1 Overview

The procedures described in the Protocol comply with or exceed the United States Centers for Disease Control and Prevention's (CDC's) recommended practices in response to the COVID-19 pandemic. It is important to note that the cleaning and disinfection procedures described herein cannot remove **ALL** viral particles from surfaces; however, following these procedures will substantially decrease the number on surfaces and thereby reduce the risk of infection and spreading.

#### 2.2 Employee Screening

As part of existing entry procedures, all Spectrum and Rock Solid employees shall undergo a temperature check prior to each day's work for signs of possible COVID-19 infection before being allowed to enter the facility. This is currently being conducted for all DOC employees, visitors, contractors, and any other visitors to the facility.  Persons who screen positive, defined as having a temperature of 100.4 degrees Fahrenheit or greater will return to their vehicle.

1

**2.3 General Procedures**

i.    The Spectrum and Rock Solid crew leaders shall meet at the beginning of each work day with the DOC point of contact for the facility(ies) to be cleaned to discuss the areas to be cleaned on that day and to coordinate the movement of cleaning crew staff through the facility.

ii.   Whenever possible, personnel shall attempt to wait at least 24 hours to enter an area or room previously occupied by an individual known to be infected with SARS-CoV-2. The National Institute of Health (NIH) has determined that the virus can remain active in the air for up to 3 hours and for up to 2 to 3 days on surfaces; however, some organizations have cautioned that the virus can remain active on surfaces for even longer periods of time.

iii.  If surfaces are visibly dirty, they shall be cleaned using a detergent or soap and water prior to disinfection. If a surface or object has been soiled with blood or other bodily fluids, initially treat the area with a 10 percent bleach solution; then proceed to disinfecting the area for COVID-19.

iv.   The product to be used for COVID-19 disinfecting is *Ecolab Peroxide Multi Surface Cleaner and Disinfectant*. (A copy of the Safety Data Sheet [SDS] for this product is included in ***Attachment A***). The product, as purchased, contains 8 percent hydrogen peroxide and has a pH of 0.5 – 1.5 (extremely corrosive) and will be provided by the DOC. Use of the product may generate irritating vapors and is corrosive to the eyes and skin. Avoid using in small spaces with limited air exchange. Avoid touching any areas of your face while cleaning to prevent contact with the disinfecting compound and potential virus.

v.    An alternate product, *Xpress Detergent Disinfectant*, may also be used.  This product will typically be used by Spectrum personnel in the fogging machine.  An SDS for this product is also included int ***Attachment A***.

vi.   Spectrum and Rock Solid shall use the designated product in accordance with the manufacturer's instructions (mixed at 6 ounces per gallon), to include ensuring the required 45-second contact time of the wet disinfectant is met. The PHE industrial hygienist(s) shall conduct random observations/inspections of disinfectant use to verify that the product is used properly, and the designated contact time is met.

vii.  When mixing disinfectant, personnel shall wear eye and face protection, to include goggles, face shields, or equivalent PPE.  Likewise, similar protection shall be used during fogging activities.

viii. In order to ensure that the correct contact time is met, contractor personnel will apply rag/cloth soaked with the Ecolab Peroxide Multi Surface Cleaner and Disinfectant dilute mixture and liberally wipe the cloth on all applicable surfaces to ensure complete coverage.  The entire surface shall be kept visibly wet for at least 45 seconds.  Once the contact time has been achieved, the surface may be wiped down with a dry rag or allowed to air dry, depending on the location and amount of traffic in a given area

**2.4 Disinfecting Procedures**

i.    Cleaning/disinfecting shall focus on all high-touch surfaces and areas, to include but not be limited to: desks, computer mouses and keyboards, phones, lockers, cubbies, window sills and counter tops, doors, frames, doorknobs and push bars, elevator buttons, light switches, handrails, bathroom floors, faucet handles, toilet handles, toilet stall door locks, towel

2

dispensers and hand driers, showers, kitchen areas, cafeterias, office common areas, nursing stations, and other rooms. An alcohol solution shall be used for all electronics. These services shall be carried out in accordance with the CDC's *Coronavirus Disease 2019 (COVID-19) Environmental Cleaning and Disinfection Recommendations* without restriction.

ii.     Ventilate the rooms/spaces prior to and during cleaning/disinfecting. If ventilation through open windows is not possible, use a high-volume, high efficiency particulate air (HEPA) filter system to remove airborne particles from the air during cleaning. Temporarily increase the cleaning area's humidity to approximately 50 percent relative humidity (RH), if possible.

iii.    Prior to disinfecting, Spectrum and Rock Solid shall perform general cleaning, removing dirt and debris using the *Ecolab Orange Force Multi Surface Cleaner and Degreaser*, to include floor mopping. Clean all dust from horizontal surfaces with a towel dampened with the cleaner/degreaser to minimize re-aerosolization of settled contaminated dust and particles. Use a slow, smooth wiping action and change out or wet clean the towel on a regular basis to minimize re-aerosolization of collected dust and particulates.

iv.     Dry sweeping with a typical straw or push-broom is not permitted.  Instead, use of an electrostatic broom or brush (e.g., Swiffer Sweeper or equivalent) is permitted to remove dust and dirt particles prior to wet mopping.

v.      When mopping, ensure the floor surfaces that are disinfected stay wet for at least 45 seconds. Frequently re-wet the mop head to ensure a thorough soaking of the floor.  Consider changing mop water at least once per day, and ensure designated mops are used for bathrooms and that these mops are not used elsewhere.  Ensure that all stairwells in the housing units are mopped as well.

vi.     Pay special attention to window ledges and other commonly dusty surfaces.  Also pay special attention to frequently touched surfaces, such as railings, ledges, and countertops.  Ensure that glass surfaces (e.g., windows, mirrors) are also disinfected.

vii.    Disinfect **ALL** vertical surfaces to a height of at least 6 feet above the floor, including but not limited to walls, windows, columns, doors, rails, etc.

viii.   As part of this protocol, it is strongly recommended that the contractor clean and disinfect heating, ventilation, and air conditioning (HVAC) supply and exhaust grills/diffusers, including removal of caked-on debris, dust, grease, etc.  This will likely require the use of a ladder as these features are typically located at ceiling level.

ix.     Disinfect floors by mopping with *Ecolab Peroxide Multi Surface Cleaner and Disinfectant* (this is the second round of mopping). Avoid aerosolizing the dirty cleaning liquid by using steady and sweeping mop swipes and careful, deliberate mop head squeezes.

x.      Restrooms shall receive special attention due to the tendency of the SARS-CoV-2 virus to bioaccumulate within feces, vomit, sputum, and urine. Clean any surfaces that have visible blood, stool, or body fluids.

xi.     Trash liners shall be removed, and the trash receptacles disinfected. After air drying of the trash receptacles, a new liner shall be inserted in each receptacle.

xii.    Following disinfecting, the DOC representative shall identify areas for fogging. Fogging shall be accomplished using ultra-low-volume foggers (a sprayer shall not be used as a substitute for a fogger) to ensure that all surfaces are adequately saturated. In general, fogging of walls shall be

3

applied to a height of 6 feet. When fogging, employees shall wear a full-face respirator equipped with organic vapor and acid gas cartridges. Access to the areas in which fogging is conducted shall be limited until the fogging aerosols have settled.

xiii.  For soft (porous) surfaces such as carpeted floors, rugs, and drapes, remove visible contamination if present, and clean with appropriate cleaners indicated for use on these surfaces. If the items can be laundered, launder items in accordance with the manufacturer's instructions using the warmest appropriate water setting for the items and then dry items completely. Otherwise, use products with the U.S. Environmental Protection Agency (USEPA)-approved emerging viral pathogens claims that are suitable for porous surfaces.

xiv.  Vacuum carpeting and other fabrics with vacuums equipped with HEPA filtration systems. Take appropriate precautions when changing the vacuum HEPA or pre-filter to minimize exposures to airborne dusts.

xv.  Although the procedures described herein are designed for Spectrum and Rock Solid, ensure that any other entity performing disinfectant cleaning at the facilities (e.g., Summit in the dining rooms or the inmate cleaning detail) are following these procedures as well or are following equivalent procedures.

## 2.5 Employee Safety

i.  Spectrum and Rock Solid employees shall complete the appropriate training, to include COVID-19 awareness, hazard communication (with specific attention on the hazards of the cleaners and disinfectants to be used), and bloodborne pathogens exposure control.

ii.  Protection from potential viral infection from skin contact and aerosol inhalation is required through the use of PPE and hand washing. The minimal level of PPE for workers performing the decontamination and disinfection includes a face mask and nitrile gloves.  Additional PPE shall be permitted as desired, to include half-mask or full-face negative pressure respirators with dual P-100 organic vapor and acid gas cartridges and full-body Tyvek coveralls (with shoe coverings). Gloves may be sealed to the coveralls with duct tape for additional protection, and replaced immediately if punctured or torn. Crew members shall inspect each other to verify that the PPE is donned correctly prior to beginning work. Cleaning employees shall be reminded to avoid touching any unprotected parts of the face. Employees shall wear goggles  while transferring and/or diluting the *Ecolab Peroxide Multi Surface Cleaner and Disinfectant*, and while emptying buckets*.* Employees shall be medically approved, trained, and properly fit-tested to wear the respective respirators.

iii.  If any breaches should occur in the PPE or if contact with unprotected skin occurs, the following steps must be followed:
   a.  immediately stop work;
   b.  remove the damaged PPE;
   c.  wash the skin with soap and warm water (if soap and water are not available, use an alcohol-based hand sanitizer that contains 60 to-95 percent alcohol); and
   d.  report the breach to the crew leader.

iv.  Extension cords for portable electrical equipment will be protected by ground fault circuit interrupters (GFCI).

4

v.      Slip hazards are a potential concern due to the wet application (mopping of floors). Non-slip shoes shall be worn.

**3.0 Quality Control and Oversight**

The PHE industrial hygienist (or designated DC DOC employee) shall conduct random observations/inspections of wiped/mopped/fogged areas and document that the required contact time for the disinfectant (45 seconds) was achieved. The form in **Attachment B** may be used for this purpose, if desired.

**ATTACHMENT A – SAFETY DATA SHEETS (SDSs)**



**SAFETY DATA SHEET**

| **PEROXIDE MULTI SURFACE CLEANER AND DISINFECTANT** |
| --- |

| SECTION 1. PRODUCT AND COMPANY IDENTIFICATION |
| --- |

| | | |
| --- | --- | --- |
| Product name | : | PEROXIDE MULTI SURFACE CLEANER AND DISINFECTANT |
| Other means of identification | : | Not applicable |
| Recommended use | : | Disinfectant |
| Restrictions on use | : | Reserved for industrial and professional use. |
| Product dilution information | : | 3.125 % - 4.6875 % |
| Company | : | Ecolab Inc.<br>1 Ecolab Place<br>St. Paul, Minnesota USA 55102<br>1-800-352-5326 |
| Emergency health information | : | 1-800-328-0026 (US/Canada), 1-651-222-5352 (outside US) |
| Issuing date | : | 02/03/2020 |

| SECTION 2. HAZARDS IDENTIFICATION |
| --- |

**GHS Classification**

**Product AS SOLD**

| | | |
| --- | --- | --- |
| Acute toxicity (Oral) | : | Category 4 |
| Acute toxicity (Inhalation) | : | Category 3 |
| Acute toxicity (Dermal) | : | Category 4 |
| Skin corrosion | : | Category 1A |
| Serious eye damage | : | Category 1 |
| Skin sensitization | : | Category 1 |

**Product AT USE DILUTION**

| | | |
| --- | --- | --- |
| Eye irritation | : | Category 2B |

**GHS label elements**

**Product AS SOLD**

| | | |
| --- | --- | --- |
| Hazard pictograms | : |   |

| | | |
| --- | --- | --- |
| Signal Word | : | Danger |
| Hazard Statements | : | Harmful if swallowed or in contact with skin.<br>Causes severe skin burns and eye damage.<br>May cause an allergic skin reaction.<br>Toxic if inhaled. |
| Precautionary Statements | : | **Prevention:**<br>Avoid breathing dust/ fume/ gas/ mist/ vapors/ spray. Wash skin thoroughly after handling. Do not eat, drink or smoke when using this product. Use only outdoors or in a well-ventilated area. Contaminated work clothing must not be allowed out of the workplace. Wear |

SAFETY DATA SHEET

## PEROXIDE MULTI SURFACE CLEANER AND DISINFECTANT

protective gloves/ protective clothing/ eye protection/ face protection.
**Response:**
IF SWALLOWED: Call a POISON CENTER/doctor if you feel unwell.
Rinse mouth. IF SWALLOWED: Rinse mouth. Do NOT induce
vomiting. IF ON SKIN (or hair): Take off immediately all contaminated
clothing. Rinse skin with water/shower. IF INHALED: Remove person
to fresh air and keep comfortable for breathing. Immediately call a
POISON CENTER/doctor. IF IN EYES: Rinse cautiously with water for
several minutes. Remove contact lenses, if present and easy to do.
Continue rinsing. Immediately call a POISON CENTER/doctor. If skin
irritation or rash occurs: Get medical advice/ attention. Wash
contaminated clothing before reuse.
**Storage:**
Store in a well-ventilated place. Keep container tightly closed. Store
locked up.
**Disposal:**
Dispose of contents/ container to an approved waste disposal plant.

**Product AT USE DILUTION**

| | | |
|---|---|---|
| Signal Word | : | Warning |
| Hazard Statements | : | Causes eye irritation. |
| Precautionary Statements | : | **Prevention:**<br>Wash skin thoroughly after handling.<br>**Response:**<br>IF IN EYES: Rinse cautiously with water for several minutes. Remove<br>contact lenses, if present and easy to do. Continue rinsing. If eye<br>irritation persists: Get medical advice/ attention. |

**Product AS SOLD**

| | | |
|---|---|---|
| **Other hazards** | : | Do not mix with bleach or other chlorinated products – will cause<br>chlorine gas. |

## SECTION 3. COMPOSITION/INFORMATION ON INGREDIENTS

**Product AS SOLD**

Pure substance/mixture          :    Mixture

| Chemical name | CAS-No. | Concentration (%) |
|---|---|---|
| dodecylbenzene sulfonic acid | 27176-87-0 | 5 - 10 |
| Hydrogen peroxide | 7722-84-1 | 8 |
| Proprietary Fragrance | Proprietary Ingredient | 0.1 - 1 |
| Sulfuric acid | 7664-93-9 | 0.1 - 1 |

**Product AT USE DILUTION**

| Chemical name | CAS-No. | Concentration (%) |
|---|---|---|
| dodecylbenzene sulfonic acid | 27176-87-0 | 0.1 - 1 |
| Hydrogen peroxide | 7722-84-1 | 0.375 |

## SECTION 4. FIRST AID MEASURES

**Product AS SOLD**

| | | |
|---|---|---|
| In case of eye contact | : | Rinse immediately with plenty of water, also under the eyelids, for at<br>least 15 minutes. Remove contact lenses, if present and easy to do.<br>Continue rinsing. Get medical attention immediately. |
| In case of skin contact | : | Wash off immediately with plenty of water for at least 15 minutes. Use |

**SAFETY DATA SHEET**

| PEROXIDE MULTI SURFACE CLEANER AND DISINFECTANT |
|---|

|  |  |  |
|---|---|---|
|  |  | a mild soap if available. Wash clothing before reuse. Thoroughly clean shoes before reuse. Get medical attention immediately. |
| If swallowed | : | Rinse mouth with water. Do NOT induce vomiting. Never give anything by mouth to an unconscious person. Get medical attention immediately. |
| If inhaled | : | Remove to fresh air. Treat symptomatically. Get medical attention immediately. |
| Protection of first-aiders | : | If potential for exposure exists refer to Section 8 for specific personal protective equipment. |
| Notes to physician | : | Treat symptomatically. |
| Most important symptoms and effects, both acute and delayed | : | See Section 11 for more detailed information on health effects and symptoms. |

**Product AT USE DILUTION**

| In case of eye contact | : | Rinse with plenty of water. |
|---|---|---|
| In case of skin contact | : | Rinse with plenty of water. |
| If swallowed | : | Rinse mouth. Get medical attention if symptoms occur. |
| If inhaled | : | Get medical attention if symptoms occur. |

| SECTION 5. FIRE-FIGHTING MEASURES |
|---|

**Product AS SOLD**

| Suitable extinguishing media | : | Use extinguishing measures that are appropriate to local circumstances and the surrounding environment. |
|---|---|---|
| Unsuitable extinguishing media | : | None known. |
| Specific hazards during fire fighting | : | Oxidizer. Contact with other material may cause fire. |
| Hazardous combustion products | : | Decomposition products may include the following materials: Carbon oxides Sulfur oxides |
| Special protective equipment for fire-fighters | : | Use personal protective equipment. |
| Specific extinguishing methods | : | Fire residues and contaminated fire extinguishing water must be disposed of in accordance with local regulations. In the event of fire and/or explosion do not breathe fumes. |

| SECTION 6. ACCIDENTAL RELEASE MEASURES |
|---|

**Product AS SOLD**

| Personal precautions, protective equipment and emergency procedures | : | Ensure adequate ventilation. Keep people away from and upwind of spill/leak. Avoid inhalation, ingestion and contact with skin and eyes. When workers are facing concentrations above the exposure limit they must use appropriate certified respirators. Ensure clean-up is |
|---|---|---|

**SAFETY DATA SHEET**

| PEROXIDE MULTI SURFACE CLEANER AND DISINFECTANT |
|---|

conducted by trained personnel only. Refer to protective measures listed in sections 7 and 8.

| | | |
|---|---|---|
| Environmental precautions | : | Do not allow contact with soil, surface or ground water. |
| Methods and materials for containment and cleaning up | : | Stop leak if safe to do so. Contain spillage, and then collect with non-combustible absorbent material, (e.g. sand, earth, diatomaceous earth, vermiculite) and place in container for disposal according to local / national regulations (see section 13). Flush away traces with water. Isolate absorbed wastes contaminated with this product from other waste streams containing combustible materials (paper, wood fibers, cloth, etc.). Combustible materials exposed to this product should be rinsed immediately with large amounts of water to ensure that all product is removed. Residual product which is allowed to dry on organic materials such as rags, cloths, paper, fabrics, cotton, leather, wood, or other combustibles may spontaneously ignite and result in a fire. |

**Product AT USE DILUTION**

| | | |
|---|---|---|
| Personal precautions, protective equipment and emergency procedures | : | Refer to protective measures listed in sections 7 and 8. |
| Environmental precautions | : | Do not allow contact with soil, surface or ground water. |
| Methods and materials for containment and cleaning up | : | Stop leak if safe to do so. Contain spillage, and then collect with non-combustible absorbent material, (e.g. sand, earth, diatomaceous earth, vermiculite) and place in container for disposal according to local / national regulations (see section 13). Flush away traces with water. For large spills, dike spilled material or otherwise contain material to ensure runoff does not reach a waterway. |

| SECTION 7. HANDLING AND STORAGE |
|---|

**Product AS SOLD**

| | | |
|---|---|---|
| Advice on safe handling | : | Do not ingest. Do not get in eyes, on skin, or on clothing. Do not breathe dust/ fume/ gas/ mist/ vapors/ spray. Use only with adequate ventilation. Wash hands thoroughly after handling. Do not mix with bleach or other chlorinated products – will cause chlorine gas. In case of mechanical malfunction, or if in contact with unknown dilution of product, wear full Personal Protective Equipment (PPE). |
| Conditions for safe storage | : | Keep in a cool, well-ventilated place. Keep away from reducing agents. Keep away from strong bases. Keep away from combustible material. Keep out of reach of children. Keep container tightly closed. Store in suitable labeled containers. |
| Storage temperature | : | 15 °C to 40 °C |

**Product AT USE DILUTION**

| | | |
|---|---|---|
| Advice on safe handling | : | Wash hands thoroughly after handling. In case of mechanical malfunction, or if in contact with unknown dilution of product, wear full Personal Protective Equipment (PPE). |
| Conditions for safe storage | : | Keep out of reach of children. Store in suitable labeled containers. |

| SECTION 8. EXPOSURE CONTROLS/PERSONAL PROTECTION |
|---|

**Product AS SOLD**

---

914443-01                                      4 / 11

**SAFETY DATA SHEET**

| PEROXIDE MULTI SURFACE CLEANER AND DISINFECTANT |
|---|

**Ingredients with workplace control parameters**

| Components | CAS-No. | Form of exposure | Permissible concentration | Basis |
|---|---|---|---|---|
| Hydrogen peroxide | 7722-84-1 | TWA | 1 ppm | ACGIH |
|  |  | TWA | 1 ppm 1.4 mg/m3 | NIOSH REL |
|  |  | TWA | 1 ppm 1.4 mg/m3 | OSHA Z1 |
| sulphuric acid | 7664-93-9 | TWA (Thoracic fraction) | 0.2 mg/m3 | ACGIH |
|  |  | TWA | 1 mg/m3 | NIOSH REL |
|  |  | TWA | 1 mg/m3 | OSHA Z1 |

| Engineering measures | : | Effective exhaust ventilation system. Maintain air concentrations below occupational exposure standards. |
|---|---|---|

**Personal protective equipment**

| Eye protection | : | Wear eye protection/ face protection. |
|---|---|---|
| Hand protection | : | Wear the following personal protective equipment: Standard glove type. Gloves should be discarded and replaced if there is any indication of degradation or chemical breakthrough. |
| Skin protection | : | Personal protective equipment comprising: suitable protective gloves, safety goggles and protective clothing |
| Respiratory protection | : | When workers are facing concentrations above the exposure limit they must use appropriate certified respirators. |
| Hygiene measures | : | Handle in accordance with good industrial hygiene and safety practice. Remove and wash contaminated clothing before re-use. Wash face, hands and any exposed skin thoroughly after handling. Provide suitable facilities for quick drenching or flushing of the eyes and body in case of contact or splash hazard. |

**Product AT USE DILUTION**

| Engineering measures | : | Good general ventilation should be sufficient to control worker exposure to airborne contaminants. |
|---|---|---|

**Personal protective equipment**

| Eye protection | : | No special protective equipment required. |
|---|---|---|
| Hand protection | : | No special protective equipment required. |
| Skin protection | : | No special protective equipment required. |
| Respiratory protection | : | No personal respiratory protective equipment normally required. |

| SECTION 9. PHYSICAL AND CHEMICAL PROPERTIES |
|---|

|  | **Product AS SOLD** | **Product AT USE DILUTION** |
|---|---|---|
| Appearance | : liquid | liquid |
| Color | : clear, yellow | yellow |

**SAFETY DATA SHEET**

| PEROXIDE MULTI SURFACE CLEANER AND DISINFECTANT |
|---|

| | | | |
|---|---|---|---|
| Odor | : | Perfumes, fragrances | Perfumes, fragrances |
| pH | : | 0.5 - 1.5,    (100 %) | 2.0 - 2.5 |
| Flash point | : | Not applicable, Does not sustain combustion. | |
| Odor Threshold | : | No data available | |
| Melting point/freezing point | : | No data available | |
| Initial boiling point and boiling range | : | > 100 °C | |
| Evaporation rate | : | No data available | |
| Flammability (solid, gas) | : | Not applicable | |
| Upper explosion limit | : | No data available | |
| Lower explosion limit | : | No data available | |
| Vapor pressure | : | No data available | |
| Relative vapor density | : | No data available | |
| Relative density | : | 1.025 - 1.049 | |
| Water solubility | : | soluble | |
| Solubility in other solvents | : | No data available | |
| Partition coefficient: n-octanol/water | : | No data available | |
| Autoignition temperature | : | No data available | |
| Thermal decomposition | : | No data available | |
| Viscosity, kinematic | : | No data available | |
| Explosive properties | : | No data available | |
| Oxidizing properties | : | The substance or mixture is not classified as oxidizing. | |
| Molecular weight | : | No data available | |
| VOC | : | No data available | |

| SECTION 10. STABILITY AND REACTIVITY |
|---|

**Product AS SOLD**

| | | |
|---|---|---|
| Reactivity | : | No dangerous reaction known under conditions of normal use. |
| Chemical stability | : | Contamination may result in dangerous pressure increases - closed containers may rupture. |
| Possibility of hazardous reactions | : | Do not mix with bleach or other chlorinated products – will cause chlorine gas. |
| Conditions to avoid | : | None known. |
| Incompatible materials | : | Bases<br>Metals |
| Hazardous decomposition products | : | In case of fire hazardous decomposition products may be produced such as:<br>Carbon oxides<br>Sulfur oxides |

| SECTION 11. TOXICOLOGICAL INFORMATION |
|---|

**SAFETY DATA SHEET**

| PEROXIDE MULTI SURFACE CLEANER AND DISINFECTANT |
| --- |

| | | |
| --- | --- | --- |
| Information on likely routes of exposure | : | Inhalation, Eye contact, Skin contact |

**Potential Health Effects**

**Product AS SOLD**

| | | |
| --- | --- | --- |
| Eyes | : | Causes serious eye damage. |
| Skin | : | Harmful if absorbed through skin. Causes severe skin burns. May cause allergic skin reaction. |
| Ingestion | : | Harmful if swallowed. Causes digestive tract burns. |
| Inhalation | : | Toxic if inhaled. May cause nose, throat, and lung irritation. |
| Chronic Exposure | : | Health injuries are not known or expected under normal use. |

**Product AT USE DILUTION**

| | | |
| --- | --- | --- |
| Eyes | : | Causes eye irritation. |
| Skin | : | Health injuries are not known or expected under normal use. |
| Ingestion | : | Health injuries are not known or expected under normal use. |
| Inhalation | : | Health injuries are not known or expected under normal use. |
| Chronic Exposure | : | Health injuries are not known or expected under normal use. |

**Experience with human exposure**

**Product AS SOLD**

| | | |
| --- | --- | --- |
| Eye contact | : | Redness, Pain, Corrosion |
| Skin contact | : | Redness, Pain, Irritation, Corrosion, Allergic reactions |
| Ingestion | : | Corrosion, Abdominal pain |
| Inhalation | : | Respiratory irritation, Cough |

**Product AT USE DILUTION**

| | | |
| --- | --- | --- |
| Eye contact | : | Redness, Irritation |
| Skin contact | : | No symptoms known or expected. |
| Ingestion | : | No symptoms known or expected. |
| Inhalation | : | No symptoms known or expected. |

**Toxicity**

**Product AS SOLD**
**Product**

| | | |
| --- | --- | --- |
| Acute oral toxicity | : | Acute toxicity estimate : > 300 mg/kg |
| Acute inhalation toxicity | : | Acute toxicity estimate : 0.55 mg/l<br>Test atmosphere: dust/mist |
| Acute dermal toxicity | : | Acute toxicity estimate : > 1,200 mg/kg |

---

**SAFETY DATA SHEET**

| PEROXIDE MULTI SURFACE CLEANER AND DISINFECTANT |
|---|

| Respiratory or skin sensitization | : | No data available |
|---|---|---|
| Carcinogenicity | : | No data available |
| Reproductive effects | : | No data available |
| Germ cell mutagenicity | : | No data available |
| Teratogenicity | : | No data available |
| STOT-single exposure | : | No data available |
| STOT-repeated exposure | : | No data available |
| Aspiration toxicity | : | No data available |

| SECTION 12. ECOLOGICAL INFORMATION |
|---|

**Product AS SOLD**
**Ecotoxicity**

| Environmental Effects | : | Harmful to aquatic life. |
|---|---|---|

**Product**

| Toxicity to fish | : | No data available |
|---|---|---|
| Toxicity to daphnia and other aquatic invertebrates | : | No data available |
| Toxicity to algae | : | No data available |

**Components**

| Toxicity to fish | : | dodecylbenzene sulfonic acid 96 h LC50: 4.3 mg/l |
|---|---|---|
| | | Sulfuric acid 96 h LC50: 22 mg/l |

**Components**

| Toxicity to algae | : | Hydrogen peroxide 72 h EC50: 1.38 mg/l |
|---|---|---|

**Persistence and degradability**

**Product AS SOLD**
Not applicable - inorganic

**Product AT USE DILUTION**
Not applicable - inorganic

**Bioaccumulative potential**

No data available

**Mobility in soil**

No data available

**Other adverse effects**

No data available

| SECTION 13. DISPOSAL CONSIDERATIONS |
|---|

## SAFETY DATA SHEET

---

| **PEROXIDE MULTI SURFACE CLEANER AND DISINFECTANT** |
| --- |

**Product AS SOLD**

| | |
| --- | --- |
| Disposal methods | : Do not contaminate ponds, waterways or ditches with chemical or used container. Where possible recycling is preferred to disposal or incineration. If recycling is not practicable, dispose of in compliance with local regulations. Dispose of wastes in an approved waste disposal facility. |
| Disposal considerations | : Dispose of as unused product. Empty containers should be taken to an approved waste handling site for recycling or disposal. Do not re-use empty containers. Dispose of in accordance with local, state, and federal regulations. |
| RCRA - Resource Conservation and Recovery Authorization Act Hazardous waste | : D002 (Corrosive) |

**Product AT USE DILUTION**

| | |
| --- | --- |
| Disposal methods | : Diluted product can be flushed to sanitary sewer. |
| Disposal considerations | : Dispose of in accordance with local, state, and federal regulations. |

---

| **SECTION 14. TRANSPORT INFORMATION** |
| --- |

**Product AS SOLD**

The shipper/consignor/sender is responsible to ensure that the packaging, labeling, and markings are in compliance with the selected mode of transport.

**Land transport (DOT)**

Not dangerous goods

**Sea transport (IMDG/IMO)**

Not dangerous goods

---

| **SECTION 15. REGULATORY INFORMATION** |
| --- |

**Product AS SOLD**

**EPA Registration number** : 1677-238

**EPCRA - Emergency Planning and Community Right-to-Know**

**CERCLA Reportable Quantity**

| Components | CAS-No. | Component RQ (lbs) | Calculated product RQ (lbs) |
| --- | --- | --- | --- |
| dodecylbenzene sulfonic acid | 27176-87-0 | 1000 | 10416 |

**SARA 304 Extremely Hazardous Substances Reportable Quantity**
This material does not contain any components with a section 304 EHS RQ.

| | |
| --- | --- |
| **SARA 311/312 Hazards** | : Acute toxicity (any route of exposure) Skin corrosion or irritation Serious eye damage or eye irritation Respiratory or skin sensitization |

---

## SAFETY DATA SHEET

### PEROXIDE MULTI SURFACE CLEANER AND DISINFECTANT

| SARA 302 | : | The following components are subject to reporting levels established by SARA Title III, Section 302: |
|---|---|---|

Hydrogen peroxide        7722-84-1                        5 - 10 %

| SARA 313 | : | This material does not contain any chemical components with known CAS numbers that exceed the threshold (De Minimis) reporting levels established by SARA Title III, Section 313. |
|---|---|---|

**California Prop. 65**
This product does not contain any chemicals known to the State of California to cause cancer, birth, or any other reproductive defects.

**California Cleaning Product Right to Know Act of 2017 (SB 258)**
This regulation applies to this product.

| Chemical Name | CAS-No. | Function | List(s) |
|---|---|---|---|
| water | 7732-18-5 | Diluent | Not Applicable |
| dodecylbenzene sulfonic acid | 27176-87-0 | Cleaning Agent | Not Applicable |
| Hydrogen peroxide | 7722-84-1 | Biocide | Not Applicable |
| Fragrance Ingredient(s) | Not Available | Fragrance | Not Applicable |
| Aryl carboxylic acid | Withheld | Stabilizer | Not Applicable |
| Yellow dye | Withheld | Dye | Not Applicable |
| Silicone | Withheld | Processing Aid | Not Applicable |

*refer to ecolab.com/sds for electronic links to designated lists

**The ingredients of this product are reported in the following inventories:**

**Switzerland. New notified substances and declared preparations** :
not determined

**United States TSCA Inventory** :
All substances listed as active on the TSCA inventory

**Canadian Domestic Substances List (DSL)** :
This product contains one or several components listed in the Canadian NDSL.

**Australia Inventory of Chemical Substances (AICS)** :
not determined

**New Zealand. Inventory of Chemical Substances** :
not determined

**Japan. ENCS - Existing and New Chemical Substances Inventory** :
not determined

**Korea. Korean Existing Chemicals Inventory (KECI)** :
On the inventory, or in compliance with the inventory

**Philippines Inventory of Chemicals and Chemical Substances (PICCS)** :
On the inventory, or in compliance with the inventory

**China. Inventory of Existing Chemical Substances in China (IECSC)** :
not determined

**Taiwan Chemical Substance Inventory (TCSI)** :
not determined

**SAFETY DATA SHEET**

**PEROXIDE MULTI SURFACE CLEANER AND DISINFECTANT**

**SECTION 16. OTHER INFORMATION**

**Product AS SOLD**
**NFPA:**



**HMIS III:**

| HEALTH | 3* |
|---|---|
| FLAMMABILITY | 0 |
| PHYSICAL HAZARD | 0 |

0 = not significant, 1 = Slight,
2 = Moderate, 3 = High
4 = Extreme, * = Chronic



**Product AT USE DILUTION**
**NFPA:**

**HMIS III:**

| HEALTH | 1 |
|---|---|
| FLAMMABILITY | 0 |
| PHYSICAL HAZARD | 0 |

0 = not significant, 1 = Slight,
2 = Moderate, 3 = High
4 = Extreme, * = Chronic

| | |
|---|---|
| Issuing date | : 02/03/2020 |
| Version | : 1.12 |
| Prepared by | : Regulatory Affairs |

REVISED INFORMATION: Significant changes to regulatory or health information for this revision is indicated by a bar in the left-hand margin of the SDS.

The information provided in this Safety Data Sheet is correct to the best of our knowledge, information and belief at the date of its publication. The information given is designed only as a guidance for safe handling, use, processing, storage, transportation, disposal and release and is not to be considered a warranty or quality specification. The information relates only to the specific material designated and may not be valid for such material used in combination with any other materials or in any process, unless specified in the text.



**SAFETY DATA SHEET**

## Xpress Detergent Disinfectant

## 1. PRODUCT AND COMPANY IDENTIFICATION

**Product Name:**         Xpress Detergent Disinfectant
**Product Code:**         A0346
**Recommended Use:**      General cleaner and disinfectant

**Company**

Auto-Chlor System

746 Poplar Avenue

Memphis, TN 38105

Questions/Comments: 901-579-2300

**Emergency Telephone Numbers**
**MEDICAL:** 1-866-923-4946 (PROSAR)          **SPILLS:** 1-800-424-9300 (CHEMTREC)

## 2. HAZARDS IDENTIFICATION

**OSHA Hazard Classification**

**Signal Word:  WARNING**
**Acute Toxicity:** Category 4 (oral)
 **Acute Toxicity:** Category 4 (dermal)
**Eye Irritation:** Category 2B



| HAZARD STATEMENTS | PRECAUTIONARY STATEMENTS |
|---|---|
| H302:  Harmful if swallowed | P264:   Wash hands thoroughly after handling |
| H312:  Harmful in contact with skin | P270:   Do not eat, drink or smoke when using this product |
| H320:  Causes eye irritation | P280:   Wear eye protection |
| | P301/P312: If swallowed, call a poison center or or physician if you feel unwell. rinse mouth. |
| | P302/P352: If on skin, wash with plenty of soap and water. |
| | P362/P364: Take off contaminated clothing and wash it before reuse. |

## 3. COMPOSITION/INFORMATION ON INGREDIENTS

| INGREDIENTS | CAS NO. | % |
|---|---|---|
| _Diethylene glycol monobutyl ether | 112-34-5 | 8 |
| Tetra sodium ethylenediamine tetra acetic acid (Na4 EDTA) | 64-02-8 | 1.6 |

**Xpress Detergent Disinfectant**

| | | |
|---|---|---|
| _Alkyl (68% C12, 32% C14) dimethyl ethylbenzyl ammonium chloride | 85409-23-0 | 0.11 |
| _Alkyl dimethyl benzyl ammonium chloride (C12-C18) | 68391-01-5 | 0.11 |
| Other components below reportable levels | 141-43-5 | <1.0 |

## 4.  FIRST AID MEASURES

**Ingestion:**    If swallowed, call a poison center if you feel unwell. Rinse mouth.

**Skin Contact:**    If on skin, wash with plenty of water. If skin irritation occurs, get medical advice. Take off contaminated clothing and wash it before reuse.

**Eye Contact:**    If in eyes, rinse cautiously with water for several minutes.  Remove contact lenses, if present and easy to do.  Continue rinsing. If eye irritation persists, get medical advice.

## 5.  FIREFIGHTING MEASURES

**Extinguishing Media:**    Class A/B/C fire extinguisher, dry chemical, carbon dioxide, or foam

**Specific Hazards:**    During fire, gases hazardous to health may be formed.

**Protective Equipment:**  Wear full protective clothing and self-contained breathing apparatus

## 6.  ACCIDENTAL RELEASE MEASURES

**Personal Precautions:**  Isolate spill or leak area immediately.  Adequately ventilate area.

**Protective Equipment:**  Wear appropriate personal protective equipment as specified in Section 8.

**Cleanup Procedures:**  Absorb with earth, sand or other non-combustible material and transfer to containers for later disposal.

## 7.  HANDLING AND STORAGE

**Handling Precautions:**  Do not eat, drink or smoke when using this product.  Wash hands thoroughly after handling. Avoid prolonged exposure. Avoid release to the environment. FOR INDUSTRIAL AND INSTITUTIONAL USE ONLY.

**Storage:**    Protect from freezing.  Keep tightly closed in a dry, cool and well ventilated place.

## 8.  EXPOSURE CONTROLS/PERSONAL PROTECTION

**Occupational Exposure Limits:**    No occupational exposure limits established for this product.

**Appropriate Engineering Controls:**    Good general ventilation should be sufficient to control airborne levels.

**Personal Protective Equipment**

**Eye Protection:** Wear protective glasses, goggles or eye shield.

**Skin Protection:** Wear protective gloves.
**Respiratory Protection:** In case of insufficient ventilation, wear suitable respiratory equipment.

## 9. PHYSICAL AND CHEMICAL PROPERTIES

**Appearance:**
liquid
**Odor:**
Citrus
**pH:**
11.7
**Specific Gravity:**
No information available
**Solubility:**
Soluble in water
**Flash Point:**
> 93.9C
**Boiling Point:**
No information available
**VOC:**
No information available
**Viscosity:**
No information available
**Lower Explosive / Upper Explosive:**
No information available

**Evaporation Rate:**
No information available
**Odor Threshold:**
No information available
**Vapor Density:**
No information available
**Vapor Pressure:**
No information available
**Partition Coefficient:**
No information available
**Auto-Ignition Temperature:**
No information available
**Decomposition Temperature:**
No information available
**Melting/Freezing Point:**
No information available
**Flammability:**
No information available

## 10. STABILITY AND REACTIVITY

**Stability:** Stable under normal conditions
**Hazardous Polymerization:** Will not occur
**Incompatibility:** Strong acids, alkalies, and oxidizing agents.
**Hazardous Decomposition Products:** Oxides of nitrogen ammonia, carbon dioxide, carbon Monoxide, and other low molecular weight hydrocarbons

## 11. TOXICOLOGY INFORMATION

**Likely Routes of Exposure:** Inhalation, eye and skin contact

**Acute Symptoms**
**Eye and Skin Contact:** Causes eye irritation and causes mild skin irritation.
**Ingestion:** Expected to be a low ingestion hazard.
**Inhalation:** Prolonged inhalation may be harmful.

**Chronic Effects:**              None known

Assessment of acute toxicity:

| Oral LD$_{50}$ | Dermal LD$_{50}$ | Inhalation LC$_{50}$ |
|---|---|---|
| >5 g/kg | >5 g/kg | 2.43 mg/l |

## 12. ECOLOGICAL INFORMATION

Toxic to aquatic life. Harmul to aquatic life with long lasting effects. Expected to be readily biodegradable.

## 13. DISPOSAL CONSIDERATIONS

Pesticide wastes are acutely hazardous.  Improper disposal of all excess pesticide spray mixture or rinsate is a violation of Federal Law.  If these wastes cannot be disposed of by use according to label directions, contact your State Pesticide or Environmental Control Agency, or the Hazardous Waste Representatives at the nearest EPA Regional Office for guidance.

## 14. TRANSPORT INFORMATION

**UN Number:**              Not classified
**Proper Shipping Name:**      Not classified
**Hazard Class:**              Not classified
**Packing Group:**              Not classified

## 15. REGULATORY INFORMATION

This chemical is a pesticide product registered by the Environmental Protection Agency and is subject to certain labeling requirements under federal pesticide law.  These requirements differ from the classification criteria and hazard information required for safety data sheets, and for workplace labels of non-pesticide chemicals.  The pesticide label also includes other important information, including directions for use, pesticide storage and container handling.

**EPA REGISTRATION NUMBER:** 1839-83-6243

## 16. OTHER INFORMATION

**Revision Date:**          03/05/2020
**Supersedes:**          new
**Reason for Revision:**    New formulation

**Notice to Reader**:  This document has been prepared using data from sources considered technically reliable.  It does not constitute a warranty, express or implied, as to the accuracy of the information contained within. Actual conditions of use and handling are beyond seller's control. User is

responsible to evaluate all available information when using product for any particular use and to comply with all Federal, State, Provincial and Local laws and regulations.

**ATTACHMENT B – INDUSTRIAL HYGIENIST OBSERVATION LOG**

| Industrial Hygienist | |
|---|---|
| Date | |
| Facility | |

**Surface Cleaning Observation**

| Location | Adequate | Deficient |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**Disinfectant Contact Time Observation**

| Location | Time Applied | Minutes Until Dry |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

7

**Ex   D**



# FOLLOW-UP ONSITE AUDIT INSPECTION REPORT
## ENVIRONMENTAL CONDITIONS INSPECTION FOR
## SARS-CoV-2 (COVID-19) DISINFECTION AND CLEANING PROTOCOLS

## DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS (DC DOC), CENTRAL DETENTION FACILITY (CDF) AND CORRECTIONAL TREATMENT FACILITY (CTF)

## JULY 23, 2020

### *DRAFT*

**Prepared for**
District of Columbia Department of Corrections
2000 14th Street NW, 7th Floor
Washington, DC 20009

**Prepared by**
Potomac-Hudson Engineering, Inc.
77 Upper Rock Circle, Suite 302, Rockville, MD, 20850

GSA Contract No. 7QRAA18D0074
Task Order No. CW82753

## INTRODUCTION

In January 2020, a novel virus, SARS-CoV-2, was identified as the cause of an outbreak of viral pneumonia in Wuhan, China and subsequently led to the world-wide spread of coronavirus disease 2019 (COVID-19). COVID-19 is primarily transmitted via person-to-person contact; however, surface contamination is also known to be a concern with the spread of the virus. The virus is mainly spread through respiratory droplets produced when an infected person coughs or sneezes. These droplets can land on people who are nearby (within 6 feet). It may also be possible for a person to contract SARS-CoV-2 by touching a contaminated surface or object and then touching their own mouth, nose, or eyes.

In May 2020, the District of Columbia Department of Corrections (DC DOC) contracted Potomac-Hudson Engineering, Inc. (PHE) to develop a cleaning and disinfection protocol specific to COVID-19 to be used by DC DOC cleaning contractors. The purpose of the protocol is to provide guidance on proper disinfection practices and personal protective equipment (PPE) requirements. Frequent, effective, and safe cleaning and disinfecting procedures can help prevent the spread of disease to Department of Corrections (DOC) inmates, staff, and visitors.

PHE provided a draft protocol to DC DOC on June 15, 2020 and conducted initial on-site observational inspections to verify compliance with the protocol on June 29 and July 1, 2020. Following these observational inspections, the disinfection protocol was revised and a report was provided to DC DOC summarizing the inspections and recommending a number of corrective actions to improve work practices and procedures. A follow up observational inspection was conducted on July 20, 2020 to verify implementation of the corrective action recommendations by the contractors who are conducting the disinfection.

## AUDIT OVERVIEW

### SCOPE

PHE Industrial Hygienist Gary Morris conducted the follow up inspection of the DC DOC Central Detention Facility (CDF) and the Correctional Treatment Facility (CTF). This report contains observations from these follow up inspections, deviations deficiencies and from prescribed work practices and procedures, and corrective action recommendations. An In-Brief Meeting was held prior to the inspections and was attended by DC DOC representatives Gloria Robertson and Rena Myles. At the conclusion of the inspections, an Out-Brief Meeting was held that was attended by Ms. Robertson, Ms. Myles, and Gitana Stewart-Ponder to summarize observations, deficiencies, and corrective action recommendations from the follow up inspection.

Sanitizing and disinfection of the CDF is being conducted by Rock Solid Rock Solid District Group, LLC and by Spectrum Management, LLC in the CTF.

## SUMMARY OF FINDINGS

Tables 1A (CDF) and 1B (CTF) contain summaries of the findings from the initial oversight inspections, the recommended corrective action contained in the initial report, the status of each corrective action, and additional corrective action. Positive observations from the follow up inspection consist of the following:

- Some of the Spectrum Management, LLC staff did not wring out the rags after dipping in the bucket, increasing adequate coverage and contact time of surfaces (the rags were visibly soaked with the disinfectant).
- Spectrum Management, LLC staff carried the dip buckets and mop buckets with them to the areas in which they were disinfecting, increasing the frequency of re-wetting of the rags and mops.
- Spectrum Management, LLC staff periodically refilled the wipe buckets with the disinfectant.

It is recommended that these work practices be implemented by Rock Solid District Group, LLC in the CTF.



| TABLE 1A. FINDINGS FOR DC DOC CENTRAL DETENTION FACILITY | | | |
|---|---|---|---|
| **SUMMARY OF FINDING** | **RECOMMENDED CORRECTIVE ACTION** | **STATUS OF CORRECTIVE ACTION** | **UPDATED CORRECTIVE ACTION** |
| **CENTRAL DETENTION FACILITY (CDF)/ROCK SOLID MANAGEMENT** | | | |
| The contractor did not consistently allow for the 45-second minimum contact time required for the hydrogen peroxide-based disinfectant (*Ecolab Peroxide Multi Surface Cleaner and Disinfectant*). In several instances, a surface was wiped with a dry rag immediately after spray application of the disinfectant.  In other instances, only a portion of a surface was sprayed wet and allowed for a 45-second contact time.  The disinfectant was then wiped with a dry rag such that the unsprayed portion of the surface was not allotted adequate contact time with the disinfectant. | It is recommended that the contractor apply a towel sufficiently wetted with the disinfectant to all surfaces in lieu of spraying. After adequate contact time (45 seconds) has been achieved, the surfaces can then be wiped dry with a dry rag or are allowed to air-dry, as appropriate in a given area. | The majority of contractor employees were still using spray application as opposed to wet wiping. Spray application was observed used on telephones, tables, and benches in one of the housing blocks. Also, the employees who were wet wiping were not returning to the cart to re-wet their rags at such a frequency to ensure the 45 second contact time on all of the surfaces treated. We also noted that surface drying in the housing units was faster due to the existence of wall and floor fans in the hallways (to help with conditioning the space). | Replace all spray application with wet wiping. Periodically remind contractor staff that the objective of their work is to disinfect surfaces as opposed to cleaning the surfaces, reinforcing the required 45 second contact time, with additional attention to the housing units due to the faster surface drying facilitated by the wall and floor fans. Instruct crew staff to liberally wet the rags and avoid wringing them out and to take the bucket with them to enable frequent re-wetting without returning to the cart. Ensure that all applicable items are disinfected (the exercise machine in the South 3 Housing Unit was not disinfected). |



| TABLE 1A. FINDINGS FOR DC DOC CENTRAL DETENTION FACILITY | | | |
|---|---|---|---|
| SUMMARY OF FINDING | RECOMMENDED CORRECTIVE ACTION | STATUS OF CORRECTIVE ACTION | UPDATED CORRECTIVE ACTION |
| CENTRAL DETENTION FACILITY (CDF)/ROCK SOLID MANAGEMENT | | | |
| The contractor did not consistently allow for adequate wetting of the floor during mopping. On several occasions it was observed that a wet mop was used for an overly extensive period of time before being re-wetted.  This resulted in portions of the floor being inadequately damped with a sufficient amount of disinfectant to ensure a 45 second contact time. | Ensure that mops are frequently wetted in the mop bucket during floor mopping.  Consider requiring the contractor to provide additional mop buckets and dollies so that each person mopping has access to their own dolly that can be toted along with them as they mop.  Based on site observations, there was an insufficient number of mop dollies.  This required the dollies to remain in a centralized position and discouraged floor cleaners from more frequently wetting their mop heads.

Additionally, the mop buckets themselves, which have their own sets of wheels on them, should be removed from the dollies and transported with those mopping the floors. | Observations of floor mopping indicated that the 45 second contact time was achieved. | As noted above, the existence of wall and floor fans in the housing units facilitates faster drying of surfaces, including floors in these areas. As an added measure, periodically remind contractor staff that additional attention is needed to ensure the 45 second contact time (i.e. periodically return the mop to the bucket to re-wet the mop) in the housing units. Removing the mop buckets from the carts will facilitate more frequent we-wetting of the mop heads. |
| The contractor did not consistently disinfect all walls or other vertical surfaces to a height of 6 feet above the floor.  While adequate disinfection of these surfaces was observed being performed in common areas, it was not being done in other areas (bathrooms, offices, and other non-communal spaces). | Ensure that the contractor is aware that ALL vertical surfaces (walls, windows, columns, doors, rails, etc.) must be properly disinfected from the floor to a height of six feet, including adequate contact time. | The contractor was not observed disinfecting walls. | Ensure that the contractor is aware that ALL vertical surfaces (walls, windows, columns, doors, rails, etc.) must be properly disinfected from the floor to a height of six feet, including adequate contact time. |



| TABLE 1A. FINDINGS FOR DC DOC CENTRAL DETENTION FACILITY | | | |
|---|---|---|---|
| **SUMMARY OF FINDING** | **RECOMMENDED CORRECTIVE ACTION** | **STATUS OF CORRECTIVE ACTION** | **UPDATED CORRECTIVE ACTION** |
| **CENTRAL DETENTION FACILITY (CDF)/ROCK SOLID MANAGEMENT** | | | |
| The contractor dry-swept all floors prior to disinfection in contradiction to the cleaning protocols. Dry sweeping can cause virus present on the floor to become airborne for several hours, increasing the contact and inhalation risk it presents. | The facility has ordered dusting brooms (e.g., Swifter Sweepers or equivalent) which use electrostatic forces to attract and remove dirt and dust, to replace the current dry sweeping brooms. This will be implemented as soon as they arrive. Ensure the contractor uses a slow, smooth wiping action and change out or clean the dust broom pads/heads on a regular basis to maximize the effectiveness of the brooms to collect as much dust and dirt particulates as possible. | DC DOC has not been able to procure the dust mops through their supplier and is investigating additional suppliers. Work practices using the brooms in such a manner to minimize dispersion of accumulated dust were observed. | Continue attempts to procure the dust mops. |
| Currently, the cleaning contractor is only responsible for disinfecting the floor and doorknobs/door handles in the basement. Although DOC staff are responsible for the remaining areas, it is unclear if they know all the surfaces they need to clean and/or if they are aware of the proper contact time for the disinfectant. | Ensure that staff cleaning personnel are familiar with and are properly implementing the cleaning protocols currently being provided to the third-party contractors. | DOC staff has been informed of the surfaces to be addressed and the importance of the 45 second contact time. | No additional action is required. |
| The contractor was observed cleaning windows, mirrors, and other glass surfaces with an ammonium-based window cleaner (Ecolab Oasis 255SF Industrial Window Cleaner) as opposed to an EPA registered product. | Test the hydrogen peroxide-based disinfectant on glass surfaces. If acceptable, consider using the disinfectant on these surfaces instead of, or in addition to, traditional window cleaning chemicals. | The hydrogen peroxide-based disinfectant was used on all surfaces. Other products were not observed on the carts. | No additional action is required. |



| TABLE 1A. FINDINGS FOR DC DOC CENTRAL DETENTION FACILITY | | | |
|---|---|---|---|
| SUMMARY OF FINDING | RECOMMENDED CORRECTIVE ACTION | STATUS OF CORRECTIVE ACTION | UPDATED CORRECTIVE ACTION |
| CENTRAL DETENTION FACILITY (CDF)/ROCK SOLID MANAGEMENT | | | |
| In some cases, contractor personnel were observed cleaning doorknobs, door handles, and other frequently-touched surfaces with a hand sanitizer. While this is technically sufficient for disinfection, it is not be applied consistently in all areas and the proper contact time may or may not be properly implemented. | Ensure that all chemicals and cleaning procedures are consistently applied throughout the facility. If hand sanitizer is to be used on a regular basis for these surfaces, they should be documented in the cleaning protocol. | The hydrogen peroxide-based disinfectant was used on all surfaces. Other products were not observed on the carts. | No additional action is required. |
| The contractor (Summit) that currently provides food service duties in the cafeteria is solely responsible for cleaning and disinfecting that area of the facility. It is not known if they are aware of or are following the proper protocols for disinfection in a manner consistent with the other areas of the facility. | Ensure that Summit is performing proper disinfection in a manner that is consistent with or exceeds the procedures being used elsewhere at the facility. | DC DOC has discussed appropriate disinfection practices with Summit (surfaces are disinfected three times per day). | No additional action is required. |



| TABLE 1B. FINDINGS FOR DC DOC CORRECTIONAL TREATMENT FACILITY | | | |
|---|---|---|---|
| RECOMMENDED CORRECTIVE ACTION | RECOMMENDED CORRECTIVE ACTION | RECOMMENDED CORRECTIVE ACTION | UPDATED CORRECTIVE ACTION |
| CORRECTIONAL TREATMENT FACILITY (CTF)/SPECTRUM MANAGEMENT | | | |
| The contractor did not consistently allow for the 45-second minimum contact time required for the hydrogen peroxide-based disinfectant (*Ecolab Peroxide Multi Surface Cleaner and Disinfectant*) being used.  In several instances, a surface was wiped with a dry rag immediately after spray application of the disinfectant.  In other instances, only a portion of a surface was sprayed wet and allowed for a 45-second contact time.  The disinfectant was then wiped with a dry rag such that the unsprayed portion of the surface was not allotted adequate contact time with the disinfectant. | Sufficiently spraying to adequately wet and entire surface such as a table or wall is extremely difficult and time-consuming. It is recommended that the contractor apply a towel sufficiently wetted with the disinfectant to all surfaces in lieu of spraying.  After adequate contact time (45 seconds) has been achieved, the surfaces should then be wiped dry with a dry rag or be allowed to air-dry, as appropriate in a given area.  This will further ensure that the entire surface is adequately wetted for the duration of the required contact time. | Spraying and wiping of surfaces has been replaced with wet wiping. The 45 second contact time was achieved on all surfaces observed, including walls. | No additional action is required. |
| The contractor did not consistently disinfect all walls or other vertical surfaces to a height of 6 feet above the floor.  While adequate disinfection of these surfaces was observed being performed in common areas, it was not being done in other areas (bathrooms, offices, and other non-communal spaces). | Ensure that the contractor is aware that ALL vertical surfaces (walls, windows, columns, doors, rails, etc.) must be properly disinfected from the floor to a height of six feet, including adequate contact time. | Observations during the follow up inspection indicated that appropriate surfaces, including walls were effectively being disinfected. | No additional action is required. |



| TABLE 1B. FINDINGS FOR DC DOC CORRECTIONAL TREATMENT FACILITY | | | |
| --- | --- | --- | --- |
| RECOMMENDED CORRECTIVE ACTION | RECOMMENDED CORRECTIVE ACTION | RECOMMENDED CORRECTIVE ACTION | UPDATED CORRECTIVE ACTION |
| CORRECTIONAL TREATMENT FACILITY (CTF)/SPECTRUM MANAGEMENT | | | |
| The contractor dry-swept all floors prior to disinfection in contradiction to the cleaning protocols.  Dry sweeping can cause virus present on the floor to become airborne for several hours, increasing the contact and inhalation risk it presents. | The facility has ordered dusting brooms (e.g., Swifter Sweepers or equivalent) which use electrostatic forces to attract and remove dirt and dust, to replace the current dry sweeping brooms.  This will be implemented as soon as they arrive. Ensure that the contractor uses a slow, smooth wiping action and change out or clean the dust broom pads/heads on a regular basis to maximize the effectiveness of the brooms to collect as much dust and dirt particulates as possible. | DC DOC has not been able to procure the dust mops through their supplier and is investigating additional suppliers. Work practices using the brooms in such a manner to minimize dispersion of accumulated dust were observed. | Continue attempts to procure the dust mops. |
| The contractor was not always performing its duties in a consistent manner. The following observations were made: <ul><li>Some of the grated stairwells in the housing areas were mopped, while others were not.</li><li>In one area, contractor personnel were using hand sanitizer to disinfect doorknobs, door handles, and phones. However, in other areas, the peroxide disinfectant was used.</li><li>In the 96 Medical Area, the contractor did not clean the area between the gates and the elevators.  However, this area was cleaned in the 82 Medical Area.</li></ul> | The following recommendations are made: <ul><li>Ensure that all stairwells in the housing units are mopped.</li><li>Since different disinfectants require different contact times (depending on the active ingredients), ensure that the contractor is consistent in what they use.  The contact time for ethanol (5 minutes) is much greater than that for peroxide (45 seconds).</li><li>Ensure that the contractor is clear on what areas are considered within their scope of work and which areas are not and ensure that they clean and disinfect all of the areas for which they are responsible.</li></ul> | All applicable surfaces were addressed in the areas observed. The hydrogen peroxide-based disinfectant was used on all surfaces. Other products were not observed on the carts. | No additional action is required. |



| TABLE 1B. FINDINGS FOR DC DOC CORRECTIONAL TREATMENT FACILITY | | | |
|---|---|---|---|
| RECOMMENDED CORRECTIVE ACTION | RECOMMENDED CORRECTIVE ACTION | RECOMMENDED CORRECTIVE ACTION | UPDATED CORRECTIVE ACTION |
| CORRECTIONAL TREATMENT FACILITY (CTF)/SPECTRUM MANAGEMENT | | | |
| The contractor was observed mixing and handling both the concentrated form of the peroxide disinfectant as well as the diluted form.  In its concentrated form, the disinfectant has a pH of less than 2 and is extremely corrosive.  Even in its diluted form, the disinfectant is still corrosive and presents danger to users.  Contractor personnel were not wearing certain personal protective equipment (PPE) while performing these tasks.<br><br>The contractor was also observed using the fogging unit without eye protection. | It is recommended that the personnel handling and mixing the disinfectant in the mixing room wear goggles and/or face shield to protect their eyes and face.  Consider also requiring longer gloves that cover exposed skin between hands and sleeves.<br><br>Consider requiring the contractor to where eye protection during fogging. | Appropriate personal protective equipment was worn during mixing and transfers of the disinfectant. Fogging was not conducted on the day of the follow-up inspection. | No additional action is required on the part of Spectrum Management. PHE will attempt to observe fogging during the next oversight inspection. |



## CORRECTIVE ACTION PLAN

PHE has developed a brief corrective action plan (CAP) as part of this document.  A CAP is a step-by-step plan of action that is developed to achieve targeted outcomes for resolution of identified errors in an effort to:

- Identify the most cost-effective actions that can be implemented to correct error causes
- Develop and implement a plan of action to improve processes or methods so that outcomes are more effective and efficient
- Achieve measurable improvement in the highest priority areas
- Eliminate repeated deficient practices

### DISCUSSIONS WITH CONTRACTORS

The findings made by PHE should be discussed directly with supervisors for each cleaning contractor, including potentially sharing this document with them.  Each of the deficiencies should be identified, and the recommendations for correction should be explored.  It is possible that the contractors may identify and suggest other corrective measures as alternatives to those suggested in this document.  As long as the same goal is reached, any alternative or additional procedures can be implemented as well.

### PERIODIC RE-INSPECTIONS

As part of the existing scope of work, PHE is scheduled to conduct up two (2) follow up monthly site inspections to ensure that the contractors are adhering to the recommended protocols and that noted deficiencies have been corrected.  As part of these follow-up inspections, PHE will hold a short, informal out-brief at the end of each day to discuss any findings or other observations made, and present options for correction.

PHE also recommends that DOC personnel perform additional inspections, as needed, based on the results of the PHE follow-up inspections, if deficiencies continue to be identified.

### EFFECTIVENESS EVALUATION

The DOC will continue to check the temperature of personnel arriving onsite and require face masks for the foreseeable future.  The DOC will also continue to perform voluntary testing of individuals onsite (both employees and inmates) every two weeks.  As the year continues on, it is likely that additional waves or peaks may be observed throughout the region.  DOC should closely monitor the number of persons onsite testing positive during these times to evaluate the effectiveness of all current procedures, including cleaning and disinfection.  Changes should be made, as applicable and appropriate, to ensure that each facility is doing as much as possible to protect all personnel from the virus.



**Ex   E**



# UP ONSITE AUDIT INSPECTION REPORT    . 2

"

## September 2020

### *DRAFT*

**Prepared for**
**District of Columbia Department of Corrections**
**2000 14ᵗʰ Street NW, 7ᵗʰ Floor**
**Washington, DC 20009**

**Prepared by**
**Potomac-Hudson Engineering, Inc.**
**77 Upper Rock Circle, Suite 302**
**Rockville, MD, 20850**

**GSA Contract No. 7QRAA18D0074**
**Task Order No. CW82753**



## INTRODUCTION

In January 2020, a novel virus, SARS-CoV-2, was identified as the cause of an outbreak of viral pneumonia in Wuhan, China and subsequently led to the world-wide spread of coronavirus disease 2019 (COVID-19). COVID-19 is primarily transmitted via person-to-person contact; however, surface contamination is also known to be a concern with the spread of the virus. The virus is mainly spread through respiratory droplets produced when an infected person coughs or sneezes. These droplets can land on people who are nearby (within 6 feet). It may also be possible for a person to contract SARS-CoV-2 by touching a contaminated surface or object and then touching their own mouth, nose, or eyes.

In May 2020, the District of Columbia Department of Corrections (DC DOC) contracted Potomac-Hudson Engineering, Inc. (PHE) to develop a cleaning and disinfection protocol specific to COVID-19 to be used by DC DOC cleaning contractors. The purpose of the protocol is to provide guidance on proper disinfection practices and personal protective equipment (PPE) requirements. Frequent, effective, and safe cleaning and disinfecting procedures can help prevent the spread of disease to DC DOC inmates, staff, and visitors.

PHE provided a draft protocol to DC DOC on June 15, 2020 and conducted initial on-site observational inspections to verify compliance with the protocol on June 29 and July 1, 2020. Following these observational inspections, the disinfection protocol was revised, and a report was provided to DC DOC summarizing the inspections and recommending a number of corrective actions to improve work practices and procedures. An initial follow-up observational inspection was conducted on July 20, 2020 to verify implementation of the corrective action recommendations by the contractors who are conducting the disinfection, and a follow-up report was issued on July 23, 2020.

On September 28, 2020, PHE conducted a second follow-up site visit to inspect the cleaning and disinfection process. This document provides a summary of PHE's observations, findings, and recommendations.

## AUDIT OVERVIEW

### SCOPE

Christopher Rua, CHMM and Gary Morris, CIH of PHE conducted the follow-up inspection of the DC DOC Central Detention Facility (CDF) and the Correctional Treatment Facility (CTF) on September 28, 2020. This report contains observations from this follow-up inspection, deficiencies and deviations from prescribed work practices and procedures, and corrective action recommendations. At the conclusion of the inspection, an Out-Brief Meeting was held to summarize observations, deficiencies, and corrective action recommendations from the follow up inspection. This meeting was attended by:

- Mr. Lennard Johnson, Warden (DOC)
- Ms. Kathy Landerkin, Deputy Warden (DOC)
- Ms. Jackie Smith, Site Safety Officer (DOC)
- Ms. Gloria Roberts, Compliance and Review Officer (DOC)
- Ms. Michele Jones, CTF Programs (DOC)
- Mr. Christopher Rua (PHE)
- Mr. Gary Morris (PHE)

Sanitizing and disinfection of the CDF is being conducted by G-SIDA General Services, LLC (G-SIDA) and by Spectrum Management, LLC (Spectrum) in the CTF. It should be noted that G-SIDA replaced Rock Solid Management Group, LLC as the contractor at the CDF on August 5, 2020. This was PHE's first observation of this contractor.



## SUMMARY OF FINDINGS

Table 1 contains a summary of the findings from this oversight inspection as well as the recommended corrective action contained.  Positive observations from the follow-up inspection consist of the following:

- Some of the staff of both contractors did not wring out the rags after dipping in the bucket, increasing adequate coverage and contact time of surfaces (the rags were visibly soaked with the disinfectant).
- Staff of both contractors carried the dip buckets and mop buckets with them to the areas in which they were disinfecting, increasing the frequency of re-wetting of the rags and mops.
- Contractor staff periodically refilled the wipe buckets with the disinfectant and changed mop water and mop heads several times throughout the day.
- Fans positioned in the housing blocks are now turned off during sanitizing to help extend contact time.
- Mop and rag buckets are filled by DOC staff to ensure consistent filling practices. Bleach solutions are also mixed by DOC staff and filled in spray bottles to ensure proper bleach/water ratios in the spray bottles.
- Spectrum crew wet wiped surfaces in the CTF Visitor's Entrance with the sanitizing solution and when dry, applied the solution a second time via a spray bottle and allowed the solution to air dry.

In general, significant improvement was observed during this site visit compared to previous site visits.



**DC Department of Corrections**
**September 2020**

**Environmental Conditions Inspection**
**Follow-Up Onsite Audit Inspection Report**

## TABLE 1. FINDINGS FOR DC DOC CENTRAL DETENTION FACILITY AND CONDITIONAL TREATMENT FACILITY

| SUMMARY OF FINDING | RECOMMENDED CORRECTIVE ACTION |
|---|---|
| The contractor did not consistently allow for the 45-second minimum contact time required for the hydrogen peroxide-based disinfectant (*Ecolab Peroxide Multi Surface Cleaner and Disinfectant*). Some contractor employees were not re-wetting their rags with sufficient frequency. As a result, some walls and other surfaces did not stay wetted for a full 45 seconds.<br><br>This was particularly noted for the gates in the common areas near the elevators due to the intricate design and abundant surface area. | Periodically remind contractor staff that the objective of their work is to disinfect surfaces as opposed to cleaning the surfaces, reinforcing the required 45-second contact time. Instruct crew staff to liberally wet the rags and avoid wringing them out. Consider instructing the crews to have a brief onsite meeting at the beginning of each day to discuss these practices to reinforce the instructions.<br><br>In the common areas, consider using the pump sprayer to thoroughly wet the gates. The sprayer will be able to coat the entirety of the surfaces more completely and efficiently than hand wiping. |
| The contractor continues to dry sweep all floors prior to disinfection in contradiction to the cleaning protocols, due to the limited availability of acceptable (i.e. plastic as opposed to metal) dusting brooms. Since dry sweeping can cause virus present on the floor to become airborne for several hours, increasing the contact and inhalation risk it presents, every attempt should be made to sweep in a slow, smooth motion. The contractors were observed to be sweeping in a rapid manner in several area. | It has been recommended that the facility procure dusting brooms (e.g., Swifter Sweepers or equivalent) which use electrostatic forces to attract and remove dirt and dust, to replace the current dry sweeping brooms. However, DC DOC has not yet been able to procure the dust mops through their supplier and is investigating additional suppliers. Continue attempts to procure the dust mops.<br><br>Until the dusting brooms are procured, ensure the contractor uses a slow, smooth wiping action and change out or clean the dust broom pads/heads on a regular basis to maximize the effectiveness of the brooms to collect as much dust and dirt particulates as possible. |
| In some cases, contractor personnel were observed cleaning the surfaces of phones and other electronic devices (e.g., computer screens, keyboards) with a hand sanitizer. While this is technically sufficient for disinfection, the proper contact time may or may not be properly achieved. Disinfectants with ethyl alcohol as the active ingredient, such as hand sanitizer, require a minimum contact time ranging from 30 seconds up to 10 minutes, depending on the specific product and concentration. | The U.S. Environmental Protection Agency (USEPA) has compiled a list of disinfectants (List N) approved for effective use for COVID-19. The list is arranged by USEPA Registration Number, product name, manufacturer, active ingredient, and other criteria. Each product included on List N is denoted with the minimum contact time required to be effective against COVID-19. The list can be found here: https://cfpub.epa.gov/giwiz/disinfectants/index.cfm.<br><br>If hand sanitizer is to be used on a regular basis for these surfaces, the product should be cross-checked against this list to determine if the product is approved and identify the proper contact time.<br><br>Alternatively, if safe to use on phones and other electronic devices, consider using the *Ecolab Peroxide Multi Surface Cleaner and Disinfectant* on these surfaces for consistency. |

PHE



## TABLE 1. FINDINGS FOR DC DOC CENTRAL DETENTION FACILITY AND CONDITIONAL TREATMENT FACILITY

| SUMMARY OF FINDING | RECOMMENDED CORRECTIVE ACTION |
|---|---|
| In general, both contractors use dedicated sets of mops for bathrooms and locker rooms which are separate from the mops they use in offices and common areas. However, in area C3-112 at the CTF, **Spectrum** personnel were observed using the same mop for two offices and a small hallway that was also used for a single-stall bathroom in that area.  It appears that the contractors did not know a bathroom was located in this area and therefore only brought one set of mops with them to this location. | Ensure at all times that mops used for bathrooms and locker rooms are not used in administrative and common areas. |
| Fogging is not being conducted by **G-SIDA** in the CDF due to the omission of this in the current contract. | As planned, include fogging in the next G-SIDA contract. |

## CORRECTIVE ACTION PLAN

PHE has developed a brief corrective action plan (CAP) as part of this document.  A CAP is a step-by-step plan of action that is developed to achieve targeted outcomes for resolution of identified errors in an effort to:

- Identify the most cost-effective actions that can be implemented to correct error causes
- Develop and implement a plan of action to improve processes or methods so that outcomes are more effective and efficient
- Achieve measurable improvement in the highest priority areas
- Eliminate repeated deficient practices

### DISCUSSIONS WITH CONTRACTORS

The findings made by PHE should be discussed directly with supervisors for each cleaning contractor, including potentially sharing this document with them.   Each of the deficiencies should be identified, and the recommendations for correction should be explored.  It is possible that the contractors may identify and suggest other corrective measures as alternatives to those suggested in this document.  As long as the same goal is reached, any alternative or additional procedures can be implemented as well.

### PERIODIC RE-INSPECTIONS

As part of the existing scope of work, PHE is scheduled to conduct one additional follow-up site inspection to ensure that the contractors are adhering to the recommended protocols and that noted deficiencies have been corrected.  As part of the follow-up inspection, PHE will hold a short, informal out-brief at the end of each day to discuss any findings or other observations made and present options for correction.

PHE also recommends that DC DOC personnel perform additional inspections, as needed, based on the results of the PHE follow-up inspections, if deficiencies continue to be identified.

### EFFECTIVENESS EVALUATION

The DC DOC will continue to check the temperature of personnel arriving onsite and require face masks for the foreseeable future.  The DC DOC will also continue to perform voluntary testing of individuals onsite (both employees and inmates) every two weeks.  As the year continues on, it is likely that additional waves or peaks in the number of virus cases may be observed throughout the region.  DC DOC should closely monitor the number of persons onsite testing positive for COVID-19 during these times to evaluate the effectiveness of all current procedures, including cleaning and disinfection.  Changes should be made, as applicable and appropriate, to ensure that each facility is doing as much as possible to protect all personnel (employees, inmates, contractors, and visitors) from the virus.



**Ex   F**



# UP ONSITE AUDIT INSPECTION REPORT        .

"

## October 30, 2020

### *DRAFT*

**Prepared for**
**District of Columbia Department of Corrections**
**2000 14th Street NW, 7th Floor**
**Washington, DC 20009**

**Prepared by**
**Potomac-Hudson Engineering, Inc.**
**77 Upper Rock Circle, Suite 302, Rockville, MD, 20850**

**GSA Contract No. 7QRAA18D0074**
**Task Order No. CW82753**

## INTRODUCTION

In January 2020, a novel virus, SARS-CoV-2, was identified as the cause of an outbreak of viral pneumonia in Wuhan, China and subsequently led to the world-wide spread of coronavirus disease 2019 (COVID-19). COVID-19 is primarily transmitted via person-to-person contact; however, surface contamination is also known to be a concern with the spread of the virus. The virus is mainly spread through respiratory droplets produced when an infected person coughs or sneezes. These droplets can land on people who are nearby (within 6 feet). It may also be possible for a person to contract SARS-CoV-2 by touching a contaminated surface or object and then touching their own mouth, nose, or eyes.

In May 2020, the District of Columbia Department of Corrections (DC DOC) contracted Potomac-Hudson Engineering, Inc. (PHE) to develop a cleaning and disinfection protocol specific to COVID-19 to be used by DC DOC cleaning contractors. The purpose of the protocol is to provide guidance on proper disinfection practices and personal protective equipment (PPE) requirements. Frequent, effective, and safe cleaning and disinfecting procedures can help prevent the spread of disease to Department of Corrections (DOC) inmates, staff, and visitors.

PHE provided a draft protocol to DC DOC on June 15, 2020 and conducted initial on-site observational inspections to verify compliance with the protocol on June 29 and July 1, 2020. Following these observational inspections, the disinfection protocol was revised, and a report was provided to DC DOC summarizing the inspections and recommending a number of corrective actions to improve work practices and procedures. An initial follow up observational inspection was conducted on July 20, 2020 to verify implementation of the corrective action recommendations by the contractors who are conducting the disinfection, and a follow-up report was issued on July 23, 2020.  A subsequent inspection was performed on September 28, 2020 and reported on October 2, 2020.

PHE conducted a final follow-up site visit on October 23, 2020 to observe disinfection practices of the two contractors who disinfecting surfaces in the two DOC buildings. This document provides a summary of PHE's observations, findings, and recommendations.

## AUDIT OVERVIEW

### SCOPE

Gary Morris, CIH of PHE conducted the follow up inspection of the DC DOC Central Detention Facility (CDF) and the Correctional Treatment Facility (CTF) on October 23, 2020. This report contains observations from these follow up inspections, deviations deficiencies and from prescribed work practices and procedures, and corrective action recommendations.  At the conclusion of the inspections, an Out-Brief Meeting was held to summarize observations, deficiencies, and corrective action recommendations from the follow up inspection.  This meeting was attended by:

- Jackie Smith, Site Safety Officer (DOC)
- Rena Myles
- Gary Morris (PHE)

Sanitizing and disinfection of the CDF is being conducted by G-SIDA General Services, LLC (G-SIDA) and by Spectrum Management, LLC (Spectrum) in the CTF. During the October 23, 2020 inspection, observations were made in the CDF during disinfection of SW-2, SO-2, and the South 2 Lobby and in the Staff Entrance of the CTF.

## SUMMARY OF FINDINGS

Tables 1 contains a summary of the findings from this oversight inspection as well as the recommended corrective action contained.  Positive observations from the follow up inspection consist of the following:



- Some of the staff of both contractors did not wring out the rags after dipping in the bucket, increasing adequate coverage and contact time of surfaces (the rags were visibly soaked with the disinfectant).
- Staff of both contractors carried the dip buckets and mop buckets with them to the areas in which they were disinfecting, increasing the frequency of re-wetting of the rags and mops.
- Contractor staff periodically refilled the wipe buckets with the disinfectant, and change mop water and mop heads during observation period.
- The 45 second contact time was achieved on all surfaces disinfected by the CTF contractor (Spectrum Management) during observation of disinfection in the Staff Entrance, including chairs, the floor, lockers, tables, doors, windows, window frames, and door handles.
- The 45 second contact time was achieved on surfaces disinfected by the CDF contractor, excluding phone handsets in the SO-2 housing block and the metal gates in the South 2 Lobby.

In general, significant improvement was observed during this site visit compared to previous site visits.



DC Department of Corrections
October 30, 2020

Environmental Conditions Inspection
Follow-Up Onsite Audit Inspection Report

## TABLE 1. FINDINGS FOR DC DOC CENTRAL DETENTION FACILITY AND CONDITIONAL TREATMENT FACILITY

| SUMMARY OF FINDING | RECOMMENDED CORRECTIVE ACTION |
|---|---|
| The 45 second contact time was not achieved by the CDF contractor on the metal partition gates in the South 2 Elevator Lobby. One employee was observed cleaning with a hand towel for about 10 minutes without re-wetting the towel. | Remind contractor staff at the beginning of each day to ensure that the 45 second contact time is achieved on all surfaces. Instruct crew staff to liberally wet the rags and avoid wringing them out.<br><br>Consider using the pump sprayer to thoroughly wet the gates in the elevator lobbies. The sprayer will be able to coat the entirety of the surfaces more efficiently than hand wiping. |
| Both contractors continue to dry sweep the floors with standard brooms prior to disinfection (in contradiction to the cleaning protocol). Dry sweeping may result in the re-suspension of viral particles that have collected on the floor, increasing contact and inhalation risk. In general, contractor staff was observed using the wide floor brooms with a slow and short sweeping motion, while those using standard brooms (to sweep under furniture and in corners) employed a longer and more forceful sweeping motion. | Continue attempting to procure dusting brooms (e.g., Swifter Sweepers or equivalent) which use electrostatic forces to attract and remove dirt and dust, to replace the current dry sweeping brooms. Until the dusting brooms are procured, instruct contractor staff to use a smooth wiping action and change out or clean the dust broom pads/heads on a regular basis to maximize the effectiveness of the brooms to collect as much dust and dirt particulates as possible. |
| G-SIDA employees were observed cleaning phones with a hand sanitizer spray. While this is technically sufficient for disinfection, the proper contact time may or may not be achieved, as disinfectants with ethyl alcohol as the active ingredient (such as hand sanitizer) require a minimum contact time ranging from 30 seconds to 10 minutes, depending on the specific product and concentration. Long contact time with hand sanitizer spray is difficult to achieve, as the alcohol dries faster than other disinfectants. | Disinfect phone handsets and key pads with the *Ecolab Peroxide Multi Surface Cleaner and Disinfectant*. |

PHE

## CORRECTIVE ACTION PLAN

PHE has developed a brief corrective action plan (CAP) as part of this document.  A CAP is a step-by-step plan of action that is developed to achieve targeted outcomes for resolution of identified errors in an effort to:

- Identify the most cost-effective actions that can be implemented to correct error causes
- Develop and implement a plan of action to improve processes or methods so that outcomes are more effective and efficient
- Achieve measurable improvement in the highest priority areas
- Eliminate repeated deficient practices

### DISCUSSIONS WITH CONTRACTORS

The findings made by PHE should be discussed directly with supervisors for each cleaning contractor, including potentially sharing this document with them.  Each of the deficiencies should be identified, and the recommendations for correction should be explored.  It is possible that the contractors may identify and suggest other corrective measures as alternatives to those suggested in this document.  As long as the same goal is reached, any alternative or additional procedures can be implemented as well.

### PERIODIC RE-INSPECTIONS

This report represents the final follow up site inspection by PHE under the existing contract.  PHE recommends that DOC personnel perform additional inspections, as needed, to ensure that the contractors are adhering to the recommended protocols and that noted deficiencies have been corrected.

### EFFECTIVENESS EVALUATION

The DOC will continue to check the temperature of personnel arriving onsite and require face masks for the foreseeable future and perform voluntary testing of individuals onsite (both employees and inmates).  As the year continues on, it is likely that additional waves or peaks may be observed throughout the region.  DOC should closely monitor the number of persons onsite testing positive during these times to evaluate the effectiveness of all current procedures, including cleaning and disinfection.  Changes should be made, as applicable and appropriate, to ensure that each facility is doing as much as possible to protect all personnel from the virus.



**Ex   G**

| MODIFICATION OF CONTRACT | | | 1. Contract Number DCAM-20-NC-EM-0079C | Page of Pages | |
|---|---|---|---|---|---|
| | | | | 1 | 2 |
| 2. Modification Number | 3. Effective Date | 4. Requisition/Purchase Request No. | 5. Contract Caption | | |
| M03 | See Block 16C | TBD | Comprehensive Hazardous Materials ("HAZMAT") Environmental Cleaning Services related to the SARS-CoV-2 (COVID-19) Coronavirus-19 Pandemic for the Department of Corrections | | |

6. Issued By:
Department of General Services
Contracting and Procurement Division
2000 14th Street, 8th Floor
Washington, DC 20009
**Attention:** Domonique L. Banks   (202) 719-6544   domonique.banks@dc.gov

7. Administered By (If other than line 6)
Department of General Services
Facilities Division
2000 14th Street NW, 8th Floor
Washington, DC 20009
**Attention:** Ruth Jenkins     **PH:** (202) 579-2624     **EMAIL:** ruth.jenkins@dc.gov

| 8. Name and Address of Contractor (No. Street, city, country, state and ZIP Code) | | 9A. Amendment of Solicitation No. |
|---|---|---|
| **G-SIDA GENERAL SERVICES, LLC** 1818 New York Avenue, N.E. Washington, D.C. 20002 **ATTN:** Genet Mersha (202) 468-8977     gmersha@gsgservicesllc.com | | 9B. Dated (See Item 11) |
| | | 10A. Modification of Contract/Order No. |
| | X | DCAM-20-NC-EM-0079C |
| | | 10B. Dated (See Item 13) |
| | | **August 5, 2020** |

11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended. ☐ is not extended.
Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the
following methods: (a) By completing Items 8 and 15, and returning ___1___ copies of the amendment: (b) By acknowledging receipt of this
amendment on each copy of the offer submitted; or (c) By separate letter or fax which includes a reference to the solicitation and
amendment number. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS
PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change
an offer already submitted, such change may be made by letter or fax, provided each letter or telegram makes reference to the
solicitation and this amendment, and is received prior to the opening hour and date specified.

13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS.
IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14

| | A. This change order is issued pursuant to: (Specify Authority) The changes set forth in Item 14 are made in the contract/order no. in item 10A. |
|---|---|
| | B. The above numbered contract/order is modified to reflect the administrative changes (such as changes in paying office, appropriation date, etc.) set forth in item 14. |
| | C. This supplemental agreement is entered into pursuant to authority of: |
| X | D. Other (Specify type of modification and authority)     Contract   DCAM-20-NC-EM-0079C   and Title 27 DCMR Sections 4727 |

E. IMPORTANT:   Contractor ☐ is not,   ☒ is required to sign this document and return     1     copy to the issuing office.

14. Description of modification (Organized by UCF Section headings, including solicitation/contract subject matter where feasible.)

Contract No. **DCAM-20-NC-EM-0079C**   *Comprehensive Hazardous Materials ("HAZMAT") Environmental Cleaning Services related to the SARS-CoV-2 (COVID-19) Coronavirus-19 Pandemic for the Department of Corrections*   is hereby modified as follows:

1. As a result of, and pursuant to, D.C. Code § 7–2304. Issuance of emergency executive order; contents; actions of Mayor in response to the World Health Organization's ("WHO") declaration of the imminent threat and spread of SARS-CoV-2 (COVID-19) Coronavirus-19 as a world-wide Pandemic, the Department hereby issues this Modification No. 03 extending services for a period of three (3) month beginning on December 1, 2020 and ending February 28, 2021.

2. As a result of Item No. 01, of this Modification No. 03 for Comprehensive Hazardous Materials ("HAZMAT") Environmental Cleaning Services related to the SARS-CoV-2 (COVID-19) Coronavirus-19 Pandemic for the Department of Corrections, Basic Services are hereby increased from $1,007,274.72 by $755,456.04 to $1,787,730.76.

3. **CONTRACT RECAP** Basic Services shall not exceed $1,649,477.69 and Cost Reimbursement Services shall not exceed $25,000.00. **_The Total Not-To-Exceed_** Value for Emergency Contract is **$1,787,730.76.**

4. The continuation of services beyond February 28, 2021 is subject to the availability of FY21 Appropriated budgets and extension of the emergency executive order D.C. Code § 7–2304.

5. All other Terms and Conditions of Contract DCAM-20-NC-EM-0079C remain unchanged.

6. **RELEASE:** It is mutually agreed that in exchange for this Modification and other consideration, the Contractor hereby releases, waives, settles, and holds the Department harmless from any and all actual or potential claims or demands for delays, disruptions, additional work, additional time, additional costs, contract extensions, compensation, or liability under any theory, whether known or unknown, that the Contractor may have now or in the future against the Department arising from or out of, as a consequences or result of, relating to or in any manner connected with this Modification, the above-referenced Services, and the work provided pursuant to the Agreement.

Except as provided herein, all terms and conditions of the document referenced in Item (9A or 10A) remain unchanged and in full force and effect

| 15A. Name and Title of Signer (Type or print) Genet Mersha (President/CEO) | 16A. Name of Contracting Officer **GEORGE G. LEWIS, CPPO** **Chief Procurement Officer, Chief of Contracts & Procurement** | |
|---|---|---|
| 15B. Name of Contractor G-Sida General Services | 15C. Date Signed 11/30/2020 | 16B. District of Columbia | 16C. Date Signed 11/30/2020 |
| (Signature of person authorized to sign) | George G (Signature of Contracting Officer) | |

(Continuation)

| Contract Number | Modification No. | Page of Pages | |
|---|---|---|---|
| DCAM-20-NC-EM-0079C | M03 | 2 | 2.00 |

**1. Emergency Contract**                    **05-August-2020 - 314-October-2020**
    **a.** Basic Services      228,780.00
    **b.** Cost Reimbursement for Supplemental Services      25,000.00
         **253,780.00**

**2. Correction to Monthly Cost**            **05-August-2020 - 31-October-2020**
    Modification No. 01
    **a.** Delete in its entirety - Contract Ceiling listed in sections A and Section B.3.1      (253,780.00)
    **b.** Correction of Monthly cost ($251,818.68 3 months) plus $25K Cost Reimbursement      755,456.04
         25,000.00
         **526,676.04**

**3. Increase Services**                     **01-November-2020 thru 30-November-2020**
    Modification No. 02
    **a.** Extended the Term of Services for one (1) Month - 1-NOV-2020 thru 30-NOV-2020      $    -
    **b.** Increase Basic Services from $755,456.04 by $251,818.68 to $1,007,274.72      $    251,818.68
         $    **251,818.68**

**4. Increase Services**                     **01-December-2020 thru 28-February-2021**
    Modification No. 03
    **a.** Extended the Term of Services for three (3) Month - 1-DEC-2020 thru 28-FEB-2021      $    -
    **b.** Increase Basic Services from $1,007,274.72 by $755,456.04 to $1,787,730.76      $    755,456.04
         $    **755,456.04**

| SARS-CoV-2 (COVID-19) EMERGENCY CONTRACT GRAND TOTAL | $ 1,787,730.76 |
|---|---|

**Ex   H**

# MODIFICATION OF CONTRACT

| | | 1. Contract Number DCAM-20-NC-EM-0079B | Page of Pages 1 | 2 |
|---|---|---|---|---|

| 2. Modification Number **M04** | 3. Effective Date **See Block 16C** | 4. Requisition/Purchase Request No. **TBD** | 5. Contract Caption **Comprehensive Hazardous Materials ("HAZMAT") Environmental Cleaning Services related to the SARS-CoV-2 (COVID-19) Coronavirus-19 Pandemic for the Department of Corrections** |
|---|---|---|---|

| 6. Issued By: Department of General Services Contracting and Procurement Division 2000 14th Street, 8th Floor Washington, DC 20009 ATTN: Domonique L. Banks   (202) 719-6544   domonique.banks@dc.gov | 7. Administered By (If other than line 6) Department of General Services Facilities Division 2000 14th Street NW, 8th Floor Washington, DC 20009 Attention: Ruth Jenkins    PH: (202) 579-2624    EMAIL: ruth.jenkins@dc.gov |
|---|---|

| 8. Name and Address of Contractor (No. Street, city, country, state and ZIP Code) **SPECTRUM MANAGEMENT, LLC** 1229 Pennsylvania Avenue, S.E. Washington, D.C. 20003  ATTN: George Simpson  (202) 546-2080        gtsimpson@smusa.us | 9A. Amendment of Solicitation No. |
|---|---|
| | 9B. Dated (See Item 11) |
| | 10A. Modification of Contract/Order No.   **X DCAM-20-NC-EM-0079B** |
| | 10B. Dated (See Item 13) **May 18, 2020** |

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

| The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended. ☐ is not extended. |
|---|

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning _____1_____ copies of the amendment: (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or fax which includes a reference to the solicitation and amendment number. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by letter or fax, provided each letter or telegram makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

| 12. Accounting and Appropriation Data (If Required) |
|---|

**13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14**

| | A. This change order is issued pursuant to: (Specify Authority) The changes set forth in Item 14 are made in the contract/order no. in item 10A. |
|---|---|
| | B. The above numbered contract/order is modified to reflect the administrative changes (such as changes in paying office, appropriation date, etc.) set forth in item 14. |
| | C. This supplemental agreement is entered into pursuant to authority of: |
| **X** | D. Other (Specify type of modification and authority)    **Contract   DCAM-20-NC-EM-0079B   and Title 27 DCMR Sections 4727** |

| E. IMPORTANT:    Contractor ☐ is not,   ☒ is required to sign this document and return    1    copy to the issuing office. |
|---|

14. Description of modification (Organized by UCF Section headings, including solicitation/contract subject matter where feasible.)

Contract No. **DCAM-20-NC-EM-0079B**   *Comprehensive Hazardous Materials ("HAZMAT") Environmental Cleaning Services related to the SARS-CoV-2 (COVID-19) Coronavirus-19 Pandemic for the Department of Corrections*   is hereby modified as follows:

1. As a result of, and pursuant to, D.C. Code § 7–2304. Issuance of emergency executive order; contents; actions of Mayor in response to the World Health Organization's ("WHO") declaration of the imminent threat and spread of SARS-CoV-2 (COVID-19) Coronavirus-19 as a world-wide Pandemic, the Department hereby issues this Modification No. 04 extending services for a period of three (3) month beginning on December 1, 2020 and ending February 28, 2021.

2. As a result of Item No. 01, of this Modification No. 04 for Comprehensive Hazardous Materials ("HAZMAT") Environmental Cleaning Services related to the SARS-CoV-2 (COVID-19) Coronavirus-19 Pandemic for the Department of Corrections, Basic Services are hereby increased from $1,649,477.69 by $765,221.61 to $2,444,699.30.

3. **CONTRACT RECAP** Basic Services shall not exceed $1,649,477.69 and Cost Reimbursement Services shall not exceed $30,000.00. *The Total Not-To-Exceed* Value for Emergency Contract is **$2,444,699.30.**

4. The continuation of services beyond February 28, 2021 is subject to the availability of FY21 Appropriated budgets and extension of the emergency executive order D.C. Code § 7–2304.

5. All other Terms and Conditions of Contract DCAM-20-NC-EM-0079B remain unchanged.

6. **RELEASE:** It is mutually agreed that in exchange for this Modification and other consideration, the Contractor hereby releases, waives, settles, and holds the Department harmless from any and all actual or potential claims or demands for delays, disruptions, additional work, additional time, additional costs, contract extensions, compensation, or liability under any theory, whether known or unknown, that the Contractor may have now or in the future against the Department arising from or out of, as a consequences or result of, relating to or in any manner connected with this Modification, the above-referenced Services, and the work provided pursuant to the Agreement.

Except as provided herein, all terms and conditions of the document referenced in Item (9A or 10A) remain unchanged and in full force and effect

| 15A. Name and Title of Signer (Type or print) **Kaneedreck Adams, COO** | 16A. Name of Contracting Officer **GEORGE G. LEWIS, CPPO** **Chief Procurement Officer, Chief of Contracts & Procurement** |
|---|---|
| 15B. Name of Contractor *Kaneedreck Ada—* (Signature of person authorized to sign) | 15C. Date Signed 11/30/2020 | 16B. District of Columbia *George G. Lewis. CPPO* (Signature of Contracting Officer) | 16C. Date Signed 11/30/2020 |

(Continuation)

| Contract Number | Modification No. | Page of Pages | |
|---|---|---|---|
| DCAM-20-NC-EM-0079B | M04 | 2 | 2 |

**1. Emergency Contract**                          **18-May-2020 thru 16-August-2020**

    **a.** Basic Services          $    765,221.61

    **b.** Cost Reimbursement for Supplemental Services      $     25,000.00

                                                **$    790,221.61**

**2. Increase Services**                          **17-August-2020 thru 24-August-2020**

Modification No. 01

    **a.** Increase Basic Services from $765,221.61 by $45,512.31 to $832,733.92     $     42,512.31

                                                **$      42,512.31**

**3. Increase Services**                          **24-August-2020 thru 31-October-2020**

Modification No. 02

    **a.** Increase Basic Services from $832,733.92 by $586,669.90 to $1,394,403.82     $    586,669.90

    **b.** Increase Supplemental Service Ceiling from $25K by $5K to $30K     $      5,000.00

                                                **$    591,669.90**

**4. Increase Services**                          **01-November-2020 thru 30-November-2020**

Modification No. 03

    **a.** Extended the Term of Services for one (1) Month - 1-NOV-2020 thru 30-NOV-2020     $           -

    **a.** Increase Basic Services from $1,394,403.82 by $255,073.87 to $1,679,477.69     $    255,073.87

                                                  **$    255,073.87**

**5. Increase Services**                          **01-December-2020 thru 28-February-2021**

Modification No. 04

    **a.** Extended the Term of Services for three (3) Month - 1-DEC-2020 thru 30-FEB-2021     $           -

    **a.** Increase Basic Services from $1,679,477.69 by $765,221.61 to $2,444,699.30     $    765,221.61

                                                  **$    765,221.61**

| EMERGENCY CONTRACT GRAND TOTAL | $ 2,444,699.30 |
|---|---|

**Ex   I**

**From:** Lewis, George (DGS)
**Sent:** Monday, November 23, 2020 9:59 AM
**To:** Stewart-Ponder, Gitana (DOC) <gitana.stewart-ponder@dc.gov>
**Cc:** Fuller, Yohance (DGS) <yohance.fuller@dc.gov>; Gonzalez, Donny (DGS) <donny.gonzalez@dc.gov>; Meadors, Danielle (DGS) <danielle.meadors@dc.gov>; Holt, Kasmin (DGS) <Kasmin.Holt@dc.gov>; Ha  on, Tim (DGS) <m.ha    on@dc.gov>; Gray, Kim M. (DGS) <Kim.Gray@dc.gov>; Robertson, Gloria (DOC) <gloria.robertson@dc.gov>; Ponder, Gizele (DOC) <gizele.ponder@dc.gov>; Ford Dickerson, Pamela (DGS) <Pamela.Dickerson@dc.gov>
**Subject:** RE: DOC Cleaning Contracts Renewal

Good morning Gitana. As discussed we will extend the Contract to **February 2021** and will work with our Budget Team to ensure funding is secured to ensure compliance with the Court Order.
Kim, let's extend both contracts to February 2021 and work with our team for incremental funding.
We should review in January to ensure that Court Order is sll v  alid and if so we may need to prepare a compev    e solicitaon in Januar  y if we must connue the c  ontract beyond February 2021.
Thanks all.

George G. Lewis, CPPO
Chief, Contracts and Procurement
Chief Procurement Officer
Department of General Services

2000 14th ST N.W
Washington, DC 20009
Office (202) 478-5727
Cell (202) 430-9967



1/1

**Ex**

## Job Description

| | |
|---|---|
| **Job Title** | Sanitation Inspection Specialist |
| **Job ID** | 10564 |
| **Date Opened** | 05/21/2020 |
| **Date Closed** | 05/26/2020 |
| **Location** | Detention Facility |
| **Full/Part Time** | Full-Time |
| **Regular/Temporary** | Regular |
| **Agency** | FL      Department of Corrections |
| **Area of Consideration** | Open to Public |
| **Grade** | 12 |
| **Bargaining Unit** | CH11      Non Union - Chapter 11 |
| **Minimum Range** | $76,126.000000 |
| **Target Openings** | 1 |

**Type of Appointment**   Career Service - Reg Appt

**Maximum Range**   $97,375.000000

**Available Openings**   1

Return to Previous Page         Switch to Internal View

**General Job Information**

### JOB SUMMARY

This position is located in the Department of Corrections (DOC), Office of Accreditation and Compliance located inside the Central Detention Facility (CDF), and Correctional Treatment Facility (CTF). The operational focus is on supporting activities related to staffs, inmates, and visitors' health and well-being.

The Environmental Safety and Sanitation Inspection Specialist (ESS) provides environmental safety and sanitation oversight for the CDF and CTF and ensures that the housing units common areas are clean, sanitary and environmentally safe, and the facilities and equipment are maintained in good working order/condition as well as the laundry operations, barber and cosmetology, and commissary areas.

### DUTIES AND RESPONSIBILITIES

Plans, designs, develops and coordinates correctional environmental safety and sanitation initiatives; and serves in a key supporting role for the implementation of departmental initiatives focusing on core correctional needs and support requirements as it relates to environmental safety and sanitation of the CDF and CTF. Incumbent ensures day-to-day oversight for compliance with applicable regulations, codes and standards relevant to the mission and goals; oversees and coordinates inspections conducted by the DC Department of Health (DOH) and conducts comprehensive and thorough inspections to ensure that the facilities are compliant. Maintains a manual and automated reporting system to keep up to date with inspection schedules and cleaning squads/crews; and coordinates with department managers, supervisors, officers, and employees regarding the cleaning and inspection schedules

Provides instructions and guidelines to detail squads; replenishes/orders supplies and tools for cleaning purposes, and documents whether the operation is compliant with prevention, identification and abatement activities. Addresses departmental issues and key initiatives; and assists in the development of funding and resource proposals to support program initiatives.

Recommends revisions to internal policies and interfaces with key officials within the Department, with other Federal and District Government agencies and the private sector in the course of working out administrative systems and procedures that are inherent in attaining the goals.

Oversees and assesses the inspections of all facility areas e.g., weekly/monthly/annually; collaborates with supervisors and managers to designate employees to conduct regular internal inspections to identify and document deficiencies.

Oversees sanitation supplies are available for distribution; and are distributed to the units based on an approved schedule. Collaborates with correctional officers and supervisors to ensure cleaning equipment is utilized in the proper manner and makes inspections a part of their daily tasks.

Makes rounds with designated staff. Rounds shall include inspections of showers, dayrooms, on-unit classrooms and recreation areas, chase closets and storage area supply closets, tiers, and the control bubble. Inspections require each program manager or designee to be present when the ESS performs inspections of areas such as the medical unit, the warehouse, storage rooms, shops, commissary, food services, etc.

Collaborates with the Facilities Maintenance manager regarding repairs, based on schedule, visits housing units to

Collaborates with the Facilities Maintenance manager regarding repairs, based on schedule; visits housing units to conduct a general visual inspection for cleanliness and ensures that adequate cleaning supplies are available and equipment and fixtures are operational in common areas. Reviews inspection reports of cells and ensures cells are free from graffiti and peeling paint. Managers affected by this report are responsible for preparing a closed out Corrective Action Plan (CAP) to the ESS and appropriate DOC manager official. The ESS follows up on the CAP to ensure adequate corrective action is taken in a timely manner.

Evaluates performance management for operational efficiency and support services for effectiveness; and participates in scheduled or random audit reviews of internal programs offices. Evaluates and documents results of each program audit; and prescribes corrective action or remediation in difficult and complex work assignment

Makes sure cellblock control modules, administrative areas, office areas, medical unit, Inmate Reception Center (IRC), and other areas are thoroughly cleaned; and coordinates with maintenance staff for cleaning air vents, windows and high walls.

Maintains documentation relevant to DOH inspections, corrective action plans and abatement schedules and determines the frequency of required treatments.  Keeps in contact with the DC Departments of Health, Occupational Safety and Health Administration, DC Fire and Emergency Management and other independent consultants.

### QUALIFICATIONS AND EDUCATION

Applicants must have at least one (1) year of specialized experience.  Specialized experience is experience which is in or directly related to the line of work of the position and has equipped the applicant with the particular knowledge, skills and abilities to successfully perform the duties of the position.

### LICENSE AND CERTIFICATION

None

### WORKING CONDITIONS

Work is performed both in an office and correctional institutional facility environment.

### OTHER SIGNIFICANT FACTS

**Tour of Duty:** 7:30 a.m. - 4:30 p.m.   Must be flexible to varying work hours.

**Collective Bargaining:** This position is not in Collective Bargaining

**Duration of Appointment:** Career Service Appointment

**Position Designation:**  The incumbent of this position will be subject to enhanced suitability screening pursuant to Chapter 4 of the DC Personnel Regulations Suitability-Safety Sensitive. This position requires a background check and drug screening; therefore, you may be required to provide information about your criminal history and pass a drug screening in order to be appointed to this position.  A TB Test will be required prior to entry on duty.

If the position you are applying for is in the Career, Management Supervisor, or Educational Service at an annual salary of one hundred fifty thousand dollars ($150,000) or more, you must establish residency in the District of Columbia within one hundred eighty (180) days of the effective date of the appointment and continue to maintain residency within the District of Columbia throughout the duration of appointment.

### EEO Statement

The District of Columbia Government is an Equal Opportunity Employer.   All qualified candidates will receive consideration without regard to race, color religion, national orgin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, matriculation, physical handicap, or political affiliation.

Return to Previous Page                    Switch to Internal View

## Job Description

| | |
|---|---|
| **Job Title** | Sanitation Inspection Specialist |
| **Job ID** | 10793 |
| **Date Opened** | 06/17/2020 |
| **Date Closed** | 06/26/2020 |
| **Location** | Detention Facility |
| **Full/Part Time** | Full-Time |
| **Regular/Temporary** | Regular |
| **Agency** | FL    Department of Corrections |
| **Area of Consideration** | Open to Public |
| **Grade** | 12 |
| **Bargaining Unit** | CH11    Non Union - Chapter 11 |
| **Minimum Range** | $76,126.000000 |

**Type of Appointment**   Career Service - Reg Appt

**Maximum Range**   $97,375.000000

**Target Openings**   1      **Available Openings**   1

Return to Previous Page        Switch to Internal View

**General Job Information**

### JOB SUMMARY

This position is located in the Department of Corrections (DOC), Office of Accreditation and Compliance located inside the Central Detention Facility (CDF), and Correctional Treatment Facility (CTF). The operational focus is on supporting activities related to staffs, inmates, and visitors' health and well-being.

The Environmental Safety and Sanitation Inspection Specialist (ESS) provides environmental safety and sanitation oversight for the CDF and CTF and ensures that the housing units common areas are clean, sanitary and environmentally safe, and the facilities and equipment are maintained in good working order/condition as well as the laundry operations, barber and cosmetology, and commissary areas.

### DUTIES AND RESPONSIBILITIES

Plans, designs, develops and coordinates correctional environmental safety and sanitation initiatives; and serves in a key supporting role for the implementation of departmental initiatives focusing on core correctional needs and support requirements as it relates to environmental safety and sanitation of the CDF and CTF. Incumbent ensures day-to-day oversight for compliance with applicable regulations, codes and standards relevant to the mission and goals; oversees and coordinates inspections conducted by the DC Department of Health (DOH) and conducts comprehensive and thorough inspections to ensure that the facilities are compliant. Maintains a manual and automated reporting system to keep up to date with inspection schedules and cleaning squads/crews; and coordinates with department managers, supervisors, officers, and employees regarding the cleaning and inspection schedules

Provides instructions and guidelines to detail squads; replenishes/orders supplies and tools for cleaning purposes, and documents whether the operation is compliant with prevention, identification and abatement activities. Addresses departmental issues and key initiatives; and assists in the development of funding and resource proposals to support program initiatives.

Recommends revisions to internal policies and interfaces with key officials within the Department, with other Federal and District Government agencies and the private sector in the course of working out administrative systems and procedures that are inherent in attaining the goals.

Oversees and assesses the inspections of all facility areas e.g., weekly/monthly/annually; collaborates with supervisors and managers to designate employees to conduct regular internal inspections to identify and document deficiencies.

Oversees sanitation supplies are available for distribution; and are distributed to the units based on an approved schedule. Collaborates with correctional officers and supervisors to ensure cleaning equipment is utilized in the proper manner and makes inspections a part of their daily tasks.

Makes rounds with designated staff. Rounds shall include inspections of showers, dayrooms, on-unit classrooms and recreation areas, chase closets and storage area supply closets, tiers, and the control bubble. Inspections require each program manager or designee to be present when the ESS performs inspections of areas such as the medical unit, the warehouse, storage rooms, shops, commissary, food services, etc.

Collaborates with the Facilities Maintenance manager regarding repairs, based on schedule, visits housing units to

Collaborates with the Facilities Maintenance manager regarding repairs, based on schedule, visits housing units to conduct a general visual inspection for cleanliness and ensures that adequate cleaning supplies are available and equipment and fixtures are operational in common areas. Reviews inspection reports of cells and ensures cells are free from graffiti and peeling paint. Managers affected by this report are responsible for preparing a closed out Corrective Action Plan (CAP) to the ESS and appropriate DOC manager official. The ESS follows up on the CAP to ensure adequate corrective action is taken in a timely manner.

Evaluates performance management for operational efficiency and support services for effectiveness; and participates in scheduled or random audit reviews of internal programs offices. Evaluates and documents results of each program audit; and prescribes corrective action or remediation in difficult and complex work assignment

Makes sure cellblock control modules, administrative areas, office areas, medical unit, Inmate Reception Center (IRC), and other areas are thoroughly cleaned; and coordinates with maintenance staff for cleaning air vents, windows and high walls.

Maintains documentation relevant to DOH inspections, corrective action plans and abatement schedules and determines the frequency of required treatments.  Keeps in contact with the DC Departments of Health, Occupational Safety and Health Administration, DC Fire and Emergency Management and other independent consultants.

## QUALIFICATIONS AND EDUCATION

Applicants must have at least one (1) year of specialized experience equivalent to the next lower grade level. Specialized experience is experience which is in or directly related to the line of work of the position and has equipped the applicant with the particular knowledge, skills and abilities to successfully perform the duties of the position.

## LICENSE AND CERTIFICATION

None

## WORKING CONDITIONS

Work is performed both in an office and correctional institutional facility environment.

## OTHER SIGNIFICANT FACTS

**Tour of Duty:** 7:30 a.m. - 4:30 p.m.   Must be flexible to varying work hours.

**Collective Bargaining:** This position is not in Collective Bargaining

**Duration of Appointment**: Career Service Appointment

**Position Designation:** "This position is designated as a Safety Sensitive position and is subject to mandatory pre-employment and periodic Criminal Background Checks and Traffic Records Checks (as applicable). This position is also subject to mandatory pre-employment and random Drug and Alcohol Testing. In this position, you may be disqualified from employment based on the presence of marijuana in test results, even if you possess a medical card authorizing the use of medical marijuana." A TB Test will be required prior to entry on duty.

If the position you are applying for is in the Career, Management Supervisor, or Educational Service at an annual salary of one hundred fifty thousand dollars ($150,000) or more, you must establish residency in the District of Columbia within one hundred eighty (180) days of the effective date of the appointment and continue to maintain residency within the District of Columbia throughout the duration of appointment.

## EEO Statement

The District of Columbia Government is an Equal Opportunity Employer.  All qualified candidates will receive consideration without regard to race, color religion, national orgin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, matriculation, physical handicap, or political affiliation.

---

Return to Previous Page                              Switch to Internal View

## Job Description

| | |
|---|---|
| **Job Title** | Sanitation Inspection Specialist |
| **Job ID** | 10853 |
| **Date Opened** | 07/07/2020 |
| **Date Closed** | 07/16/2020 |
| **Location** | Detention Facility |
| **Full/Part Time** | Full-Time     **Type of Appointment**   Career Service - Reg Appt |
| **Regular/Temporary** | Regular |
| **Agency** | FL      Department of Corrections |
| **Area of Consideration** | Open to Public |
| **Grade** | 12 |
| **Bargaining Unit** | CH11     Non Union - Chapter 11 |
| **Minimum Range** | $76,126.000000     **Maximum Range**   $97,375.000000 |
| **Target Openings** | 1     **Available Openings**   1 |

Return to Previous Page                    Switch to Internal View

**General Job Information**

**JOB SUMMARY**

This position is located in the Department of Corrections (DOC), Office of Accreditation and Compliance located inside the Central Detention Facility (CDF), and Correctional Treatment Facility (CTF). The operational focus is on supporting activities related to staffs, inmates, and visitors' health and well-being.

The Environmental Safety and Sanitation Inspection Specialist (ESS) provides environmental safety and sanitation oversight for the CDF and CTF and ensures that the housing units common areas are clean, sanitary and environmentally safe, and the facilities and equipment are maintained in good working order/condition as well as the laundry operations, barber and cosmetology, and commissary areas.

**DUTIES AND RESPONSIBILITIES**

Plans, designs, develops and coordinates correctional environmental safety and sanitation initiatives; and serves in a key supporting role for the implementation of departmental initiatives focusing on core correctional needs and support requirements as it relates to environmental safety and sanitation of the CDF and CTF. Incumbent ensures day-to-day oversight for compliance with applicable regulations, codes and standards relevant to the mission and goals; oversees and coordinates inspections conducted by the DC Department of Health (DOH) and conducts comprehensive and thorough inspections to ensure that the facilities are compliant. Maintains a manual and automated reporting system to keep up to date with inspection schedules and cleaning squads/crews; and coordinates with department managers, supervisors, officers, and employees regarding the cleaning and inspection schedules

Provides instructions and guidelines to detail squads; replenishes/orders supplies and tools for cleaning purposes, and documents whether the operation is compliant with prevention, identification and abatement activities. Addresses departmental issues and key initiatives; and assists in the development of funding and resource proposals to support program initiatives.

Recommends revisions to internal policies and interfaces with key officials within the Department, with other Federal and District Government agencies and the private sector in the course of working out administrative systems and procedures that are inherent in attaining the goals.

Oversees and assesses the inspections of all facility areas e.g., weekly/monthly/annually; collaborates with supervisors and managers to designate employees to conduct regular internal inspections to identify and document deficiencies.

Oversees sanitation supplies are available for distribution; and are distributed to the units based on an approved schedule. Collaborates with correctional officers and supervisors to ensure cleaning equipment is utilized in the proper manner and makes inspections a part of their daily tasks.

Makes rounds with designated staff. Rounds shall include inspections of showers, dayrooms, on-unit classrooms and recreation areas, chase closets and storage area supply closets, tiers, and the control bubble. Inspections require each program manager or designee to be present when the ESS performs inspections of areas such as the medical unit, the warehouse, storage rooms, shops, commissary, food services, etc.

Collaborates with the Facilities Maintenance manager regarding repairs, based on schedule, visits housing units to

Collaborates with the Facilities Maintenance manager regarding repairs, based on schedule, visits housing units to conduct a general visual inspection for cleanliness and ensures that adequate cleaning supplies are available and equipment and fixtures are operational in common areas. Reviews inspection reports of cells and ensures cells are free from graffiti and peeling paint. Managers affected by this report are responsible for preparing a closed out Corrective Action Plan (CAP) to the ESS and appropriate DOC manager official. The ESS follows up on the CAP to ensure adequate corrective action is taken in a timely manner.

Evaluates performance management for operational efficiency and support services for effectiveness; and participates in scheduled or random audit reviews of internal programs offices. Evaluates and documents results of each program audit; and prescribes corrective action or remediation in difficult and complex work assignment

Makes sure cellblock control modules, administrative areas, office areas, medical unit, Inmate Reception Center (IRC), and other areas are thoroughly cleaned; and coordinates with maintenance staff for cleaning air vents, windows and high walls.

Maintains documentation relevant to DOH inspections, corrective action plans and abatement schedules and determines the frequency of required treatments. Keeps in contact with the DC Departments of Health, Occupational Safety and Health Administration, DC Fire and Emergency Management and other independent consultants. Must have experience working in a correctional facility.

## QUALIFICATIONS AND EDUCATION

Applicants must have at least one (1) year of specialized experience equivalent to the next lower grade level. Specialized experience is experience which is in or directly related to the line of work of the position and has equipped the applicant with the particular knowledge, skills and abilities to successfully perform the duties of the position.

## LICENSE AND CERTIFICATION

None

## WORKING CONDITIONS

Work is performed both in an office and correctional institutional facility environment.

## OTHER SIGNIFICANT FACTS

**Tour of Duty:** 7:30 a.m. - 4:30 p.m. Must be flexible to varying work hours.

**Collective Bargaining:** This position is not in Collective Bargaining

**Duration of Appointment:** Career Service Appointment

**Position Designation:** "This position is designated as a Safety Sensitive position and is subject to mandatory pre-employment and periodic Criminal Background Checks and Traffic Records Checks (as applicable). This position is also subject to mandatory pre-employment and random Drug and Alcohol Testing. In this position, you may be disqualified from employment based on the presence of marijuana in test results, even if you possess a medical card authorizing the use of medical marijuana." A TB Test will be required prior to entry on duty.

If the position you are applying for is in the Career, Management Supervisor, or Educational Service at an annual salary of one hundred fifty thousand dollars ($150,000) or more, you must establish residency in the District of Columbia within one hundred eighty (180) days of the effective date of the appointment and continue to maintain residency within the District of Columbia throughout the duration of appointment.

## EEO Statement

The District of Columbia Government is an Equal Opportunity Employer. All qualified candidates will receive consideration without regard to race, color religion, national orgin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, matriculation, physical handicap, or political affiliation.

Return to Previous Page        Switch to Internal View

Favorites ▾      Main Menu ▾      ›   Recruiting ▾   ›   Search Job Openings      ›   Manage Job Opening

Home      Worklist      Add to Favorites      **Sign Out**

Welcome **Lurendy W Armstrong** (00009045).

## Job Description

| | |
|---|---|
| **Job Title** | Sanitation Inspection Specialist |
| **Job ID** | 11022 |
| **Date Opened** | 07/31/2020 |
| **Date Closed** | 09/13/2020 |
| **Location** | Detention Facility |
| **Full/Part Time** | Full-Time |
| **Regular/Temporary** | Regular |
| **Agency** | FL      Department of Corrections |
| **Area of Consideration** | Open to Public |
| **Grade** | 12 |
| **Bargaining Unit** | CH11      Non Union - Chapter 11 |
| **Minimum Range** | $76,126.000000 |

**Type of Appointment**   Career Service - Reg Appt

**Maximum Range**   $97,375.000000

**Target Openings**   1

**Available Openings**   1

Return to Previous Page            Switch to Internal View

**General Job Information**

**JOB SUMMARY**

This position is located in the Department of Corrections (DOC), Office of Accreditation and Compliance located inside the Central Detention Facility (CDF), and Correctional Treatment Facility (CTF). The operational focus is on supporting activities related to staffs, inmates, and visitors' health and well-being.

The Environmental Safety and Sanitation Inspection Specialist (ESS) provides environmental safety and sanitation oversight for the CDF and CTF and ensures that the housing units common areas are clean, sanitary and environmentally safe, and the facilities and equipment are maintained in good working order/condition as well as the laundry operations, barber and cosmetology, and commissary areas.

**DUTIES AND RESPONSIBILITIES**

Plans, designs, develops and coordinates correctional environmental safety and sanitation initiatives; and serves in a key supporting role for the implementation of departmental initiatives focusing on core correctional needs and support requirements as it relates to environmental safety and sanitation of the CDF and CTF. Incumbent ensures day-to-day oversight for compliance with applicable regulations, codes and standards relevant to the mission and goals; oversees and coordinates inspections conducted by the DC Department of Health (DOH) and conducts comprehensive and thorough inspections to ensure that the facilities are compliant. Maintains a manual and automated reporting system to keep up to date with inspection schedules and cleaning squads/crews; and coordinates with department managers, supervisors, officers, and employees regarding the cleaning and inspection schedules

Provides instructions and guidelines to detail squads; replenishes/orders supplies and tools for cleaning purposes, and documents whether the operation is compliant with prevention, identification and abatement activities. Addresses departmental issues and key initiatives; and assists in the development of funding and resource proposals to support program initiatives.

Recommends revisions to internal policies and interfaces with key officials within the Department, with other Federal and District Government agencies and the private sector in the course of working out administrative systems and procedures that are inherent in attaining the goals.

Oversees and assesses the inspections of all facility areas e.g., weekly/monthly/annually; collaborates with supervisors and managers to designate employees to conduct regular internal inspections to identify and document deficiencies.

Oversees sanitation supplies are available for distribution; and are distributed to the units based on an approved schedule. Collaborates with correctional officers and supervisors to ensure cleaning equipment is utilized in the proper manner and makes inspections a part of their daily tasks.

Makes rounds with designated staff. Rounds shall include inspections of showers, dayrooms, on-unit classrooms and recreation areas, chase closets and storage area supply closets, tiers, and the control bubble. Inspections require each program manager or designee to be present when the ESS performs inspections of areas such as the medical unit, the warehouse, storage rooms, shops, commissary, food services, etc.

Collaborates with the Facilities Maintenance manager regarding repairs, based on schedule, visits housing units to

Collaborates with the Facilities Maintenance manager regarding repairs, based on schedule, visits housing units to conduct a general visual inspection for cleanliness and ensures that adequate cleaning supplies are available and equipment and fixtures are operational in common areas. Reviews inspection reports of cells and ensures cells are free from graffiti and peeling paint. Managers affected by this report are responsible for preparing a closed out Corrective Action Plan (CAP) to the ESS and appropriate DOC manager official. The ESS follows up on the CAP to ensure adequate corrective action is taken in a timely manner.

Evaluates performance management for operational efficiency and support services for effectiveness; and participates in scheduled or random audit reviews of internal programs offices. Evaluates and documents results of each program audit; and prescribes corrective action or remediation in difficult and complex work assignment

Makes sure cellblock control modules, administrative areas, office areas, medical unit, Inmate Reception Center (IRC), and other areas are thoroughly cleaned; and coordinates with maintenance staff for cleaning air vents, windows and high walls.

Maintains documentation relevant to DOH inspections, corrective action plans and abatement schedules and determines the frequency of required treatments. Keeps in contact with the DC Departments of Health, Occupational Safety and Health Administration, DC Fire and Emergency Management and other independent consultants. Must have experience working in a correctional facility.

## QUALIFICATIONS AND EDUCATION

Applicants must have at least one (1) year of specialized experience equivalent to the next lower grade level. Specialized experience is experience which is in or directly related to the line of work of the position and has equipped the applicant with the particular knowledge, skills and abilities to successfully perform the duties of the position.

## LICENSE AND CERTIFICATION

None

## WORKING CONDITIONS

Work is performed both in an office and correctional institutional facility environment.

## OTHER SIGNIFICANT FACTS

**Tour of Duty:** 7:30 a.m. - 4:30 p.m.   Must be flexible to varying work hours.

**First Screening Date:** 08/17/2020

**Collective Bargaining:** This position is not in Collective Bargaining

**Duration of Appointment**: Career Service Appointment

**Position Designation:** "This position is designated as a Safety Sensitive position and is subject to mandatory pre-employment and periodic Criminal Background Checks and Traffic Records Checks (as applicable). This position is also subject to mandatory pre-employment and random Drug and Alcohol Testing. In this position, you may be disqualified from employment based on the presence of marijuana in test results, even if you possess a medical card authorizing the use of medical marijuana." A TB Test will be required prior to entry on duty.

If the position you are applying for is in the Career, Management Supervisor, or Educational Service at an annual salary of one hundred fifty thousand dollars ($150,000) or more, you must establish residency in the District of Columbia within one hundred eighty (180) days of the effective date of the appointment and continue to maintain residency within the District of Columbia throughout the duration of appointment.

## EEO Statement

The District of Columbia Government is an Equal Opportunity Employer.  All qualified candidates will receive consideration without regard to race, color religion, national orgin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, matriculation, physical handicap, or political affiliation.

Return to Previous Page                    Switch to Internal View

## Job Description

| | |
|---|---|
| **Job Title** | Sanitation Inspection Specialist |
| **Job ID** | 11318 |
| **Date Opened** | 09/18/2020 |
| **Date Closed** | 09/22/2020 |
| **Location** | Detention Facility |
| **Full/Part Time** | Full-Time |
| **Regular/Temporary** | Regular |
| **Agency** | FL      Department of Corrections |
| **Area of Consideration** | Open to Public |
| **Grade** | 12 |
| **Bargaining Unit** | CH11      Non Union - Chapter 11 |
| **Minimum Range** | $76,126.000000 |
| **Target Openings** | 1 |

**Type of Appointment** Career Service - Reg Appt

**Maximum Range** $97,375.000000

**Available Openings** 1

Return to Previous Page                    Switch to Internal View

**General Job Information**

**JOB SUMMARY**

This position is located in the Department of Corrections (DOC), Office of Accreditation and Compliance located inside the Central Detention Facility (CDF), and Correctional Treatment Facility (CTF). The operational focus is on supporting activities related to staffs, inmates, and visitors' health and well-being.

The Environmental Safety and Sanitation Inspection Specialist (ESS) provides environmental safety and sanitation oversight for the CDF and CTF and ensures that the housing units common areas are clean, sanitary and environmentally safe, and the facilities and equipment are maintained in good working order/condition as well as the laundry operations, barber and cosmetology, and commissary areas.

**DUTIES AND RESPONSIBILITIES**

Plans, designs, develops and coordinates correctional environmental safety and sanitation initiatives; and serves in a key supporting role for the implementation of departmental initiatives focusing on core correctional needs and support requirements as it relates to environmental safety and sanitation of the CDF and CTF. Incumbent ensures day-to-day oversight for compliance with applicable regulations, codes and standards relevant to the mission and goals; oversees and coordinates inspections conducted by the DC Department of Health (DOH) and conducts comprehensive and thorough inspections to ensure that the facilities are compliant. Maintains a manual and automated reporting system to keep up to date with inspection schedules and cleaning squads/crews; and coordinates with department managers, supervisors, officers, and employees regarding the cleaning and inspection schedules

Provides instructions and guidelines to detail squads; replenishes/orders supplies and tools for cleaning purposes, and documents whether the operation is compliant with prevention, identification and abatement activities. Addresses departmental issues and key initiatives; and assists in the development of funding and resource proposals to support program initiatives.

Recommends revisions to internal policies and interfaces with key officials within the Department, with other Federal and District Government agencies and the private sector in the course of working out administrative systems and procedures that are inherent in attaining the goals.

Oversees and assesses the inspections of all facility areas e.g., weekly/monthly/annually; collaborates with supervisors and managers to designate employees to conduct regular internal inspections to identify and document deficiencies.

Oversees sanitation supplies are available for distribution; and are distributed to the units based on an approved schedule. Collaborates with correctional officers and supervisors to ensure cleaning equipment is utilized in the proper manner and makes inspections a part of their daily tasks.

Makes rounds with designated staff. Rounds shall include inspections of showers, dayrooms, on-unit classrooms and recreation areas, chase closets and storage area supply closets, tiers, and the control bubble. Inspections require each program manager or designee to be present when the ESS performs inspections of areas such as the medical unit, the warehouse, storage rooms, shops, commissary, food services, etc.

Collaborates with the Facilities Maintenance manager regarding repairs, based on schedule, visits housing units to

Collaborates with the Facilities Maintenance manager regarding repairs, based on schedule; visits housing units to conduct a general visual inspection for cleanliness and ensures that adequate cleaning supplies are available and equipment and fixtures are operational in common areas. Reviews inspection reports of cells and ensures cells are free from graffiti and peeling paint. Managers affected by this report are responsible for preparing a closed out Corrective Action Plan (CAP) to the ESS and appropriate DOC manager official. The ESS follows up on the CAP to ensure adequate corrective action is taken in a timely manner.

Evaluates performance management for operational efficiency and support services for effectiveness; and participates in scheduled or random audit reviews of internal programs offices. Evaluates and documents results of each program audit; and prescribes corrective action or remediation in difficult and complex work assignment

Makes sure cellblock control modules, administrative areas, office areas, medical unit, Inmate Reception Center (IRC), and other areas are thoroughly cleaned; and coordinates with maintenance staff for cleaning air vents, windows and high walls.

Maintains documentation relevant to DOH inspections, corrective action plans and abatement schedules and determines the frequency of required treatments. Keeps in contact with the DC Departments of Health, Occupational Safety and Health Administration, DC Fire and Emergency Management and other independent consultants. Must have experience working in a correctional facility.

## QUALIFICATIONS AND EDUCATION

Applicants must have at least one (1) year of specialized experience equivalent to the next lower grade level. Specialized experience is experience which is in or directly related to the line of work of the position and has equipped the applicant with the particular knowledge, skills and abilities to successfully perform the duties of the position.

## LICENSE AND CERTIFICATION

None

## WORKING CONDITIONS

Work is performed both in an office and correctional institutional facility environment.

## OTHER SIGNIFICANT FACTS

**Tour of Duty:** 7:30 a.m. - 4:30 p.m. Must be flexible to varying work hours.

**Collective Bargaining:** This position is not in Collective Bargaining

**Duration of Appointment:** Career Service Appointment

**Position Designation:** "This position is designated as a Safety Sensitive position and is subject to mandatory pre-employment and periodic Criminal Background Checks and Traffic Records Checks (as applicable). This position is also subject to mandatory pre-employment and random Drug and Alcohol Testing. In this position, you may be disqualified from employment based on the presence of marijuana in test results, even if you possess a medical card authorizing the use of medical marijuana." A TB Test will be required prior to entry on duty.

## EEO Statement

The District of Columbia Government is an Equal Opportunity Employer. All qualified candidates will receive consideration without regard to race, color religion, national orgin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, matriculation, physical handicap, or political affiliation.

Return to Previous Page            Switch to Internal View

Favorites ▾      Main Menu ▾        ›  Recruiting ▾  ›  Search Job Openings     ›  Manage Job Opening

                                                                        Home      Worklist      Add to Favorites      **Sign Out**

Welcome **Lurendy W Armstrong** (00009045).

## Job Description

|                        |                                                     |                          |                                    |
|------------------------|-----------------------------------------------------|--------------------------|------------------------------------|
| **Job Title**          | Sanitation Inspection Specialist                    |                          |                                    |
| **Job ID**             | 11358                                               |                          |                                    |
| **Date Opened**        | 09/29/2020                                           |                          |                                    |
| **Date Closed**        | 10/03/2020                                           |                          |                                    |
| **Location**           | Detention Facility                                  |                          |                                    |
| **Full/Part Time**     | Full-Time                                           | **Type of Appointment**  | Career Service - Reg Appt          |
| **Regular/Temporary**  | Regular                                             |                          |                                    |
| **Agency**             | FL       Department of Corrections                  |                          |                                    |
| **Area of Consideration** | Open to Public                                   |                          |                                    |
| **Grade**              | 12                                                  |                          |                                    |
| **Bargaining Unit**    | CH11     Non Union - Chapter 11                     |                          |                                    |
| **Minimum Range**      | $76,126.000000                                      | **Maximum Range**        | $97,375.000000                     |
| **Target Openings**    | 1                                                   | **Available Openings**   | 1                                  |

Return to Previous Page                     Switch to External View

**General Job Information**

### JOB SUMMARY

This position is located in the Department of Corrections (DOC), Office of Accreditation and Compliance located inside the Central Detention Facility (CDF), and Correctional Treatment Facility (CTF). The operational focus is on supporting activities related to staffs, inmates, and visitors' health and well-being.

The Environmental Safety and Sanitation Inspection Specialist (ESS) provides environmental safety and sanitation oversight for the CDF and CTF and ensures that the housing units common areas are clean, sanitary and environmentally safe, and the facilities and equipment are maintained in good working order/condition as well as the laundry operations, barber and cosmetology, and commissary areas.

### DUTIES AND RESPONSIBILITIES

Plans, designs, develops and coordinates correctional environmental safety and sanitation initiatives; and serves in a key supporting role for the implementation of departmental initiatives focusing on core correctional needs and support requirements as it relates to environmental safety and sanitation of the CDF and CTF. Incumbent ensures day-to-day oversight for compliance with applicable regulations, codes and standards relevant to the mission and goals; oversees and coordinates inspections conducted by the DC Department of Health (DOH) and conducts comprehensive and thorough inspections to ensure that the facilities are compliant. Maintains a manual and automated reporting system to keep up to date with inspection schedules and cleaning squads/crews; and coordinates with department managers, supervisors, officers, and employees regarding the cleaning and inspection schedules

Provides instructions and guidelines to detail squads; replenishes/orders supplies and tools for cleaning purposes, and documents whether the operation is compliant with prevention, identification and abatement activities. Addresses departmental issues and key initiatives; and assists in the development of funding and resource proposals to support program initiatives.

Recommends revisions to internal policies and interfaces with key officials within the Department, with other Federal and District Government agencies and the private sector in the course of working out administrative systems and procedures that are inherent in attaining the goals.

Oversees and assesses the inspections of all facility areas e.g., weekly/monthly/annually; collaborates with supervisors and managers to designate employees to conduct regular internal inspections to identify and document deficiencies.

Oversees sanitation supplies are available for distribution; and are distributed to the units based on an approved schedule. Collaborates with correctional officers and supervisors to ensure cleaning equipment is utilized in the proper manner and makes inspections a part of their daily tasks.

Makes rounds with designated staff. Rounds shall include inspections of showers, dayrooms, on-unit classrooms and recreation areas, chase closets and storage area supply closets, tiers, and the control bubble. Inspections require each program manager or designee to be present when the ESS performs inspections of areas such as the medical unit, the warehouse, storage rooms, shops, commissary, food services, etc.

Collaborates with the Facilities Maintenance manager regarding repairs, based on schedule, visits housing units to

conduct a general visual inspection for cleanliness and ensures that adequate cleaning supplies are available and equipment and fixtures are operational in common areas. Reviews inspection reports of cells and ensures cells are free from graffiti and peeling paint. Managers affected by this report are responsible for preparing a closed out Corrective Action Plan (CAP) to the ESS and appropriate DOC manager official. The ESS follows up on the CAP to ensure adequate corrective action is taken in a timely manner.

Evaluates performance management for operational efficiency and support services for effectiveness; and participates in scheduled or random audit reviews of internal programs offices. Evaluates and documents results of each program audit; and prescribes corrective action or remediation in difficult and complex work assignment

Makes sure cellblock control modules, administrative areas, office areas, medical unit, Inmate Reception Center (IRC), and other areas are thoroughly cleaned; and coordinates with maintenance staff for cleaning air vents, windows and high walls.

Maintains documentation relevant to DOH inspections, corrective action plans and abatement schedules and determines the frequency of required treatments. Keeps in contact with the DC Departments of Health, Occupational Safety and Health Administration, DC Fire and Emergency Management and other independent consultants. Must have experience working in a correctional facility.

## QUALIFICATIONS AND EDUCATION

Applicants must have at least one (1) year of specialized experience equivalent to the next lower grade level. Specialized experience is experience which is in or directly related to the line of work of the position and has equipped the applicant with the particular knowledge, skills and abilities to successfully perform the duties of the position.

## LICENSE AND CERTIFICATION

None

## WORKING CONDITIONS

Work is performed both in an office and correctional institutional facility environment.

## OTHER SIGNIFICANT FACTS

**Tour of Duty:** 7:30 a.m. - 4:30 p.m. Must be flexible to varying work hours.

**Collective Bargaining:** This position is not in Collective Bargaining

**Duration of Appointment**: Career Service Appointment

**Position Designation:** "This position is designated as a Safety Sensitive position and is subject to mandatory pre-employment and periodic Criminal Background Checks and Traffic Records Checks (as applicable). This position is also subject to mandatory pre-employment and random Drug and Alcohol Testing. In this position, you may be disqualified from employment based on the presence of marijuana in test results, even if you possess a medical card authorizing the use of medical marijuana." A TB Test will be required prior to entry on duty.

## EEO Statement

The District of Columbia Government is an Equal Opportunity Employer. All qualified candidates will receive consideration without regard to race, color religion, national orgin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, matriculation, physical handicap, or political affiliation.

Return to Previous Page                    Switch to External View

**Ex**

# NEHA
# Registered Environmental Health Specialist/Registered Sanitarian (REHS/RS®)



Candidate Information Brochure



Revised 10/26/2018

**REHS/RS® Examination**

**Eligibility Requirements**

To be eligible to sit for the REHS/RS® credential examination, a candidate must meet all of the criteria for Track A or Track B or Track C.

**Track A – Environmental Health Degree Track**. You must be able to answer YES to all the questions for Track A.  If you answer a question with a "No," proceed to Track B.

1.  Do you have a Bachelor's degree, Master's degree or PhD from a college or university in the United States?   Yes_____       No_____.   For foreign degrees and diplomas, see the section below on foreign education.
2.  Is your degree in Environmental Health?    Yes_____        No_____
3.  Is your school and degree program on the appropriate EHAC list below? Yes\_\_\_\_\_  No_____
    a.  Bachelor's in Environmental Health: http://www.nehspac.org/about-ehac/accredited-programs-ehac-undergraduate-programs/
    b.  Master's or PhD in Environmental Health: http://www.nehspac.org/about-ehac/accredited-programs-ehac-graduate-programs/

If you answered "Yes" to all three questions above, you can apply on Track A.  You will not need to submit proof of work experience.

**Track B – Bachelor's Degree Track.**  You must be able to answer YES to all questions for Track B. If you answer a question with a "No," proceed to Track C.

1.  Do you have a Bachelor's degree, Master's degree or PhD from a college or university accredited in the United States?  Your degree can be in any subject. Yes\_\_\_\_\_  No\_\_\_\_\_.  For foreign degrees or diplomas, see the section below on foreign education.
2.  Do you have 30 semester hours (or 45 quarter hours) of college credit in basic science coursework?  Basic sciences include Life Sciences, Natural Sciences, Physical Sciences or Health Sciences.  Yes_____  No_____.
3.  Do you have credit for a college level Math or Statistics class?  Yes_____ No_____
4.  Do you have two years or more experience working in environmental health\*? Work experience should be full-time paid work.  Yes_____No_____

*  Eligible areas of environmental health include general environmental health (including inspections, environmental microbiology, and contamination control), food protection, wastewater, solid and hazardous waste, potable water, inspections of facilities, vectors and pests, institutions and licensed establishments, swimming pool inspections, radiation, occupational safety and health, healthy housing, indoor air quality, disaster and emergency planning, and environmental health issues related to climate change.

**Track C – "In Training" Track.**   On Track B above, if you said YES to questions 1, 2, and 3 but you do NOT have two years of work experience in environmental health, you

can apply on the "In Training" Track.    You would choose REHS/RS®-In Training (I.T.) on the application.  You will not be required to submit proof of work experience.  If you pass the exam, your certificate will say, "REHS/RS® – In Training."  You will then have 3 years to obtain 2 years of work experience. Once you have acquired that experience, you can qualify for the full REHS/RS® certificate by notifying NEHA and submitting proof of work experience.  If you do not obtain the 2 years of work experience, your "In Training" status will expire and you risk losing the credential and may have to reapply and retake the exam.

On Track B above, if you said NO to question 1 (and you do not have a foreign degree either) *OR* said NO to question 2 (science hours) *OR* question 3 (math class), then your education does not meet the requirements for the REHS/RS® credential set by the NEHA Board of Directors.

The Board of Directors has ruled that NEHA cannot accept work experience in lieu of college coursework.

If you are not sure about whether your college courses meet the requirements, you can request a transcript review as noted below.

**Transcript Review for United States College Transcripts**
Candidates with education from within the United States can request NEHA to review their transcripts for eligibility separate from the application procedure for $50. A transcript review form must be completed and is available at
http://neha.org/sites/default/files/Transcript-Review.pdf.
Please see additional instructions on the form.

The $50 fee is non-refundable even if NEHA finds that your education does not meet the REHS/RS® qualification requirements.  It can take 2-4 weeks for your transcripts to be reviewed and you will be notified by letter and/or e-mail.

**Foreign Education**
If you have college or university education from outside the United States or its territories, you must have your foreign education evaluated by a "third party" foreign education evaluation service to determine equivalency to a Bachelor's degree in the United States.  You must submit an evaluation report with your NEHA Credential Application or the report can be sent by the evaluation service directly to NEHA.

NEHA cannot evaluate foreign educational documents even if they have been translated into English.  All foreign transcripts must be evaluated by foreign education specialists.

NEHA strongly recommends you choose a service that is a member of the National Association of Credential Evaluation Services (NACES).  For information on NACES member companies, go to www.naces.org.

Canadian education is considered foreign education.  It must be evaluated by a third party evaluation service.

## <u>Completing the Application</u>

Applications must be completed and submitted to NEHA for review <u>at least</u> 6 weeks prior to the exam date. If an application is received less than 6 weeks prior to your planned exam date, you may have to schedule the exam for another date.

A complete application should include:

1. Completed NEHA Application.
2. Official College Transcripts. To be considered an official transcript it should be received at the NEHA office in the sealed envelope from the College Registrar's Office/Transcript Office. It can be sent directly from the school to NEHA or submitted with the application in the sealed school envelope. Electronic transcripts from the school or transcript service are accepted when e-mailed to credentialing@neha.org.
3. Work Experience Verification Form signed by a third party.
4. Appropriate fees.
5. Third party review report (applicable for candidates with foreign education).

## <u>Application Expiration Policy</u>

Applications are good for 2 years from the date NEHA received them. If you have not tested within 2 years of applying, you will need to submit a new application and fees.

## <u>Exam Fees</u>

All fees should accompany the NEHA Application.

|  | <u>Member Rate</u> | <u>Non-Member Rate</u> |
|---|---|---|
| Application fees: | $95.00 | $130.00 |
| Examination fees: | $185.00 | $335.00 |
| Pearson VUE fee (if applicable): | $110.00 | $110.00 |

## <u>Exam Scheduling and Locations</u>

Candidates can choose to schedule the REHS/RS® examination in several different ways:

1. The REHS/RS® exam is offered annually at the NEHA Annual Educational Conference (AEC) & Exhibition.  See neha.org for AEC information.

2. Candidates can choose to take the exam on computer through *Pearson VUE.* By choosing this option candidates can schedule the examination at their convenience at one of *Pearson VUE's* testing locations nationwide. To find a *Pearson VUE* testing center near you please visit http://www.pearsonvue.com/neha. Taking the exam at *Pearson VUE* not only offers the candidate flexibility in scheduling the exam, but also allows the candidate to receive his/her unofficial scores immediately following the conclusion of the exam.

3.  Special test sites may be arranged through NEHA.  Must have a minimum of 3 NEHA credential testing candidates. In order to accommodate requests for special test sites, arrangements must be made a minimum of 6-8 weeks prior to the requested date. The fee to set up a special test site is $350.00. For groups of 10 or more exam candidates, the special test site fee is waived. Credential applications are <u>due 6 weeks before the test date</u>. Please complete the Special Test Site Request form (Appendix A) and return it to NEHA with your application.

## <u>Special Accommodations for Candidates with Disabilities or Impairments</u>

NEHA is committed to ensuring that no individual is deprived of the opportunity to take a credentialing examination solely by reason of a disability or impairment. All test centers are fully accessible and compliant with the American with Disabilities Act (ADA).

To make a request for special accommodations you must complete the ADA Accommodation Request Form including the specific diagnosis of your disability, Section 2 filled out and signed by an appropriate licensed professional, and the type of accommodation being requested.  All forms and documentation must be returned to NEHA at least 8 weeks prior to the scheduled test date. To receive a copy of the form please contact Credentialing@neha.org.

If the forms are not returned to NEHA at least 8 weeks prior to the scheduled test date, your request for special accommodations may not be honored or may be delayed.

With respect to all matters related to testing accommodations, NEHA will only communicate with the candidate, professionals knowledgeable about the candidate's disability or impairment, the candidate's authorized representative (if applicable), Professional Testing Inc. (PTI) and the test administrator or proctor.

## <u>Computer Testing at Pearson VUE:</u> NEHA will send you an authorization letter via e-mail when your application is processed as approved.  Then you will get another e-mail, 1-3 days later, from Pearson VUE c/o PTI.  That e-mail will have your PTI ID number and instructions on how to schedule the exam at Pearson VUE.  The PTI ID number is good for one year.

On test day you must bring your photo ID as required by Pearson VUE's instructions.

If you need to postpone your scheduled computer test, you must contact Pearson VUE <u>at least 24 hours in advance</u> of your scheduled test time.  If you do not show up and did not give at least 24 hours' notice, you will forfeit your Exam Fee and your Computer Test Fee.  Contact NEHA to pay your fees again so you can be authorized to reschedule.

## <u>Taking a Paper and Pencil Exam, Admission Letter:</u>

If you are taking the exam on paper (not computer), NEHA will send an admission letter approximately 2 weeks prior to your test date. The admission letter will detail the exam date and location, reporting time, and starting time. Those that do not appear on the date of the exam at the appropriate time will forfeit all exam fees. Persons arriving after the examination has started may not be admitted.

If you lost your admission letter or have not received an admission letter at least 2 days prior to the test date, please contact NEHA.

Only approved candidates will be admitted to the exam. No walk-in applicants will be admitted.

On test day please bring with you your admission letter, photo identification (i.e. driver's license or passport), and sharpened #2 pencils.

## Scores

The NEHA REHS/RS® examination will report scores using scaled scores that range from 0 to 900 with a passing score of 650. The raw passing score is mathematically transformed so that the passing scaled score equals 650. This process is similar to the way one adjusts Celsius and Fahrenheit temperature scales. While the values may differ the temperatures are the same. For example, water boils at the same temperature regardless of the scale used.

Candidates who pass the examination will earn scaled scores of 650 and above, and those who fail will earn a scaled score between 0 and 649. A scaled score is NOT a percentage score. In summary, a scaled score is merely a transformation of a raw score. Scaling is done to report comparable results when forms and raw passing scores vary over time. This is similar to the SAT scores for entrance to college.

Your score will be based on the number of questions answered correctly. If you are unsure of the answer it is better to guess. You will not be given credit for any question left blank.

Your exam results will be mailed to you from the NEHA office 4-6 weeks after the administration.

If you pass the exam, NEHA will send you a credentialing packet with a score letter, certificate, wallet card and Continuing Education information.

If you fail the exam, NEHA will send you a score letter and a Retake Application. You must wait at least 90 days from your test date before you can retake the exam. To retake the exam, you need to submit the Retake Application and pay the Exam Fee and Computer Test Fee, if you will retake the exam on computer. You do not need to do the whole application again or resubmit transcripts. There is no limit on the number of times you can retake the exam, but you must wait 90 days between each attempt.

## Reciprocity

In some cases, if you hold a state REHS/RS® credential, you may be eligible to receive NEHA's REHS/RS® credential without re-examination (reciprocity). In order to be eligible for reciprocity you must:

1.  Have a valid, current state registration; and

2. Have a Bachelor's degree with 30 semester/45 quarter hours in basic sciences; and
3. Have a passing score of:
    a. 650 or higher on the NEHA exam taken on or after July 13, 2014, or
    b. 68% or higher on the NEHA exam taken between January 1, 1998, and July 12, 2014, or
    c. 70% or higher on the PES exam provided it was taken before December 31, 1997. PES exams taken after this date are not eligible to receive national REHS/RS® reciprocity through NEHA.

For more information on qualifying for national REHS/RS® reciprocity please contact the NEHA Credentialing Department at (303) 756-9090 ext. 310, or email credentialing@neha.org.

## Credential Maintenance
Once you have obtained the REHS/RS® credential you must maintain it. To keep your credential in good standing you must:

1. Submit a minimum of 24 hours of continuing education every two years; and
2. Submit renewal fees for your credential every two years ($130.00 members; $345.00 non-members).

## NEHA's Credentialing Handbook
It is strongly recommended that you read NEHA's Credentialing Handbook: *Guide to Policies and Procedures for NEHA's Credentialing Programs*. This handbook outlines all the policies you are expected to follow by being a NEHA credential holder. The handbook also outlines in further detail the procedures for applying for a credential, submitting continuing education, and maintaining your credential.

You can access the Credentialing Handbook at www.neha.org. Click on Professional Development, then click on Credentials and look for the link to the Handbook on the left side.

## Exam Description and Content Outline

The REHS/RS® examination consists of a total of 250 multiple-choice questions. The exam is split into two parts of 125 questions each. Candidates are given a total of four (4) hours to complete the entire exam or two (2) hours for each part with a short 10-minute break in between.  Of the 250 items, 225 will be scored. The remaining 25 questions will be unscored, pilot questions. Those items will not be called out within the exam.

Below is an outline of the different content areas the examination covers and the percentages allotted to each of those areas. Please use this outline as a guide when preparing for the examination.

| | Content Areas | Final Weight | Number of Items |
|---|---|---|---|
| A | Conducting Facility Inspections | 35.0% | 79 |
| 1 | Prioritize Inspections | 1.0% | 2 |
| 2 | Maintain Inspection Equipment | 1.0% | 2 |
| 3 | Perform Food Facility Inspections | 17.5% | 40 |
| 4 | Perform Institution Inspections | 2.0% | 5 |
| 5 | Perform Recreational Water Inspections | 2.5% | 6 |
| 6 | Perform Group Gathering Inspections | 2.0% | 4 |
| 7 | Perform Healthy Homes Inspections | 2.0% | 4 |
| 8 | Perform Hazardous Waste Inspections | 1.0% | 2 |
| 9 | Perform Bio-Medical Facility Inspections | 1.0% | 2 |
| 10 | Perform Confined Feeding Operations Inspections | 1.0% | 2 |
| 11 | Perform Other Facility Inspections | 2.0% | 5 |
| 12 | Perform Solid Waste Facility Inspections | 2.0% | 5 |
| B | Conducting System Inspections | 20.0% | 45 |
| 1 | Perform Occupational Health and Safety Inspections | 2.0% | 5 |
| 2 | Perform Onsite Waste Water System Inspections | 12.0% | 27 |
| 3 | Perform Potable Water Quality Inspections | 6.0% | 13 |
| C | Conducting Investigations | 14.0% | 32 |
| 1 | Perform Complaint Investigations | 5.0% | 11 |
| 2 | Perform Epidemiology Investigations | 4.0% | 9 |
| 3 | Investigate Illegal Operators | 2.0% | 4 |
| 4 | Perform Hazardous Waste Investigations | 1.5% | 3 |
| 5 | Perform Indoor Air Quality Investigations | 2.0% | 5 |
| D | Ensuring Compliance | 13.0% | 29 |
| 1 | Develop Regulations | 1.0% | 2 |
| 2 | Conduct Plan Review | 5.0% | 11 |
| 3 | Review Establishment's HACCP Plan | 2.0% | 5 |
| 4 | Provide Technical Assistance to Stakeholders | 5.0% | 11 |
| E | Promoting Environmental Public Health Awareness | 10.0% | 22 |
| 1 | Conduct Environmental Public Health Assessment | 1.0% | 2 |
| 2 | Establish Community Partnerships | 1.0% | 2 |
| 3 | Conduct Community Outreach | 2.0% | 4 |
| 4 | Communicate Environmental Public Health Risks to Stakeholders | 3.0% | 7 |

| 5 | Conduct Environmental Surveillance | 3.0% | 7 |
|---|---|---|---|
| F | Responding To Emergencies | 8.0% | 18 |
| 1 | Assess Community Risks | 1.5% | 3 |
| 2 | Create Environmental Public Health Emergency Preparedness Plans | 2.0% | 5 |
| 3 | Conduct Emergency Preparedness Training | 1.0% | 2 |
| 4 | Implement Environmental Public Health Emergency Preparedness Plan | 2.0% | 5 |
| 5 | Conduct Recovery Follow-up | 1.5% | 3 |
| | **Total** | **100.0%** | **225** |

**Recommended Study References**

Below is a list of study references that are recommended to assist the candidate in preparing for the REHS/RS® examination. Many study references are available for purchase at the NEHA Bookstore.

A REHS/RS® Study Guide is has been updated and is available for purchase here: **REHS/RS® Study Guide**

**Individual References**

1. **REHS/RS® Study Guide** (Fourth Edition), 2014, NEHA

2. *Handbook of Environmental Health, Volumes 1 and 2 (Fourth Edition)*, 2003, H. Koren and M. Bisesi

3. *Environmental Engineering, 3-Volume Set (Sixth Edition)*, 2009, N.L. Nemerow, F.J. Agardy, P. Sullivan, and J.A. Salvato (editors)

4. *Control of Communicable Diseases Manual (20th Edition)*, 2015, D.L. Heymann (Editor), American Public Health Association

5. *Basic Environmental Health,* 2001, A. Yassi, T. Kjellstrom, T. de Kok, and T.L. Guidotti

6. *Essential Epidemiology: Principles and Applications,* 2002, W. Oleckno

7. *Pool & Spa Operator™ Handbook,* 2017, National Swimming Pool Foundation

8. *Principles of Food Sanitation (Fifth Edition)*, 2006, N.G. Marriott and R.B. Gravani

9. *Food Code*, Food and Drug Administration

10. Centers for Disease Control and Prevention – National Environmental Public Health Tracking

11. FEMA National Incident Management System (NIMS) Courses

12. Centers for Disease Control and Prevention (CDC), Environmental Health Emergency Response Guide

13. HUD's Healthy Homes Program

14. CDC's Community Assessment for Public Health Emergency Response (CASPER) Toolkit: Second edition. Atlanta, GA: CDC; 2012

15. CDC's Healthy Homes Program

<u>Appendix A.</u>

# Special Test Site Request Form for Paper and Pencil Group Exams.

Minimum of 3 people testing. $350 fee for 3-9 people.
Please allow 6-8 weeks for processing.

**Name of Person Requesting Site:**
_____

**Phone Number:**
_____

**Employer:**
_____

**Address:**
_____

_____

**Email Address:**
_____

**Requested Test Date:**
_____

**Requested Location:**
_____

**Number of Expected Exam Candidates:  _____**

**Please attach to this application a list of candidate names and which exam (REHS/RS®, CP-FS®, CCFS®, CFSSA® and CFOI®) they are taking.  We need the list a month before the test date.  There is a 3-person minimum for setting up a special test site.**

## Acknowledgement Statement

I, _____, acknowledge that this request to the National Environmental Health Association (NEHA) for a special test site is only a request and not a binding agreement to provide such a test site.  I also acknowledge that if there are fewer than 10 candidates testing, **a fee of $350.00** will be incurred and must be paid in full a month PRIOR to the test date.

My signature below attests to my understanding and abiding to the above statement.

_____          _____
Signature                                                                          Date

<u>Appendix A, page 2</u>

## Proctor Information for Special Test Sites

Proctor Name: _____

Title: _____

Mailing Address (Cannot ship to PO Box, APO or FPO):

Street: _____

_____

City: _____ State: _____ Zip: _____

Work Phone: _____

Cell: _____

Email Address: _____

National Environmental Health Association
Attn: Credentialing Department
720 S. Colorado Blvd., Suite 1000-N
Denver, CO 80246

E-mail: credentialing@neha.org
Fax: 303-691-9490

**Please allow 6-8 weeks for processing and setting up test arrangements.**

If you have any questions or need assistance completing this application, please contact the
NEHA Credentialing Department at: 303-756-9090, ext. 310.

**Ex   L**

# Sanitarian

**Company:** District of Columbia Department of Health

**Location:** Washington, D.C.

**Date Posted:** January 6, 2020

**Application Deadline:** January 12, 2020

**Employment Type:** Full time

**Salary:** $62,287.00 – $78,190.00



DC | HEALTH
GOVERNMENT OF THE DISTRICT OF COLUMBIA

Sanitarian

## About the Position

Bring your professional career to Washington, D.C., the most dynamic and diverse city in the country. With its proximity to major museums, world class parks, entertainment and restaurants, increasing job opportunities and the seat of the federal government. The District of Columbia continues to be ranked the top 10 thriving city indicators where you can live work and play. Contribute to and work for a nationally accredited Health Department. The District of Columbia, Department of Health (DC Health) earned national accredited by the Public Health Accreditation Board (PHAB) and is an early adopter in attaining the designation. Come see where your skills are appreciated and rewarded by applying the following public health opportunity.

This position is located in the Department of Health (DC Health), Health Regulation and Licensing Administration (HRLA), Food Safety and Hygiene Inspection Services Division (FSHISD). The FSHISD is responsible for protecting the

public health and safety and the environment of the residents and visitors in the District of Columbia through inspecting and protecting the food supply, inspecting other non-food health establishments, such as, spas, and investigating food borne illnesses. Incumbent is responsible for inspecting and evaluating environment health conditions throughout the food service industry through periodic inspections of food service establishments, such as, restaurants, grocery stores, delicatessens, food vendors, ice cream and diary plants and open air markets. Incumbent also inspects and evaluates environment health conditions in non-food establishments, such as, beauty and barber shops, nail salons, public baths, spas, massage parlors, health clubs, bedding manufacturers, electrolysis salons and swimming pools.

## Duties and Responsibilities

The incumbent serves as a Sanitarian and will be responsible for conducting daily route and work assignments to ensure timely completion as well as addressing appointments, consultations and instructional meetings relative to promoting improvement within assigned area. The incumbent performs routine inspections of low to moderate risk food and non-food establishments and determines what type of action to take once violations or unsanitary conditions are found and conducts re-inspection investigations of low to moderate risk facilities to ensure that establishments are in compliance with verbal or written instructions of abatement. The incumbent investigates low to moderate risk public and official complaints alleging violations or unsanitary conditions within food and non-food establishments that may result in a possible hygienic-related or food borne illness. In the event that the owner/manager fails to comply with requirements, the incumbent initiates enforcement actions on routine matters and refers more complex or controversial issues to Supervisor. The incumbent will prepare written reports explaining the violations found during inspections, along with recommendations and a deadline for abatement.

The incumbent utilizes observational techniques and a variety of detection instruments and solutions, as well as specialized equipment in the conduct of inspections and investigations. The incumbent serves as a witness for the agency in cases where owners/managers have not complied with the District laws and regulations and appears at the administrative trials. The incumbent provides factual testimony and prepares and presents evidence for pertinent cases. The incumbent also compiles and prepares statistical reports for use by management staff in analyzing program/project progress to ensure that internal and external reporting is completed in a timely manner. The incumbent Responds quickly, orally and in writing, to inquiries, provides relevant information to the public concerning Division programs and services.

Working Conditions and Environment

The work environment involves moderate risk or discomfort, which require safety precautions typical of an office or duties conducted in the field. The office is adequately lighted and ventilated. Incumbent is required to conduct field activities in inclement weather.

Other Significant Facts

Tour of Duty: Monday – Friday – 8:15 a.m. – 4:45 p.m.

Promotion Potential: None

Duration of Appointment: Career Service (Permanent) Appointment

Pay Plan, Series and Grade: CS-688-09

This position is in the collective bargaining unit represented by AFGE Local 2725 and you may be required to pay an agency fee (dues) through direct payroll.

Employee's work schedule will or may deviate from the standard tour of duty to accommodate evening inspections of facilities for observation of Hookah violations or other violations enforced by FSHISD.

Emergency Designation

Case 1:20-cv-00849-CKK   Document 138-2   Filed 12/12/20   Page 108 of 232

This position has been designated as Emergency.

Employees occupying positions designated as Emergency are required to:

Provide advice, recommendations, and/or specific functional support necessary for the continuity of operations during a declared emergency.
Remain at their duty station, or alternate work location (approved by their supervisor), if activated, when a situation or condition occurs and results in early dismissal for nonessential/non-emergency employees.

Report to their duty station, when activated, on time and as scheduled when a situation or condition occurs during non-work hours, and results in the late arrival or closing of District government offices for non-essential/non-emergency employees.

Telework during a declared emergency, instead of remaining or reporting to his or her duty station, if directed by the agency head (or designee), supervisor or manager.
Carry or wear their official District government ID card during the period of the declared emergency, if not teleworking.
Position Designation: Security Sensitive under the guidelines of the DC Personnel Manual. Incumbents of this position are subject to enhanced suitability screening pursuant to Chapter 4 of DC personnel regulations, and are subject to the following checks and test:

(a) Criminal background check;

(b) Traffic record check (as applicable);

(c) Consumer credit check (as applicable);

(d) Reasonable suspicion drug and alcohol test; and

(e) Post-accident or incident drug and alcohol test.

EEO Statement: The District of Columbia Government is an Equal Opportunity Employer. All qualified candidates will receive consideration without regard to race, color, religion, national origin, sex, age, marital status, personal appearance,

Case 1:20-cv-00849-CKK   Document 138-2   Filed 12/12/20   Page 109 of 232

sexual orientation, family responsibilities, matriculation, physical handicap, or political affiliation.

## Qualifications

Individuals must possess one (1) year of specialized experience equivalent to the Grade 07 level, or its non-District equivalent. Specialized experience is experience which is in or directly related to the line of work of this position and has equipped the applicant with the particular knowledge, skills, and abilities to successfully perform the duties of this position.

A full 4-year course of study that meets all the requirements for a bachelor's degree, and that included or was supplemented by at least 30 semester hours in a science or any combination of sciences directly related to environmental health (such as sanitary science, public health, chemistry, microbiology, or any appropriate agricultural, biological, or physical science).

or

Four years of experience in inspectional, investigational, technical support, or other responsible work that provided a knowledge and a fundamental understanding of, and the ability to use, environmental health principles, methods, and techniques equivalent to that which would have been gained through a 4-year college curriculum.

or

A combination of education and experience as described above.

In addition to meeting the basic requirements, applicants must have the amounts of education and/or experience required for the grade level as shown below:

Requirements:

GS-9 - 2 full years of progressively higher level graduate education or master's or equivalent graduate degree related to environmental health and 1 year of experience equivalent to at least the GS-7 level.

Case 1:20-cv-00849-CKK   Document 138-2   Filed 12/12/20   Page 110 of 232

Licenses, Certifications, and Other Requirements

Incumbent is required to possess a valid driver license in order to drive a government/personal vehicle to inspection sites.

## How to Apply

Go to **https://dchr.dc.gov/page/careers <https://dchr.dc.gov/page/careers>** and click on Careers DC. Search for "Sanitarian" or Job ID "9490"

**BACK TO JOB LISTINGS <HTTPS://WWW.NEHA.ORG/PROFESSIONAL-DEVELOPMENT/CAREERS>**

**Ex   M**

# Training Plan for DOC Sanitarian



# WORLD HEALTH ORGANIZATION

# Online Training

**Modules include:**

Infection Prevention and Control for novel coronavirus (COVID-19)

How to put on and remove personal protective equipment

Standard Precautions: Hand Hygiene

Standard Precautions: Waste Management

Standard Precautions: Environmental Cleaning and Disinfection

Basic Microbiology

To access training please use this link:

https://www.who.int/emergencies/diseases/novel-coronavirus-2019/training/online-training

# CENTERS FOR DISEASE CONTROL AND PREVENTION

The COVID-19 pandemic is a serious global health threat, and CDC is committed to stopping its spread. CDC has a long history of strengthening public health capacity throughout the world to contain outbreaks at their source and minimize their impact.

CDC is working closely with the World Health Organization (WHO) and other partners to assist countries to prepare for and respond to COVID-19. CDC routinely provides technical assistance to ministries of health and subnational and international partners to improve our collective response to infectious disease threats like COVID-19.

This interim guidance is based on what is currently known about the transmission and severity of coronavirus disease 2019 (COVID-19) as of the date of posting, October 7, 2020.

This document provides interim guidance specific for correctional facilities and detention centers during the outbreak of COVID-19, to ensure continuation of essential public services and protection of the health and safety of incarcerated and detained persons, staff, and visitors. Recommendations may need to be revised as more information becomes available.

***Guidance for Cleaning and Disinfecting-** attachment A

***Reopening Guidance for Cleaning and Disinfecting Public Spaces, Workplaces, Businesses, Schools, and Homes-** attachment B

***Cleaning and Disinfecting Your Facility-** attachment C

## Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities
**Updated Oct. 21, 2020**

## Cleaning and Disinfecting Practices

√ Even if COVID-19 has not yet been identified inside the facility or in the surrounding community, implement intensified cleaning and disinfecting procedures according to

3

the recommendations below. These measures can help prevent spread of SARS-CoV-2 if introduced, and if already present through asymptomatic infections.

√ **Adhere to** <ins>**CDC recommendations for cleaning and disinfection during the COVID-19 response**</ins>. Monitor these recommendations for updates.

- Visit the CDC website for a <ins>tool</ins> to help implement cleaning and disinfection.

- Several times per day, clean and disinfect surfaces and objects that are frequently touched, especially in common areas. Such surfaces may include objects/surfaces not ordinarily cleaned daily (e.g., doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, telephones, and computer equipment).

- Staff should clean shared equipment (e.g., radios, service weapons, keys, handcuffs) several times per day and when the use of the equipment has concluded.

- Use household cleaners and <ins>EPA-registered disinfectants effective against SARS-CoV-2, the virus that causes COVID-19external icon</ins> as appropriate for the surface.

- Follow label instructions for safe and effective use of the cleaning product, including precautions that should be taken when applying the product, such as wearing gloves and making sure there is good ventilation during use, and around people. Clean according to label instructions to ensure safe and effective use, appropriate product dilution, and contact time. Facilities may consider lifting restrictions on undiluted disinfectants (i.e., requiring the use of undiluted product), if applicable.

√ Consider increasing the number of staff and/or incarcerated/detained persons trained and responsible for cleaning common areas to ensure continual cleaning of these areas throughout the day.

√ Ensure adequate supplies to support intensified cleaning and disinfection practices, and have a plan in place to restock rapidly if needed.

## Hygiene

√ Encourage all staff and incarcerated/detained persons to wear a <ins>cloth face mask</ins> as much as safely possible, to prevent transmission of SARS-CoV-2 through respiratory droplets that are created when a person talks, coughs, or sneezes ("source control").

- Provide masks at no cost to incarcerated/detained individuals and launder them routinely.

- Clearly explain the purpose of <ins>masks</ins> and when their use may be <ins>contraindicated</ins>. Because many individuals with COVID-19 do not have

4

symptoms, it is important for everyone to wear masks in order to protect each other: "My mask protects you, your mask protects me."

- Ensure staff know that cloth masks should not be used as a substitute for surgical masks or N95 respirators that may be required based on an individual's scope of duties. Cloth masks are not PPE but are worn to protect others in the surrounding area from respiratory droplets generated by the wearer.

- Surgical masks may also be used as source control but should be conserved for situations requiring PPE.

√ Reinforce healthy hygiene practices, and provide and continually restock hygiene supplies throughout the facility, including in bathrooms, food preparation and dining areas, intake areas, visitor entries and exits, visitation rooms and waiting rooms, common areas, medical, and staff-restricted areas (e.g., break rooms).

check light icon Provide incarcerated/detained persons and staff no-cost access to:

- **Soap** – Provide liquid or foam soap where possible. If bar soap must be used, ensure that it does not irritate the skin, as this would discourage frequent hand washing, and ensure that individuals are not sharing bars of soap.

- **Running water, and hand drying machines or disposable paper towels** for hand washing

- **Tissues** and (where possible) no-touch trash receptacles for disposal

- Face masks

√ **Provide alcohol-based hand sanitizer with at least 60% alcohol where permissible based on security restrictions.** Consider allowing staff to carry individual-sized bottles to maintain hand hygiene.

√ Communicate that sharing drugs and drug preparation equipment can spread SARS-CoV-2 due to potential contamination of shared items and close contact between individuals.

5

# DC Department of Youth and Rehabilitation Services

Training schedule to be devised within next seven days.

Dwayne Coley has agreed to assist DOC in the training of our Sanitarian.


Training shall begin November 16, 2020. We will meet within the next seven days to discuss a training plan.

# DC Department of Corrections Environmental and Fire Safety Programs

**Internal training shall begin once training with DYRS Sanitarian is complete.**

## Training shall include:

## Bloodborne pathogens

By: Gloria J Robertson/information from K Robinson

## COVID Cleaning

By: Sgt. Wortham and Gloria J Robertson

## Environmental Practices (inspections):

By: Sgt. Wortham

## Self-Study:

Potomac Hudson Engineering Inc, "Onsite Audit Inspection Report" – attachment D

7

# U.S. DEPARTMENT OF LABOR

OVERVIEW:

What are bloodborne pathogens?

Bloodborne pathogens are infectious microorganisms in human blood that can cause disease in humans. These pathogens include, but are not limited to, hepatitis B (HBV), hepatitis C (HCV) and human immunodeficiency virus (HIV). Needlesticks and other sharps-related injuries may expose workers to bloodborne pathogens. Workers in many occupations, including first responders, housekeeping personnel in some industries, nurses and other healthcare personnel, all may be at risk for exposure to bloodborne pathogens.

What can be done to control exposure to bloodborne pathogens?

In order to reduce or eliminate the hazards of occupational exposure to bloodborne pathogens, an employer must implement an exposure control plan for the worksite with details on employee protection measures. The plan must also describe how an employer will use engineering and work practice controls, personal protective clothing and equipment, employee training, medical surveillance, hepatitis B vaccinations, and other provisions as required by OSHA's Bloodborne Pathogens Standard (29 CFR 1910.1030). Engineering controls are the primary means of eliminating or minimizing employee exposure and include the use of safer medical devices, such as needleless devices, shielded needle devices, and plastic capillary tubes.

To continue training, please access via link:

https://www.osha.gov/bloodborne-pathogens

8



# ATTACHMENT A

# GUIDANCE FOR CLEANING AND DISINFECTING

# GUIDANCE FOR CLEANING AND DISINFECTING

## PUBLIC SPACES, WORKPLACES, BUSINESSES, SCHOOLS, AND HOMES



SCAN HERE
FOR MORE
INFORMATION

This guidance is intended for all Americans, whether you own a business, run a school, or want to ensure the cleanliness and safety of your home. Reopening America requires all of us to move forward together by practicing social distancing and other daily habits to reduce our risk of exposure to the virus that causes COVID-19. Reopening the country also strongly relies on public health strategies, including increased testing of people for the virus, social distancing, isolation, and keeping track of how someone infected might have infected other people. This plan is part of the larger United States Government plan and focuses on cleaning and disinfecting public spaces, workplaces, businesses, schools, and can also be applied to your home.

## Cleaning and disinfecting public spaces including your workplace, school, home, and business will require you to:

- Develop your plan

- Implement your plan

- Maintain and revise your plan

Reducing the risk of exposure to COVID-19 by cleaning and disinfection is an important part of reopening public spaces that will require careful planning. Every American has been called upon to slow the spread of the virus through social distancing and prevention hygiene, such as frequently washing your hands and wearing face coverings. Everyone also has a role in making sure our communities are as safe as possible to reopen and remain open.

The virus that causes COVID-19 can be killed if you use the right products. EPA has compiled a list of disinfectant products that can be used against COVID-19, including ready-to-use sprays, concentrates, and wipes. Each product has been shown to be effective against viruses that are harder to kill than viruses like the one that causes COVID-19.

For more information, please visit **CORONAVIRUS.GOV**




CS316485C September 16, 2020 10:42 AM

This document provides a general framework for cleaning and disinfection practices. The framework is based on doing the following:

1. Normal routine cleaning with soap and water will decrease how much of the virus is on surfaces and objects, which reduces the risk of exposure.

2. Disinfection using EPA-approved disinfectants against COVID-19 can also help reduce the risk. Frequent disinfection of surfaces and objects touched by multiple people is important.

3. When EPA-approved disinfectants are not available, alternative disinfectants can be used (for example, 1/3 cup of bleach added to 1 gallon of water, or 70% alcohol solutions). Do not mix bleach or other cleaning and disinfection products together—this can cause fumes that may be very dangerous to breathe in. Keep all disinfectants out of the reach of children.

Links to specific recommendations for many public spaces that use this framework, can be found at the end of this document. ***It's important to continue to follow federal, state, tribal, territorial, and local guidance for reopening America.***

## A Few Important Reminders about Coronaviruses and Reducing the Risk of Exposure:

- Coronaviruses on surfaces and objects naturally die within hours to days. Warmer temperatures and exposure to sunlight will reduce the time the virus survives on surfaces and objects.

- Normal routine cleaning with soap and water removes germs and dirt from surfaces. It lowers the risk of spreading COVID-19 infection.

- Disinfectants kill germs on surfaces. By killing germs on a surface after cleaning, you can further lower the risk of spreading infection. EPA-approved disinfectants are an important part of reducing the risk of exposure to COVID-19. If disinfectants on this list are in short supply, alternative disinfectants can be used (for example, 1/3 cup of bleach added to 1 gallon of water, or 70% alcohol solutions).

- Store and use disinfectants in a responsible and appropriate manner according to the label. Do not mix bleach or other cleaning and disinfection products together—this can cause fumes that may be very dangerous to breathe in. Keep all disinfectants out of the reach of children.

- Do not overuse or stockpile disinfectants or other supplies. This can result in shortages of appropriate products for others to use in critical situations.

- Always wear gloves appropriate for the chemicals being used when you are cleaning and disinfecting. Additional personal protective equipment (PPE) may be needed based on setting and product. For more information, see CDC's website on Cleaning and Disinfection for Community Facilities.

- Practice social distancing, wear facial coverings, and follow proper prevention hygiene, such as washing your hands frequently and using alcohol-based (at least 60% alcohol) hand sanitizer when soap and water are not available.

If you oversee staff in a workplace, your plan should include considerations about the safety of custodial staff and other people who are carrying out the cleaning or disinfecting. These people are at increased risk of being exposed to the virus and to any toxic effects of the cleaning chemicals. These staff should wear appropriate PPE for cleaning and disinfecting. To protect your staff and to ensure that the products are used effectively, staff should be instructed on how to apply the disinfectants according to the label. For more information on concerns related to cleaning staff, visit the Occupational Safety and Health Administration's website on Control and Prevention.

# DEVELOP YOUR PLAN

Evaluate your workplace, school, home, or business to determine what kinds of surfaces and materials make up that area. Most surfaces and objects will just need normal routine cleaning. Frequently touched surfaces and objects like light switches and doorknobs will need to be cleaned and then disinfected to further reduce the risk of germs on surfaces and objects.

- First, clean the surface or object with soap and water.

- Then, disinfect using an EPA-approved disinfectant.

- If an EPA-approved disinfectant is unavailable, you can use 1/3 cup of bleach added to 1 gallon of water, or 70% alcohol solutions to disinfect. Do not mix bleach or other cleaning and disinfection products together. Find additional information at CDC's website on Cleaning and Disinfecting Your Facility.

You should also consider what items can be moved or removed completely to reduce frequent handling or contact from multiple people. Soft and porous materials, such as area rugs and seating, may be removed or stored to reduce the challenges with cleaning and disinfecting them. Find additional reopening guidance for cleaning and disinfecting in the Reopening Decision Tool.

It is critical that your plan includes how to maintain a cleaning and disinfecting strategy after reopening. Develop a flexible plan with your staff or family, adjusting the plan as federal, state, tribal, territorial, or local guidance is updated and if your specific circumstances change.

## Determine what needs to be cleaned

Some surfaces only need to be cleaned with soap and water. For example, surfaces and objects that are not frequently touched should be cleaned and do not require additional disinfection. Additionally, disinfectants should typically not be applied on items used by children, especially any items that children might put in their mouths. Many disinfectants are toxic when swallowed. In a household setting, cleaning toys and other items used by children with soap and water is usually sufficient. Find more information on cleaning and disinfection toys and other surfaces in the childcare program setting at CDC's Guidance for Childcare Programs that Remain Open.

These questions will help you decide which surfaces and objects will need normal routine cleaning.

### Is the area outdoors?

Outdoor areas generally require normal routine cleaning and do not require disinfection. Spraying disinfectant on sidewalks and in parks is not an efficient use of disinfectant supplies and has not been proven to reduce the risk of COVID-19 to the public. You should maintain existing cleaning and hygiene practices for outdoor areas.

The targeted use of disinfectants can be done effectively, efficiently and safely on outdoor hard surfaces and objects frequently touched by multiple people. Certain outdoor areas and facilities, such as bars and restaurants, may have additional requirements. More information can be found on CDC's website on Food Safety and the Coronavirus Disease 2019 (COVID-19).

There is no evidence that the virus that causes COVID-19 can spread directly to humans from water in pools, hot tubs or spas, or water play areas. Proper operation, maintenance, and disinfection (for example, with chlorine or bromine) of pools, hot tubs or spas, and water playgrounds should kill the virus that causes COVID-19. However, there are additional concerns with outdoor areas that may be maintained less frequently, including playgrounds, or other facilities located within local, state, or national parks. For more information, visit CDC's website on Visiting Parks & Recreational Facilities.

**Has the area been unoccupied for the last 7 days?**

If your workplace, school, or business has been unoccupied for 7 days or more, it will only need your normal routine cleaning to reopen the area. This is because the virus that causes COVID-19 has not been shown to survive on surfaces longer than this time.

There are many public health considerations, not just COVID-19 related, when reopening public buildings and spaces that have been closed for extended periods. For example, take measures to ensure the safety of your building water system. It is not necessary to clean ventilation systems, other than routine maintenance, as part of reducing risk of coronaviruses. For healthcare facilities, additional guidance is provided on CDC's Guidelines for Environmental Infection Control in Health-Care Facilities.

## Determine what needs to be disinfected

Following your normal routine cleaning, you can disinfect frequently touched surfaces and objects using a product from EPA's list of approved products that are effective against COVID-19.

These questions will help you choose appropriate disinfectants.

### Are you cleaning or disinfecting a hard and non-porous material or item like glass, metal, or plastic?

Consult EPA's list of approved products for use against COVID-19. This list will help you determine the most appropriate disinfectant for the surface or object. You can use diluted household bleach solutions if appropriate for the surface. Pay special attention to the personal protective equipment (PPE) that may be needed to safely apply the disinfectant and the manufacturer's recommendations concerning any additional hazards. Keep all disinfectants out of the reach of children. Please visit CDC's website on How to Clean and Disinfect for additional details and warnings.

Examples of frequently touched surfaces and objects that will need routine disinfection following reopening are:

- tables,
- doorknobs,
- light switches,
- countertops,
- handles,
- desks,
- phones,
- keyboards,
- toilets,
- faucets and sinks,
- gas pump handles,
- touch screens, and
- ATM machines.

Each business or facility will have different surfaces and objects that are frequently touched by multiple people. Appropriately disinfect these surfaces and objects. For example, transit stations have specific guidance for application of cleaning and disinfection.

### Are you cleaning or disinfecting a soft and porous material or items like carpet, rugs, or seating in areas?

Soft and porous materials are generally not as easy to disinfect as hard and non-porous surfaces. EPA has listed a limited number of products approved for disinfection for use on soft and porous materials. Soft and porous materials that are not frequently touched should only be cleaned or laundered, following the directions on the item's label, using the warmest appropriate water setting. Find more information on CDC's website on Cleaning and Disinfecting Your Facility for developing strategies for dealing with soft and porous materials.

## Consider the resources and equipment needed

Keep in mind the availability of cleaning and disinfection products and appropriate PPE. Always wear gloves appropriate for the chemicals being used for routine cleaning and disinfecting. Follow the directions on the disinfectant label for additional PPE needs. In specific instances, personnel with specialized training and equipment may be required to apply certain disinfectants such as fumigants or fogs. For more information on appropriate PPE for cleaning and disinfection, see CDC's website on Cleaning and Disinfection for Community Facilities.

# IMPLEMENT YOUR PLAN

Once you have a plan, it's time to take action. Read all manufacturer's instructions for the cleaning and disinfection products you will use. Put on your gloves and other required personal protective equipment (PPE) to begin the process of cleaning and disinfecting.

## Clean visibly dirty surfaces with soap and water

Clean surfaces and objects using soap and water prior to disinfection. Always wear gloves appropriate for the chemicals being used for routine cleaning and disinfecting. Follow the directions on the disinfectant label for additional PPE needs. When you finish cleaning, remember to wash hands thoroughly with soap and water.

Clean or launder soft and porous materials like seating in an office or coffee shop, area rugs, and carpets. Launder items according to the manufacturer's instructions, using the warmest temperature setting possible and dry items completely.

## Use the appropriate cleaning or disinfectant product

EPA approved disinfectants, when applied according to the manufacturer's label, are effective for use against COVID-19. Follow the instructions on the label for all cleaning and disinfection products for concentration, dilution, application method, contact time and any other special considerations when applying.

## Always follow the directions on the label

Follow the instructions on the label to ensure safe and effective use of the product. Many product labels recommend keeping the surface wet for a specific amount of time. The label will also list precautions such as wearing gloves and making sure you have good ventilation during use of the product. Keep all disinfectants out of the reach of children.

# MAINTAIN AND REVISE YOUR PLAN

Take steps to reduce your risk of exposure to the virus that causes COVID-19 during daily activities. CDC provides tips to reduce your exposure and risk of acquiring COVID-19. Reducing exposure to yourself and others is a shared responsibility. Continue to update your plan based on updated guidance and your current circumstances.

## Continue routine cleaning and disinfecting

Routine cleaning and disinfecting are an important part of reducing the risk of exposure to COVID-19. Normal routine cleaning with soap and water alone can reduce risk of exposure and is a necessary step before you disinfect dirty surfaces.

Surfaces frequently touched by multiple people, such as door handles, desks, phones, light switches, and faucets, should be cleaned and disinfected at least daily. More frequent cleaning and disinfection may be required based on level of use. For example, certain surfaces and objects in public spaces, such as shopping carts and point of sale keypads, should be cleaned and disinfected before each use.

Consider choosing a different disinfectant if your first choice is in short supply. Make sure there is enough supply of gloves and appropriate personal protective equipment (PPE) based on the label, the amount of product you will need to apply, and the size of the surface you are treating.

## Maintain safe behavioral practices

We have all had to make significant behavioral changes to reduce the spread of COVID-19. To reopen America, we will need to continue these practices:

- social distancing (specifically, staying 6 feet away from others when you must go into a shared space)
- frequently washing hands or use alcohol-based (at least 60% alcohol) hand sanitizer when soap and water are not available
- wearing cloth face coverings
- avoiding touching eyes, nose, and mouth
- staying home when sick
- cleaning and disinfecting frequently touched objects and surfaces

It's important to continue to follow federal, state, tribal, territorial, and local guidance for reopening America. Check this resource for updates on COVID-19. This will help you change your plan when situations are updated.

## Consider practices that reduce the potential for exposure

It is also essential to change the ways we use public spaces to work, live, and play. We should continue thinking about our safety and the safety of others.

To reduce your exposure to or the risk of spreading COVID-19 after reopening your business or facility, consider whether you need to touch certain surfaces or materials. Consider wiping public surfaces before and after you touch them. These types of behavioral adjustments can help reduce the spread of COVID-19. There are other resources for more information on COVID-19 and how to Prevent Getting Sick.

Another way to reduce the risk of exposure is to make long-term changes to practices and procedures. These could include reducing the use of porous materials used for seating, leaving some doors open to reduce touching by multiple people, opening windows to improve ventilation, or removing objects in your common areas, like coffee creamer containers. There are many other steps that businesses and institutions can put into place to help reduce the spread of COVID-19 and protect their staff and the public. More information can be found at CDC's Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission.

# CONCLUSION

Reopening America requires all of us to move forward together using recommended best practices and maintaining safe daily habits in order to reduce our risk of exposure to COVID-19. Remember: We're all in this together!

**Additional resources with more specific recommendations.**

## HEALTHCARE SETTINGS

**Long-term Care Facilities, Nursing Homes**

Infection Control in Healthcare Settings

Using Personal Protective Equipment

Hand Hygiene

Interim Guidance for Infection Prevention

Preparedness Checklist

Things Facilities Should Do Now to Prepare for COVID-19

When there are Cases in the Facility

**Dialysis Facilities**

Infection Control in Healthcare Settings

Using Personal Protective Equipment

Hand Hygiene

Interim guidance for Outpatient Hemodialysis Facilities

Patient Screening

**Blood and Plasma Facilities**

Infection control in Healthcare Settings

Infection Control and Environmental Management

Using Personal Protective Equipment

Hand Hygiene

Interim Guidance for Blood and Plasma Collection Facilities

**Alternate Care Sites**

Infection Prevention and Control

**Dental Settings**

Infection Control in Healthcare Settings

Using Personal Protective Equipment

Hand Hygiene

Interim Guidance for Dental Settings

**Pharmacies**

Infection Control in Healthcare Settings

Using Personal Protective Equipment

Hand Hygiene

Interim Guidance for Pharmacies

Risk-Reduction During Close-Contact Services

**Outpatient and ambulatory care facilities**

Infection Control in Healthcare Settings

Using Personal Protective Equipment

Hand Hygiene

Interim Guidance for Outpatient & Ambulatory Care Settings

**Postmortem Care**

Using Personal Protective Equipment

Hand Hygiene

Collection and Submission of Postmortem Samples

Cleaning and Waste Disposal

Transportation of Human Remains

**GUIDANCE FOR CLEANING AND DISINFECTING PUBLIC SPACES, WORKPLACES, BUSINESSES, SCHOOLS, AND HOMES**

---

## COMMUNITY LOCATIONS

**Critical Infrastructure Employees**

Interim Guidance for Critical Infrastructure Employees

Cleaning and Disinfecting your Facility

**Schools and childcare programs**

K-12 and Childcare Interim Guidance

Cleaning and Disinfecting your Facility

FAQ for Administrators

Parent and Teacher Checklist

**Colleges and universities**

Interim Guidance for Colleges & Universities

Cleaning and Disinfecting your Facility

Guidance for Student Foreign Travel

FAQ for Administrators

**Gatherings and community events**

Interim Guidance for Mass Gatherings and Events

Election Polling Location Guidance

Events FAQ

**Community- and faith-based organizations**

Interim Guidance for Organizations

Cleaning and Disinfecting your Facility

**Businesses**

Interim Guidance for Businesses

**Parks & Rec Facilities**

Guidance for Administrators of Parks

**Law Enforcement**

What Law Enforcement Personnel Need to Know about COVID-19

**Homeless Service Providers**

Interim Guidance for Homeless Service Providers

**Retirement Homes**

Interim Guidance for Retirement Communities

FAQ for Administrators

**Correction & Detention Facilities**

Interim Guidance for Correction & Detention Facilities

FAQ for Administrators

## HOME SETTING

**Preventing Getting Sick**

How to Protect Yourself and Others

How to Safely Sterilize/Clean a Cloth Face Covering

Cleaning and Disinfecting your Home

Tribal—How to Prevent the Spread of Coronavirus (COVID-19) in Your Home

Tribal—How to Care for Yourself at Home During Covid-19

**Running Errands**

Shopping for Food and Other Essential Items

Accepting Deliveries and Takeout

Banking

Getting Gasoline

Going to the Doctor and Pharmacy

**If you are sick**

Steps to Help Prevent the Spread of COVID19 if You are Sick

## TRANSPORTATION

**Ships**

Interim Guidance for Ships on Managing Suspected COVID-19

**Airlines**

Cleaning Aircraft Carriers

Airline Agents Interim Guidance

**Buses**

Bus Transit Operator

**Rail**

Rail Transit Operators

Transit Station Workers

**EMS Transport Vehicles**

Interim Guidance for EMS

**Taxis and Rideshares**

Keeping Commercial Establishments Safe

## RESTAURANTS & BARS

Best Practices from FDA



# ATTACHMENT B

# Reopening Guidance for Cleaning and Disinfecting Public Spaces, Workplaces, Businesses, Schools, and Homes



# Coronavirus Disease 2019 (COVID-19)

MENU ›

## Reopening Guidance for Cleaning and Disinfecting Public Spaces, Workplaces, Businesses, Schools, and Homes

Updated May 7, 2020                  Print

This guidance is intended for all Americans, whether you own a business, run a school, or want to ensure the cleanliness and safety of your home. Reopening America requires all of us to move forward together by practicing social distancing and other daily habits to reduce our risk of exposure to the virus that causes COVID-19. Reopening the country also strongly relies on public health strategies, including increased testing of people for the virus, social distancing, isolation, and keeping track of how someone infected might have infected other people. This plan is part of the larger United States Government plan 🗗 and focuses on cleaning and disinfecting public spaces, workplaces, businesses, schools, and can also be applied to your home.



Cleaning & Disinfecting Decision Tool

Reopening Guidance for Cleaning and Disinfecting  📕 [PDF – 9 pages]

Cleaning and disinfecting public spaces including your workplace, school, home, and business will require you to:

- Develop your plan
- Implement your plan
- Maintain and revise your plan

Reducing the risk of exposure to COVID-19 by cleaning and disinfection is an important part of reopening public spaces that will require careful planning. Every American has been called upon to slow the spread of the virus through social distancing and prevention hygiene, such as frequently washing your hands and wearing masks. Everyone also has a role in making sure our communities are as safe as possible to reopen and remain open.

The virus that causes COVID-19 can be killed if you use the right products. EPA has compiled a list of disinfectant products that can be used against COVID-19, including ready-to-use sprays, concentrates, and wipes. Each product has been shown to be effective against viruses that are harder to kill than viruses like the one that causes COVID-19.

This document provides a general framework for cleaning and disinfection practices. The framework is based on doing the following:

1. Normal routine cleaning with soap and water will decrease how much of the virus is on surfaces and objects, which reduces the risk of exposure.

2. Disinfection using EPA-approved disinfectants against COVID-19 🗗 can also help reduce the risk.  Frequent disinfection of surfaces and objects touched by multiple people is important.

3. When EPA-approved disinfectants 🗗  are not available, alternative disinfectants can be used (for example, 1/3 cup of 5.25%–8.25% bleach added to 1 gallon of water, or 70% alcohol solutions). Do not mix bleach or other cleaning and disinfection products together. This can cause fumes that may be very dangerous to breathe in. Bleach solutions will be effective for disinfection up to 24 hours. Keep all disinfectants out of the reach of children. Read EPA's infographic on how to use these disinfectant products 🗗  safely and effectively.

**Always read and follow the directions on the label** to ensure safe and effective use.

- Wear skin protection and consider eye protection for potential splash hazards
- Ensure adequate ventilation
- Use no more than the amount recommended on the label
- Use water at room temperature for dilution (unless stated otherwise on the label)
- Avoid mixing chemical products
- Label diluted cleaning solutions
- Store and use chemicals out of the reach of children and pets

You should never eat, drink, breathe or inject these products into your body or apply directly to your skin as they can cause serious harm. Do not wipe or bathe pets with these products or any other products that are not approved for animal use.

See EPA's 6 steps for Safe and Effective Disinfectant Use [↗] .

Special considerations should be made for people with asthma and they should not be present when cleaning and disinfecting is happening as this can trigger asthma exacerbations. Learn more about reducing asthma triggers.

Links to specific recommendations for many public spaces that use this framework, can be found at the end of this document.

*It's important to continue to follow federal, state, tribal, territorial, and local guidance for reopening America.*

# A Few Important Reminders about Coronaviruses and Reducing the Risk of Exposure:

- Coronaviruses on surfaces and objects naturally die within hours to days. Warmer temperatures and exposure to sunlight will reduce the time the virus survives on surfaces and objects.
- Normal routine cleaning with soap and water removes germs and dirt from surfaces. It lowers the risk of spreading COVID-19 infection.
- Disinfectants kill germs on surfaces. By killing germs on a surface after cleaning, you can further lower the risk of spreading infection. EPA-approved disinfectants [↗]  are an important part of reducing the risk of exposure to COVID-19. If disinfectants on this list are in short supply, alternative disinfectants can be used (for example, 1/3 cup of 5.25%–8.25% bleach added to 1 gallon of water, or 70% alcohol solutions).  Bleach solutions will be effective for disinfection up to 24 hours.
- Store and use disinfectants in a responsible and appropriate manner according to the label.  Do not mix bleach or other cleaning and disinfection products together–this can cause fumes that may be very dangerous to breathe in. Keep all disinfectants out of the reach of children.
- Do not overuse or stockpile disinfectants or other supplies.  This can result in shortages of appropriate products for others to use in critical situations.
- Always wear gloves appropriate for the chemicals being used when you are cleaning and disinfecting. Additional personal protective equipment (PPE) may be needed based on setting and product. For more information, see CDC's website on Cleaning and Disinfection for Community Facilities.
- Practice social distancing, wear facial coverings, and follow proper prevention hygiene, such as washing your hands frequently and using alcohol-based (at least 60% alcohol) hand sanitizer when soap and water are not available.

If you oversee staff in a workplace, your plan should include considerations about the safety of custodial staff and other people who are carrying out the cleaning or disinfecting. These people are at increased risk of being exposed to the virus and to any toxic effects of the cleaning chemicals. These staff should wear appropriate PPE for cleaning and disinfecting. To protect your staff and to ensure that the products are used effectively, staff should be instructed on how to apply the disinfectants according to the label. For more information on concerns related to cleaning staff, visit the Occupational Safety and Health Administration's website on Control and Prevention. [↗]

# Develop Your Plan

Evaluate your workplace, school, home, or business to determine what kinds of surfaces and materials make up that area. Most surfaces and objects will just need normal routine cleaning. Frequently touched surfaces and objects like light switches and doorknobs will need to be cleaned and then disinfected to further reduce the risk of germs on surfaces and objects.

- First, clean the surface or object with soap and water.
- Then, disinfect using an EPA-approved disinfectant ☒ .
- If an EPA-approved disinfectant is unavailable, you can use 1/3 cup of 5.25%–8.25% bleach added to 1 gallon of water, or 70% alcohol solutions to disinfect. Do not mix bleach or other cleaning and disinfection products together. Bleach solutions will be effective for disinfection up to 24 hours.  Find additional information at CDC's website on Cleaning and Disinfecting Your Facility.

You should also consider what items can be moved or removed completely to reduce frequent handling or contact from multiple people. Soft and porous materials, such as area rugs and seating, may be removed or stored to reduce the challenges with cleaning and disinfecting them. Find additional reopening guidance for cleaning and disinfecting in the Reopening Decision Tool 🗎 .

It is critical that your plan includes how to maintain a cleaning and disinfecting strategy after reopening. Develop a flexible plan with your staff or family, adjusting the plan as federal, state, tribal, territorial, or local guidance is updated and if your specific circumstances change.

# Determine what needs to be cleaned

Some surfaces only need to be cleaned with soap and water. For example, surfaces and objects that are not frequently touched should be cleaned and do not require additional disinfection. Additionally, disinfectants should typically not be applied on items used by children, especially any items that children might put in their mouths. Many disinfectants are toxic when swallowed. In a household setting, cleaning toys and other items used by children with soap and water is usually sufficient. Find more information on cleaning and disinfection toys and other surfaces in the childcare program setting at CDC's Guidance for Childcare Programs that Remain Open.

These questions will help you decide which surfaces and objects will need normal routine cleaning.

## Is the area outdoors?

Outdoor areas generally require normal routine cleaning and do not require disinfection. Spraying disinfectant on sidewalks and in parks is not an efficient use of disinfectant supplies and has not been proven to reduce the risk of COVID-19 to the public. You should maintain existing cleaning and hygiene practices for outdoor areas.

The targeted use of disinfectants can be done effectively, efficiently and safely on outdoor hard surfaces and objects frequently touched by multiple people. Certain outdoor areas and facilities, such as bars and restaurants, may have additional requirements. More information can be found on FDA's website on Food Safety and the Coronavirus Disease 2019 (COVID-19) ☒ .

There is no evidence that the virus that causes COVID-19 can spread directly to humans from water in pools, hot tubs or spas, or water play areas. Proper operation, maintenance, and disinfection (for example, with chlorine or bromine) of pools, hot tubs or spas, and water playgrounds should kill the virus that causes COVID-19. However, there are additional concerns with outdoor areas that may be maintained less frequently, including playgrounds, or other facilities located within local, state, or national parks. For more information, visit CDC's website on Visiting Parks & Recreational Facilities.

## Has the area been unoccupied for the last 7 days?

If your workplace, school, or business has been unoccupied for 7 days or more, it will only need your normal routine cleaning to reopen the area. This is because the virus that causes COVID-19 has not been shown to survive on surfaces longer than this time.

Case 1:20-cv-00849-CKK Document 138-2 Filed 12/12/20 Page 184 of 232

There are many public health considerations, not just COVID-19 related, when reopening public buildings and spaces that have been closed for extended periods. For example, take measures to ensure the safety of your building water system. It is not necessary to clean ventilation systems, other than routine maintenance, as part of reducing risk of corona viruses. For healthcare facilities, additional guidance is provided on CDC's Guidelines for Environmental Infection Control in Health-Care Facilities 📕 .

# Determine what needs to be disinfected

Following your normal routine cleaning, you can disinfect frequently touched surfaces and objects using a product from EPA's list of approved products that are effective against  COVID-19. ↗

These questions will help you choose appropriate disinfectants.

## Are you cleaning or disinfecting a hard and non-porous material or item like glass, metal, or plastic?

Consult EPA's list of approved products for use against COVID-19 ↗ . This list will help you determine the most appropriate disinfectant for the surface or object. You can use diluted household bleach solutions if appropriate for the surface. Pay special attention to the personal protective equipment (PPE) that may be needed to safely apply the disinfectant and the manufacturer's recommendations concerning any additional hazards. Keep all disinfectants out of the reach of children. Please visit CDC's website on How to Clean and Disinfect for additional details and warnings.

Examples of frequently touched surfaces and objects that will need routine disinfection following reopening are:

- tables,
- doorknobs,
- light switches,
- countertops,
- handles,
- desks,
- phones,
- keyboards,
- toilets,
- faucets and sinks,
- gas pump handles,
- touch screens, and
- ATM machines

Each business or facility will have different surfaces and objects that are frequently touched by multiple people. Appropriately disinfect these surfaces and objects. For example, transit stations have specific guidance for application of cleaning and disinfection.

## Are you cleaning or disinfecting a soft and porous material or items like carpet, rugs, or seating in areas?

Soft and porous materials are generally not as easy to disinfect as hard and non-porous surfaces. EPA has listed a limited number of products approved for disinfection for use on soft and porous materials ↗ . Soft and porous materials that are not frequently touched should only be cleaned or laundered, following the directions on the item's label, using the warmest appropriate water setting. Find more information on CDC's website on Cleaning and Disinfecting Your Facility for developing strategies for dealing with soft and porous materials.

# Consider the resources and equipment needed

Case 1:20-cv-00849-CKK Document 138-2 Filed 12/13/20 Page 185 of 232

Keep in mind the availability of cleaning and disinfection products and appropriate PPE. Always wear gloves appropriate for the chemicals being used for routine cleaning and disinfecting. Follow the directions on the disinfectant label for additional PPE needs. In specific instances, personnel with specialized training and equipment may be required to apply certain disinfectants such as fumigants or fogs. For more information on appropriate PPE for cleaning and disinfection, see CDC's website on Cleaning and Disinfection for Community Facilities.

## Implement Your Plan

Once you have a plan, it's time to take action. Read all manufacturer's instructions for the cleaning and disinfection products you will use. Put on your gloves and other required personal protective equipment (PPE) to begin the process of cleaning and disinfecting.

## Clean visibly dirty surfaces with soap and water

Clean surfaces and objects using soap and water prior to disinfection. Always wear gloves appropriate for the chemicals being used for routine cleaning and disinfecting. Follow the directions on the disinfectant label for additional PPE needs. When you finish cleaning, remember to wash hands thoroughly with soap and water.

Clean or launder soft and porous materials like seating in an office or coffee shop, area rugs, and carpets. Launder items according to the manufacturer's instructions, using the warmest temperature setting possible and dry items completely.

## Use the appropriate cleaning or disinfectant product

EPA approved disinfectants ⬀ , when applied according to the manufacturer's label, are effective for use against COVID-19. Follow the instructions on the label for all cleaning and disinfection products for concentration, dilution, application method, contact time and any other special considerations when applying.

## Always follow the directions on the label

Follow the instructions on the label to ensure safe and effective use of the product. Many product labels recommend keeping the surface wet for a specific amount of time. The label will also list precautions such as wearing gloves and making sure you have good ventilation during use of the product. Keep all disinfectants out of the reach of children.

## Maintain and Revise Your Plan

Take steps to reduce your risk of exposure to the virus that causes COVID-19 during daily activities. CDC provides tips to reduce your exposure and risk of acquiring COVID-19. Reducing exposure to yourself and others is a shared responsibility. Continue to update your plan based on updated guidance and your current circumstances.

## Continue routine cleaning and disinfecting

Routine cleaning and disinfecting are an important part of reducing the risk of exposure to COVID-19. Normal routine cleaning with soap and water alone can reduce risk of exposure and is a necessary step before you disinfect dirty surfaces.

Surfaces frequently touched by multiple people, such as door handles, desks, phones, light switches, and faucets, should be cleaned and disinfected at least daily. More frequent cleaning and disinfection may be required based on level of use. For example, certain surfaces and objects in public spaces, such as shopping carts and point of sale keypads, should be cleaned and disinfected before each use.

Consider choosing a different disinfectant if your first choice is in short supply. Make sure there is enough supply of gloves and appropriate personal protective equipment (PPE) based on the label, the amount of product you will need to apply, and the size of the surface you are treating.

## Maintain safe behavioral practices

We have all had to make significant behavioral changes to reduce the spread of COVID-19. To reopen America, we will need to continue these practices:

- social distancing (specifically, staying 6 feet away from others when you must go into a shared space)
- frequently washing hands or use alcohol-based (at least 60% alcohol) hand sanitizer when soap and water are not available
- wearing masks
- avoiding touching eyes, nose, and mouth
- staying home when sick
- cleaning and disinfecting frequently touched objects and surfaces

It's important to continue to follow federal, state, tribal, territorial, and local guidance for reopening America. Check this resource for updates on COVID-19 ⬈ . This will help you change your plan when situations are updated.

# Consider practices that reduce the potential for exposure

It is also essential to change the ways we use public spaces to work, live, and play. We should continue thinking about our safety and the safety of others.

To reduce your exposure to or the risk of spreading COVID-19 after reopening your business or facility, consider whether you need to touch certain surfaces or materials. Consider wiping public surfaces before and after you touch them. These types of behavioral adjustments can help reduce the spread of COVID-19. There are other resources for more information on COVID-19 ⬈ and how to Prevent Getting Sick.

Another way to reduce the risk of exposure is to make long-term changes to practices and procedures. These could include reducing the use of porous materials used for seating, leaving some doors open to reduce touching by multiple people, opening windows to improve ventilation, or removing objects in your common areas, like coffee creamer containers. There are many other steps that businesses and institutions can put into place to help reduce the spread of COVID-19 and protect their staff and the public. More information can be found at CDC's Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission 📄 .

# Conclusion

Reopening America requires all of us to move forward together using recommended best practices and maintaining safe daily habits in order to reduce our risk of exposure to COVID-19. Remember: We're all in this together!

# Additional resources with more specific recommendations.

### Healthcare Setting

- Long-term Care Facilities, Nursing Homes
  - Infection Control in Healthcare Settings
  - Using Personal Protective Equipment
  - Hand Hygiene
  - Interim Guidance for Infection Prevention
  - Preparedness Checklist 📄
  - Things Facilities Should Do Now to Prepare for COVID-19
  - When there are Cases in the Facility
- Dialysis Facilities
  - Infection Control in Healthcare Settings
  - Using Personal Protective Equipment
  - Hand Hygiene
  - Interim guidance for Outpatient Hemodialysis Facilities

- Patient Screening
- Blood and Plasma Facilities
  - Infection control in Healthcare Settings
  - Infection Control and Environmental Management
  - Using Personal Protective Equipment
  - Hand Hygiene
  - Interim Guidance for Blood and Plasma Collection Facilities
- Alternate Care Sites
  - Infection Prevention and Control
- Dental Settings
  - Infection control in Healthcare Settings
  - Using Personal Protective Equipment
  - Hand Hygiene
  - Interim Guidance for Dental Settings
- Pharmacies
  - Infection control in Healthcare Settings
  - Using Personal Protective Equipment
  - Hand Hygiene
  - Interim Guidance for Pharmacies
  - Risk-Reduction During Close-Contact Services
- Outpatient and ambulatory care facilities
  - Infection control in Healthcare Settings
  - Using Personal Protective Equipment
  - Hand Hygiene
  - Interim Guidance for Outpatient & Ambulatory Care Settings
- Postmortem Care
  - Using Personal Protective Equipment
  - Hand Hygiene
  - Collection and Submission of Postmortem Samples
  - Cleaning and Waste Disposal
  - Transportation of Human Remains

## Community Locations

- Critical Infrastructure Employees
  - Interim Guidance for Critical Infrastructure Employees
  - Cleaning and Disinfecting your Facility
- Schools and childcare programs
  - K-12 and Childcare Interim Guidance
  - Cleaning and Disinfecting your Facility
  - FAQ for Administrators
  - Parent and Teacher Checklist
- Colleges and universities
  - Interim Guidance for Colleges & Universities
  - Cleaning and Disinfecting your Facility
  - Guidance for Student Foreign Travel
  - Considerations for Administrators
- Gatherings and community events
  - Interim Guidance for Mass Gatherings and Events
  - Election Polling Location Guidance

- Election Polling Location Guidance
  - Events FAQ
- Community- and faith-based organizations
  - Interim Guidance for Organizations
  - Cleaning and Disinfecting your Facility
- Businesses
  - Interim Guidance for Businesses
- Parks & Rec Facilities
  - Guidance for Administrators of Parks
- Law Enforcement
  - What Law Enforcement Personnel Need to Know about COVID-19
- Homeless Service Providers
  - Interim Guidance for Homeless Service Providers
- Retirement Homes
  - Interim Guidance for Retirement Communities
  - FAQ for Administrators
- Correction & Detention Facilities
  - Interim Guidance for Correction & Detention Facilities
  - FAQ for Administrators

## Home Setting

- Preventing Getting Sick
  - How to Protect Yourself and Others
  - Cleaning and Disinfecting your Home
  - Tribal – How to Prevent the Spread of Coronavirus (COVID-19) in Your Home 📄 ⬈
- Running Errands
  - Shopping for Food and Other Essential Items
  - Accepting Deliveries and Takeout
  - Banking
  - Getting Gasoline
  - Going to the Doctor and Pharmacy
- If you are sick
  - Steps to Help Prevent the Spread of COVID19 if You are Sick

## Transportation

- Ships
  - Interim Guidance for Ships on Managing Suspected COVID-19
- Airlines
  - Cleaning Aircraft Carriers
  - Airline Agents Interim Guidance
- Buses
  - Bus Transit Operator
- Rail
  - Rail Transit Operators
  - Transit Station Workers
- EMS Transport Vehicles
  - Interim Guidance for EMS
- Taxis and Rideshares
  - Keeping Commercial Establishments Safe 📄

## Restaurants & Bars

Case 1:20-cv-00849-CKK Document 138-2 Filed 12/12/20 Page 189 of 232

- Best Practices from FDA ☒

Last Updated May 7, 2020



# ATTACHMENT C

# Cleaning and Disinfecting YOUR FACILITY



# Coronavirus Disease 2019 (COVID-19)

MENU >

## Cleaning and Disinfecting Your Facility
## Disinfecting Your Facility

Everyday Steps, Steps When Someone is Sick, and Considerations for Employers

Updated July 28, 2020        Print

# How to clean and disinfect



## Clean

- **Wear disposable gloves** to clean and disinfect.

- **Clean surfaces using soap and water, then use disinfectant.**

- Cleaning with soap and water **reduces number of germs, dirt and impurities** on the surface. **Disinfecting kills germs** on surfaces.

- **Practice routine cleaning** of frequently touched surfaces.
  - More frequent cleaning and disinfection may be required based on level of use.
  - Surfaces and objects in public places, such as shopping carts and point of sale keypads should be cleaned and disinfected before each use.

- **High touch surfaces include:**
  - Tables, doorknobs, light switches, countertops, handles, desks, phones, keyboards, toilets, faucets, sinks, etc.



## Disinfect

- **Disinfect with a household disinfectant on** List N: Disinfectants for use against SARs-CoV-2  , the virus that causes COVID 19.

  **Follow the instructions on the label** to ensure safe and effective use of the product.
  Many products recommend:
  - Keeping surface wet for a period of time (see product label).
  - Precautions such as wearing gloves and making sure you have good ventilation during use of the product.

**Always read and follow the directions on the label** to ensure safe and effective use.

- Wear skin protection and consider eye protection for potential splash hazards
- Ensure adequate ventilation
- Use no more than the amount recommended on the label
- Use water at room temperature for dilution (unless stated otherwise on the label)
- Avoid mixing chemical products
- Label diluted cleaning solutions
- Store and use chemicals out of the reach of children and pets

You should never eat, drink, breathe or inject these products into your body or apply directly to your skin as they can cause serious harm. Do not wipe or bathe pets with these products or any other products that are not approved for animal use.

See EPA's 6 steps for Safe and Effective Disinfectant Use 🔗

Special considerations should be made for people with asthma and they should not be present when cleaning and disinfecting is happening as this can trigger asthma exacerbations. Learn more about reducing asthma triggers.

- If products on List N 🔗 are not available, **diluted household bleach solutions** can be used if appropriate for the surface. Unexpired household bleach will be effective against coronaviruses when properly diluted.
  - Use bleach containing 5.25%–8.25% sodium hypochlorite. Do not use a bleach product if the percentage is not in this range or is not specified.
  - Follow the manufacturer's application instructions for the surface, ensuring a contact time of at least 1 minute.
  - Ensure proper ventilation during and after application.
  - Check to ensure the product is not past its expiration date.
  - Never mix household bleach with ammonia or any other cleanser. This can cause fumes that may be very dangerous to breathe in.
- **Prepare a bleach solution** by mixing:
  - 5 tablespoons (1/3rd cup) of 5.25%–8.25% bleach per gallon of room temperature water OR
  - 4 teaspoons of 5.25%–8.25% bleach per quart of room temperature water
- Bleach solutions will be effective for disinfection up to 24 hours.
- **Alcohol solutions with at least 70% alcohol may also be used.**



## Soft surfaces

For soft surfaces such as carpeted floor, rugs, and drapes

- **Clean the surface using soap and water** or with cleaners appropriate for use on these surfaces.
- **Launder items** (if possible) according to the manufacturer's instructions.Use the warmest appropriate water setting and dry items completely.

  OR
- Disinfect with a household disinfectant on List N: Disinfectants for use against SARs-CoV-2 🔗 .
- Vacuum as usual.



## Electronics

For electronics, such as tablets, touch screens, keyboards, remote controls, and ATM machines

- Consider putting a **wipeable cover** on electronics.
- **Follow manufacturer's instruction** for cleaning and disinfecting.
  - If no guidance, **use alcohol-based wipes or sprays containing at least 70% alcohol.** Dry surface thoroughly.



## Laundry

For clothing, towels, linens and other items

- Launder items according to the manufacturer's instructions. Use the warmest appropriate water setting and dry items completely.
- **Wear disposable gloves** when handling dirty laundry from a person who is sick.
- Dirty laundry from a person who is sick can be washed with other people's items.
- **Do not shake** dirty laundry.
- Clean and **disinfect clothes hampers** according to guidance above for surfaces.
- Remove gloves, and wash hands right away.



## Cleaning and disinfecting your building or facility if someone is sick

- **Close off areas** used by the person who is sick.
  - Companies do not necessarily need to close operations, if they can close off affected areas.
- **Open outside doors and windows** to increase air circulation in the area.
- **Wait 24 hours** before you clean or disinfect. If 24 hours is not feasible, wait as long as possible.
- Clean and disinfect **all areas used by the person who is sick**, such as offices, bathrooms, common areas, shared electronic equipment like tablets, touch screens, keyboards, remote controls, and ATM machines.
- Vacuum the space if needed. Use a vacuum equipped with high-efficiency particulate air (HEPA) filter, if available.
  - Do not vacuum a room or space that has people in it. Wait until the room or space is empty to vacuum, such as at night, for common spaces, or during the day for private rooms.
  - Wear disposable gloves to clean and disinfect. For soft (porous) surfaces such as carpeted floors or rugs, clean the surface with detergents or cleaners appropriate for use on these surfaces, according to the textile's label. After cleaning, disinfect with an appropriate EPA-registered disinfectant on List N: Disinfectants for use against SARS-CoV-2 ⧉ . Soft and porous materials, like carpet, are generally not as easy to disinfect as hard and non-porous surfaces. EPA has listed a limited number of products approved for disinfection for use on soft and porous materials on List N. Follow the disinfectant manufacturer's safety instructions (such as wearing gloves and ensuring adequate ventilation), concentration level, application method and contact time. Allow sufficient drying time if vacuum is not intended for wet surfaces.
  - Temporarily turn off in-room, window-mounted, or on-wall recirculation HVAC to avoid contamination of the HVAC units.
  - Do NOT deactivate central HVAC systems. These systems tend to provide better filtration capabilities and introduce outdoor air into the areas that they serve.
  - Consider temporarily turning off room fans and the central HVAC system that services the room or space, so that particles that escape from vacuuming will not circulate throughout the facility.
- Once area has been **appropriately disinfected**, it **can be opened for use**.
  - **Workers without close contact** with the person who is sick can return to work immediately after disinfection.
- If **more than 7 days** since the person who is sick visited or used the facility, additional cleaning and disinfection is not necessary.
  - Continue routing cleaning and disinfection. This includes everyday practices that businesses and communities normally use to maintain a healthy environment.



## Cleaning and disinfecting outdoor areas

- Outdoor areas, like **playgrounds in schools and parks** generally require **normal routine cleaning**, but **do not require disinfection.**
  - Do not spray disinfectant on outdoor playgrounds- it is not an efficient use of supplies and is not proven to reduce risk of COVID-19 to the public.
  - High touch surfaces made of plastic or metal, such as grab bars and railings should be cleaned routinely.

10/29/2020
Case 1:20-cv-00849-CKK   Document 138-2   Filed 12/12/20   Page 144 of 232
Cleaning and disinfecting your facility | CDC

○ Cleaning and disinfection of wooden surfaces (play structures, benches, tables) or groundcovers (mulch, sand) is not recommended.

- **Sidewalks and roads should not be disinfected.**
    ○ Spread of COVID-19 from these surfaces is very low and disinfection is not effective.



# When cleaning

- **Regular cleaning staff** can clean and disinfect community spaces.
    ○ Ensure they are trained on appropriate use of cleaning and disinfection chemicals.
- **Wear disposable gloves and gowns for all tasks in the cleaning process, including handling trash.**
    ○ Additional personal protective equipment (PPE) might be required based on the cleaning/disinfectant products being used and whether there is a risk of splash.
    ○ Gloves and gowns should be removed carefully to avoid contamination of the wearer and the surrounding area.
- **Wash your hands often** with soap and water for 20 seconds.
    ○ Always wash immediately after removing gloves and after contact with a person who is sick.
    ○ Hand sanitizer: If soap and water are not available and hands are not visibly dirty, an alcohol-based hand sanitizer that contains at least 60% alcohol may be used. However, if hands are visibly dirty, always wash hands with soap and water.

---

**Always read and follow the directions on the label** to ensure safe and effective use.

- Keep hand sanitizers away from fire or flame
- For children under six years of age, hand sanitizer should be used with adult supervision
- Always store hand sanitizer out of reach of children and pets

See FDA's Tips for Safe Sanitizer Use ↗  and CDC's Hand Sanitizer Use Considerations

---

- **Additional key times to wash hands** include:
    ○ After blowing one's nose, coughing, or sneezing.
    ○ After using the restroom.
    ○ Before eating or preparing food.
    ○ After contact with animals or pets.
    ○ Before and after providing routine care for another person who needs assistance (e.g., a child).



# Additional considerations for employers

- **Educate workers** performing cleaning, laundry, and trash pick-up to recognize the symptoms of COVID-19.
- Provide instructions on what to do if they develop symptoms within 14 days after their last possible exposure to the virus.
- **Develop policies for worker protection and provide training** to all cleaning staff on site prior to providing cleaning tasks.
    ○ Training should include when to use PPE, what PPE is necessary, how to properly don (put on), use, and doff (take off) PPE, and how to properly dispose of PPE.
- Ensure workers are trained on the hazards of the cleaning chemicals used in the workplace in accordance with OSHA's Hazard Communication standard (29 CFR 1910.1200 ↗ ).
- **Comply with OSHA's standards** on Bloodborne Pathogens (29 CFR 1910.1030 ↗ ), including proper disposal of regulated waste, and PPE (29 CFR 1910.132 ↗ ).

 Alternative disinfection methods

- The efficacy of alternative disinfection methods, such as ultrasonic waves, high intensity UV radiation, and LED blue light against COVID-19 virus is not known.
  - EPA does not routinely review the safety or efficacy of pesticidal devices, such as UV lights, LED lights, or ultrasonic devices. Therefore, EPA cannot confirm whether, or under what circumstances, such products might be effective against the spread of COVID-19.
- CDC does not recommend the use of sanitizing tunnels. There is no evidence that they are effective in reducing the spread of COVID-19. Chemicals used in sanitizing tunnels could cause skin, eye, or respiratory irritation or damage.
- CDC only recommends use of the surface disinfectants identified on List N ⬀ against the virus that causes COVID-19.

 For facilities that house people overnight

- Follow CDC's guidance for colleges and universities. Work with state and local health officials to determine the best way to isolate people who are sick and if temporary housing is needed.
- For guidance on cleaning and disinfecting the bedroom/bathroom for someone who is sick, review CDC's guidance on disinfecting your home if someone is sick.

More details: Detailed Disinfection Guidance for Community Facilities

## More information

Transport Vehicles

Last Updated July 28, 2020



# ATTACHMENT D

# Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities

10/29/2020
Case 1:20-cv-00849-CKK Document 132-2 (Filed 12/12/20 Page 147 of 232 | CDC
Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities | CDC



# Coronavirus Disease 2019 (COVID-19)

MENU >

## Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities

Updated Oct. 21, 2020          Print

---

This interim guidance is based on what is currently known about the transmission and severity of coronavirus disease 2019 (COVID-19) as of the date of posting, October 7, 2020.

The US Centers for Disease Control and Prevention (CDC) will update this guidance as needed and as additional information becomes available. Please check the CDC website periodically for updated interim guidance.

This document provides interim guidance specific for correctional facilities and detention centers during the outbreak of COVID-19, to ensure continuation of essential public services and protection of the health and safety of incarcerated and detained persons, staff, and visitors. Recommendations may need to be revised as more information becomes available.

---

A revision was made 10/21/2020 to reflect the following:

- Updated language for the close contact definition.

A revision was made 10/7/2020 to reflect the following:

- Updated criteria for releasing individuals with confirmed COVID-19 from medical isolation (symptom-based approach).
- Added link to CDC Guidance for Performing Broad-Based Testing for SARS-CoV-2 in Congregate Settings
- Reorganized information on Quarantine into 4 sections: Contact Tracing, Testing Close Contacts, Quarantine Practices, and Cohorted Quarantine for Multiple Close Contacts

A revision was made 7/14/20 to reflect the following:

- Added testing and contact tracing considerations for incarcerated/detained persons (including testing newly incarcerated or detained persons at intake; testing close contacts of cases; repeated testing of persons in cohorts of quarantined close contacts; testing before release). Linked to more detailed Interim Considerations for SARS-CoV-2 Testing in Correctional and Detention Facilities.
- Added recommendation to consider testing and a 14-day quarantine for individuals preparing for release or transfer to another facility.
- Added recommendation that confirmed COVID-19 cases may be medically isolated as a cohort. (Suspected cases should be isolated individually.)
- Reduced recommended frequency of symptom screening for quarantined individuals to once per day (from twice per day).
- Added recommendation to ensure that PPE donning/doffing stations are set up directly outside spaces requiring PPE. Train staff to move from areas of lower to higher risk of exposure if they must re-use PPE due to shortages.
- Added recommendation to organize staff assignments so that the same staff are assigned to the same areas of the facility over time, to reduce the risk of transmission through staff movements.
- Added recommendation to suspend work release programs, especially those within other congregate settings, when there is a COVID-19 case in the correctional or detention facility.
- Added recommendation to modify work details so that they only include incarcerated/detained persons from a single housing unit.
- Added considerations for safely transporting individuals with COVID-19 or their close contacts.

10/29/2020
Case 1:20-cv-00849-CKK Document 138-2 Filed 12/12/20 Page 148 of 232
Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities | CDC

- Added considerations for release and re-entry planning in the context of COVID-19.

# Intended Audience

This document is intended to provide guiding principles for healthcare and non-healthcare administrators of correctional and detention facilities (including but not limited to federal and state prisons, local jails, and detention centers), law enforcement agencies that have custodial authority for detained populations (i.e., U.S. Immigration and Customs Enforcement and U.S. Marshals Service), and their respective health departments, to assist in preparing for potential introduction, spread, and mitigation of SARS-CoV-2 (the virus that causes Coronavirus Disease 2019, or COVID-19) in their facilities. In general, the document uses terminology referring to correctional environments but can also be applied to civil and pre-trial detention settings.

This guidance will not necessarily address every possible custodial setting and may not use legal terminology specific to individual agencies' authorities or processes.

**The guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions.** Facilities should contact CDC or their state, local, territorial, and/or tribal public health department if they need assistance in applying these principles or addressing topics that are not specifically covered in this guidance.

This guidance will not necessarily address every possible custodial setting and may not use legal terminology specific to individual agencies' authorities or processes.

**The guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions.** Facilities should contact CDC or their state, local, territorial, and/or tribal public health department if they need assistance in applying these principles or addressing topics that are not specifically covered in this guidance.

# Guidance Overview

The guidance below includes detailed recommendations on the following topics related to COVID-19 in correctional and detention settings:

✓ Operational and communications preparations for COVID-19

✓ Enhanced cleaning/disinfecting and hygiene practices

✓ Social distancing strategies to increase space between individuals in the facility

✓ Strategies to limit transmission from visitors

✓ Infection control, including recommended personal protective equipment (PPE) and potential alternatives during PPE shortages

✓ Verbal screening and temperature check protocols for incoming incarcerated/detained individuals, staff, and visitors

✓ Testing considerations for SARS-CoV-2

✓ Medical isolation of individuals with confirmed and suspected COVID-19 and quarantine of close contacts, including considerations for cohorting when individual spaces are limited

✓ Healthcare evaluation for individuals with suspected COVID-19

✓ Clinical care for individuals with confirmed and suspected COVID-19

✓ Considerations for people who are at increased risk for severe illness from COVID-19

# Definitions of Commonly Used Terms

**Close contact of someone with COVID-19** – Someone who was within 6 feet of an infected person for a cumulative total of 15 minutes or more over a 24-hour period* starting from 2 days before illness onset (or, for asymptomatic patients, 2 days prior to test specimen collection) until the time the patient is isolated.

*Individual exposures added together over a 24-hour period (e.g., three 5-minute exposures for a total of 15 minutes). Data are limited, making it difficult to precisely define "close contact;" however, 15 cumulative minutes of exposure at a distance of 6 feet or less can be used as an operational definition for contact investigation. Factors to consider when defining close contact include proximity (closer distance likely increases exposure risk), the duration of exposure (longer exposure time likely increases exposure risk), whether the infected individual has symptoms (the period around onset of symptoms is associated with the highest levels of viral shedding), if the infected person was likely to generate respiratory aerosols (e.g., was coughing, singing, shouting), and other environmental factors (crowding, adequacy of ventilation, whether exposure was indoors or outdoors). Because the general public has not received training on proper selection and use of respiratory PPE, such as an N95, the determination of close contact should generally be made irrespective of whether the contact was wearing respiratory PPE. At this time, differential determination of close contact for those using fabric face coverings is not recommended.*

**Cohorting** – In this guidance, cohorting refers to the practice of isolating multiple individuals with laboratory-confirmed COVID-19 together or quarantining close contacts of an infected person together as a group due to a limited number of individual cells. While cohorting those with confirmed COVID-19 is acceptable, cohorting individuals with suspected COVID-19 is not recommended due to high risk of transmission from infected to uninfected individuals. See Quarantine and Medical Isolation sections below for specific details about ways to implement cohorting as a harm reduction strategy to minimize the risk of disease spread and adverse health outcomes.

**Community transmission of SARS-CoV-2** – Community transmission of SARS-CoV-2 occurs when individuals are exposed to the virus through contact with someone in their local community, rather than through travel to an affected location. When community transmission is occurring in a particular area, correctional facilities and detention centers are more likely to start seeing infections inside their walls. Facilities should consult with local public health departments if assistance is needed to determine how to define "local community" in the context of SARS-CoV-2 spread. However, because all states have reported cases, all facilities should be vigilant for introduction of the virus into their populations.

**Confirmed vs. suspected COVID-19** – A person has **confirmed COVID-19** when they have received a positive result from a COVID-19 viral test (antigen or PCR test) but they may or may not have symptoms. A person has **suspected COVID-19** if they show symptoms of COVID-19 but either have not been tested via a viral test or are awaiting test results. If their test result is positive, suspected COVID-19 is reclassified as confirmed COVID-19.

**Incarcerated/detained persons** – For the purpose of this document, "incarcerated/detained persons" refers to persons held in a prison, jail, detention center, or other custodial setting. The term includes those who have been sentenced (i.e., in prisons) as well as those held for pre-trial (i.e., jails) or civil purposes (i.e., detention centers). Although this guidance does not specifically reference individuals in every type of custodial setting (e.g., juvenile facilities, community confinement facilities), facility administrators can adapt this guidance to apply to their specific circumstances as needed.

**Masks** – Masks cover the nose and mouth and are intended to help prevent people who have the virus from transmitting it to others, even if they do not have symptoms. CDC recommends wearing cloth masks in public settings where social distancing measures are difficult to maintain. Masks are recommended as a simple barrier to help prevent respiratory droplets from traveling into the air and onto other people when the person wearing the mask coughs, sneezes, talks, or raises their voice. This is called source control. If everyone wears a mask in congregate settings, the risk of exposure to SARS-CoV-2 can be reduced. Anyone who has trouble breathing or is unconscious, incapacitated, younger than 2 years of age or otherwise unable to remove the mask without assistance should not wear a mask (for more details see How to Wear Masks). **CDC does not recommend use of masks for source control if they have an exhalation valve or vent).** Individuals working under conditions that require PPE should not use a cloth mask when a surgical mask or N95 respirator is indicated (see Table 1). Surgical masks and N95 respirators should be reserved for situations where the wearer needs PPE. Detailed recommendations for wearing a mask can be found here.

**Medical isolation** – Medical isolation refers to separating someone with confirmed or suspected COVID-19 infection to prevent their contact with others to reduce the risk of transmission. Medical isolation ends when the individual meets pre-established criteria for release from isolation, in consultation with clinical providers and public health officials. In this context, isolation

does NOT refer to punitive isolation for behavioral infractions within the custodial setting. Staff are encouraged to use the term "medical isolation" to avoid confusion, and should ensure that the conditions in medical isolation spaces are distinct from those in punitive isolation.

**Quarantine** – Quarantine refers to the practice of separating individuals who have had close contact with someone with COVID-19 to determine whether they develop symptoms or test positive for the disease. Quarantine reduces the risk of transmission if an individual is later found to have COVID-19. Quarantine for COVID-19 should last for 14 days after the exposure has ended. Ideally, each quarantined individual should be housed in a single cell with solid walls and a solid door that closes. If symptoms develop during the 14-day period, and/or a quarantined individual receives a positive viral test result for SARS-CoV-2, the individual should be placed under medical isolation and evaluated by a healthcare professional. If symptoms do not develop during the 14-day period and the individual does not receive a positive viral test result for SARS-CoV-2, quarantine restrictions can be lifted. (NOTE: Some facilities may also choose to implement a "routine intake quarantine," in which individuals newly incarcerated/detained are housed separately or as a group for 14 days before being integrated into general housing. This type of quarantine is conducted to prevent introduction of SARS-CoV-2 from incoming individuals whose exposure status is unknown, rather than in response to a known exposure to someone infected with SARS-CoV-2.)

**Social distancing** – Social distancing is the practice of increasing the space between individuals and decreasing their frequency of contact to reduce the risk of spreading a disease (ideally to maintain at least 6 feet between all individuals, even those who are asymptomatic). Social distancing strategies can be applied on an individual level (e.g., avoiding physical contact), a group level (e.g., canceling group activities where individuals would be in close contact), and an operational level (e.g., rearranging chairs in the dining hall to increase distance between them). Social distancing can be challenging to practice in correctional and detention environments; examples of potential social distancing strategies for correctional and detention facilities are detailed in the guidance below. Social distancing is vital for the prevention of respiratory diseases such as COVID-19, especially because people who have been infected with SARS-CoV-2 but do not have symptoms can still spread the infection. Additional information about social distancing, including information on its use to reduce the spread of other viral illnesses, is available in this CDC publication 📄 [900 KB, 36 pages].

**Staff** – In this document, "staff" refers to all public or private-sector employees (e.g., contracted healthcare or food service workers) working within a correctional facility. Except where noted, "staff" does not distinguish between healthcare, custody, and other types of staff, including private facility operators.

**Symptoms** – Symptoms of COVID-19 include cough, shortness of breath or difficulty breathing, fever, chills, muscle pain, sore throat, and new loss of taste or smell. This list is not exhaustive. Other less common symptoms have been reported, including nausea and vomiting. Like other respiratory infections, COVID-19 can vary in severity from mild to severe, and pneumonia, respiratory failure, and death are possible. COVID-19 is a novel disease, therefore the full range of signs and symptoms, the clinical course of the disease, and the individuals and populations at increased risk for severe illness are not yet fully understood. Monitor the CDC website for updates on symptoms.

# Facilities with Limited Onsite Healthcare Services

Although many large facilities such as prisons and some jails employ onsite healthcare staff and have the capacity to evaluate incarcerated/detained persons for potential illness within a dedicated healthcare space, many smaller facilities do not. Some of these facilities have access to on-call healthcare staff or providers who visit the facility every few days. Others have neither onsite healthcare capacity nor onsite medical isolation/quarantine space and must transfer ill patients to other correctional or detention facilities or local hospitals for evaluation and care.

The majority of the guidance below is designed to be applied to any correctional or detention facility, either as written or with modifications based on a facility's individual structure and resources. However, topics related to healthcare evaluation and clinical care of persons with confirmed and suspected COVID-19 infection and their close contacts may not apply directly to facilities with limited or no onsite healthcare services. It will be especially important for these types of facilities to coordinate closely with their state, local, tribal, and/or territorial health department when they identify incarcerated/detained persons or staff with confirmed or suspected COVID-19, in order to ensure effective medical isolation and quarantine, necessary medical evaluation and care, and medical transfer if needed. The guidance makes note of strategies tailored to facilities without onsite healthcare where possible.

Note that all staff in any sized facility, regardless of the presence of onsite healthcare services, should observe guidance on recommended PPE in order to ensure their own safety when interacting with persons with confirmed or suspected COVID-19

Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities | CDC

infection.

# COVID-19 Guidance for Correctional Facilities

Guidance for correctional and detention facilities is organized into 3 sections: Operational Preparedness, Prevention, and Management of COVID-19. Recommendations across these sections should be applied simultaneously based on the progress of the outbreak in a particular facility and the surrounding community.

- **Operational Preparedness.** This guidance is intended to help facilities prepare for potential SARS-CoV-2 transmission in the facility. Strategies focus on operational and communications planning, training, and personnel practices.
- **Prevention.** This guidance is intended to help facilities prevent spread of SARS-CoV-2 within the facility and between the community and the facility. Strategies focus on reinforcing hygiene practices; intensifying cleaning and disinfection of the facility; regular symptom screening for new intakes, visitors, and staff; continued communication with incarcerated/detained persons and staff; social distancing measures; as well as testing symptomatic and asymptomatic individuals in correctional and detention facilities. Refer to the Interim Guidance on Testing for SARS-CoV-2 in Correctional and Detention Facilities for additional considerations regarding testing in correctional and detention settings.
- **Management.** This guidance is intended to help facilities clinically manage persons with confirmed or suspected COVID-19 inside the facility and prevent further transmission of SARS-CoV-2. Strategies include medical isolation and care of incarcerated/detained persons with COVID-19 (including considerations for cohorting), quarantine and testing of close contacts, restricting movement in and out of the facility, infection control practices for interactions with persons with COVID-19 and their quarantined close contacts or contaminated items, intensified social distancing, and cleaning and disinfecting areas where infected persons spend time.

# Operational Preparedness

Administrators can plan and prepare for COVID-19 by ensuring that all persons in the facility know the symptoms of COVID-19 and the importance of reporting those symptoms if they develop. Other essential actions include developing contingency plans for reduced workforces due to absences, coordinating with public health and correctional partners, training staff on proper use of personal protective equipment (PPE) that may be needed in the course of their duties, and communicating clearly with staff and incarcerated/detained persons about these preparations and how they may temporarily alter daily life.

# Communication and Coordination

✓ **Develop information-sharing systems with partners.**

- ○ Identify points of contact in relevant state, local, tribal, and/or territorial public health departments before SARS-CoV-2 infections develop. Actively engage with the health department to understand in advance which entity has jurisdiction to implement public health control measures for COVID-19 in a particular correctional or detention facility.
- ○ Create and test communications plans to disseminate critical information to incarcerated/detained persons, staff, contractors, vendors, and visitors as the pandemic progresses.
- ○ Communicate with other correctional facilities in the same geographic area to share information including disease surveillance and absenteeism patterns among staff.
- ○ Where possible, put plans in place with other jurisdictions to prevent individuals with confirmed or suspected COVID-19 and their close contacts from being transferred between jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, release, or to prevent overcrowding.
- ○ Stay informed about updates to CDC guidance via the CDC COVID-19 website as more information becomes known.

✓ **Review existing influenza, all-hazards, and disaster plans, and revise for COVID-19.**

- ○ Train staff on the facility's COVID-19 plan. All personnel should have a basic understanding of COVID-19, how the disease is thought to spread, what the symptoms of the disease are, and what measures are being implemented and can be taken by individuals to prevent or minimize the transmission of SARS-CoV-2.
- ○ Ensure that **separate** physical locations (dedicated housing areas and bathrooms) have been identified to 1) isolate individuals with confirmed COVID-19 (individually or cohorted), 2) isolate individuals with suspected COVID-19 (individually – do not cohort), and 3) quarantine close contacts of those with confirmed or suspected COVID-19

(ideally individually; cohorted if necessary). The plan should include contingencies for multiple locations if numerous infected individuals and/or close contacts are identified and require medical isolation or quarantine simultaneously. See Medical Isolation and Quarantine sections below for more detailed cohorting considerations.

- Facilities without onsite healthcare capacity should make a plan for how they will ensure that individuals with suspected COVID-19 will be isolated, evaluated, tested, and provided necessary medical care.
- Make a list of possible social distancing strategies that could be implemented as needed at different stages of transmission intensity.
- Designate officials who will be authorized to make decisions about escalating or de-escalating response efforts as the disease transmission patterns change.

✓ **Coordinate with local law enforcement and court officials.**

- Identify legally acceptable alternatives to in-person court appearances, such as virtual court, as a social distancing measure to reduce the risk of SARS-CoV-2
- Consider options to prevent overcrowding (e.g., diverting new intakes to other facilities with available capacity, and encouraging alternatives to incarceration and other decompression strategies where allowable).

✓ **Encourage all persons in the facility to take the following actions to protect themselves and others from COVID-19. Post signs throughout the facility and communicate this information verbally on a regular basis. Sample** signage and other communications materials **are available on the CDC website.** Ensure that materials can be understood by non-English speakers and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or have low-vision.

- For all:
  - Practice good cough and sneeze etiquette: Cover your mouth and nose with your elbow (or ideally with a tissue) rather than with your hand when you cough or sneeze, and throw all tissues in the trash immediately after use.
  - Practice good hand hygiene: Regularly wash your hands with soap and water for at least 20 seconds, especially after coughing, sneezing, or blowing your nose; after using the bathroom; before eating; before and after preparing food; before taking medication; and after touching garbage.
  - Wear masks, unless PPE is indicated.
  - Avoid touching your eyes, nose, or mouth without cleaning your hands first.
  - Avoid sharing eating utensils, dishes, and cups.
  - Avoid non-essential physical contact.
- For incarcerated/detained persons:
  - the importance of reporting symptoms to staff
  - Social distancing and its importance for preventing COVID-19
  - Purpose of quarantine and medical isolation
- For staff:
  - Stay at home when sick
  - If symptoms develop while on duty, leave the facility as soon as possible and follow CDC-recommended steps for persons who are ill with COVID-19 symptoms including self-isolating at home, contacting a healthcare provider as soon as possible to determine whether evaluation or testing is needed, and contacting a supervisor.

# Personnel Practices

✓ **Review the sick leave policies of each employer that operates within the facility.**

- Review policies to ensure that they are flexible, non-punitive, and actively encourage staff not to report to work when sick.
- Determine which officials will have the authority to send symptomatic staff home.

10/29/2020
Case 1:20-cv-00849-CKK Document 132-2 (Filed 12/12/20 Page 153 of 232
Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities | CDC

✓ **Identify duties that can be performed remotely.** Where possible, allowing staff to work from home can be an effective social distancing strategy to reduce the risk of SARS-CoV-2

✓ **Plan for staff absences.** Staff should stay home when they are sick, or they may need to stay home to care for a sick household member or care for children in the event of school and childcare dismissals.

- Identify critical job functions and plan for alternative coverage.
- Determine minimum levels of staff in all categories required for the facility to function safely. If possible, develop a plan to secure additional staff if absenteeism due to COVID-19 threatens to bring staffing to minimum levels.
- Review CDC guidance on safety practices for critical infrastructure workers (including correctional officers, law enforcement officers, and healthcare workers) who continue to work after a potential exposure to SARS-CoV-2.
- Consider increasing keep on person (KOP) medication orders to cover 30 days in case of healthcare staff shortages.

✓ **Consider offering revised duties to staff who are at** increased risk for severe illness from COVID-19. Persons at increased risk may include older adults and persons of any age with serious underlying medical conditions including lung disease, moderate to severe asthma, heart disease, chronic kidney disease, severe obesity, and diabetes. See CDC's website for a complete list and check regularly for updates as more data become available.

- Consult with occupational health providers to determine whether it would be allowable to reassign duties for specific staff members to reduce their likelihood of exposure to SARS-CoV-2.

✓ **Make plans in advance for how to change staff duty assignments to prevent unnecessary movement between housing units during a COVID-19**

- If there are people with COVID-19 inside the facility, it is **essential** for staff members to maintain a consistent duty assignment in the same area of the facility across shifts to prevent transmission across different facility areas.
- Where feasible, consider the use of telemedicine to evaluate persons with COVID-19 symptoms and other health conditions to limit the movement of healthcare staff across housing units.

✓ **Offer the seasonal influenza vaccine to all incarcerated/detained persons (existing population and new intakes) and staff throughout the influenza season.** Symptoms of COVID-19 are similar to those of influenza. Preventing influenza in a facility can speed the detection of COVID-19 and reduce pressure on healthcare resources.

✓ Reference the Occupational Safety and Health Administration website ⧉ for recommendations regarding worker health.

✓ Review CDC's guidance for businesses and employers to identify any additional strategies the facility can use within its role as an employer, or share with others.

# Operations, Supplies, and PPE Preparations

✓ **Ensure that sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical supplies (consistent with the healthcare capabilities of the facility) are on hand and available and have a plan in place to restock as needed.**

- Standard medical supplies for daily clinic needs
- Tissues
- Liquid or foam soap when possible. If bar soap must be used, ensure that it does not irritate the skin and thereby discourage frequent hand washing. Ensure a sufficient supply of soap for each individual.
- Hand drying supplies
- Alcohol-based hand sanitizer containing at least 60% alcohol (where permissible based on security restrictions)
- Cleaning supplies, including EPA-registered disinfectants effective against SARS-CoV-2 ⧉ , the virus that causes COVID-19
- Recommended PPE (surgical masks, N95 respirators, eye protection, disposable medical gloves, and disposable gowns/one-piece coveralls). See PPE section and Table 1 for more detailed information, including recommendations for extending the life of all PPE categories in the event of shortages, and when surgical masks are acceptable alternatives to N95s. Visit CDC's website for a calculator to help determine rate of PPE usage.

  - ○ Cloth face masks for source control
  - ○ SARS-CoV-2 specimen collection and testing supplies

✓ **Make contingency plans for possible PPE shortages during the COVID-19 pandemic, particularly for non-healthcare workers.**

  - ○ See CDC guidance optimizing PPE supplies.

✓ **Consider relaxing restrictions on allowing alcohol-based hand sanitizer in the secure setting, where security concerns allow.** If soap and water are not available, CDC recommends cleaning hands with an alcohol-based hand sanitizer that contains at least 60% alcohol. Consider allowing staff to carry individual-sized bottles for their personal hand hygiene while on duty, and place dispensers at facility entrances/exits and in PPE donning/doffing stations.

✓ **Provide a no-cost supply of soap to incarcerated/detained persons, sufficient to allow frequent hand washing.** (See Hygiene section below for additional detail regarding recommended frequency and protocol for hand washing.)

  - ○ Provide liquid or foam soap where possible. If bar soap must be used, ensure that it does not irritate the skin and thereby discourage frequent hand washing, and ensure that individuals do not share bars of soap.

✓ **If not already in place, employers operating within the facility should establish a respiratory protection program** as appropriate, to ensure that staff and incarcerated/detained persons are fit-tested for any respiratory protection they will need within the scope of their responsibilities.

✓ **Ensure that staff and incarcerated/detained persons are trained to correctly don, doff, and dispose of PPE that they will need to use within the scope of their responsibilities.**

  - ○ See Table 1 for recommended PPE for incarcerated/detained persons and staff with varying levels of contact with persons with COVID-19 or their close contacts.
  - ○ Visit CDC's website for PPE donning and doffing training videos and job aids 🔴 [2.9 MB, 3 pages].

✓ **Prepare to set up designated PPE donning and doffing areas outside all spaces where PPE will be used. These spaces should include:**

  - ○ A dedicated trash can for disposal of used PPE
  - ○ A hand washing station or access to alcohol-based hand sanitizer
  - ○ A poster demonstrating correct PPE donning and doffing procedures

✓ Review CDC and EPA guidance for cleaning and disinfecting of the facility.

# Prevention

Cases of COVID-19 have been documented in all 50 US states. Correctional and detention facilities can prevent introduction of SARS-CoV-2 and reduce transmission if it is already inside by reinforcing good hygiene practices among incarcerated/detained persons, staff, and visitors (including increasing access to soap and paper towels), intensifying cleaning/disinfection practices, and implementing social distancing strategies.

Because many individuals infected with SARS-CoV-2 do not display symptoms, the virus could be present in facilities before infections are identified. Good hygiene practices, vigilant symptom screening, wearing cloth face masks (if not contraindicated), and social distancing are critical in preventing further transmission.

Testing symptomatic and asymptomatic individuals and initiating medical isolation for suspected and confirmed cases and quarantine for close contacts, can help prevent spread of SARS-CoV-2.

# Operations

10/29/2020
Case 1:20-cv-00849-CKK   Document 138-2   Filed 12/12/20   Page 155 of 232
Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities | CDC

## Operations

✓ Stay in communication with partners about your facility's current situation.

- State, local, territorial, and/or tribal health departments
- Other correctional facilities

✓ Communicate with the public about any changes to facility operations, including visitation programs.

✓ Limit transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, release, or to prevent overcrowding.

- If a transfer is absolutely necessary:
  - Perform verbal screening and a temperature check as outlined in the Screening section below, before the individual leaves the facility. If an individual does not clear the screening process, delay the transfer and follow the protocol for suspected COVID-19 infection – including giving the individual a cloth face mask (unless contraindicated), if not already wearing one, immediately placing them under medical isolation, and evaluating them for SARS-CoV-2
  - Ensure that the receiving facility has capacity to properly quarantine or isolate the individual upon arrival.
  - See Transportation section below on precautions to use when transporting an individual with confirmed or suspected COVID-19.

✓ **Make every possible effort to modify staff assignments to minimize movement across housing units and other areas of the facility.** For example, ensure that the same staff are assigned to the same housing unit across shifts to prevent cross-contamination from units where infected individuals have been identified to units with no infections.

✓ Consider suspending work release and other programs that involve movement of incarcerated/detained individuals in and out of the facility, especially if the work release assignment is in another congregate setting, such as a food processing plant.

✓ Implement lawful alternatives to in-person court appearances where permissible.

✓ Where relevant, consider suspending co-pays for incarcerated/detained persons seeking medical evaluation for possible COVID-19 symptoms, to remove possible barriers to symptom reporting.

✓ Limit the number of operational entrances and exits to the facility.

✓ **Where feasible, consider establishing an on-site laundry option for staff so that they can change out of their uniforms, launder them at the facility, and wear street clothes and shoes home.** If on-site laundry for staff is not feasible, encourage them to change clothes before they leave the work site, and provide a location for them to do so. This practice may help minimize the risk of transmitting SARS-CoV-2 between the facility and the community.

## Cleaning and Disinfecting Practices

✓ **Even if COVID-19 has not yet been identified inside the facility or in the surrounding community, implement intensified cleaning and disinfecting procedures according to the recommendations below. These measures can help prevent spread of SARS-CoV-2 if introduced, and if already present through asymptomatic infections.**

✓ **Adhere to** CDC recommendations for cleaning and disinfection during the COVID-19 response. Monitor these recommendations for updates.

- Visit the CDC website for a tool to help implement cleaning and disinfection.
- Several times per day, clean and disinfect surfaces and objects that are frequently touched, especially in common areas. Such surfaces may include objects/surfaces not ordinarily cleaned daily (e.g., doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, telephones, and computer equipment).
- Staff should clean shared equipment (e.g., radios, service weapons, keys, handcuffs) several times per day and when the use of the equipment has concluded.
- Use household cleaners and EPA-registered disinfectants effective against SARS-CoV-2, the virus that causes COVID-19 ✎, as appropriate for the surface.

19 ☐ as appropriate for the surface.

- Follow label instructions for safe and effective use of the cleaning product, including precautions that should be taken when applying the product, such as wearing gloves and making sure there is good ventilation during use, and around people. Clean according to label instructions to ensure safe and effective use, appropriate product dilution, and contact time. Facilities may consider lifting restrictions on undiluted disinfectants (i.e., requiring the use of undiluted product), if applicable.

✓ Consider increasing the number of staff and/or incarcerated/detained persons trained and responsible for cleaning common areas to ensure continual cleaning of these areas throughout the day.

✓ Ensure adequate supplies to support intensified cleaning and disinfection practices, and have a plan in place to restock rapidly if needed.

# Hygiene

✓ Encourage all staff and incarcerated/detained persons to wear a cloth face mask as much as safely possible, to prevent transmission of SARS-CoV-2 through respiratory droplets that are created when a person talks, coughs, or sneezes ("source control").

- Provide masks at no cost to incarcerated/detained individuals and launder them routinely.
- Clearly explain the purpose of masks and when their use may be contraindicated. Because many individuals with COVID-19 do not have symptoms, it is important for everyone to wear masks in order to protect each other: "My mask protects you, your mask protects me."
- Ensure staff know that cloth masks should not be used as a substitute for surgical masks or N95 respirators that may be required based on an individual's scope of duties. Cloth masks are not PPE but are worn to protect others in the surrounding area from respiratory droplets generated by the wearer.
- Surgical masks may also be used as source control but should be conserved for situations requiring PPE.

✓ Reinforce healthy hygiene practices, and provide and continually restock hygiene supplies throughout the facility, including in bathrooms, food preparation and dining areas, intake areas, visitor entries and exits, visitation rooms and waiting rooms, common areas, medical, and staff-restricted areas (e.g., break rooms).

✓ Provide incarcerated/detained persons and staff no-cost access to:

- **Soap** – Provide liquid or foam soap where possible. If bar soap must be used, ensure that it does not irritate the skin, as this would discourage frequent hand washing, and ensure that individuals are not sharing bars of soap.
- **Running water, and hand drying machines or disposable paper towels** for hand washing
- **Tissues** and (where possible) no-touch trash receptacles for disposal
- Face masks

✓ Provide alcohol-based hand sanitizer with at least 60% alcohol where permissible based on security restrictions. Consider allowing staff to carry individual-sized bottles to maintain hand hygiene.

✓ Communicate that sharing drugs and drug preparation equipment can spread SARS-CoV-2 due to potential contamination of shared items and close contact between individuals.

# Testing for SARS-CoV-2

Correctional and detention facilities are high-density congregate settings that present unique challenges to implementing testing for SARS-CoV-2, the virus that causes COVID-19. Refer to Testing guidance for details regarding testing strategies in correctional and detention settings.

# Prevention Practices for Incarcerated/Detained Persons

✓ Provide cloth face masks (unless contraindicated) and perform pre-intake symptom screening and temperature checks for all new entrants in order to identify and immediately place individuals with symptoms under medical isolation. Screening should take place in an outdoor space prior to entry, in the sally port, or at the point of entry into the facility immediately upon entry, before beginning the intake process. See Screening section below for the wording of screening questions and a recommended procedure to safely perform a temperature check. Staff performing temperature checks should wear recommended PPE (see PPE section below).

- If an individual has symptoms of COVID-19:
    - Require the individual to wear a mask (as much as possible, use cloth masks in order to reserve surgical masks for situations requiring PPE). Anyone who has trouble breathing, or is unconscious, incapacitated or otherwise unable to remove the mask without assistance should not wear a mask.
    - Ensure that staff who have direct contact with the symptomatic individual wear recommended PPE.
    - Place the individual under medical isolation and refer to healthcare staff for further evaluation. (See Infection Control and Clinical Care sections below.)
    - Facilities without onsite healthcare staff should contact their state, local, tribal, and/or territorial health department to coordinate effective medical isolation and necessary medical care. See Transport section and coordinate with the receiving facility.

- If an individual is an asymptomatic close contact of someone with COVID-19:
    - Quarantine the individual and monitor for symptoms at least once per day for 14 days. (See Quarantine section below.)
    - Facilities without onsite healthcare staff should contact their state, local, tribal, and/or territorial health department to coordinate effective quarantine and necessary medical care. See Transport section and coordinate with the receiving facility.

✓ Consider strategies for testing asymptomatic incarcerated/detained persons without known SARS-CoV-2 exposure for early identification of SARS-CoV-2 in the facility.

Implement social distancing strategies to increase the physical space between incarcerated/detained persons (ideally 6 feet between all individuals, regardless of symptoms), and to minimize mixing of individuals from different housing units. Strategies will need to be tailored to the individual space in the facility and the needs of the population and staff. Not all strategies will be feasible in all facilities. Example strategies with varying levels of intensity include:

- Common areas:
    - Enforce increased space between individuals in holding cells as well as in lines and waiting areas such as intake (e.g., remove every other chair in a waiting area).
- Recreation:
    - Choose recreation spaces where individuals can spread out
    - Stagger time in recreation spaces (clean and disinfect between groups).
    - Restrict recreation space usage to a single housing unit per space (where feasible).
- Meals:
    - Stagger meals in the dining hall (one housing unit at a time; clean and disinfect between groups).
    - Rearrange seating in the dining hall so that there is more space between individuals (e.g., remove every other chair and use only one side of the table).
    - Provide meals inside housing units or cells.
- Group activities:
    - Limit the size of group activities.
    - Increase space between individuals during group activities.
    - Suspend group programs where participants are likely to be in closer contact than they are in their housing environment.
    - Consider alternatives to existing group activities, in outdoor areas or other areas where individuals can spread out.
- Housing:

- If space allows, reassign bunks to provide more space between individuals, ideally 6 feet or more in all directions. (Ensure that bunks are cleaned thoroughly if assigned to a new occupant.)

- Arrange bunks so that individuals sleep head to foot to increase the distance between their faces.

- Minimize the number of individuals housed in the same room as much as possible.

- Rearrange scheduled movements to minimize mixing of individuals from different housing areas.

- Work details:
  - Modify work detail assignments so that each detail includes only individuals from a single housing unit.

- Medical:
  - If possible, designate a room near each housing unit to evaluate individuals with COVID-19 symptoms, rather than having them walk through the facility to be evaluated in the medical unit. If this is not feasible, consider staggering individuals' sick call visits.

  - Stagger pill line, or stage pill line within individual housing units.

  - Identify opportunities to implement telemedicine to minimize the movement of healthcare staff across multiple housing units and to minimize the movement of ill individuals through the facility.

  - Designate a room near the intake area to evaluate new entrants who are flagged by the intake symptom screening process before they move to other parts of the facility.

✓ Note that if group activities are discontinued, it will be important to identify alternative forms of activity to support the mental health of incarcerated/detained persons.

✓ Provide up-to-date information about COVID-19 to incarcerated/detained persons on a regular basis. As much as possible, provide this information in person and allow opportunities for incarcerated/detained individuals to ask questions (e.g., town hall format if social distancing is feasible, or informal peer-to-peer education). Updates should address:

- Symptoms of COVID-19 and its health risks
- Reminders to report COVID-19 symptoms to staff at the first sign of illness
  - Address concerns related to reporting symptoms (e.g., being sent to medical isolation), explain the need to report symptoms immediately to protect everyone, and explain the differences between medical isolation and solitary confinement.
- Reminders to use masks as much as possible
- Changes to the daily routine and how they can contribute to risk reduction

# Prevention Practices for Staff

✓ When feasible and consistent with security priorities, encourage staff to maintain a distance of 6 feet or more from an individual with COVID-19 symptoms while interviewing, escorting, or interacting in other ways, and to wear recommended PPE if closer contact is necessary.

✓ Ask staff to keep interactions with individuals with COVID-19 symptoms as brief as possible.

✓ Remind staff to stay at home if they are sick. Ensure staff are aware that they will not be able to enter the facility if they have symptoms of COVID-19, and that they will be expected to leave the facility as soon as possible if they develop symptoms while on duty.

✓ Consider strategies for testing asymptomatic staff without known SARS-CoV-2 exposure for early identification of SARS-CoV-2 in the facility.

- Follow guidance from the Equal Employment Opportunity Commission ↗ when offering testing to staff. Any time a positive test result is identified, relevant employers should:
  - Ensure that the individual is rapidly notified, connected to appropriate medical care, and advised how to self-isolate.
  - Inform other staff about their possible exposure in the workplace but should maintain the infected employee's confidentiality as required by the Americans with Disabilities Act ↗ .

10/29/2020
Case 1:20-cv-00849-CKK Document 138-2 (Filed 12/12/20 Page 159 of 232
Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities | CDC

✓ **Perform verbal screening and temperature checks for all staff daily on entry.** See Screening section below for wording of screening questions and a recommended procedure to safely perform temperature checks.

- In very small facilities with only a few staff, consider self-monitoring or virtual monitoring (e.g., reporting to a central authority via phone).
- Send staff home who do not clear the screening process, and advise them to follow CDC-recommended steps for persons who are ill with COVID-19 symptoms.

✓ **Provide staff with** up-to-date information about COVID-19 **and about facility policies on a regular basis, including:**

- Symptoms of COVID-19 and its health risks
- Employers' sick leave policy

✓ **If staff develop a fever or other** symptoms of COVID-19 **while at work**, they should immediately put on a mask (if not already wearing one), inform their supervisor, leave the facility, and follow CDC-recommended steps for persons who are ill with COVID-19 symptoms.

✓ **Staff identified as close contacts of someone with COVID-19 should self-quarantine at home for 14 days, unless a shortage of critical staff precludes quarantine.**

- Staff identified as close contacts should self-monitor for symptoms and seek testing.
- Refer to CDC guidelines for further recommendations regarding home quarantine.
- **To ensure continuity of operations,** critical infrastructure workers **(including corrections officers, law enforcement officers, and healthcare staff) may be permitted to continue work following potential exposure to SARS-CoV-2 , provided that they remain** *asymptomatic* **and additional precautions are implemented to protect them and others.**
  - **Screening:** The facility should ensure that temperature and symptom screening takes place daily before the staff member enters the facility.
  - **Regular Monitoring:** The staff member should self-monitor under the supervision of their employer's occupational health program. If symptoms develop, they should follow CDC guidance on isolation with COVID-19 symptoms.
  - **Wear a Mask:** The staff member should wear a mask (unless contraindicated) at all times while in the workplace for 14 days after the last exposure (if not already wearing one due to universal use of masks).
  - **Social Distance:** The staff member should maintain 6 feet between themselves and others and practice social distancing as work duties permit.
  - **Disinfect and Clean Workspaces:** The facility should continue enhanced cleaning and disinfecting practices in all areas including offices, bathrooms, common areas, and shared equipment.

✓ **Staff with confirmed or suspected COVID-19 should inform workplace and personal contacts immediately. These staff should be required to meet CDC criteria for** ending home isolation **before returning to work.** Monitor CDC guidance on discontinuing home isolation regularly, as circumstances evolve rapidly.

## Prevention Practices for Visitors

✓ **Restrict non-essential vendors, volunteers, and tours from entering the facility.**

✓ **If possible, communicate with potential visitors to discourage contact visits in the interest of their own health and the health of their family members and friends inside the facility.**

✓ **Require visitors to wear** masks **(unless** contraindicated**), and perform verbal screening and temperature checks for all visitors and volunteers on entry.** See Screening section below for wording of screening questions and a recommended procedure to safely perform temperature checks.

- Staff performing temperature checks should wear recommended PPE.
- Exclude visitors and volunteers who do not clear the screening process or who decline screening.

Case 1:20-cv-00849-CKK  Document 138-2  Filed 12/12/20  Page 160 of 232

✓ Provide alcohol-based hand sanitizer with at least 60% alcohol in visitor entrances, exits, and waiting areas.

✓ Provide visitors and volunteers with information to prepare them for screening.

- Instruct visitors to postpone their visit if they have COVID-19 symptoms.
- If possible, inform potential visitors and volunteers before they travel to the facility that they should expect to be screened for COVID-19 (including a temperature check), and will be unable to enter the facility if they do not clear the screening process or if they decline screening.
- Display signage outside visiting areas explaining the COVID-19 symptom screening and temperature check process. Ensure that materials are understandable for non-English speakers and those with low literacy.

✓ Promote non-contact visits:

- Encourage incarcerated/detained persons to limit in-person visits in the interest of their own health and the health of their visitors.
- Consider reducing or temporarily eliminating the cost of phone calls for incarcerated/detained persons.
- Consider increasing incarcerated/detained persons' telephone privileges to promote mental health and reduce exposure from direct contact with community visitors.

✓ Consider suspending or modifying visitation programs, if legally permissible. For example, provide access to virtual visitation options where available.

- If moving to virtual visitation, clean electronic surfaces regularly after each use. (See Cleaning guidance below for instructions on cleaning electronic surfaces.)
- Inform potential visitors of changes to, or suspension of, visitation programs.
- Clearly communicate any visitation program changes to incarcerated/detained persons, along with the reasons for them (including protecting their health and their family and community members' health).
- If suspending contact visits, provide alternate means (e.g., phone or video visitation) for incarcerated/detained individuals to engage with legal representatives, clergy, and other individuals with whom they have legal right to consult.

NOTE: Suspending visitation should only be done in the interest of incarcerated/detained persons' physical health and the health of the general public. Visitation is important to maintain mental health. If visitation is suspended, facilities should explore alternative ways for incarcerated/detained persons to communicate with their families, friends, and other visitors in a way that is not financially burdensome for them.

# Management

If there is an individual with suspected COVID-19 inside the facility (among incarcerated/detained persons, staff, or visitors who have recently been inside), begin implementing Management strategies while test results are pending. Essential Management strategies include placing individuals with suspected or confirmed COVID-19 under medical isolation, quarantining their close contacts, and facilitating necessary medical care, while observing relevant infection control and environmental disinfection protocols and wearing recommended PPE.

Testing symptomatic and asymptomatic individuals (incarcerated or detained individuals and staff) and initiating medical isolation for suspected and confirmed cases and quarantine for close contacts, can help prevent spread of SARS-CoV-2 in correctional and detention facilities. Continue following recommendations outlined in the Preparedness and Prevention sections above.

# Operations

✓ **Coordinate with state, local, tribal, and/or territorial health departments.** When an individual has suspected or confirmed COVID-19, notify public health authorities and request any necessary assistance with medical isolation, evaluation, and clinical care, and contact tracing and quarantine of close contacts. See Medical Isolation, Quarantine and Clinical Care sections below.

10/29/2020
Case 1:20-cv-00849-CKK  Document 138-2  Filed 12/12/20  Page 161 of 232
Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities | CDC

✓ Implement alternate work arrangements deemed feasible in the Operational Preparedness section.

✓ Suspend all transfers of incarcerated/detained persons to and from other jurisdictions and facilities (including work release), unless necessary for medical evaluation, medical isolation/quarantine, health care, extenuating security concerns, release, or to prevent overcrowding.

✓ Set up PPE donning/doffing stations as described in the Preparation section.

✓ If possible, consider quarantining all new intakes for 14 days before they enter the facility's general population (separately from other individuals who are quarantined due to contact with someone who has COVID-19). This practice is referred to as routine intake quarantine.

✓ Consider testing all newly incarcerated/detained persons before they join the rest of the population in the correctional or detention facility.

✓ Minimize interactions between incarcerated/detained persons living in different housing units, to prevent transmission from one unit to another. For example, stagger mealtimes and recreation times, and consider implementing broad movement restrictions.

✓ Ensure that work details include only incarcerated/detained persons from a single housing unit, supervised by staff who are normally assigned to the same housing unit.

  ○ If a work detail provides goods or services for other housing units (e.g., food service or laundry), ensure that deliveries are made with extreme caution. For example, have a staff member from the work detail deliver prepared food to a set location, leave, and have a staff member from the delivery location pick it up. Clean and disinfect all coolers, carts, and other objects involved in the delivery.

✓ Incorporate COVID-19 prevention practices into release planning.

  ○ Consider implementing a release quarantine (ideally in single cells) for 14 days prior to individuals' projected release date.
  ○ Consider testing individuals for SARS-CoV-2 before release, particularly if they will be released to a congregate setting or to a household with persons at increased risk for severe illness from COVID-19.
  ○ Screen all releasing individuals for COVID-19 symptoms and perform a temperature check (see Screening section below.)
    ■ If an individual does not clear the screening process, follow the protocol for suspected COVID-19 – including giving the individual a mask, if not already wearing one, immediately placing them under medical isolation, and evaluating them for SARS-CoV-2 testing.

    ■ If the individual is released from the facility before the recommended medical isolation period is complete, discuss release of the individual with state, local, tribal, and/or territorial health departments to ensure safe medical transport and continued shelter and medical care, as part of release planning. Make direct linkages to community resources to ensure proper medical isolation and access to medical care.

    ■ Before releasing an incarcerated/detained individual who has confirmed or suspected COVID-19, or who is a close contact of someone with COVID-19, contact local public health officials to ensure they are aware of the individual's release and anticipated location. If the individual will be released to a community-based facility, such as a homeless shelter, contact the facility's staff to ensure adequate time for them to prepare to continue medical isolation or quarantine as needed.

✓ Incorporate COVID-19 prevention practices into re-entry programming.

  ○ Ensure that facility re-entry programs include information on accessing housing, social services, mental health services, and medical care within the context of social distancing restrictions and limited community business operations related to COVID-19.
    ■ Provide individuals about to be released with COVID-19 prevention information, hand hygiene supplies, and masks.

- Link individuals who need medication-assisted treatment for opioid use disorder to substance use, harm reduction, and/or recovery support systems ⬈ . If the surrounding community is under movement restrictions due to COVID-19, ensure that referrals direct releasing individuals to programs that are continuing operations.
- Link releasing individuals to Medicaid enrollment and healthcare resources ⬈ , including continuity of care for chronic conditions that may place an individual at increased risk for severe illness from COVID-19.
- When possible, encourage releasing individuals to seek housing options among their family or friends in the community, to prevent crowding in other congregate settings such as homeless shelters. When linking individuals to shared housing, link preferentially to accommodations with the greatest capacity for social distancing.

# Hygiene

✓ Continue to ensure that hand hygiene supplies are well-stocked in all areas of the facility (see above).

✓ Continue to emphasize practicing good hand hygiene and cough etiquette (see above).

# Cleaning and Disinfecting Practices

✓ Continue adhering to recommended cleaning and disinfection procedures for the facility at large (see above).

✓ Reference specific cleaning and disinfection procedures for areas where individuals with COVID-19 spend time (see below).

# Management of Incarcerated/Detained Persons with COVID-19 Symptoms

NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities without onsite healthcare capacity or without sufficient space for medical isolation should coordinate with local public health officials to ensure that individuals with suspected COVID-19 will be effectively isolated, evaluated, tested (if indicated), and given care.

✓ Staff interacting with incarcerated/detained individuals with COVID-19 symptoms should wear recommended PPE (see Table 1).

✓ If possible, designate a room near each housing unit for healthcare staff to evaluate individuals with COVID-19 symptoms, rather than having symptomatic individuals walk through the facility to be evaluated in the medical unit.

✓ Incarcerated/detained individuals with COVID-19 symptoms should wear a mask (if not already wearing one, and unless contraindicated) and should be placed under medical isolation immediately. See Medical Isolation section below.

✓ Medical staff should evaluate symptomatic individuals to determine whether SARS-CoV-2 testing is indicated. Refer to CDC guidelines for information on evaluation and testing. See Infection Control and Clinical Care sections below as well. Incarcerated/detained persons with symptoms are included in the high-priority group for testing in CDC's recommendations due to the high risk of transmission within congregate settings.

- If the individual's SARS-CoV-2 test is positive, continue medical isolation. (See Medical Isolation section below.)
- If the SARS-CoV-2 test is negative, the individual can be returned to their prior housing assignment unless they require further medical assessment or care or if they need to be quarantined as a close contact of someone with COVID-19.

✓ Work with public health or private labs, as available, to access testing supplies or services.

# Medical Isolation of Individuals with Confirmed or Suspected COVID-19

NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities without onsite healthcare capacity, or without sufficient space to implement effective medical isolation, should coordinate with local public health officials to ensure that individuals with confirmed or suspected COVID-19 will be appropriately isolated, evaluated,

Case 1:20-cv-00849-CKK Document 132-2 Filed 12/12/20 Page 163 of 232

health officials to ensure that individuals with confirmed or suspected COVID-19 will be appropriately isolated, evaluated, tested, and given care.

✓ As soon as an individual develops symptoms of COVID-19 or tests positive for SARS-CoV-2 they should be given a mask (if not already wearing one and if it can be worn safely), immediately placed under medical isolation in a separate environment from other individuals, and medically evaluated.

✓ Ensure that medical isolation for COVID-19 is distinct from punitive solitary confinement of incarcerated/detained individuals, both in name and in practice.

Because of limited individual housing spaces within many correctional and detention facilities, infected individuals are often placed in the same housing spaces that are used for solitary confinement. To avoid being placed in these conditions, incarcerated/detained individuals may be hesitant to report COVID-19 symptoms, leading to continued transmission within shared housing spaces and, potentially, lack of health care and adverse health outcomes for infected individuals who delay reporting symptoms. Ensure that medical isolation is *operationally* distinct from solitary confinement, even if the same housing spaces are used for both. For example:

- Ensure that individuals under medical isolation receive regular visits from medical staff and have access to mental health services.
- Make efforts to provide similar access to radio, TV, reading materials, personal property, and commissary as would be available in individuals' regular housing units.
- Consider allowing increased telephone privileges without a cost barrier to maintain mental health and connection with others while isolated.
- Communicate regularly with isolated individuals about the duration and purpose of their medical isolation period.

✓ Keep the individual's movement outside the medical isolation space to an absolute minimum.

- Provide medical care to isolated individuals inside the medical isolation space, unless they need to be transferred to a healthcare facility. See Infection Control and Clinical Care sections for additional details.
- Serve meals inside the medical isolation space.
- Exclude the individual from all group activities.
- Assign the isolated individual(s) a dedicated bathroom when possible. When a dedicated bathroom is not feasible, do not reduce access to restrooms or showers as a result. Clean and disinfect areas used by infected individuals frequently on an ongoing basis during medical isolation.

✓ Ensure that the individual is wearing a mask if they must leave the medical isolation space for any reason, and whenever another individual enters. Provide clean masks as needed. Masks should be washed routinely and changed when visibly soiled or wet.

✓ If the facility is housing individuals with confirmed COVID-19 as a cohort:

- Only individuals with laboratory-confirmed COVID-19 should be placed under medical isolation as a cohort. Do not cohort those with confirmed COVID-19 with those with suspected COVID-19, with close contacts of individuals with confirmed or suspected COVID-19, or with those with undiagnosed respiratory infection who do not meet the criteria for suspected COVID-19.
- Ensure that cohorted groups of people with confirmed COVID-19 wear masks whenever anyone else (including staff) enters the isolation space. (Anyone who has trouble breathing, or is unconscious, incapacitated or otherwise unable to remove the mask without assistance should not wear a mask.)
- When choosing a space to cohort groups of people with confirmed COVID-19, use a well-ventilated room with solid walls and a solid door that closes fully.
- Use one large space for cohorted medical isolation rather than several smaller spaces. This practice will conserve PPE and reduce the chance of cross-contamination across different parts of the facility.

✓ If possible, avoid transferring infected individual(s) to another facility unless necessary for medical care. If transfer is necessary, see Transport section for safe transport guidance.

✓ **Staff assignments to isolation spaces should remain as consistent as possible, and these staff should limit their movements to other parts of the facility as much as possible.** These staff should wear recommended PPE as appropriate for their level of contact with the individual under medical isolation (see PPE section below) and should limit their own movement between different parts of the facility.

- If staff must serve multiple areas of the facility, ensure that they change PPE when leaving the isolation space. If a shortage of PPE supplies necessitates reuse, ensure that staff move only from areas of low to high exposure risk while wearing the same PPE, to prevent cross-contamination. For example, start in a housing unit where no one is known to be infected, then move to a space used as quarantine for close contacts, and end in an isolation unit. Ensure that staff are highly trained in infection control practices, including use of recommended PPE.

✓ **Provide individuals under medical isolation with tissues and, if permissible, a lined no-touch trash receptacle.** Instruct them to:

- **Cover** their mouth and nose with a tissue when they cough or sneeze
- **Dispose** of used tissues immediately in the lined trash receptacle
- **Wash hands** immediately with soap and water for at least 20 seconds. If soap and water are not available, clean hands with an alcohol-based hand sanitizer that contains at least 60% alcohol (where security concerns permit). Ensure that hand washing supplies are continually restocked.

✓ **Maintain medical isolation at least until CDC criteria for discontinuing home-based isolation have been met. These criteria have changed since CDC corrections guidance was originally issued and may continue to change as new data become available. Monitor the sites linked below regularly for updates.** This content will not be outlined explicitly in this document due to the rapid pace of change.

- CDC's recommended strategy for release from home-based isolation can be found in the *Discontinuation of Isolation for Persons with COVID-19 Not in Healthcare Settings Interim Guidance*.
- Detailed information about the data informing the symptom-based strategy, and considerations for extended isolation periods for persons in congregate settings including corrections, can be found here.
- If persons will require ongoing care by medical providers, discontinuation of transmission-based precautions (PPE) should be based on similar criteria found here.

## Cleaning Spaces where Individuals with COVID–19 Spend Time

✓ **Ensure that staff and incarcerated/detained persons performing cleaning wear recommended PPE.** (See PPE section below.)

✓ **Thoroughly and frequently clean and disinfect all areas where individuals with confirmed or suspected COVID-19 spend time.**

- After an individual has been medically isolated for COVID-19, close off areas that they have used prior to isolation. If possible, open outside doors and windows to increase air circulation in the area. Wait as long as practical, up to 24 hours under the poorest air exchange conditions (consult CDC Guidelines for Environmental Infection Control in Health-Care Facilities for wait time based on different ventilation conditions) before beginning to clean and disinfect, to minimize potential for exposure to respiratory droplets.
- Clean and disinfect all areas (e.g., cells, bathrooms, and common areas) used by the infected individual, focusing especially on frequently touched surfaces (see list above in Prevention section).
- Clean and disinfect areas used by infected individuals on an ongoing basis during medical isolation.

✓ Hard (non-porous) surface cleaning and disinfection

- If surfaces are soiled, they should be cleaned using a detergent or soap and water prior to disinfection.
- Consult the list of products that are EPA-approved for use against the virus that causes COVID-19 ⧉ . Follow the manufacturer's instructions for all cleaning and disinfection products (e.g., concentration, application method and contact time, etc.).

- If EPA-approved disinfectants are not available, diluted household bleach solutions can be used if appropriate for the surface. Unexpired household bleach will be effective against coronaviruses when properly diluted.
  - Use bleach containing 5.25%–8.25% sodium hypochlorite. Do not use a bleach product if the percentage is not in this range or is not specified.
  - Follow the manufacturer's application instructions for the surface, ensuring a contact time of at least 1 minute.
  - Ensure proper ventilation during and after application.
  - Check to ensure the product is not past its expiration date.
  - Never mix household bleach with ammonia or any other cleanser. This can cause fumes that may be very dangerous to breathe in.
- Prepare a bleach solution by mixing:
  - 5 tablespoons (1/3rd cup) of 5.25%–8.25% bleach per gallon of room temperature water

    OR
  - 4 teaspoons of 5.25%–8.25% bleach per quart of room temperature water
- Bleach solutions will be effective for disinfection up to 24 hours.
- Alcohol solutions with at least 70% alcohol may also be used.

✓ Soft (porous) surface cleaning and disinfection

- For soft (porous) surfaces such as carpeted floors and rugs, remove visible contamination if present and clean with appropriate cleaners indicated for use on these surfaces. After cleaning:
  - If the items can be laundered, launder items in accordance with the manufacturer's instructions using the warmest appropriate water setting for the items and then dry items completely.
  - Otherwise, use products that are EPA-approved for use against the virus that causes COVID-19 ⧉ and are suitable for porous surfaces.

✓ Electronics cleaning and disinfection

- For electronics such as tablets, touch screens, keyboards, and remote controls, remove visible contamination if present.
  - Follow the manufacturer's instructions for all cleaning and disinfection products.
  - Consider use of wipeable covers for electronics.
  - If no manufacturer guidance is available, consider the use of alcohol-based wipes or spray containing at least 70% alcohol to disinfect touch screens. Dry surfaces thoroughly to avoid pooling of liquids.

    Additional information on cleaning and disinfection of communal facilities such can be found on CDC's website.

✓ **Food service items.** Individuals under medical isolation should throw disposable food service items in the trash in their medical isolation room. Non-disposable food service items should be handled with gloves and washed following food safety requirements. Individuals handling used food service items should clean their hands immediately after removing gloves.

✓ Laundry from individuals with COVID-19 can be washed with other's laundry.

- Individuals handling laundry from those with COVID-19 should wear a mask, disposable gloves, and a gown, discard after each use, and clean their hands immediately after.
- Do not shake dirty laundry. This will minimize the possibility of dispersing virus through the air. Ensure that individuals performing cleaning wear recommended PPE (see PPE section below).
- Launder items as appropriate in accordance with the manufacturer's instructions. If possible, launder items using the warmest appropriate water setting for the items and dry items completely.
- Clean and disinfect clothes hampers according to guidance above for surfaces. If permissible, consider using a bag liner that is either disposable or can be laundered.

# Transporting Individuals with Confirmed and Suspected COVID-19 and Quarantined Close Contacts

✓ Refer to CDC guidance for Emergency Medical Services (EMS) on safely transporting individuals with confirmed or suspected COVID-19. This guidance includes considerations for vehicle type, air circulation, communication with the receiving facility, and cleaning the vehicle after transport.

    ◦ If the transport vehicle is not equipped with the features described in the EMS guidance, at minimum drive with the windows down and ensure that the fan is set to high, in non-recirculating mode. If the vehicle has a ceiling hatch, keep it open.

✓ Use the same precautions when transporting individuals under quarantine as close contacts of someone with COVID-19.

✓ See Table 1 for the recommended PPE for staff transporting someone with COVID-19.

## Managing Close Contacts of Individuals with COVID-19

NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities without onsite healthcare capacity or without sufficient space to implement effective quarantine should coordinate with local public health officials to ensure that close contacts of individuals with COVID-19 will be effectively quarantined and medically monitored

### Contact Tracing

✓ To determine who is considered a close contact of an individual with COVID-19, see definition of close contact and the Interim Guidance on Developing a COVID-19 Case Investigation and Contact Tracing Plan 📄 [12 Kb, 1 page] for more information.

✓ Contact tracing can be a useful tool to help contain disease outbreaks. When deciding whether to perform contact tracing, consider the following:

    ◦ Have a plan in place for how close contacts of individuals with COVID-19 will be managed, including quarantine logistics.
    ◦ Contact tracing can be especially impactful when:
        ■ There is a small number of infected individuals in the facility or in a particular housing unit. Aggressively tracing close contacts can help curb transmission before many other individuals are exposed.
        ■ The infected individual is a staff member or an incarcerated/detained individual who has had close contact with individuals from other housing units or with other staff. Identifying those close contacts can help prevent spread to other parts of the facility.
        ■ The infected individual is a staff member or an incarcerated/detained individual who has recently visited a community setting. In this situation, identifying close contacts can help reduce transmission from the facility into the community.
    ◦ Contact tracing may be more feasible and effective in settings where incarcerated/detained individuals have limited contact with others (e.g., celled housing units), compared to settings where close contact is frequent and relatively uncontrolled (e.g., open dormitory housing units).
    ◦ If there is a large number of individuals with COVID-19 in the facility, contact tracing may become difficult to manage. Under such conditions, consider broad-based testing in order to identify infections and prevent further transmission.
    ◦ Consult CDC recommendations for Performing Broad-Based Testing for SARS-CoV-2 in Congregate Settings for further information regarding selecting a testing location, ensuring proper ventilation and PPE usage, setting up testing stations and supplies, and planning test-day operations.

### Testing Close Contacts

✓ Testing is recommended for all close contacts 📄 [12 KB, 1 page] of persons with SARS-CoV-2 infection, regardless of whether the close contacts have symptoms.

    ◦ Medically isolate those who test positive to prevent further transmission (see Medical Isolation section above).
    ◦ Asymptomatic close contacts testing negative should be placed under quarantine precautions for 14 days from

their last exposure.

## *Quarantine for Close Contacts (who test negative)*

✓ Incarcerated/detained persons who are close contacts of someone with confirmed or suspected COVID-19 (whether the infected individual is another incarcerated/detained person, staff member, or visitor) should be placed under quarantine for 14 days. (Refer to the Interim Guidance on Developing a COVID-19 Case Investigation and Contact Tracing Plan 📄 [12 KB, 1 page] for more information):

- If a quarantined individual is tested again during quarantine and they remain negative, they should continue to quarantine for the full 14 days after last exposure and follow all recommendations of local public health authorities.
- If an individual is quarantined due to contact with someone with suspected COVID-19 who is subsequently tested and receives a negative result, they can be released from quarantine. See Interim Guidance on Testing for SARS-CoV-2 in Correctional and Detention Facilities for more information about testing strategies in correctional and detention settings.

✓ Quarantined individuals should be monitored for COVID-19 symptoms at least once per day including temperature checks.

- See Screening section for a procedure to perform temperature checks safely on asymptomatic close contacts of someone with COVID-19.
- If an individual develops symptoms for SARS-CoV-2, they should be considered a suspected COVID-19 case, given a mask (if not already wearing one), and moved to medical isolation immediately (individually, and separately from those with confirmed COVID-19 and others with suspected COVID-19) and further evaluated. (See Medical Isolation section above.) If the individual is tested and receives a positive result, they can then be cohorted with other individuals with confirmed COVID-19.

✓ Quarantined individuals can be released from quarantine restrictions if they have not developed COVID-19 symptoms and have not tested positive for SARS-CoV-2 for 14 days since their last exposure to someone who tested positive.

✓ Keep a quarantined individual's movement outside the quarantine space to an absolute minimum.

- Provide medical evaluation and care inside or near the quarantine space when possible.
- Serve meals inside the quarantine space.
- Exclude the quarantined individual from all group activities.
- Assign the quarantined individual a dedicated bathroom when possible. When providing a dedicated bathroom is not feasible, do not reduce access to restrooms or showers as a result.

✓ Restrict quarantined individuals from leaving the facility (including transfers to other facilities) during the 14-day quarantine period, unless released from custody or a transfer is necessary for medical care, infection control, lack of quarantine space, or extenuating security concerns.

✓ If a quarantined individual leaves the quarantine space for any reason, they should wear a mask (unless contraindicated) as source control, if not already wearing one.

- Quarantined individuals housed as a cohort should wear masks at all times (see cohorted quarantine section below).
- Quarantined individuals housed alone should wear a mask whenever another individual enters the quarantine space.
- Anyone who has trouble breathing, or is unconscious, incapacitated or otherwise unable to remove the mask without assistance should not wear a mask.

✓ Meals should be provided to quarantined individuals in their quarantine spaces. Individuals under quarantine should throw disposable food service items in the trash. Non-disposable food service items should be handled with gloves and washed with hot water or in a dishwasher. Individuals handling used food service items should clean their hands immediately after removing gloves.

✓ Laundry from quarantined individuals can be washed with others' laundry.

- Individuals handling laundry from quarantined persons should wear a mask, disposable gloves, and a gown, discard after each use, and clean their hands immediately after.
- Do not shake dirty laundry. This will minimize the possibility of dispersing virus through the air.
- Launder items as appropriate in accordance with the manufacturer's instructions. If possible, launder items using the warmest appropriate water setting for the items and dry items completely.
- Clean and disinfect clothes hampers according to guidance above for surfaces. If permissible, consider using a bag liner that is either disposable or can be laundered.

✓ **Staff assignments to quarantine spaces should remain as consistent as possible, and these staff should limit their movements to other parts of the facility.** These staff should wear recommended PPE based on their level of contact with the individuals under quarantine (see PPE section below).

- If staff must serve multiple areas of the facility, ensure that they change PPE when leaving the quarantine space. If a shortage of PPE supplies necessitates reuse, ensure that staff move only from areas of low to high exposure risk while wearing the same PPE, to prevent cross-contamination.
- Staff supervising asymptomatic incarcerated/detained persons under routine intake quarantine (with no known exposure to someone with COVID-19) do not need to wear PPE but should still wear a mask as source control.

## *Cohorted Quarantine for Multiple Close Contacts (who test negative)*

✓ **Facilities should make every possible effort to individually quarantine close contacts of individuals with confirmed or suspected COVID-19.** Cohorting multiple quarantined close contacts could transmit SARS-CoV-2 from those who are infected to those who are uninfected. Cohorting should only be practiced if there are no other available options.

✓ **In order of preference, multiple quarantined individuals should be housed:**

- **IDEAL:** Separately, in single cells with solid walls (i.e., not bars) and solid doors that close fully
- Separately, in single cells with solid walls but without solid doors
- As a cohort, in a large, well-ventilated cell with solid walls, a solid door that closes fully, and at least 6 feet of personal space assigned to each individual in all directions
- As a cohort, in a large, well-ventilated cell with solid walls and at least 6 feet of personal space assigned to each individual in all directions, but without a solid door
- As a cohort, in single cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells creating at least 6 feet of space between individuals. (Although individuals are in single cells in this scenario, the airflow between cells essentially makes it a cohort arrangement in the context of COVID-19.)
- As a cohort, in multi-person cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. Employ social distancing strategies related to housing in the Prevention section to maintain at least 6 feet of space between individuals housed in the same cell.
- As a cohort, in individuals' regularly assigned housing unit but with no movement outside the unit (if an entire housing unit has been exposed – referred to as "quarantine in place"). Employ social distancing strategies related to housing in the Prevention section above to maintain at least 6 feet of space between individuals.
- Safely transfer to another facility with capacity to quarantine in one of the above arrangements. (See Transport) (NOTE – Transfer should be avoided due to the potential to introduce infection to another facility; proceed only if no other options are available.)

If the ideal choice does not exist in a facility, use the next best alternative as a harm reduction approach.

✓ **If cohorting close contacts is absolutely necessary, be especially mindful of** those who are at increased risk for severe illness from COVID-19. Ideally, they should not be cohorted with other quarantined individuals. If cohorting is unavoidable, make all possible accommodations to reduce exposure for the individuals with increased risk of severe illness. (For example, intensify social distancing strategies for individuals with increased risk.)

✓ **If single cells for isolation (of those with suspected COVID-19) and quarantine (of close contacts) are limited, prioritize them in rank order as follows to reduce the risk of further SARS-CoV-2 transmission and adverse health outcomes:**

10/29/2020
Case 1:20-cv-00849-CKK Document 138-2 (Filed 12/12/20 Page 160 of 232
Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities | CDC

- Individuals with suspected COVID-19 who are at increased risk for severe illness from COVID-19
- Others with suspected COVID-19
- Quarantined close contacts of someone with COVID-19 who are themselves at increased risk for severe illness from COVID-19

✓ If a facility must cohort quarantined close contacts, **all cohorted individuals should be monitored closely for symptoms of COVID-19, and those with symptoms should be placed under** medical isolation **immediately.**

✓ **If an individual who is part of a quarantined cohort becomes symptomatic:**

- **If the individual is tested for SARS-CoV-2 and receives a positive result:** the 14-day quarantine clock for the remainder of the cohort must be reset to 0.
- **If the individual is tested for SARS-CoV-2 and receives a negative result:** the 14-day quarantine clock for this individual and the remainder of the cohort does not need to be reset. This individual can return from medical isolation to the quarantine cohort for the remainder of the quarantine period as their symptoms and diagnosis allow.
- **If the individual is not tested for SARS-CoV-2:** the 14-day quarantine clock for the remainder of the cohort must be reset to 0.

✓ **Consider** re-testing **all individuals in a quarantine cohort every 3-7 days, and immediately place those who test positive under medical isolation.** This strategy can help identify and isolate infected individuals early and minimize continued transmission within the cohort.

✓ **Consider testing all individuals quarantined as close contacts of someone with suspected or confirmed COVID-19 at the end of the 14-day quarantine period, before releasing them from quarantine precautions.**

✓ **Do not add more individuals to an existing quarantine cohort after the 14-day quarantine clock has started.** Doing so would complicate the calculation of the cohort's quarantine period, and potentially introduce new sources of infection.

✓ Some facilities may choose to quarantine all new intakes for 14 days before moving them to the facility's general population as a general rule (not because they were exposed to someone with COVID-19). **Under this scenario, do not mix individuals undergoing routine intake quarantine with those who are quarantined due to COVID-19 exposure.**

## Management Strategies for Incarcerated/Detained Persons without COVID-19 Symptoms

✓ **Provide** clear information **to incarcerated/detained persons about the presence of COVID-19 within the facility, and the need to increase social distancing and maintain hygiene precautions.**

- As much as possible, provide this information in person and allow opportunities for incarcerated/detained individuals to ask questions (e.g., town hall format if social distancing is feasible, or informal peer-to-peer education).
- Ensure that information is provided in a manner that can be understood by non-English speaking individuals and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf or hard-of-hearing, blind, or have low-vision.

✓ **If individuals with COVID-19 have been identified among staff or incarcerated/detained persons anywhere in a facility, consider implementing regular symptom screening and temperature checks in housing units that have** *not* **yet identified infections, until no additional infections have been identified in the facility for 14 days.** Because some incarcerated/detained persons are hesitant to report symptoms, it is very important to monitor for symptoms closely even though doing so is resource intensive. See Screening section for a procedure to safely perform a temperature check.

✓ **Consider additional options to intensify** social distancing **within the facility.**

## Management Strategies for Staff

✓ Provide clear information to staff about the presence of COVID-19 within the facility, and the need to enforce universal use of masks (unless contraindicated) and social distancing and to encourage hygiene precautions.

- As much as possible, provide this information in person (if social distancing is feasible) and allow opportunities for staff to ask questions.

✓ Staff identified as close contacts of someone with COVID-19 should be tested for SARS-CoV-2 and self-quarantine at home for 14 days, unless a shortage of critical staff precludes quarantine of those who are asymptomatic (see considerations for critical infrastructure workers). Refer to the Interim Guidance on Developing a COVID-19 Case Investigation and Contact Tracing Plan ⬛ [12 KB, 1 page] for more information about contact tracing.

- Close contacts should self-monitor for symptoms and seek testing.
- Refer to CDC guidelines for further recommendations regarding home quarantine.

✓ Staff who have confirmed or suspected COVID-19 should meet CDC criteria for ending home isolation before returning to work. Monitor CDC guidance on discontinuing home isolation regularly, as circumstances evolve rapidly.

# Infection Control

Infection control guidance below is applicable to all types of correctional and detention facilities. Individual facilities should assess their unique needs based on the types of exposure staff and incarcerated/detained persons may have with someone with confirmed or suspected COVID-19.

✓ All individuals who have the potential for direct or indirect exposure to someone with COVID-19 or infectious materials (including body substances; contaminated medical supplies, devices, and equipment; contaminated environmental surfaces; or contaminated air) should follow infection control practices outlined in the CDC Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings. Monitor these guidelines regularly for updates.

- Implement the above guidance as fully as possible within the correctional/detention context. Some of the specific language may not apply directly to healthcare settings within correctional facilities and detention centers, or to facilities without onsite healthcare capacity, and may need to be adapted to reflect facility operations and custody needs.
- Note that these recommendations apply to staff as well as to incarcerated/detained individuals who may come in contact with contaminated materials during the course of their work placement in the facility (e.g., cleaning).

✓ Staff should exercise caution and wear recommended PPE when in contact with individuals showing COVID-19 symptoms. Contact should be minimized to the extent possible until the infected individual is wearing a mask (if not already wearing one and if not contraindicated) and staff are wearing PPE.

✓ Refer to PPE section to determine recommended PPE for individuals in contact with individuals with COVID-19, their close contacts, and potentially contaminated items.

✓ Remind staff about the importance of limiting unnecessary movements between housing units and through multiple areas of the facility, to prevent cross-contamination.

✓ Ensure that staff and incarcerated/detained persons are trained to doff PPE after they leave a space where PPE is required, as needed within the scope of their duties and work details. Ideally, staff should don clean PPE before entering a different space within the facility that also requires PPE.

- If PPE shortages make it impossible for staff to change PPE when they move between different spaces within the facility, ensure that they are trained to move from areas of low exposure risk ("clean") to areas of higher exposure risk ("dirty") while wearing the same PPE, to minimize the risk of contamination across different parts of the facility.

# Clinical Care for Individuals with COVID–19

10/29/2020
Case 1:20-cv-00849-CKK Document 132-9 Filed 12/12/20 Page 171 of 232
Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities | CDC

✓ Facilities should ensure that incarcerated/detained individuals receive medical evaluation and treatment at the first signs of COVID-19 symptoms.

- If a facility is not able to provide such evaluation and treatment, a plan should be in place to safely transfer the individual to another facility or local hospital (including notifying the facility/hospital in advance). See Transport section. The initial medical evaluation should determine whether a symptomatic individual is at increased risk for severe illness from COVID-19. Persons at increased risk may include older adults and persons of any age with serious underlying medical conditions, including chronic kidney disease, serious heart conditions, and Type-2 diabetes. See CDC's website for a complete list and check regularly for updates as more data become available to inform this issue.

- Based on available information, pregnant people seem to have the same risk of COVID-19 as adults who are not pregnant. However, much remains unknown about the risks of COVID-19 to the pregnant person, the pregnancy, and the unborn child. Prenatal and postnatal care is important for all pregnant people, including those who are incarcerated/detained. Visit the CDC website for more information on pregnancy and breastfeeding in the context of COVID-19.

✓ Staff evaluating and providing care for individuals with confirmed or suspected COVID-19 should follow the CDC Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19) and monitor the guidance website regularly for updates to these recommendations.

✓ Healthcare staff should evaluate persons with COVID-19 symptoms and those who are close contacts of someone with COVID-19 in a separate room, with the door closed if possible, while wearing recommended PPE and ensuring that the individual being evaluated is wearing a mask.

- If possible, designate a room near each housing unit to evaluate individuals with COVID-19 symptoms, rather than having symptomatic individuals walk through the facility to be evaluated in the medical unit.

✓ Clinicians are strongly encouraged to test for other causes of respiratory illness (e.g., influenza). However, presence of another illness such as influenza does not rule out COVID-19.

✓ When evaluating and treating persons with symptoms of COVID-19 who do not speak English, use a language line or provide a trained interpreter when possible.

# Recommended PPE and PPE Training for Staff and Incarcerated/Detained Persons

✓ Ensure that all staff (healthcare and non-healthcare) and incarcerated/detained persons who will have contact with infectious materials in their work placements have been trained to correctly don, doff, and dispose of PPE relevant to the level of contact they will have with individuals with confirmed and suspected COVID-19. Ensure strict adherence to OSHA PPE requirements.

- Ensure that staff and incarcerated/detained persons who require respiratory protection (e.g., N95 respirator) for their work responsibilities have been medically cleared, trained, and fit-tested in the context of an employer's respiratory protection program. If individuals wearing N95 respirators have facial hair, it should not protrude under the respirator seal, or extend far enough to interfere with the device's valve function (see OSHA regulations ↗ ).

- For PPE training materials and posters, visit the CDC website on Protecting Healthcare Personnel.

✓ Ensure that all staff are trained to perform hand hygiene after removing PPE.

✓ Ensure that PPE is readily available where and when needed, and that PPE donning/doffing/disposal stations have been set up as described in the Preparation section.

✓ Recommended PPE for incarcerated/detained individuals and staff in a correctional facility will vary based on the type of contact they have with someone with COVID-19 and their close contacts (see Table 1). Each type of recommended PPE is defined below. As above, note that PPE shortages are anticipated in every category during the COVID-19 response.

- ○ **N95 respirator**

  N95 respirators should be prioritized when staff anticipate contact with infectious aerosols or droplets from someone with COVID-19. See below for guidance on when surgical masks are acceptable alternatives for N95s. Individuals working under conditions that require an N95 respirator should not use a cloth mask when an N95 is indicated.

- ○ **Surgical mask**

  Worn to protect the wearer from splashes, sprays, and respiratory droplets generated by others. (NOTE: Surgical masks are distinct from cloth masks, which are not PPE but are worn to protect others in the surrounding area from respiratory droplets generated by the wearer. Individuals working under conditions that require a surgical mask should not use a cloth mask when a surgical mask is indicated.)

- ○ **Eye protection**

  Goggles or disposable face shield that fully covers the front and sides of the face.

- ○ **A single pair of disposable patient examination gloves**

  Gloves should be changed if they become torn or heavily contaminated.

- ○ **Disposable medical isolation gown or single-use/disposable coveralls, when feasible**
  - ■ If custody staff are unable to wear a disposable gown or coveralls because it limits access to their duty belt and gear, ensure that duty belt and gear are disinfected after close contact with an individual with confirmed or suspected COVID-19, and that clothing is changed as soon as possible and laundered. Clean and disinfect duty belt and gear prior to reuse using a household cleaning spray or wipe, according to the product label.
  - ■ If there are shortages of gowns, they should be prioritized for aerosol-generating procedures, activities where splashes and sprays are anticipated, and high-contact activities that provide opportunities for transfer of pathogens to the hands and clothing of the wearer.

✓ Note that shortages of all PPE categories have been seen during the COVID-19 response, particularly for non-healthcare workers. Guidance for optimizing the supply of each category (including strategies to reuse PPE safely) can be found on CDC's website:

- ○ Strategies for optimizing the supply of N95 respirators
  - ■ Based on local and regional situational analysis of PPE supplies, **surgical masks are an acceptable alternative when the supply chain of respirators cannot meet the demand**. During this time, available respirators should be prioritized for staff engaging in activities that would expose them to respiratory aerosols, which pose the highest exposure risk.
- ○ Strategies for optimizing the supply of surgical masks
  - ■ Reserve surgical masks for individuals who need PPE. Issue cloth masks to incarcerated/detained persons and staff as source control, in order to preserve surgical mask supply (see recommended PPE).

- ○ Strategies for optimizing the supply of eye protection
- ○ Strategies for optimizing the supply of gowns/coveralls
- ○ Strategies for optimizing the supply of disposable medical gloves

# Table 1. Recommended Personal Protective Equipment (PPE) for Incarcerated/Detained Persons and Staff in a Correctional or Detention Facility during the COVID-19 Response

| Classification of Individual Wearing PPE | N95 respirator | Surgical mask | Eye Protection | Gloves | Gown/ Coveralls |
|---|---|---|---|---|---|
| **Incarcerated/Detained Persons** | | | | | |
| Asymptomatic incarcerated/detained persons (under quarantine as close contacts of someone with COVID-19) | Use cloth masks as source control (NOTE: cloth face coverings are NOT PPE and may not protect the wearer. Prioritize cloth masks for source control among all persons who do not meet criteria for N95 or surgical masks, and to conserve surgical masks for situations that require PPE.) | | | | |

| Classification of Individual Wearing PPE | N95 respirator | Surgical mask | Eye Protection | Gloves | Gown/ Coveralls |
|---|---|---|---|---|---|
| Incarcerated/detained persons who have confirmed or suspected COVID-19, or showing symptoms of COVID-19 | | | | | |
| Incarcerated/detained persons handling laundry or used food service items from someone with COVID-19 or their close contacts | | | | X | X |
| Incarcerated/detained persons cleaning an area where someone with COVID-19 spends time | Additional PPE may be needed based on the product label. See CDC guidelines for more details. | | | X | X |
| **Staff** | | | | | |
| Staff having direct contact with asymptomatic incarcerated/detained persons under quarantine as close contacts of someone with COVID-19* (but not performing temperature checks or providing medical care) | | Surgical mask, eye protection, and gloves as local supply and scope of duties allow. | | | |
| Staff performing temperature checks on any group of people (staff, visitors, or incarcerated/detained persons), or providing medical care to asymptomatic quarantined persons | | X | X | X | |
| Staff having direct contact with (including transport) or offering medical care to individuals with confirmed or suspected COVID-19 (See CDC infection control guidelines). For recommended PPE for staff performing collection of specimens for SARS-CoV-2 testing see the Standardized procedure for SARS-CoV-2 testing in congregate settings. | X** | | X | X | X |
| Staff present during a procedure on someone with confirmed or suspected COVID-19 that may generate infectious aerosols (See CDC infection control guidelines) | X | | X | X | X |
| Staff handling laundry or used food service items from someone with COVID-19 or their close contacts | | | | X | X |
| Staff cleaning an area where someone with COVID-19 spends time | Additional PPE may be needed based on the product label. See CDC guidelines for more details. | | | X | X |

Classification of Individual Wearing PPE

\* A NIOSH-approved N95 respirator is preferred. However, based on local and regional situational analysis of PPE supplies, surgical masks are an acceptable alternative when the supply chain of respirators cannot meet the demand. During this time, available respirators should be prioritized for procedures that are likely to generate respiratory aerosols, which would pose the highest exposure risk to staff.

# Verbal Screening and Temperature Check Protocols for Incarcerated/Detained Persons, Staff, and Visitors

Case 1:20-cv-00849-CKK   Document 138-2   Filed 12/12/20   Page 174 of 232

## Incarcerated/Detained Persons, Staff, and Visitors

The guidance above recommends verbal screening and temperature checks for incarcerated/detained persons, staff, volunteers, and visitors who enter correctional and detention facilities, as well as incarcerated/detained persons who are transferred to another facility or released from custody. Below, verbal screening questions for COVID-19 symptoms and contact with known cases, and a safe temperature check procedure are detailed.

✓ Verbal screening for symptoms of COVID-19 and contact with COVID-19 cases should include the following questions:

- *Today or in the past 24 hours, have you had any of the following symptoms?*
  - *Fever, felt feverish, or had chills?*
  - *Cough?*
  - *Difficulty breathing?*
- *In the past 14 days, have you had close contact with a person known to be infected with the novel coronavirus (COVID-19)?*

✓ The following is a protocol to safely check an individual's temperature:

- Wash hands with soap and water for at least 20 seconds. If soap and water are not available, use hand sanitizer with at least 60% alcohol.
- Put on a surgical mask, eye protection (goggles or disposable face shield that fully covers the front and sides of the face), and a single pair of disposable gloves
- Check individual's temperature
- **If performing a temperature check on multiple individuals, ensure that a clean pair of gloves is used for each individual and that the thermometer has been thoroughly cleaned in between each check.** If disposable or non-contact thermometers are used and the screener did not have physical contact with an individual, gloves do not need to be changed before the next check. If non-contact thermometers are used, they should be cleaned with an alcohol wipe (or isopropyl alcohol on a cotton swab) between each individual.
- Remove and discard PPE
- Wash hands with soap and water for at least 20 seconds. If soap and water are not available, use hand sanitizer with at least 60% alcohol

✓ **If a physical barrier or partition is used to protect the screener rather than a PPE-based approach, the following protocol can be used.** (During screening, the screener stands behind a physical barrier, such as a glass or plastic window or partition, that can protect the screener's face and mucous membranes from respiratory droplets that may be produced when the person being screened sneezes, coughs, or talks.)

- Wash hands with soap and water for at least 20 seconds. If soap and water are not available, use hand sanitizer with at least 60% alcohol.
- Put on a single pair of disposable gloves.
- Check the individual's temperature, reaching around the partition or through the window. Make sure the screener's face stays behind the barrier at all times during the screening.
- **If performing a temperature check on multiple individuals, ensure that a clean pair of gloves is used for each individual and that the thermometer has been thoroughly cleaned in between each check.** If disposable or non-contact thermometers are used and the screener did not have physical contact with an individual, gloves do not need to be changed before the next check. If non-contact thermometers are used, they should be cleaned with an alcohol wipe (or isopropyl alcohol on a cotton swab) between each individual.
- Remove and discard gloves.

Last Updated Oct. 21, 2020



# ATTACHMENT E

# POTOMAC-HUDSON ENGINEERING INC, ONSITE AUDIT INSPECTION REPORT



# ONSITE AUDIT INSPECTION REPORT
## ENVIRONMENTAL CONDITIONS INSPECTION FOR
## SARS-CoV-2 (COVID-19) DISINFECTION AND CLEANING PROTOCOLS

## DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS (DC DOC), CENTRAL DETENTION FACILITY (CDF) AND CORRECTIONAL TREATMENT FACILITY (CTF)

## JULY 2020

### *DRAFT*

**Prepared for**
District of Columbia Department of Corrections
2000 14th Street NW, 7th Floor
Washington, DC 20009

**Prepared by**
Potomac-Hudson Engineering, Inc.
77 Upper Rock Circle, Suite 302, Rockville, MD, 20850

GSA Contract No. 7QRAA18D0074
Task Order No. CW82753

## INTRODUCTION

In January 2020, a novel virus, SARS-CoV-2, was identified as the cause of an outbreak of viral pneumonia in Wuhan, China and subsequently led to the world-wide spread of coronavirus disease 2019 (COVID-19). COVID-19 is primarily transmitted via person-to-person contact; however, surface contamination is also known to be a concern with the spread of the virus. The virus is mainly spread through respiratory droplets produced when an infected person coughs or sneezes. These droplets can land on people who are nearby (within 6 feet). It may also be possible for a person to contract SARS-CoV-2 by touching a contaminated surface or object and then touching their own mouth, nose, or eyes.

In May 2020, the District of Columbia Department of Corrections (DC DOC) contracted Potomac-Hudson Engineering, Inc. (PHE) to develop a cleaning and disinfection protocol specific to COVID-19 to be used by DC DOC cleaning contractors. The purpose of this protocol is to provide guidance on proper disinfection practices and personal protective equipment (PPE) requirements. Frequent, effective, and safe cleaning and disinfecting procedures can prevent the spread of disease to Department of Corrections (DOC) inmates, staff, and visitors.  PHE provided a draft protocol to DC DOC on June 15, 2020, and the procedures described in the protocol were subsequently implemented later that week.

## AUDIT OVERVIEW

### SCOPE

PHE was tasked with inspecting the cleaning procedures used by two independent contractors at two DC DOC facilities after implementation of the procedures described in the Draft Protocol. PHE performed these inspections on June 29 and July 1, 2020. This report documents observed deviations, omissions, inconsistencies, and deficiencies, along with corrective action recommendations.

### CENTRAL DETENTION FACILITY

On June 29, 2020, PHE inspected implementation of the cleaning procedures of Rock Solid District Group, LLC at the DC DOC's Central Detention Facility (CDF).  An In-Brief Meeting was held prior to the inspection and was attended by:

- Ms. Gitana Stewart-Ponder (DOC)
- Ms. Gloria Robertson (DOC)
- Sgt. D. Worthan (DOC)
- Mr. Christopher Rua (PHE)
- Mr. Gary Morris (PHE)

At the conclusion of the inspection, an Out-Brief Meeting was held.  This meeting was attended by:

- Mr. Lennard Johnson, Warden (DOC)
- Ms. Kathy Landerkin Deputy Warden (DOC)
- Ms. Rena Myles (DOC)
- Ms. Gloria Roberts (DOC)
- Ms. Gitana Stewart-Ponder (DOC) (via telephone)
- Mr. Christopher Rua (PHE)
- Mr. Gary Morris (PHE)



CORRECTIONAL TREATMENT FACILITY

On July 1, 2020, PHE inspected the cleaning procedures of Spectrum Management, LLC at the DC DOC's Correctional Treatment Facility (CTF).  An Out-Brief Meeting was held at the conclusion of the inspection and was attended by:

- Ms. Gloria Robertson (DOC)
- Ms. Jackie Smith (DOC)
- Ms. Florinda Eaglin (DOC)
- Mr. Christopher Rua (PHE)
- Mr. Gary Morris (PHE)

## DRAFT SUMMARY OF FINDINGS

*Table 1* summarizes findings observed during the June 29 and July 1, 2020 onsite inspections.  The table also provides recommended actions to correct the findings.

Following the table is a brief Action Plan with recommendations for implementing the corrective actions identified in *Table 1*.



| TABLE 1. FINDINGS FOR DC DOC FACILITIES (CDF AND CTF) | |
|---|---|
| **SUMMARY OF FINDING** | **RECOMMENDED CORRECTIVE ACTION** |
| **CENTRAL DETENTION FACILITY (CDF)/ROCK SOLID MANAGEMENT** | |
| The contractor did not consistently allow for the 45-second minimum contact time required for the hydrogen peroxide-based disinfectant (*Ecolab Peroxide Multi Surface Cleaner and Disinfectant*) being used.  In several instances, a surface was wiped with a dry rag immediately after spray application of the disinfectant.  In other instances, only a portion of a surface was sprayed wet and allowed for a 45-second contact time.  The disinfectant was then wiped with a dry rag such that the unsprayed portion of the surface was not allotted adequate contact time with the disinfectant. | Sufficiently spraying to adequately wet and entire surface such as a table or wall is extremely difficult and time-consuming.  It is recommended that the contractor apply a towel sufficiently wetted with the disinfectant to all surfaces in lieu of spraying.  After adequate contact time (45 seconds) has been achieved, the surfaces should then be wiped dry with a dry rag or are allowed to air-dry, as appropriate in a given area.  This will further ensure that the entire surface is adequately wetted for the duration of the required contact time. |
| The contractor did not consistently allow for adequate wetting of the floor during mopping.  On several occasions it was observed that a wet mop was used for an overly extensive period of time before being re-wetted.  This resulted in portions of the floor being inadequately damped with a sufficient amount of disinfectant to ensure a 45 second contact time. | Ensure that mops are frequently wetted in the slop bucket during floor mopping.  Consider requiring the contractor to provide additional mop buckets and dollies so that each person mopping has access to their own dolly that can be toted along with them as they mop.  Based on site observations, there was an insufficient number of mop dollies.  This required the dollies to remain in a centralized position and discouraged floor cleaners from more frequently wetting their mop heads.<br><br>Additionally, the mop buckets themselves, which have their own sets of wheels on them, should be removed from the dollies and transported with those mopping the floors. |
| The contractor did not consistently disinfect all walls or other vertical surfaces to a height of 6 feet above the floor.  While adequate disinfection of these surfaces was observed being performed in common areas, it was not being done in other areas (bathrooms, offices, and other non-communal spaces). | Ensure that the contractor is aware that ALL vertical surfaces (walls, windows, columns, doors, rails, etc.) must be properly disinfected from the floor to a height of six feet, including adequate contact time. |
| The contractor dry-swept all floors prior to disinfection in contradiction to the cleaning protocols.  Dry sweeping can cause virus present on the floor to become airborne for several hours, increasing the contact and inhalation risk it presents. | The facility has ordered dusting brooms (e.g., Swifter Sweepers or equivalent) which use electrostatic forces to attract and remove dirt and dust, to replace the current dry sweeping brooms.  This will be implemented as soon as they arrive.<br><br>Ensure the contractor uses a slow, smooth wiping action and change out or clean the dust broom pads/heads on a regular basis to maximize the effectiveness of the brooms to collect as much dust and dirt particulates as possible. |



| TABLE 1. FINDINGS FOR DC DOC FACILITIES (CDF AND CTF) ||
|---|---|
| SUMMARY OF FINDING | RECOMMENDED CORRECTIVE ACTION |
| Currently, the cleaning contractor is only responsible for disinfecting the floor and doorknobs/door handles in the basement.  Although DOC staff are responsible for the remaining areas, it is unclear if they know all the surfaces they need to clean and/or if they are aware of the proper contact time for the disinfectant. | Ensure that staff cleaning personnel are familiar with and are properly implementing the cleaning protocols currently being provided to the third-party contractors. |
| The contractor was observed cleaning windows, mirrors, and other glass surfaces with an ammonium-based window cleaner (Ecolab Oasis 255SF Industrial Window Cleaner) as opposed to an EPA-registered product approved for COVID-19. | Test the hydrogen peroxide-based disinfectant on glass surfaces.  If acceptable, consider using the disinfectant on these surfaces instead of, or in addition to, traditional window cleaning chemicals. |
| In some cases, contractor personnel was observed cleaning doorknobs, door handles, and other frequently-touched surfaces with a hand sanitizer.  While this is technically sufficient for disinfection, it is not be applied consistently in all areas and the proper contact time may or may not be properly implemented. | Ensure that all chemicals and cleaning procedures are consistently applied throughout the facility.  If hand sanitizer is to be used on a regular basis for these surfaces, they should be documented in the cleaning protocol. |
| The contractor (Summit) that currently provides food service duties in the cafeteria is solely responsible for cleaning and disinfecting that area of the facility.  It is not known if they are aware of or are following the proper protocols for disinfection in a manner consistent with the other areas of the facility. | Ensure that Summit is performing proper disinfection in a manner that is consistent with or exceeds the procedures being used elsewhere at the facility. |
| CONDITIONAL TREATMENT FACILITY (CTF)/SPECTRUM MANAGEMENT ||
| The contractor did not consistently allow for the 45-second minimum contact time required for the hydrogen peroxide-based disinfectant (*Ecolab Peroxide Multi Surface Cleaner and Disinfectant*) being used.  In several instances, a surface was wiped with a dry rag immediately after spray application of the disinfectant.  In other instances, only a portion of a surface was sprayed wet and allowed for a 45-second contact time.  The disinfectant was then wiped with a dry rag such that the unsprayed portion of the surface was not allotted adequate contact time with the disinfectant.<br><br>Although this contractor (Spectrum) generally applied greater volumes of the disinfectant with the sprayers in a given area as compared to Rock Solid, it was still observed to be insufficient. | Sufficiently spraying to adequately wet and entire surface such as a table or wall is extremely difficult and time-consuming.  It is recommended that the contractor apply a towel sufficiently wetted with the disinfectant to all surfaces in lieu of spraying.  After adequate contact time (45 seconds) has been achieved, the surfaces should then be wiped dry with a dry rag or be allowed to air-dry, as appropriate in a given area.  This will further ensure that the entire surface is adequately wetted for the duration of the required contact time. |



**DC Department of Corrections**
**July 2020**

**Environmental Conditions Inspection**
**Draft Onsite Audit Inspection Report**

| TABLE 1. FINDINGS FOR DC DOC FACILITIES (CDF AND CTF) | |
|---|---|
| **SUMMARY OF FINDING** | **RECOMMENDED CORRECTIVE ACTION** |
| The contractor did not consistently disinfect all walls or other vertical surfaces to a height of 6 feet above the floor.  While adequate disinfection of these surfaces was observed being performed in common areas, it was not being done in other areas (bathrooms, offices, and other non-communal spaces). | Ensure that the contractor is aware that ALL vertical surfaces (walls, windows, columns, doors, rails, etc.) must be properly disinfected from the floor to a height of six feet, including adequate contact time. |
| The contractor dry-swept all floors prior to disinfection in contradiction to the cleaning protocols.  Dry sweeping can cause virus present on the floor to become airborne for several hours, increasing the contact and inhalation risk it presents. | The facility has ordered dusting brooms (e.g., Swifter Sweepers or equivalent) which use electrostatic forces to attract and remove dirt and dust, to replace the current dry sweeping brooms.  This will be implemented as soon as they arrive.<br><br>Ensure that the contractor uses a slow, smooth wiping action and change out or clean the dust broom pads/heads on a regular basis to maximize the effectiveness of the brooms to collect as much dust and dirt particulates as possible. |
| The contractor was not always performing its duties in a consistent manner.  The following observations were made:<br><br>• Some of the grated stairwells in the housing areas were mopped, while others were not.<br>• In one area, contractor personnel were using hand sanitizer to disinfect doorknobs, door handles, and phones.  However, in other areas, the peroxide disinfectant was used.<br>• In the 96 Medical Area, the contractor did not clean the area between the gates and the elevators.  However, this area was cleaned in the 82 Medical Area. | The following recommendations are made:<br><br>• Ensure that all stairwells in the housing units are mopped.<br>• Since different disinfectants require different contact times (depending on the active ingredients), ensure that the contractor is consistent in what they use.  The contact time for ethanol (5 minutes) is much greater than that for peroxide (45 seconds).<br>• Ensure that the contractor is clear on what areas are considered within their scope of work and which areas are not and ensure that they clean and disinfect all of the areas for which they are responsible. |
| The contractor was observed mixing and handling both the concentrated form of the peroxide disinfectant as well as the diluted form.  In its concentrated form, the disinfectant has a pH of less than 2 and is extremely corrosive.  Even in its diluted form, the disinfectant is still corrosive and presents danger to users.  Contractor personnel were not wearing certain personal protective equipment (PPE) while performing these tasks.<br><br>The contractor was also observed using the fogging unit without eye protection. | It is recommended that the personnel handling and mixing the disinfectant in the mixing room wear goggles and/or face shield to protect their eyes and face.  Consider also requiring longer gloves that cover exposed skin between hands and sleeves.<br><br>Consider requiring the contractor to where eye protection during fogging. |

Potomac-Hudson Engineering, Inc
Page 6



| TABLE 1. FINDINGS FOR DC DOC FACILITIES (CDF AND CTF) | |
|---|---|
| **SUMMARY OF FINDING** | **RECOMMENDED CORRECTIVE ACTION** |
| The following POSITIVE observations were made with respect to Spectrum during the site inspection:<br><br> • Personnel changed out mop water and/or mop heads at certain times throughout the day.<br> • The peroxide disinfectant was used on windows, mirrors, and other glass surfaces in lieu of a typical glass cleaner.<br> • The walls in the bathrooms were scrubbed with a hard-bristled mop. | Consider instructing Rock Solid personnel to follow some of these procedures as well. |



## CORRECTIVE ACTION PLAN

PHE has developed a brief corrective action plan (CAP) as part of this document.  A CAP is a step-by-step plan of action that is developed to achieve targeted outcomes for resolution of identified errors in an effort to:

- Identify the most cost-effective actions that can be implemented to correct error causes
- Develop and implement a plan of action to improve processes or methods so that outcomes are more effective and efficient
- Achieve measurable improvement in the highest priority areas
- Eliminate repeated deficient practices

### UPDATED PROTOCOL

As the first step in this CAP, PHE has prepared an updated COVID-19 Disinfection and Cleaning Protocol to help guide the cleaning contractors (see **Appendix A**).  The protocol has been improved to focus on and address observed contractor deficiencies.  The update also revises some of the procedural language to more closely reflect site conditions, based on observations made during the site visit and conversations with both contractor and DOC personnel.

Specific items added to the protocol to correct deficiencies include:

- Added emphasis on thoroughly wetting the floors during mopping.  The updates include requiring the contractors to remove mop buckets from the carts and/or providing additional carts with mop buckets to be available.
- Removing spray bottle application of the disinfectant as an option and requiring that wet cloths be used to more thoroughly wet each surface and ensure full contact time is met across the entire surface.
- Indicating that dry-sweeping is only permissible if an electrostatic broom or brush is used to collect dust and dirt with minimal aerosolization.
- Re-emphasizing that ALL vertical surfaces must be disinfected, with specific examples.
- Adding additional PPE requirements when working in the mixing room.

### DISCUSSIONS WITH CONTRACTORS

The findings made by PHE should be discussed directly with supervisors for each cleaning contractor, including potentially sharing this document with them.  Each of the deficiencies should be identified, and the recommendations for correction should be explored.  It is possible that the contractors may identify and suggest other corrective measures as alternatives to those suggested in this document.  As long as the same goal is reached, any alternative or additional procedures can be implemented as well.

When providing the updated protocol, DOC should specifically point out those items which have changed from the draft protocol and ensure that the contractors understand all of their responsibilities and expectations.

### PERIODIC RE-INSPECTIONS

As part of the existing scope of work, PHE is scheduled to conduct up two (2) follow up monthly site inspections to ensure that the contractors are adhering to the recommended protocols and that noted deficiencies have been corrected.  As part of these follow-up inspections, PHE will hold a short, informal out-brief at the end of each day to discuss any findings or other observations made, and present options for correction.



PHE also recommends that DOC personnel perform additional inspections, as needed, based on the results of the PHE follow-up inspections, if deficiencies continue to be identified.

## EFFECTIVENESS EVALUATION

The DOC will continue to check the temperature of personnel arriving onsite and require face masks for the foreseeable future.  The DOC will also continue to perform voluntary testing of individuals onsite (both employees and inmates) every two weeks.  As the year continues on, it is likely that additional waves or peaks may be observed throughout the region.  DOC should closely monitor the number of persons onsite testing positive during these times to evaluate the effectiveness of all current procedures, including cleaning and disinfection.  Changes should be made, as applicable and appropriate, to ensure that each facility is doing as much as possible to protect all personnel from the virus.



DC Department of Corrections
July 2020

Environmental Conditions Inspection
Draft Onsite Audit Inspection Report

*This page intentionally blank.*

Potomac-Hudson Engineering, Inc
Page 10



APPENDIX A

SARS-CoV-2 (COVID-19) DISINFECTION AND CLEANING PROTOCOLS



# SARS-CoV-2 (COVID-19) DISINFECTION AND CLEANING PROTOCOLS

**PROJECT LOCATION:**          **DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS**

**CLEANING CONTRACTORS:**      **SPECTRUM MANAGEMENT, LLC and ROCK SOLID DISTRICT GROUP, LLC**

## 1.0 Introduction

In January 2020, a novel virus, SARS-CoV-2, was identified as the cause of an outbreak of viral pneumonia in Wuhan, China and subsequently led to the world-wide spread of coronavirus disease 2019 (COVID-19). COVID-19 is primarily transmitted via person-to-person contact; however, surface contamination is also known to be a concern with the spread of the virus. The virus is mainly spread through respiratory droplets produced when an infected person coughs or sneezes. These droplets can land on people who are nearby (within 6 feet). It may also be possible for a person to contract SARS-CoV-2 by touching a contaminated surface or object and then touching their own mouth, nose, or eyes.

The purpose of this Protocol is to provide guidance on proper disinfection practices and personal protective equipment (PPE) requirements. Frequent, effective, and safe cleaning and disinfecting procedures can prevent the spread of disease to Department of Corrections (DOC) inmates, staff, and visitors. Cleaning crews should clean and disinfect all identified areas, focusing especially on frequently touched surfaces.

The procedures described in this Protocol shall be executed by the current contractors, Spectrum Management, LLC (Spectrum), and Rock Solid District Group, LLC (Rock Solid), with oversight by Potomac-Hudson Engineering, Inc. (PHE).

## 2.0 Implementation

### 2.1 Overview

The procedures described in the Protocol comply with or exceed the United States Centers for Disease Control and Prevention's (CDC's) recommended practices in response to the COVID-19 pandemic. It is important to note that the cleaning and disinfection procedures described herein cannot remove **ALL** viral particles from surfaces; however, following these procedures will substantially decrease the number on surfaces and thereby reduce the risk of infection and spreading.

### 2.2 Employee Screening

As part of existing entry procedures, all Spectrum and Rock Solid employees shall undergo a temperature check prior to each day's work for signs of possible COVID-19 infection before being allowed to enter the facility. This is currently being conducted for all DOC employees, visitors, contractors, and any other visitors to the facility.  Persons who screen positive, defined as having a temperature of 100.4 degrees Fahrenheit or greater will return to their vehicle.

1

### 2.3 General Procedures

i.    The Spectrum and Rock Solid crew leaders shall meet at the beginning of each work day with the DOC point of contact for the facility(ies) to be cleaned to discuss the areas to be cleaned on that day and to coordinate the movement of cleaning crew staff through the facility.

ii.    Whenever possible, personnel shall attempt to wait at least 24 hours to enter an area or room previously occupied by an individual known to be infected with SARS-CoV-2. The National Institute of Health (NIH) has determined that the virus can remain active in the air for up to 3 hours and for up to 2 to 3 days on surfaces; however, some organizations have cautioned that the virus can remain active on surfaces for even longer periods of time.

iii.    If surfaces are visibly dirty, they shall be cleaned using a detergent or soap and water prior to disinfection. If a surface or object has been soiled with blood or other bodily fluids, initially treat the area with a 10 percent bleach solution; then proceed to disinfecting the area for COVID-19.

iv.    The product to be used for COVID-19 disinfecting is *Ecolab Peroxide Multi Surface Cleaner and Disinfectant*. (A copy of the Safety Data Sheet [SDS] for this product is included in **Attachment A**). The product, as purchased, contains 8 percent hydrogen peroxide and has a pH of 0.5 – 1.5 (extremely corrosive) and will be provided by the DOC. Use of the product may generate irritating vapors and is corrosive to the eyes and skin. Avoid using in small spaces with limited air exchange. Avoid touching any areas of your face while cleaning to prevent contact with the disinfecting compound and potential virus.

v.    An alternate product, *Xpress Detergent Disinfectant*, may also be used.  This product will typically be used by Spectrum personnel in the fogging machine.  An SDS for this product is also included int **Attachment A**.

vi.    Spectrum and Rock Solid shall use the designated product in accordance with the manufacturer's instructions (mixed at 6 ounces per gallon), to include ensuring the required 45-second contact time of the wet disinfectant is met. The PHE industrial hygienist(s) shall conduct random observations/inspections of disinfectant use to verify that the product is used properly, and the designated contact time is met.

vii.    When mixing disinfectant, personnel shall wear eye and face protection, to include goggles, face shields, or equivalent PPE.  Likewise, similar protection shall be used during fogging activities.

viii.    In order to ensure that the correct contact time is met, contractor personnel will apply rag/cloth soaked with the Ecolab Peroxide Multi Surface Cleaner and Disinfectant dilute mixture and liberally wipe the cloth on all applicable surfaces to ensure complete coverage.  The entire surface shall be kept visibly wet for at least 45 seconds.  Once the contact time has been achieved, the surface may be wiped down with a dry rag or allowed to air dry, depending on the location and amount of traffic in a given area

### 2.4 Disinfecting Procedures

i.    Cleaning/disinfecting shall focus on all high-touch surfaces and areas, to include but not be limited to: desks, computer mouses and keyboards, phones, lockers, cubbies, window sills and counter tops, doors, frames, doorknobs and push bars, elevator buttons, light switches, handrails, bathroom floors, faucet handles, toilet handles, toilet stall door locks, towel

2

dispensers and hand driers, showers, kitchen areas, cafeterias, office common areas, nursing stations, and other rooms. An alcohol solution shall be used for all electronics. These services shall be carried out in accordance with the CDC's *Coronavirus Disease 2019 (COVID-19) Environmental Cleaning and Disinfection Recommendations* without restriction.

ii. Ventilate the rooms/spaces prior to and during cleaning/disinfecting. If ventilation through open windows is not possible, use a high-volume, high efficiency particulate air (HEPA) filter system to remove airborne particles from the air during cleaning. Temporarily increase the cleaning area's humidity to approximately 50 percent relative humidity (RH), if possible.

iii. Prior to disinfecting, Spectrum and Rock Solid shall perform general cleaning, removing dirt and debris using the *Ecolab Orange Force Multi Surface Cleaner and Degreaser*, to include floor mopping. Clean all dust from horizontal surfaces with a towel dampened with the cleaner/degreaser to minimize re-aerosolization of settled contaminated dust and particles. Use a slow, smooth wiping action and change out or wet clean the towel on a regular basis to minimize re-aerosolization of collected dust and particulates.

iv. Dry sweeping with a typical straw or push-broom is not permitted.  Instead, use of an electrostatic broom or brush (e.g., Swiffer Sweeper or equivalent) is permitted to remove dust and dirt particles prior to wet mopping.

v. When mopping, ensure the floor surfaces that are disinfected stay wet for at least 45 seconds. Frequently re-wet the mop head to ensure a thorough soaking of the floor.  Consider changing mop water at least once per day, and ensure designated mops are used for bathrooms and that these mops are not used elsewhere.  Ensure that all stairwells in the housing units are mopped as well.

vi. Pay special attention to window ledges and other commonly dusty surfaces.  Also pay special attention to frequently touched surfaces, such as railings, ledges, and countertops.  Ensure that glass surfaces (e.g., windows, mirrors) are also disinfected.

vii. Disinfect **ALL** vertical surfaces to a height of at least 6 feet above the floor, including but not limited to walls, windows, columns, doors, rails, etc.

viii. As part of this protocol, it is strongly recommended that the contractor clean and disinfect heating, ventilation, and air conditioning (HVAC) supply and exhaust grills/diffusers, including removal of caked-on debris, dust, grease, etc.  This will likely require the use of a ladder as these features are typically located at ceiling level.

ix. Disinfect floors by mopping with *Ecolab Peroxide Multi Surface Cleaner and Disinfectant* (this is the second round of mopping). Avoid aerosolizing the dirty cleaning liquid by using steady and sweeping mop swipes and careful, deliberate mop head squeezes.

x. Restrooms shall receive special attention due to the tendency of the SARS-CoV-2 virus to bioaccumulate within feces, vomit, sputum, and urine. Clean any surfaces that have visible blood, stool, or body fluids.

xi. Trash liners shall be removed, and the trash receptacles disinfected. After air drying of the trash receptacles, a new liner shall be inserted in each receptacle.

xii. Following disinfecting, the DOC representative shall identify areas for fogging. Fogging shall be accomplished using ultra-low-volume foggers (a sprayer shall not be used as a substitute for a fogger) to ensure that all surfaces are adequately saturated. In general, fogging of walls shall be

3

applied to a height of 6 feet. When fogging, employees shall wear a full-face respirator equipped with organic vapor and acid gas cartridges. Access to the areas in which fogging is conducted shall be limited until the fogging aerosols have settled.

xiii.   For soft (porous) surfaces such as carpeted floors, rugs, and drapes, remove visible contamination if present, and clean with appropriate cleaners indicated for use on these surfaces. If the items can be laundered, launder items in accordance with the manufacturer's instructions using the warmest appropriate water setting for the items and then dry items completely. Otherwise, use products with the U.S. Environmental Protection Agency (USEPA)-approved emerging viral pathogens claims that are suitable for porous surfaces.

xiv.   Vacuum carpeting and other fabrics with vacuums equipped with HEPA filtration systems. Take appropriate precautions when changing the vacuum HEPA or pre-filter to minimize exposures to airborne dusts.

xv.   Although the procedures described herein are designed for Spectrum and Rock Solid, ensure that any other entity performing disinfectant cleaning at the facilities (e.g., Summit in the dining rooms or the inmate cleaning detail) are following these procedures as well or are following equivalent procedures.

### 2.5 Employee Safety

i.   Spectrum and Rock Solid employees shall complete the appropriate training, to include COVID-19 awareness, hazard communication (with specific attention on the hazards of the cleaners and disinfectants to be used), and bloodborne pathogens exposure control.

ii.   Protection from potential viral infection from skin contact and aerosol inhalation is required through the use of PPE and hand washing. The minimal level of PPE for workers performing the decontamination and disinfection includes a face mask and nitrile gloves.  Additional PPE shall be permitted as desired, to include half-mask or full-face negative pressure respirators with dual P-100 organic vapor and acid gas cartridges and full-body Tyvek coveralls (with shoe coverings). Gloves may be sealed to the coveralls with duct tape for additional protection, and replaced immediately if punctured or torn. Crew members shall inspect each other to verify that the PPE is donned correctly prior to beginning work. Cleaning employees shall be reminded to avoid touching any unprotected parts of the face. Employees shall wear goggles  while transferring and/or diluting the *Ecolab Peroxide Multi Surface Cleaner and Disinfectant*, and while emptying buckets*.* Employees shall be medically approved, trained, and properly fit-tested to wear the respective respirators.

iii.   If any breaches should occur in the PPE or if contact with unprotected skin occurs, the following steps must be followed:
   a.   immediately stop work;
   b.   remove the damaged PPE;
   c.   wash the skin with soap and warm water (if soap and water are not available, use an alcohol-based hand sanitizer that contains 60 to-95 percent alcohol); and
   d.   report the breach to the crew leader.

iv.   Extension cords for portable electrical equipment will be protected by ground fault circuit interrupters (GFCI).

4

v.      Slip hazards are a potential concern due to the wet application (mopping of floors). Non-slip shoes shall be worn.

**3.0 Quality Control and Oversight**

The PHE industrial hygienist (or designated DC DOC employee) shall conduct random observations/inspections of wiped/mopped/fogged areas and document that the required contact time for the disinfectant (45 seconds) was achieved. The form in ***Attachment B*** may be used for this purpose, if desired.

**ATTACHMENT A – SAFETY DATA SHEETS (SDSs)**



**SAFETY DATA SHEET**

| PEROXIDE MULTI SURFACE CLEANER AND DISINFECTANT |
|---|

---

## SECTION 1. PRODUCT AND COMPANY IDENTIFICATION

| | | |
|---|---|---|
| Product name | : | PEROXIDE MULTI SURFACE CLEANER AND DISINFECTANT |
| Other means of identification | : | Not applicable |
| Recommended use | : | Disinfectant |
| Restrictions on use | : | Reserved for industrial and professional use. |
| Product dilution information | : | 3.125 % - 4.6875 % |
| Company | : | Ecolab Inc.<br>1 Ecolab Place<br>St. Paul, Minnesota USA 55102<br>1-800-352-5326 |
| Emergency health information | : | 1-800-328-0026 (US/Canada), 1-651-222-5352 (outside US) |
| Issuing date | : | 02/03/2020 |

---

## SECTION 2. HAZARDS IDENTIFICATION

**GHS Classification**

**Product AS SOLD**

| | | |
|---|---|---|
| Acute toxicity (Oral) | : | Category 4 |
| Acute toxicity (Inhalation) | : | Category 3 |
| Acute toxicity (Dermal) | : | Category 4 |
| Skin corrosion | : | Category 1A |
| Serious eye damage | : | Category 1 |
| Skin sensitization | : | Category 1 |

**Product AT USE DILUTION**

| | | |
|---|---|---|
| Eye irritation | : | Category 2B |

**GHS label elements**

**Product AS SOLD**

Hazard pictograms :



| | | |
|---|---|---|
| Signal Word | : | Danger |
| Hazard Statements | : | Harmful if swallowed or in contact with skin.<br>Causes severe skin burns and eye damage.<br>May cause an allergic skin reaction.<br>Toxic if inhaled. |
| Precautionary Statements | : | **Prevention:**<br>Avoid breathing dust/ fume/ gas/ mist/ vapors/ spray. Wash skin thoroughly after handling. Do not eat, drink or smoke when using this product. Use only outdoors or in a well-ventilated area. Contaminated work clothing must not be allowed out of the workplace. Wear |

---

914443-01

## SAFETY DATA SHEET

# PEROXIDE MULTI SURFACE CLEANER AND DISINFECTANT

protective gloves/ protective clothing/ eye protection/ face protection.
**Response:**
IF SWALLOWED: Call a POISON CENTER/doctor if you feel unwell.
Rinse mouth. IF SWALLOWED: Rinse mouth. Do NOT induce
vomiting. IF ON SKIN (or hair): Take off immediately all contaminated
clothing. Rinse skin with water/shower. IF INHALED: Remove person
to fresh air and keep comfortable for breathing. Immediately call a
POISON CENTER/doctor. IF IN EYES: Rinse cautiously with water for
several minutes. Remove contact lenses, if present and easy to do.
Continue rinsing. Immediately call a POISON CENTER/doctor. If skin
irritation or rash occurs: Get medical advice/ attention. Wash
contaminated clothing before reuse.
**Storage:**
Store in a well-ventilated place. Keep container tightly closed. Store
locked up.
**Disposal:**
Dispose of contents/ container to an approved waste disposal plant.

**Product AT USE DILUTION**

| | | |
|---|---|---|
| Signal Word | : | Warning |
| Hazard Statements | : | Causes eye irritation. |
| Precautionary Statements | : | **Prevention:**<br>Wash skin thoroughly after handling.<br>**Response:**<br>IF IN EYES: Rinse cautiously with water for several minutes. Remove contact lenses, if present and easy to do. Continue rinsing. If eye irritation persists: Get medical advice/ attention. |

**Product AS SOLD**

| | | |
|---|---|---|
| **Other hazards** | : | Do not mix with bleach or other chlorinated products – will cause chlorine gas. |

## SECTION 3. COMPOSITION/INFORMATION ON INGREDIENTS

**Product AS SOLD**

Pure substance/mixture          :   Mixture

| Chemical name | CAS-No. | Concentration (%) |
|---|---|---|
| dodecylbenzene sulfonic acid | 27176-87-0 | 5 - 10 |
| Hydrogen peroxide | 7722-84-1 | 8 |
| Proprietary Fragrance | Proprietary Ingredient | 0.1 - 1 |
| Sulfuric acid | 7664-93-9 | 0.1 - 1 |

**Product AT USE DILUTION**

| Chemical name | CAS-No. | Concentration (%) |
|---|---|---|
| dodecylbenzene sulfonic acid | 27176-87-0 | 0.1 - 1 |
| Hydrogen peroxide | 7722-84-1 | 0.375 |

## SECTION 4. FIRST AID MEASURES

**Product AS SOLD**

| | | |
|---|---|---|
| In case of eye contact | : | Rinse immediately with plenty of water, also under the eyelids, for at least 15 minutes. Remove contact lenses, if present and easy to do. Continue rinsing. Get medical attention immediately. |
| In case of skin contact | : | Wash off immediately with plenty of water for at least 15 minutes. Use |

## SAFETY DATA SHEET

---

### PEROXIDE MULTI SURFACE CLEANER AND DISINFECTANT

---

|  |  |
|---|---|
|  | a mild soap if available. Wash clothing before reuse. Thoroughly clean shoes before reuse. Get medical attention immediately. |
| If swallowed | : Rinse mouth with water. Do NOT induce vomiting. Never give anything by mouth to an unconscious person. Get medical attention immediately. |
| If inhaled | : Remove to fresh air. Treat symptomatically. Get medical attention immediately. |
| Protection of first-aiders | : If potential for exposure exists refer to Section 8 for specific personal protective equipment. |
| Notes to physician | : Treat symptomatically. |
| Most important symptoms and effects, both acute and delayed | : See Section 11 for more detailed information on health effects and symptoms. |

**Product AT USE DILUTION**

| In case of eye contact | : Rinse with plenty of water. |
|---|---|
| In case of skin contact | : Rinse with plenty of water. |
| If swallowed | : Rinse mouth. Get medical attention if symptoms occur. |
| If inhaled | : Get medical attention if symptoms occur. |

---

### SECTION 5. FIRE-FIGHTING MEASURES

**Product AS SOLD**

| Suitable extinguishing media | : Use extinguishing measures that are appropriate to local circumstances and the surrounding environment. |
|---|---|
| Unsuitable extinguishing media | : None known. |
| Specific hazards during fire fighting | : Oxidizer. Contact with other material may cause fire. |
| Hazardous combustion products | : Decomposition products may include the following materials: Carbon oxides Sulfur oxides |
| Special protective equipment for fire-fighters | : Use personal protective equipment. |
| Specific extinguishing methods | : Fire residues and contaminated fire extinguishing water must be disposed of in accordance with local regulations. In the event of fire and/or explosion do not breathe fumes. |

---

### SECTION 6. ACCIDENTAL RELEASE MEASURES

**Product AS SOLD**

| Personal precautions, protective equipment and emergency procedures | : Ensure adequate ventilation. Keep people away from and upwind of spill/leak. Avoid inhalation, ingestion and contact with skin and eyes. When workers are facing concentrations above the exposure limit they must use appropriate certified respirators. Ensure clean-up is |
|---|---|

---

914443-01                                    3 / 11

SAFETY DATA SHEET

PEROXIDE MULTI SURFACE CLEANER AND DISINFECTANT

| | | |
|---|---|---|
| | | conducted by trained personnel only. Refer to protective measures listed in sections 7 and 8. |
| Environmental precautions | : | Do not allow contact with soil, surface or ground water. |
| Methods and materials for containment and cleaning up | : | Stop leak if safe to do so. Contain spillage, and then collect with non-combustible absorbent material, (e.g. sand, earth, diatomaceous earth, vermiculite) and place in container for disposal according to local / national regulations (see section 13). Flush away traces with water. Isolate absorbed wastes contaminated with this product from other waste streams containing combustible materials (paper, wood fibers, cloth, etc.). Combustible materials exposed to this product should be rinsed immediately with large amounts of water to ensure that all product is removed. Residual product which is allowed to dry on organic materials such as  rags, cloths, paper, fabrics, cotton, leather, wood, or other combustibles may spontaneously ignite and result in a fire. |

**Product AT USE DILUTION**

| | | |
|---|---|---|
| Personal precautions, protective equipment and emergency procedures | : | Refer to protective measures listed in sections 7 and 8. |
| Environmental precautions | : | Do not allow contact with soil, surface or ground water. |
| Methods and materials for containment and cleaning up | : | Stop leak if safe to do so. Contain spillage, and then collect with non-combustible absorbent material, (e.g. sand, earth, diatomaceous earth, vermiculite) and place in container for disposal according to local / national regulations (see section 13). Flush away traces with water. For large spills, dike spilled material or otherwise contain material to ensure runoff does not reach a waterway. |

## SECTION 7. HANDLING AND STORAGE

**Product AS SOLD**

| | | |
|---|---|---|
| Advice on safe handling | : | Do not ingest. Do not get in eyes, on skin, or on clothing. Do not breathe dust/ fume/ gas/ mist/ vapors/ spray. Use only with adequate ventilation. Wash hands thoroughly after handling. Do not mix with bleach or other chlorinated products – will cause chlorine gas. In case of mechanical malfunction, or if in contact with unknown dilution of product, wear full Personal Protective Equipment (PPE). |
| Conditions for safe storage | : | Keep in a cool, well-ventilated place. Keep away from reducing agents. Keep away from strong bases. Keep away from combustible material. Keep out of reach of children. Keep container tightly closed. Store in suitable labeled containers. |
| Storage temperature | : | 15 °C  to  40 °C |

**Product AT USE DILUTION**

| | | |
|---|---|---|
| Advice on safe handling | : | Wash hands thoroughly after handling. In case of mechanical malfunction, or if in contact with unknown dilution of product, wear full Personal Protective Equipment (PPE). |
| Conditions for safe storage | : | Keep out of reach of children. Store in suitable labeled containers. |

## SECTION 8. EXPOSURE CONTROLS/PERSONAL PROTECTION

**Product AS SOLD**

914443-01                                            4 / 11

## SAFETY DATA SHEET

**PEROXIDE MULTI SURFACE CLEANER AND DISINFECTANT**

### Ingredients with workplace control parameters

| Components | CAS-No. | Form of exposure | Permissible concentration | Basis |
|---|---|---|---|---|
| Hydrogen peroxide | 7722-84-1 | TWA | 1 ppm | ACGIH |
| | | TWA | 1 ppm 1.4 mg/m3 | NIOSH REL |
| | | TWA | 1 ppm 1.4 mg/m3 | OSHA Z1 |
| sulphuric acid | 7664-93-9 | TWA (Thoracic fraction) | 0.2 mg/m3 | ACGIH |
| | | TWA | 1 mg/m3 | NIOSH REL |
| | | TWA | 1 mg/m3 | OSHA Z1 |

| | | |
|---|---|---|
| Engineering measures | : | Effective exhaust ventilation system. Maintain air concentrations below occupational exposure standards. |

**Personal protective equipment**

| | | |
|---|---|---|
| Eye protection | : | Wear eye protection/ face protection. |
| Hand protection | : | Wear the following personal protective equipment: Standard glove type. Gloves should be discarded and replaced if there is any indication of degradation or chemical breakthrough. |
| Skin protection | : | Personal protective equipment comprising: suitable protective gloves, safety goggles and protective clothing |
| Respiratory protection | : | When workers are facing concentrations above the exposure limit they must use appropriate certified respirators. |
| Hygiene measures | : | Handle in accordance with good industrial hygiene and safety practice. Remove and wash contaminated clothing before re-use. Wash face, hands and any exposed skin thoroughly after handling. Provide suitable facilities for quick drenching or flushing of the eyes and body in case of contact or splash hazard. |

**Product AT USE DILUTION**

| | | |
|---|---|---|
| Engineering measures | : | Good general ventilation should be sufficient to control worker exposure to airborne contaminants. |

**Personal protective equipment**

| | | |
|---|---|---|
| Eye protection | : | No special protective equipment required. |
| Hand protection | : | No special protective equipment required. |
| Skin protection | : | No special protective equipment required. |
| Respiratory protection | : | No personal respiratory protective equipment normally required. |

### SECTION 9. PHYSICAL AND CHEMICAL PROPERTIES

| | Product AS SOLD | Product AT USE DILUTION |
|---|---|---|
| Appearance | : liquid | liquid |
| Color | : clear, yellow | yellow |

## SAFETY DATA SHEET

### PEROXIDE MULTI SURFACE CLEANER AND DISINFECTANT

| | | | |
|---|---|---|---|
| Odor | : | Perfumes, fragrances | Perfumes, fragrances |
| pH | : | 0.5 - 1.5,   (100 %) | 2.0 - 2.5 |
| Flash point | : | Not applicable, Does not sustain combustion. | |
| Odor Threshold | : | No data available | |
| Melting point/freezing point | : | No data available | |
| Initial boiling point and boiling range | : | > 100 °C | |
| Evaporation rate | : | No data available | |
| Flammability (solid, gas) | : | Not applicable | |
| Upper explosion limit | : | No data available | |
| Lower explosion limit | : | No data available | |
| Vapor pressure | : | No data available | |
| Relative vapor density | : | No data available | |
| Relative density | : | 1.025 - 1.049 | |
| Water solubility | : | soluble | |
| Solubility in other solvents | : | No data available | |
| Partition coefficient: n-octanol/water | : | No data available | |
| Autoignition temperature | : | No data available | |
| Thermal decomposition | : | No data available | |
| Viscosity, kinematic | : | No data available | |
| Explosive properties | : | No data available | |
| Oxidizing properties | : | The substance or mixture is not classified as oxidizing. | |
| Molecular weight | : | No data available | |
| VOC | : | No data available | |

### SECTION 10. STABILITY AND REACTIVITY

**Product AS SOLD**

| | | |
|---|---|---|
| Reactivity | : | No dangerous reaction known under conditions of normal use. |
| Chemical stability | : | Contamination may result in dangerous pressure increases - closed containers may rupture. |
| Possibility of hazardous reactions | : | Do not mix with bleach or other chlorinated products – will cause chlorine gas. |
| Conditions to avoid | : | None known. |
| Incompatible materials | : | Bases<br>Metals |
| Hazardous decomposition products | : | In case of fire hazardous decomposition products may be produced such as:<br>Carbon oxides<br>Sulfur oxides |

### SECTION 11. TOXICOLOGICAL INFORMATION

## SAFETY DATA SHEET

**PEROXIDE MULTI SURFACE CLEANER AND DISINFECTANT**

| Information on likely routes of exposure | : | Inhalation, Eye contact, Skin contact |
|---|---|---|

**Potential Health Effects**

**Product AS SOLD**

| Eyes | : | Causes serious eye damage. |
|---|---|---|
| Skin | : | Harmful if absorbed through skin. Causes severe skin burns. May cause allergic skin reaction. |
| Ingestion | : | Harmful if swallowed. Causes digestive tract burns. |
| Inhalation | : | Toxic if inhaled. May cause nose, throat, and lung irritation. |
| Chronic Exposure | : | Health injuries are not known or expected under normal use. |

**Product AT USE DILUTION**

| Eyes | : | Causes eye irritation. |
|---|---|---|
| Skin | : | Health injuries are not known or expected under normal use. |
| Ingestion | : | Health injuries are not known or expected under normal use. |
| Inhalation | : | Health injuries are not known or expected under normal use. |
| Chronic Exposure | : | Health injuries are not known or expected under normal use. |

**Experience with human exposure**

**Product AS SOLD**

| Eye contact | : | Redness, Pain, Corrosion |
|---|---|---|
| Skin contact | : | Redness, Pain, Irritation, Corrosion, Allergic reactions |
| Ingestion | : | Corrosion, Abdominal pain |
| Inhalation | : | Respiratory irritation, Cough |

**Product AT USE DILUTION**

| Eye contact | : | Redness, Irritation |
|---|---|---|
| Skin contact | : | No symptoms known or expected. |
| Ingestion | : | No symptoms known or expected. |
| Inhalation | : | No symptoms known or expected. |

**Toxicity**

**Product AS SOLD**
**Product**

| Acute oral toxicity | : | Acute toxicity estimate : > 300 mg/kg |
|---|---|---|
| Acute inhalation toxicity | : | Acute toxicity estimate : 0.55 mg/l<br>Test atmosphere: dust/mist |
| Acute dermal toxicity | : | Acute toxicity estimate : > 1,200 mg/kg |

**SAFETY DATA SHEET**

| PEROXIDE MULTI SURFACE CLEANER AND DISINFECTANT |
|---|

| | | |
|---|---|---|
| Respiratory or skin sensitization | : | No data available |
| Carcinogenicity | : | No data available |
| Reproductive effects | : | No data available |
| Germ cell mutagenicity | : | No data available |
| Teratogenicity | : | No data available |
| STOT-single exposure | : | No data available |
| STOT-repeated exposure | : | No data available |
| Aspiration toxicity | : | No data available |

| SECTION 12. ECOLOGICAL INFORMATION |
|---|

**Product AS SOLD**
**Ecotoxicity**

| | | |
|---|---|---|
| Environmental Effects | : | Harmful to aquatic life. |

**Product**

| | | |
|---|---|---|
| Toxicity to fish | : | No data available |
| Toxicity to daphnia and other aquatic invertebrates | : | No data available |
| Toxicity to algae | : | No data available |

**Components**

| | | |
|---|---|---|
| Toxicity to fish | : | dodecylbenzene sulfonic acid<br>96 h LC50: 4.3 mg/l<br><br>Sulfuric acid<br>96 h LC50: 22 mg/l |

**Components**

| | | |
|---|---|---|
| Toxicity to algae | : | Hydrogen peroxide<br>72 h EC50: 1.38 mg/l |

**Persistence and degradability**

**Product AS SOLD**
Not applicable - inorganic

**Product AT USE DILUTION**
Not applicable - inorganic

**Bioaccumulative potential**

No data available

**Mobility in soil**

No data available

**Other adverse effects**

No data available

| SECTION 13. DISPOSAL CONSIDERATIONS |
|---|

914443-01                                    8 / 11

SAFETY DATA SHEET

---

## PEROXIDE MULTI SURFACE CLEANER AND DISINFECTANT

---

**Product AS SOLD**

| | | |
|---|---|---|
| Disposal methods | : | Do not contaminate ponds, waterways or ditches with chemical or used container. Where possible recycling is preferred to disposal or incineration. If recycling is not practicable, dispose of in compliance with local regulations. Dispose of wastes in an approved waste disposal facility. |
| Disposal considerations | : | Dispose of as unused product. Empty containers should be taken to an approved waste handling site for recycling or disposal. Do not re-use empty containers. Dispose of in accordance with local, state, and federal regulations. |
| RCRA - Resource Conservation and Recovery Authorization Act Hazardous waste | : | D002 (Corrosive) |

**Product AT USE DILUTION**

| | | |
|---|---|---|
| Disposal methods | : | Diluted product can be flushed to sanitary sewer. |
| Disposal considerations | : | Dispose of in accordance with local, state, and federal regulations. |

---

## SECTION 14. TRANSPORT INFORMATION

**Product AS SOLD**

The shipper/consignor/sender is responsible to ensure that the packaging, labeling, and markings are in compliance with the selected mode of transport.

**Land transport (DOT)**
Not dangerous goods

**Sea transport (IMDG/IMO)**

Not dangerous goods

---

## SECTION 15. REGULATORY INFORMATION

**Product AS SOLD**

**EPA Registration number** : 1677-238

**EPCRA - Emergency Planning and Community Right-to-Know**

**CERCLA Reportable Quantity**

| Components | CAS-No. | Component RQ (lbs) | Calculated product RQ (lbs) |
|---|---|---|---|
| dodecylbenzene sulfonic acid | 27176-87-0 | 1000 | 10416 |

**SARA 304 Extremely Hazardous Substances Reportable Quantity**
This material does not contain any components with a section 304 EHS RQ.

| | | |
|---|---|---|
| **SARA 311/312 Hazards** | : | Acute toxicity (any route of exposure) Skin corrosion or irritation Serious eye damage or eye irritation Respiratory or skin sensitization |

---

## SAFETY DATA SHEET

### PEROXIDE MULTI SURFACE CLEANER AND DISINFECTANT

| | | |
|---|---|---|
| **SARA 302** | : | The following components are subject to reporting levels established by SARA Title III, Section 302: |

| | CAS-No. | % |
|---|---|---|
| Hydrogen peroxide | 7722-84-1 | 5 - 10 % |

| | | |
|---|---|---|
| **SARA 313** | : | This material does not contain any chemical components with known CAS numbers that exceed the threshold (De Minimis) reporting levels established by SARA Title III, Section 313. |

**California Prop. 65**

This product does not contain any chemicals known to the State of California to cause cancer, birth, or any other reproductive defects.

**California Cleaning Product Right to Know Act of 2017 (SB 258)**

This regulation applies to this product.

| Chemical Name | CAS-No. | Function | List(s) |
|---|---|---|---|
| water | 7732-18-5 | Diluent | Not Applicable |
| dodecylbenzene sulfonic acid | 27176-87-0 | Cleaning Agent | Not Applicable |
| Hydrogen peroxide | 7722-84-1 | Biocide | Not Applicable |
| Fragrance Ingredient(s) | Not Available | Fragrance | Not Applicable |
| Aryl carboxylic acid | Withheld | Stabilizer | Not Applicable |
| Yellow dye | Withheld | Dye | Not Applicable |
| Silicone | Withheld | Processing Aid | Not Applicable |

*refer to ecolab.com/sds for electronic links to designated lists

**The ingredients of this product are reported in the following inventories:**

**Switzerland. New notified substances and declared preparations** :
not determined

**United States TSCA Inventory** :
All substances listed as active on the TSCA inventory

**Canadian Domestic Substances List (DSL)** :
This product contains one or several components listed in the Canadian NDSL.

**Australia Inventory of Chemical Substances (AICS)** :
not determined

**New Zealand. Inventory of Chemical Substances** :
not determined

**Japan. ENCS - Existing and New Chemical Substances Inventory** :
not determined

**Korea. Korean Existing Chemicals Inventory (KECI)** :
On the inventory, or in compliance with the inventory

**Philippines Inventory of Chemicals and Chemical Substances (PICCS)** :
On the inventory, or in compliance with the inventory

**China. Inventory of Existing Chemical Substances in China (IECSC)** :
not determined

**Taiwan Chemical Substance Inventory (TCSI)** :
not determined

## SAFETY DATA SHEET

### PEROXIDE MULTI SURFACE CLEANER AND DISINFECTANT

### SECTION 16. OTHER INFORMATION

**Product AS SOLD**
**NFPA:**



**HMIS III:**

| HEALTH | 3* |
| --- | --- |
| FLAMMABILITY | 0 |
| PHYSICAL HAZARD | 0 |

0 = not significant, 1 = Slight,
2 = Moderate, 3 = High
4 = Extreme, * = Chronic



**Product AT USE DILUTION**
**NFPA:**

**HMIS III:**

| HEALTH | 1 |
| --- | --- |
| FLAMMABILITY | 0 |
| PHYSICAL HAZARD | 0 |

0 = not significant, 1 = Slight,
2 = Moderate, 3 = High
4 = Extreme, * = Chronic

| Issuing date | : 02/03/2020 |
| --- | --- |
| Version | : 1.12 |
| Prepared by | : Regulatory Affairs |

REVISED INFORMATION: Significant changes to regulatory or health information for this revision is indicated by a bar in the left-hand margin of the SDS.

The information provided in this Safety Data Sheet is correct to the best of our knowledge, information and belief at the date of its publication. The information given is designed only as a guidance for safe handling, use, processing, storage, transportation, disposal and release and is not to be considered a warranty or quality specification. The information relates only to the specific material designated and may not be valid for such material used in combination with any other materials or in any process, unless specified in the text.



**SAFETY DATA SHEET**

## Xpress Detergent Disinfectant

---

## 1. PRODUCT AND COMPANY IDENTIFICATION

**Product Name:**     Xpress Detergent Disinfectant
**Product Code:**     A0346
**Recommended Use:**     General cleaner and disinfectant

**Company**
Auto-Chlor System
746 Poplar Avenue
Memphis, TN 38105
Questions/Comments: 901-579-2300

**Emergency Telephone Numbers**
**MEDICAL:** 1-866-923-4946 (PROSAR)          **SPILLS:** 1-800-424-9300 (CHEMTREC)

---

## 2. HAZARDS IDENTIFICATION

**OSHA Hazard Classification**

**Signal Word: WARNING**
**Acute Toxicity:** Category 4 (oral)
**Acute Toxicity:** Category 4 (dermal)
**Eye Irritation:** Category 2B



**HAZARD STATEMENTS**
H302: Harmful if swallowed
H312: Harmful in contact with skin
H320: Causes eye irritation

**PRECAUTIONARY STATEMENTS**
P264: Wash hands thoroughly after handling
P270: Do not eat, drink or smoke when using this product
P280: Wear eye protection
P301/P312: If swallowed, call a poison center or or physician if you feel unwell. rinse mouth.
P302/P352: If on skin, wash with plenty of soap and water.
P362/P364: Take off contaminated clothing and wash it before reuse.

---

## 3. COMPOSITION/INFORMATION ON INGREDIENTS

| INGREDIENTS | CAS NO. | % |
|---|---|---|
| _Diethylene glycol monobutyl ether | 112-34-5 | 8 |
| Tetra sodium ethylenediamine tetra acetic acid (Na4 EDTA) | 64-02-8 | 1.6 |

1 of 5

**Xpress Detergent Disinfectant**

| | | |
|---|---|---|
| _Alkyl (68% C12, 32% C14) dimethyl ethylbenzyl ammonium chloride | 85409-23-0 | 0.11 |
| _Alkyl dimethyl benzyl ammonium chloride (C12-C18) | 68391-01-5 | 0.11 |
| Other components below reportable levels | 141-43-5 | <1.0 |

## 4.  FIRST AID MEASURES

**Ingestion:**      If swallowed, call a poison center if you feel unwell. Rinse mouth.
**Skin Contact:**   If on skin, wash with plenty of water. If skin irritation occurs, get medical advice. Take off contaminated clothing and wash it before reuse.
**Eye Contact:**   If in eyes, rinse cautiously with water for several minutes.  Remove contact lenses, if present and easy to do.  Continue rinsing. If eye irritation persists, get medical advice.

## 5.  FIREFIGHTING MEASURES

**Extinguishing Media:**  Class A/B/C fire extinguisher, dry chemical, carbon dioxide, or foam
**Specific Hazards:**     During fire, gases hazardous to health may be formed.
**Protective Equipment:**  Wear full protective clothing and self-contained breathing apparatus

## 6.  ACCIDENTAL RELEASE MEASURES

**Personal Precautions:**  Isolate spill or leak area immediately.  Adequately ventilate area.
**Protective Equipment:**  Wear appropriate personal protective equipment as specified in Section 8.
**Cleanup Procedures:**   Absorb with earth, sand or other non-combustible material and transfer to containers for later disposal.

## 7.  HANDLING AND STORAGE

**Handling Precautions:**  Do not eat, drink or smoke when using this product.  Wash hands thoroughly after handling. Avoid prolonged exposure. Avoid release to the environment. FOR INDUSTRIAL AND INSTITUTIONAL USE ONLY.

**Storage:**            Protect from freezing.  Keep tightly closed in a dry, cool and well ventilated place.

## 8.  EXPOSURE CONTROLS/PERSONAL PROTECTION

**Occupational Exposure Limits:**      No occupational exposure limits established for this product.

**Appropriate Engineering Controls:**   Good general ventilation should be sufficient to control airborne levels.

**Personal Protective Equipment**

**Eye Protection:**                     Wear protective glasses, goggles or eye shield.

**Skin Protection:**                    Wear protective gloves.
**Respiratory Protection:**             In case of insufficient ventilation, wear suitable respiratory equipment.

## 9. PHYSICAL AND CHEMICAL PROPERTIES

**Appearance:**                         **Evaporation Rate:**
liquid                                  No information available
**Odor:**                               **Odor Threshold:**
Citrus                                  No information available
**pH:**                                 **Vapor Density:**
11.7                                    No information available
**Specific Gravity:**                   **Vapor Pressure:**
No information available                 No information available
**Solubility:**                         **Partition Coefficient:**
Soluble in water                        No information available
**Flash Point:**                        **Auto-Ignition Temperature:**
> 93.9C                                 No information available
**Boiling Point:**                      **Decomposition Temperature:**
No information available                 No information available
**VOC:**                                **Melting/Freezing Point:**
No information available                 No information available
**Viscosity:**                          **Flammability:**
No information available                 No information available
**Lower Explosive / Upper Explosive:**
No information available

## 10. STABILITY AND REACTIVITY

**Stability:**                          Stable under normal conditions
**Hazardous Polymerization:**           Will not occur
**Incompatibility:**                    Strong acids, alkalies, and oxidizing agents.
**Hazardous Decomposition Products:**   Oxides of nitrogen ammonia, carbon dioxide, carbon
                                        Monoxide, and other low molecular weight hydrocarbons

## 11. TOXICOLOGY INFORMATION

**Likely Routes of Exposure:**      Inhalation, eye and skin contact

**Acute Symptoms**
  **Eye and Skin Contact:**         Causes eye irritation and causes mild skin irritation.
  **Ingestion:**                    Expected to be a low ingestion hazard.
  **Inhalation:**                   Prolonged inhalation may be harmful.

| **Chronic Effects:** | None known |
|---|---|

Assessment of acute toxicity:

| **Oral LD$_{50}$** | **Dermal LD$_{50}$** | **Inhalation LC$_{50}$** |
|---|---|---|
| >5 g/kg | >5 g/kg | 2.43 mg/l |

## 12.ECOLOGICAL INFORMATION

Toxic to aquatic life. Harmul to aquatic life with long lasting effects. Expected to be readily biodegradable.

## 13.DISPOSAL CONSIDERATIONS

Pesticide wastes are acutely hazardous.  Improper disposal of all excess pesticide spray mixture or rinsate is a violation of Federal Law.  If these wastes cannot be disposed of by use according to label directions, contact your State Pesticide or Environmental Control Agency, or the Hazardous Waste Representatives at the nearest EPA Regional Office for guidance.

## 14.TRANSPORT INFORMATION

| **UN Number:** | Not classified |
|---|---|
| **Proper Shipping Name:** | Not classified |
| **Hazard Class:** | Not classified |
| **Packing Group:** | Not classified |

## 15.REGULATORY INFORMATION

This chemical is a pesticide product registered by the Environmental Protection Agency and is subject to certain labeling requirements under federal pesticide law.  These requirements differ from the classification criteria and hazard information required for safety data sheets, and for workplace labels of non-pesticide chemicals.  The pesticide label also includes other important information, including directions for use, pesticide storage and container handling.

**EPA REGISTRATION NUMBER:** 1839-83-6243

## 16.OTHER INFORMATION

| **Revision Date:** | 03/05/2020 |
|---|---|
| **Supersedes:** | new |
| **Reason for Revision:** | New formulation |

**Notice to Reader**:  This document has been prepared using data from sources considered technically reliable.  It does not constitute a warranty, express or implied, as to the accuracy of the information contained within. Actual conditions of use and handling are beyond seller's control. User is

responsible to evaluate all available information when using product for any particular use and to comply with all Federal, State, Provincial and Local laws and regulations.

**ATTACHMENT B – INDUSTRIAL HYGIENIST OBSERVATION LOG**

| Industrial Hygienist | |
|---|---|
| Date | |
| Facility | |

**Surface Cleaning Observation**

| Location | Adequate | Deficient |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**Disinfectant Contact Time Observation**

| Location | Time Applied | Minutes Until Dry |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

7



# FOLLOW-UP ONSITE AUDIT INSPECTION REPORT
## ENVIRONMENTAL CONDITIONS INSPECTION FOR
## SARS-CoV-2 (COVID-19) DISINFECTION AND CLEANING PROTOCOLS

## DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS (DC DOC), CENTRAL DETENTION FACILITY (CDF) AND CORRECTIONAL TREATMENT FACILITY (CTF)

## JULY 23, 2020

### *DRAFT*

**Prepared for**
District of Columbia Department of Corrections
2000 14th Street NW, 7th Floor
Washington, DC 20009

**Prepared by**
Potomac-Hudson Engineering, Inc.
77 Upper Rock Circle, Suite 302, Rockville, MD, 20850

GSA Contract No. 7QRAA18D0074
Task Order No. CW82753

**PHE**

## INTRODUCTION

In January 2020, a novel virus, SARS-CoV-2, was identified as the cause of an outbreak of viral pneumonia in Wuhan, China and subsequently led to the world-wide spread of coronavirus disease 2019 (COVID-19). COVID-19 is primarily transmitted via person-to-person contact; however, surface contamination is also known to be a concern with the spread of the virus. The virus is mainly spread through respiratory droplets produced when an infected person coughs or sneezes. These droplets can land on people who are nearby (within 6 feet). It may also be possible for a person to contract SARS-CoV-2 by touching a contaminated surface or object and then touching their own mouth, nose, or eyes.

In May 2020, the District of Columbia Department of Corrections (DC DOC) contracted Potomac-Hudson Engineering, Inc. (PHE) to develop a cleaning and disinfection protocol specific to COVID-19 to be used by DC DOC cleaning contractors. The purpose of the protocol is to provide guidance on proper disinfection practices and personal protective equipment (PPE) requirements. Frequent, effective, and safe cleaning and disinfecting procedures can help prevent the spread of disease to Department of Corrections (DOC) inmates, staff, and visitors.

PHE provided a draft protocol to DC DOC on June 15, 2020 and conducted initial on-site observational inspections to verify compliance with the protocol on June 29 and July 1, 2020. Following these observational inspections, the disinfection protocol was revised and a report was provided to DC DOC summarizing the inspections and recommending a number of corrective actions to improve work practices and procedures. A follow up observational inspection was conducted on July 20, 2020 to verify implementation of the corrective action recommendations by the contractors who are conducting the disinfection.

## AUDIT OVERVIEW

### SCOPE

PHE Industrial Hygienist Gary Morris conducted the follow up inspection of the DC DOC Central Detention Facility (CDF) and the Correctional Treatment Facility (CTF). This report contains observations from these follow up inspections, deviations deficiencies and from prescribed work practices and procedures, and corrective action recommendations. An In-Brief Meeting was held prior to the inspections and was attended by DC DOC representatives Gloria Robertson and Rena Myles. At the conclusion of the inspections, an Out-Brief Meeting was held that was attended by Ms. Robertson, Ms. Myles, and Gitana Stewart-Ponder to summarize observations, deficiencies, and corrective action recommendations from the follow up inspection.

Sanitizing and disinfection of the CDF is being conducted by Rock Solid Rock Solid District Group, LLC and by Spectrum Management, LLC in the CTF.

## SUMMARY OF FINDINGS

Tables 1A (CDF) and 1B (CTF) contain summaries of the findings from the initial oversight inspections, the recommended corrective action contained in the initial report, the status of each corrective action, and additional corrective action. Positive observations from the follow up inspection consist of the following:

- Some of the Spectrum Management, LLC staff did not wring out the rags after dipping in the bucket, increasing adequate coverage and contact time of surfaces (the rags were visibly soaked with the disinfectant).
- Spectrum Management, LLC staff carried the dip buckets and mop buckets with them to the areas in which they were disinfecting, increasing the frequency of re-wetting of the rags and mops.
- Spectrum Management, LLC staff periodically refilled the wipe buckets with the disinfectant.

It is recommended that these work practices be implemented by Rock Solid District Group, LLC in the CTF.



| TABLE 1A. FINDINGS FOR DC DOC CENTRAL DETENTION FACILITY | | | |
|---|---|---|---|
| SUMMARY OF FINDING | RECOMMENDED CORRECTIVE ACTION | STATUS OF CORRECTIVE ACTION | UPDATED CORRECTIVE ACTION |
| CENTRAL DETENTION FACILITY (CDF)/ROCK SOLID MANAGEMENT | | | |
| The contractor did not consistently allow for the 45-second minimum contact time required for the hydrogen peroxide-based disinfectant (*Ecolab Peroxide Multi Surface Cleaner and Disinfectant*). In several instances, a surface was wiped with a dry rag immediately after spray application of the disinfectant.  In other instances, only a portion of a surface was sprayed wet and allowed for a 45-second contact time.  The disinfectant was then wiped with a dry rag such that the unsprayed portion of the surface was not allotted adequate contact time with the disinfectant. | It is recommended that the contractor apply a towel sufficiently wetted with the disinfectant to all surfaces in lieu of spraying. After adequate contact time (45 seconds) has been achieved, the surfaces can then be wiped dry with a dry rag or are allowed to air-dry, as appropriate in a given area. | The majority of contractor employees were still using spray application as opposed to wet wiping. Spray application was observed used on telephones, tables, and benches in one of the housing blocks. Also, the employees who were wet wiping were not returning to the cart to re-wet their rags at such a frequency to ensure the 45 second contact time on all of the surfaces treated. We also noted that surface drying in the housing units was faster due to the existence of wall and floor fans in the hallways (to help with conditioning the space). | Replace all spray application with wet wiping. Periodically remind contractor staff that the objective of their work is to disinfect surfaces as opposed to cleaning the surfaces, reinforcing the required 45 second contact time, with additional attention to the housing units due to the faster surface drying facilitated by the wall and floor fans. Instruct crew staff to liberally wet the rags and avoid wringing them out and to take the bucket with them to enable frequent re-wetting without returning to the cart. Ensure that all applicable items are disinfected (the exercise machine in the South 3 Housing Unit was not disinfected). |



| TABLE 1A. FINDINGS FOR DC DOC CENTRAL DETENTION FACILITY | | | |
|---|---|---|---|
| **SUMMARY OF FINDING** | **RECOMMENDED CORRECTIVE ACTION** | **STATUS OF CORRECTIVE ACTION** | **UPDATED CORRECTIVE ACTION** |
| **CENTRAL DETENTION FACILITY (CDF)/ROCK SOLID MANAGEMENT** | | | |
| The contractor did not consistently allow for adequate wetting of the floor during mopping. On several occasions it was observed that a wet mop was used for an overly extensive period of time before being re-wetted. This resulted in portions of the floor being inadequately damped with a sufficient amount of disinfectant to ensure a 45 second contact time. | Ensure that mops are frequently wetted in the mop bucket during floor mopping. Consider requiring the contractor to provide additional mop buckets and dollies so that each person mopping has access to their own dolly that can be toted along with them as they mop. Based on site observations, there was an insufficient number of mop dollies. This required the dollies to remain in a centralized position and discouraged floor cleaners from more frequently wetting their mop heads.  Additionally, the mop buckets themselves, which have their own sets of wheels on them, should be removed from the dollies and transported with those mopping the floors. | Observations of floor mopping indicated that the 45 second contact time was achieved. | As noted above, the existence of wall and floor fans in the housing units facilitates faster drying of surfaces, including floors in these areas. As an added measure, periodically remind contractor staff that additional attention is needed to ensure the 45 second contact time (i.e. periodically return the mop to the bucket to re-wet the mop) in the housing units. Removing the mop buckets from the carts will facilitate more frequent we-wetting of the mop heads. |
| The contractor did not consistently disinfect all walls or other vertical surfaces to a height of 6 feet above the floor. While adequate disinfection of these surfaces was observed being performed in common areas, it was not being done in other areas (bathrooms, offices, and other non-communal spaces). | Ensure that the contractor is aware that ALL vertical surfaces (walls, windows, columns, doors, rails, etc.) must be properly disinfected from the floor to a height of six feet, including adequate contact time. | The contractor was not observed disinfecting walls. | Ensure that the contractor is aware that ALL vertical surfaces (walls, windows, columns, doors, rails, etc.) must be properly disinfected from the floor to a height of six feet, including adequate contact time. |



| TABLE 1A. FINDINGS FOR DC DOC CENTRAL DETENTION FACILITY | | | |
|---|---|---|---|
| **SUMMARY OF FINDING** | **RECOMMENDED CORRECTIVE ACTION** | **STATUS OF CORRECTIVE ACTION** | **UPDATED CORRECTIVE ACTION** |
| **CENTRAL DETENTION FACILITY (CDF)/ROCK SOLID MANAGEMENT** | | | |
| The contractor dry-swept all floors prior to disinfection in contradiction to the cleaning protocols.  Dry sweeping can cause virus present on the floor to become airborne for several hours, increasing the contact and inhalation risk it presents. | The facility has ordered dusting brooms (e.g., Swifter Sweepers or equivalent) which use electrostatic forces to attract and remove dirt and dust, to replace the current dry sweeping brooms. This will be implemented as soon as they arrive. <br><br> Ensure the contractor uses a slow, smooth wiping action and change out or clean the dust broom pads/heads on a regular basis to maximize the effectiveness of the brooms to collect as much dust and dirt particulates as possible. | DC DOC has not been able to procure the dust mops through their supplier and is investigating additional suppliers. Work practices using the brooms in such a manner to minimize dispersion of accumulated dust were observed. | Continue attempts to procure the dust mops. |
| Currently, the cleaning contractor is only responsible for disinfecting the floor and doorknobs/door handles in the basement. Although DOC staff are responsible for the remaining areas, it is unclear if they know all the surfaces they need to clean and/or if they are aware of the proper contact time for the disinfectant. | Ensure that staff cleaning personnel are familiar with and are properly implementing the cleaning protocols currently being provided to the third-party contractors. | DOC staff has been informed of the surfaces to be addressed and the importance of the 45 second contact time. | No additional action is required. |
| The contractor was observed cleaning windows, mirrors, and other glass surfaces with an ammonium-based window cleaner (Ecolab Oasis 255SF Industrial Window Cleaner) as opposed to an EPA registered product. | Test the hydrogen peroxide-based disinfectant on glass surfaces.  If acceptable, consider using the disinfectant on these surfaces instead of, or in addition to, traditional window cleaning chemicals. | The hydrogen peroxide-based disinfectant was used on all surfaces. Other products were not observed on the carts. | No additional action is required. |



| TABLE 1A. FINDINGS FOR DC DOC CENTRAL DETENTION FACILITY | | | |
|---|---|---|---|
| SUMMARY OF FINDING | RECOMMENDED CORRECTIVE ACTION | STATUS OF CORRECTIVE ACTION | UPDATED CORRECTIVE ACTION |
| CENTRAL DETENTION FACILITY (CDF)/ROCK SOLID MANAGEMENT | | | |
| In some cases, contractor personnel were observed cleaning doorknobs, door handles, and other frequently-touched surfaces with a hand sanitizer.  While this is technically sufficient for disinfection, it is not be applied consistently in all areas and the proper contact time may or may not be properly implemented. | Ensure that all chemicals and cleaning procedures are consistently applied throughout the facility.  If hand sanitizer is to be used on a regular basis for these surfaces, they should be documented in the cleaning protocol. | The hydrogen peroxide-based disinfectant was used on all surfaces. Other products were not observed on the carts. | No additional action is required. |
| The contractor (Summit) that currently provides food service duties in the cafeteria is solely responsible for cleaning and disinfecting that area of the facility.  It is not known if they are aware of or are following the proper protocols for disinfection in a manner consistent with the other areas of the facility. | Ensure that Summit is performing proper disinfection in a manner that is consistent with or exceeds the procedures being used elsewhere at the facility. | DC DOC has discussed appropriate disinfection practices with Summit (surfaces are disinfected three times per day). | No additional action is required. |



| TABLE 1B. FINDINGS FOR DC DOC CORRECTIONAL TREATMENT FACILITY | | | |
| --- | --- | --- | --- |
| RECOMMENDED CORRECTIVE ACTION | RECOMMENDED CORRECTIVE ACTION | RECOMMENDED CORRECTIVE ACTION | UPDATED CORRECTIVE ACTION |
| CORRECTIONAL TREATMENT FACILITY (CTF)/SPECTRUM MANAGEMENT | | | |
| The contractor did not consistently allow for the 45-second minimum contact time required for the hydrogen peroxide-based disinfectant (*Ecolab Peroxide Multi Surface Cleaner and Disinfectant*) being used.  In several instances, a surface was wiped with a dry rag immediately after spray application of the disinfectant.  In other instances, only a portion of a surface was sprayed wet and allowed for a 45-second contact time.  The disinfectant was then wiped with a dry rag such that the unsprayed portion of the surface was not allotted adequate contact time with the disinfectant. | Sufficiently spraying to adequately wet and entire surface such as a table or wall is extremely difficult and time-consuming. It is recommended that the contractor apply a towel sufficiently wetted with the disinfectant to all surfaces in lieu of spraying.  After adequate contact time (45 seconds) has been achieved, the surfaces should then be wiped dry with a dry rag or be allowed to air-dry, as appropriate in a given area.  This will further ensure that the entire surface is adequately wetted for the duration of the required contact time. | Spraying and wiping of surfaces has been replaced with wet wiping. The 45 second contact time was achieved on all surfaces observed, including walls. | No additional action is required. |
| The contractor did not consistently disinfect all walls or other vertical surfaces to a height of 6 feet above the floor.  While adequate disinfection of these surfaces was observed being performed in common areas, it was not being done in other areas (bathrooms, offices, and other non-communal spaces). | Ensure that the contractor is aware that ALL vertical surfaces (walls, windows, columns, doors, rails, etc.) must be properly disinfected from the floor to a height of six feet, including adequate contact time. | Observations during the follow up inspection indicated that appropriate surfaces, including walls were effectively being disinfected. | No additional action is required. |



| TABLE 1B. FINDINGS FOR DC DOC CORRECTIONAL TREATMENT FACILITY | | | |
|---|---|---|---|
| RECOMMENDED CORRECTIVE ACTION | RECOMMENDED CORRECTIVE ACTION | RECOMMENDED CORRECTIVE ACTION | UPDATED CORRECTIVE ACTION |
| CORRECTIONAL TREATMENT FACILITY (CTF)/SPECTRUM MANAGEMENT | | | |
| The contractor dry-swept all floors prior to disinfection in contradiction to the cleaning protocols.  Dry sweeping can cause virus present on the floor to become airborne for several hours, increasing the contact and inhalation risk it presents. | The facility has ordered dusting brooms (e.g., Swifter Sweepers or equivalent) which use electrostatic forces to attract and remove dirt and dust, to replace the current dry sweeping brooms.  This will be implemented as soon as they arrive.<br><br>Ensure that the contractor uses a slow, smooth wiping action and change out or clean the dust broom pads/heads on a regular basis to maximize the effectiveness of the brooms to collect as much dust and dirt particulates as possible. | DC DOC has not been able to procure the dust mops through their supplier and is investigating additional suppliers. Work practices using the brooms in such a manner to minimize dispersion of accumulated dust were observed. | Continue attempts to procure the dust mops. |
| The contractor was not always performing its duties in a consistent manner. The following observations were made:<br>• Some of the grated stairwells in the housing areas were mopped, while others were not.<br>• In one area, contractor personnel were using hand sanitizer to disinfect doorknobs, door handles, and phones. However, in other areas, the peroxide disinfectant was used.<br>• In the 96 Medical Area, the contractor did not clean the area between the gates and the elevators.  However, this area was cleaned in the 82 Medical Area. | The following recommendations are made:<br>• Ensure that all stairwells in the housing units are mopped.<br>• Since different disinfectants require different contact times (depending on the active ingredients), ensure that the contractor is consistent in what they use.  The contact time for ethanol (5 minutes) is much greater than that for peroxide (45 seconds).<br>• Ensure that the contractor is clear on what areas are considered within their scope of work and which areas are not and ensure that they clean and disinfect all of the areas for which they are responsible. | All applicable surfaces were addressed in the areas observed. The hydrogen peroxide-based disinfectant was used on all surfaces. Other products were not observed on the carts. | No additional action is required. |



| TABLE 1B. FINDINGS FOR DC DOC CORRECTIONAL TREATMENT FACILITY | | | |
|---|---|---|---|
| **RECOMMENDED CORRECTIVE ACTION** | **RECOMMENDED CORRECTIVE ACTION** | **RECOMMENDED CORRECTIVE ACTION** | **UPDATED CORRECTIVE ACTION** |
| **CORRECTIONAL TREATMENT FACILITY (CTF)/SPECTRUM MANAGEMENT** | | | |
| The contractor was observed mixing and handling both the concentrated form of the peroxide disinfectant as well as the diluted form.  In its concentrated form, the disinfectant has a pH of less than 2 and is extremely corrosive.  Even in its diluted form, the disinfectant is still corrosive and presents danger to users. Contractor personnel were not wearing certain personal protective equipment (PPE) while performing these tasks.<br><br>The contractor was also observed using the fogging unit without eye protection. | It is recommended that the personnel handling and mixing the disinfectant in the mixing room wear goggles and/or face shield to protect their eyes and face.  Consider also requiring longer gloves that cover exposed skin between hands and sleeves.<br><br>Consider requiring the contractor to where eye protection during fogging. | Appropriate personal protective equipment was worn during mixing and transfers of the disinfectant. Fogging was not conducted on the day of the follow-up inspection. | No additional action is required on the part of Spectrum Management. PHE will attempt to observe fogging during the next oversight inspection. |



## CORRECTIVE ACTION PLAN

PHE has developed a brief corrective action plan (CAP) as part of this document.  A CAP is a step-by-step plan of action that is developed to achieve targeted outcomes for resolution of identified errors in an effort to:

- Identify the most cost-effective actions that can be implemented to correct error causes
- Develop and implement a plan of action to improve processes or methods so that outcomes are more effective and efficient
- Achieve measurable improvement in the highest priority areas
- Eliminate repeated deficient practices

### DISCUSSIONS WITH CONTRACTORS

The findings made by PHE should be discussed directly with supervisors for each cleaning contractor, including potentially sharing this document with them.   Each of the deficiencies should be identified, and the recommendations for correction should be explored.  It is possible that the contractors may identify and suggest other corrective measures as alternatives to those suggested in this document.  As long as the same goal is reached, any alternative or additional procedures can be implemented as well.

### PERIODIC RE-INSPECTIONS

As part of the existing scope of work, PHE is scheduled to conduct up two (2) follow up monthly site inspections to ensure that the contractors are adhering to the recommended protocols and that noted deficiencies have been corrected.  As part of these follow-up inspections, PHE will hold a short, informal out-brief at the end of each day to discuss any findings or other observations made, and present options for correction.

PHE also recommends that DOC personnel perform additional inspections, as needed, based on the results of the PHE follow-up inspections, if deficiencies continue to be identified.

### EFFECTIVENESS EVALUATION

The DOC will continue to check the temperature of personnel arriving onsite and require face masks for the foreseeable future.  The DOC will also continue to perform voluntary testing of individuals onsite (both employees and inmates) every two weeks.  As the year continues on, it is likely that additional waves or peaks may be observed throughout the region.  DOC should closely monitor the number of persons onsite testing positive during these times to evaluate the effectiveness of all current procedures, including cleaning and disinfection.  Changes should be made, as applicable and appropriate, to ensure that each facility is doing as much as possible to protect all personnel from the virus.





# FOLLOW-UP ONSITE AUDIT INSPECTION REPORT No. 2
## ENVIRONMENTAL CONDITIONS INSPECTION FOR
## SARS-CoV-2 (COVID-19) DISINFECTION AND CLEANING PROTOCOLS

## DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS (DC DOC), CENTRAL DETENTION FACILITY (CDF) AND CORRECTIONAL TREATMENT FACILITY (CTF)

## September 2020

### *DRAFT*

**Prepared for**
**District of Columbia Department of Corrections**
**2000 14th Street NW, 7th Floor**
**Washington, DC 20009**

**Prepared by**
**Potomac-Hudson Engineering, Inc.**
**77 Upper Rock Circle, Suite 302**
**Rockville, MD, 20850**

**GSA Contract No. 7QRAA18D0074**
**Task Order No. CW82753**

## INTRODUCTION

In January 2020, a novel virus, SARS-CoV-2, was identified as the cause of an outbreak of viral pneumonia in Wuhan, China and subsequently led to the world-wide spread of coronavirus disease 2019 (COVID-19). COVID-19 is primarily transmitted via person-to-person contact; however, surface contamination is also known to be a concern with the spread of the virus. The virus is mainly spread through respiratory droplets produced when an infected person coughs or sneezes. These droplets can land on people who are nearby (within 6 feet). It may also be possible for a person to contract SARS-CoV-2 by touching a contaminated surface or object and then touching their own mouth, nose, or eyes.

In May 2020, the District of Columbia Department of Corrections (DC DOC) contracted Potomac-Hudson Engineering, Inc. (PHE) to develop a cleaning and disinfection protocol specific to COVID-19 to be used by DC DOC cleaning contractors. The purpose of the protocol is to provide guidance on proper disinfection practices and personal protective equipment (PPE) requirements. Frequent, effective, and safe cleaning and disinfecting procedures can help prevent the spread of disease to DC DOC inmates, staff, and visitors.

PHE provided a draft protocol to DC DOC on June 15, 2020 and conducted initial on-site observational inspections to verify compliance with the protocol on June 29 and July 1, 2020. Following these observational inspections, the disinfection protocol was revised, and a report was provided to DC DOC summarizing the inspections and recommending a number of corrective actions to improve work practices and procedures. An initial follow-up observational inspection was conducted on July 20, 2020 to verify implementation of the corrective action recommendations by the contractors who are conducting the disinfection, and a follow-up report was issued on July 23, 2020.

On September 28, 2020, PHE conducted a second follow-up site visit to inspect the cleaning and disinfection process. This document provides a summary of PHE's observations, findings, and recommendations.

## AUDIT OVERVIEW

### SCOPE

Christopher Rua, CHMM and Gary Morris, CIH of PHE conducted the follow-up inspection of the DC DOC Central Detention Facility (CDF) and the Correctional Treatment Facility (CTF) on September 28, 2020. This report contains observations from this follow-up inspection, deficiencies and deviations from prescribed work practices and procedures, and corrective action recommendations. At the conclusion of the inspection, an Out-Brief Meeting was held to summarize observations, deficiencies, and corrective action recommendations from the follow up inspection. This meeting was attended by:

- Mr. Lennard Johnson, Warden (DOC)
- Ms. Kathy Landerkin, Deputy Warden (DOC)
- Ms. Jackie Smith, Site Safety Officer (DOC)
- Ms. Gloria Roberts, Compliance and Review Officer (DOC)
- Ms. Michele Jones, CTF Programs (DOC)
- Mr. Christopher Rua (PHE)
- Mr. Gary Morris (PHE)

Sanitizing and disinfection of the CDF is being conducted by G-SIDA General Services, LLC (G-SIDA) and by Spectrum Management, LLC (Spectrum) in the CTF. It should be noted that G-SIDA replaced Rock Solid Management Group, LLC as the contractor at the CDF on August 5, 2020. This was PHE's first observation of this contractor.



## SUMMARY OF FINDINGS

Table 1 contains a summary of the findings from this oversight inspection as well as the recommended corrective action contained.  Positive observations from the follow-up inspection consist of the following:

- Some of the staff of both contractors did not wring out the rags after dipping in the bucket, increasing adequate coverage and contact time of surfaces (the rags were visibly soaked with the disinfectant).
- Staff of both contractors carried the dip buckets and mop buckets with them to the areas in which they were disinfecting, increasing the frequency of re-wetting of the rags and mops.
- Contractor staff periodically refilled the wipe buckets with the disinfectant and changed mop water and mop heads several times throughout the day.
- Fans positioned in the housing blocks are now turned off during sanitizing to help extend contact time.
- Mop and rag buckets are filled by DOC staff to ensure consistent filling practices. Bleach solutions are also mixed by DOC staff and filled in spray bottles to ensure proper bleach/water ratios in the spray bottles.
- Spectrum crew wet wiped surfaces in the CTF Visitor's Entrance with the sanitizing solution and when dry, applied the solution a second time via a spray bottle and allowed the solution to air dry.

In general, significant improvement was observed during this site visit compared to previous site visits.



| TABLE 1. FINDINGS FOR DC DOC CENTRAL DETENTION FACILITY AND CONDITIONAL TREATMENT FACILITY | |
|---|---|
| **SUMMARY OF FINDING** | **RECOMMENDED CORRECTIVE ACTION** |
| The contractor did not consistently allow for the 45-second minimum contact time required for the hydrogen peroxide-based disinfectant (*Ecolab Peroxide Multi Surface Cleaner and Disinfectant*). Some contractor employees were not re-wetting their rags with sufficient frequency.  As a result, some walls and other surfaces did not stay wetted for a full 45 seconds.<br><br>This was particularly noted for the gates in the common areas near the elevators due to the intricate design and abundant surface area. | Periodically remind contractor staff that the objective of their work is to disinfect surfaces as opposed to cleaning the surfaces, reinforcing the required 45-second contact time. Instruct crew staff to liberally wet the rags and avoid wringing them out.  Consider instructing the crews to have a brief onsite meeting at the beginning of each day to discuss these practices to reinforce the instructions.<br><br>In the common areas, consider using the pump sprayer to thoroughly wet the gates.  The sprayer will be able to coat the entirety of the surfaces more completely and efficiently than hand wiping. |
| The contractor continues to dry sweep all floors prior to disinfection in contradiction to the cleaning protocols, due to the limited availability of acceptable (i.e. plastic as opposed to metal) dusting brooms.  Since dry sweeping can cause virus present on the floor to become airborne for several hours, increasing the contact and inhalation risk it presents, every attempt should be made to sweep in a slow, smooth motion.  The contractors were observed to be sweeping in a rapid manner in several area. | It has been recommended that the facility procure dusting brooms (e.g., Swifter Sweepers or equivalent) which use electrostatic forces to attract and remove dirt and dust, to replace the current dry sweeping brooms.  However, DC DOC has not yet been able to procure the dust mops through their supplier and is investigating additional suppliers.  Continue attempts to procure the dust mops.<br><br>Until the dusting brooms are procured, ensure the contractor uses a slow, smooth wiping action and change out or clean the dust broom pads/heads on a regular basis to maximize the effectiveness of the brooms to collect as much dust and dirt particulates as possible. |
| In some cases, contractor personnel were observed cleaning the surfaces of phones and other electronic devices (e.g., computer screens, keyboards) with a hand sanitizer.  While this is technically sufficient for disinfection, the proper contact time may or may not be properly achieved.  Disinfectants with ethyl alcohol as the active ingredient, such as hand sanitizer, require a minimum contact time ranging from 30 seconds up to 10 minutes, depending on the specific product and concentration. | The U.S. Environmental Protection Agency (USEPA) has compiled a list of disinfectants (List N) approved for effective use for COVID-19.  The list is arranged by USEPA Registration Number, product name, manufacturer, active ingredient, and other criteria.  Each product included on List N is denoted with the minimum contact time required to be effective against COVID-19.  The list can be found here: https://cfpub.epa.gov/giwiz/disinfectants/index.cfm.<br><br>If hand sanitizer is to be used on a regular basis for these surfaces, the product should be cross-checked against this list to determine if the product is approved and identify the proper contact time.<br><br>Alternatively, if safe to use on phones and other electronic devices, consider using the *Ecolab Peroxide Multi Surface Cleaner and Disinfectant* on these surfaces for consistency. |



| TABLE 1. FINDINGS FOR DC DOC CENTRAL DETENTION FACILITY AND CONDITIONAL TREATMENT FACILITY | |
|---|---|
| **SUMMARY OF FINDING** | **RECOMMENDED CORRECTIVE ACTION** |
| In general, both contractors use dedicated sets of mops for bathrooms and locker rooms which are separate from the mops they use in offices and common areas. However, in area C3-112 at the CTF, **Spectrum** personnel were observed using the same mop for two offices and a small hallway that was also used for a single-stall bathroom in that area.  It appears that the contractors did not know a bathroom was located in this area and therefore only brought one set of mops with them to this location. | Ensure at all times that mops used for bathrooms and locker rooms are not used in administrative and common areas. |
| Fogging is not being conducted by **G-SIDA** in the CDF due to the omission of this in the current contract. | As planned, include fogging in the next G-SIDA contract. |

PHE

## CORRECTIVE ACTION PLAN

PHE has developed a brief corrective action plan (CAP) as part of this document.  A CAP is a step-by-step plan of action that is developed to achieve targeted outcomes for resolution of identified errors in an effort to:

- Identify the most cost-effective actions that can be implemented to correct error causes
- Develop and implement a plan of action to improve processes or methods so that outcomes are more effective and efficient
- Achieve measurable improvement in the highest priority areas
- Eliminate repeated deficient practices

### DISCUSSIONS WITH CONTRACTORS

The findings made by PHE should be discussed directly with supervisors for each cleaning contractor, including potentially sharing this document with them.  Each of the deficiencies should be identified, and the recommendations for correction should be explored.  It is possible that the contractors may identify and suggest other corrective measures as alternatives to those suggested in this document.  As long as the same goal is reached, any alternative or additional procedures can be implemented as well.

### PERIODIC RE-INSPECTIONS

As part of the existing scope of work, PHE is scheduled to conduct one additional follow-up site inspection to ensure that the contractors are adhering to the recommended protocols and that noted deficiencies have been corrected.  As part of the follow-up inspection, PHE will hold a short, informal out-brief at the end of each day to discuss any findings or other observations made and present options for correction.

PHE also recommends that DC DOC personnel perform additional inspections, as needed, based on the results of the PHE follow-up inspections, if deficiencies continue to be identified.

### EFFECTIVENESS EVALUATION

The DC DOC will continue to check the temperature of personnel arriving onsite and require face masks for the foreseeable future.  The DC DOC will also continue to perform voluntary testing of individuals onsite (both employees and inmates) every two weeks.  As the year continues on, it is likely that additional waves or peaks in the number of virus cases may be observed throughout the region.  DC DOC should closely monitor the number of persons onsite testing positive for COVID-19 during these times to evaluate the effectiveness of all current procedures, including cleaning and disinfection.  Changes should be made, as applicable and appropriate, to ensure that each facility is doing as much as possible to protect all personnel (employees, inmates, contractors, and visitors) from the virus.



**Ex   N**

**Environmental Sanitarian  CS-1801-12**

## INTRODUCTION

This position is located in the Department of Corrections (DOC), Office of Accreditation and Compliance located inside the Central Detention Facility (CDF), and Correctional Treatment Facility (CTF). The operational focus is to ensure facilities' compliance with applicable life/health safety rules, regulations, and guidance.

The position provides environmental safety and sanitation oversight for the DOC facilities. Environmental Sanitarian (ES) ensures that the DOC cleaning contractors adhere to the DOC cleaning protocol and that all facilities are clean, sanitary and environmentally safe, and the facilities and equipment are maintained in good working order/condition as well as the laundry operations, barber and cosmetology, and commissary areas.

## MAJOR DUTIES

Plans, designs, develops, and coordinates correctional environmental safety and sanitation initiatives; and serves in a key supporting role for the implementation of strategic departmental initiatives focusing on core correctional business needs and on support requirements as it relates to environmental safety and sanitation of the CDF and CTF.

Ensures day-to-day oversight for compliance with applicable regulations, codes and standards relevant to the mission and goals; coordinates inspections conducted by the DC Department of Health (DOH) and conducts comprehensive and thorough inspections to ensure that the facilities are compliant.

Maintains a manual and automated reporting system to keep up to date with inspection schedules and cleaning squads/crews; and coordinates with department managers, supervisors, officers, and employees regarding the cleaning and inspection schedules.

Provides instructions and guidelines to detail squads; replenishes/orders supplies and tools for cleaning purposes, and documents whether the operation is compliant with prevention, identification and abatement activities. Addresses departmental issues and key initiatives; and assists in the development of funding and resource proposals to support program initiatives.

Recommends revisions to internal policies to avoid conflicts regarding how to accomplish mission and goals of the program; and interfaces with key officials within the Department, with other Federal and District Government agencies and the private sector in the course of working out administrative systems and procedures that are inherent in attaining the goals.

**1** of **5**

**Environmental Sanitarian  CS-1801-12**

Ensures and assesses the inspections of all facility areas e.g., weekly/monthly/annually; collaborates with supervisors and managers to designate employees to conduct regular internal inspections to identify and document deficiencies.

Ensures sanitation supplies are available for distribution; and are distributed to the units based on an approved schedule. Collaborates with correctional officers and supervisors to ensure cleaning equipment is utilized in the proper manner and makes inspections a part of their daily tasks.

Makes rounds with designated staff. Rounds shall include inspections of showers, dayrooms, on-unit classrooms and recreation areas, chase closets and storage area supply closets, tiers, and the control bubble. Inspections require each program manager or designee to be present when the SIS performs inspections of areas such as the medical unit, the warehouse, storage rooms, shops, commissary, food services, etc. It is expected that joint inspections shall result in collaborative resolutions.

Collaborates with the Facilities Maintenance manager regarding repairs, based on schedule, visits housing units to conduct a general visual inspection for cleanliness and ensures that adequate cleaning supplies are available and equipment and fixtures are operational in common areas.

Reviews inspection reports of cells and ensures cells are free from graffiti and peeling paint. Managers affected by this report are responsible for preparing a closed out Corrective Action Plan (CAP) to the SIS and appropriate DOC manager official. The SIS follows up on the CAP to ensure adequate corrective action is taken in a timely manner.

Evaluates performance management for operational efficiency and support services for effectiveness; and participates in scheduled or random audit reviews of internal programs offices. Evaluates and documents results of each program audit; and prescribes corrective action or remediation in difficult and complex work assignments.

Develops new approaches, methods, or procedures in data gathering and analysis techniques; and recognizes and resolves discrepancies and/or inconsistencies among the findings.

Makes sure cellblock control modules, administrative areas, office areas, medical unit, Inmate Reception Center (IRC), and other areas are thoroughly cleaned; and coordinates with maintenance staff for cleaning air vents, windows and high walls.

Maintains documentation relevant to DOH inspections, corrective action plans and abatement schedules and determines the frequency of required treatments.

## Environmental Sanitarian  CS-1801-12

Keeps in contact with the DC Departments of Health, Occupational Safety and Health Administration, DC Fire and Emergency Management and other independent consultants.

Performs other related duties as assigned.

## KNOWLEDGE REQUIRED BY THE POSITION

Must possess a Certificate or License as a Registered Sanitarian OR be able to obtain certification or licensing within 180 days of employment OR must meet the following minimum standards to sit for the certification exam:

a)  Bachelor's Degree in Sanitary Science or Sanitary Engineering from an institution on the list of accredited colleges of the United States Office of Education, or any like institution approved by the Board. or

b) Bachelor's Degree with a minimum of thirty (30) semester hour's credit of basic sciences from an institution on the list of accredited colleges of the United States Office of Education (or any like institution approved by the Board), plus one (1) year full time experience in Environmental Health

Thorough knowledge of District, Federal and national standards for correctional management policies and procedures as it relates to environmental safety and sanitation of correctional facilities.

Thorough knowledge regarding standards, policies and procedures applicable to all facets of correctional operations.

Thorough knowledge of and skill in applying a wide range of complex inspection, and compliance principles, concepts, and practices; and thorough understanding of the operating problems in working in a correctional setting.

Ability to instruct squads of special detail inmate workforce ensuring compliance with applicable environmental health regulations, codes and standards; and an in-depth knowledge of the practices, procedures and responsibilities related to the operation and maintenance of adult detention facilities.

Ability to perform research, conduct meetings and coordinate group efforts in order to implement a cohesive environmental safety and sanitation program.

Ability to gather, assemble, and analyze facts, draw conclusions and interpret relevant regulations and policies.

Thorough knowledge and research skills to keep abreast of emerging standards and state of the art best practices for the correctional administration's environmental safety and sanitation program; and ability to ensure that the program is effectively operating.

## Environmental Sanitarian  CS-1801-12

Proficient in computer operations and software in order to maintain resource contact, develop spreadsheets/data bases, and report preparations as well as a tracking system.

## SUPERVISORY CONTROLS

Works under the supervision of the Compliance and Review Officer, who outlines overall objectives and available resources and discusses projects, specific timelines, and determines the parameters of the SIS's responsibilities as well as the expected outcomes.

The incumbent determines the most appropriate avenues to pursue; decides the practices and methods to apply in all phases of assignments including the approach to take, and the depth and intensity needed; interprets policy and regulations and resolves most conflicts as they arise; coordinates squad details with others as required; and keeps the supervisor informed of progress and potentially controversial matters.

The work is not normally reviewed for methods used. Completed assignments are reviewed for soundness of overall approach; effectiveness in producing results; feasibility of recommendation and adherence to deadlines, compliance and requirements.

## GUIDELINES

Guidelines include District and Federal regulations, standards, codes, manuals, department policies and procedures, American Correctional Association (ACA) expected practices, legislative requirements, and best practices and benchmarks from comparable jurisdictions that are relevant to environmental safety and sanitation. These are not completely applicable to the work or have gaps in specificity requiring the SIS to be resourceful and diligent when improvising and/or determining the best practice to use. Judgment is utilized when interpreting, adapting, applying, and deviating from guidelines. Analyzes the results of such adaptations and recommends changes in established methods and procedures.

## COMPLEXITY

The work consists of a variety of complex tasks that involves planning, coordinating and providing advice regarding environmental safety and sanitation procedures. The work requires complex efforts in problem solving and analysis directed toward the appropriate resolution to specific issues, situations and problems. Also, the work may often involve interpretations of regulatory procedures and a high degree of precision and confidence, supplementing these conclusions with credible information from a variety of sources, defending conclusions and recommending resolutions to the critical problems encountered usually in writing, but often in briefing sessions before agency management. The work also consists of analyzing data from a variety of sources, considering the impact, interrelationships, and confirms the accuracy and authenticity of information, and resolves issues of contradictory, missing, or inconclusive data.

**4** of **5**

## Environmental Sanitarian  CS-1801-12

### SCOPE AND EFFECT

The purpose of the work is designed to ensure the highest standards of management effectiveness, consistent with resource requirements, application practices and national standards for environmental safety and sanitation codes. Work efforts result in the disruption of large-scale organized activities and practices and procedures promotes the health, safety or fair treatment of a large population. The work may also result in improved planning and operational aspects of the program.

### PERSONAL CONTACTS

Contacts are with upper and mid-level departmental management officials and supervisors, inmates, contractors, correctional officers/supervisors, etc.

### PURPOSE OF CONTACTS

Purpose of Contacts involves frequent unstructured face-to-face meetings and contacts with institution staff, correctional professionals within and outside of the DOC and/or public officials. Provides expertise and advice on various matters associated with environmental safety and sanitation issues, collect and exchange information, prepare reports, analyze and resolve problems, develop new implementation strategies and proposes new approaches. Contacts are also made to establish rapport needed to the fulfillment of mission of the program, which address many areas of institutional operations. Other contacts may occur for the purpose of providing policy guidance, advice and/or training.

### PHYSICAL DEMANDS

The work is primarily sedentary, however, the incumbent is subject to long periods of standing, walking, stooping or crouching during inspection process.

### WORK ENVIRONMENT

Work is performed in both an office and correctional institutional facility environment. Administrative functions are performed in the office setting and inspections and investigations are performed in the facility.

### OTHER SIGNIFICANT FACTS

**NOTE**: The incumbent is this position must provide a certificate of good standing as a Registered Sanitarian or proof of ability to sit for examination towards certification from the applicable state, local, or municipal authority.
**NOTE**: The incumbent of this position will be subject to enhanced suitability screening pursuant to Chapter 4 of DC Personnel Regulations, Suitability – **Safety Sensitive.**

**Environmental Sanitarian  CS-1801-12**

The incumbent in this position is designated as an essential employee.

Flexibility in work schedule is required.

**Ex   A**

# LEGAL CALLS



Emergency Calls to Private and Public Attorneys
(April 20 - October 15, 2020)

N = 448
Completed, Attempted, Notified: 378
Not Completed, Attempted, Notified: 70

N = 1,286
Completed, Attempted, Notified: 1,077
Not Completed, Attempted, Notified: 209

N = 1,507
Completed, Attempted, Notified: 1,341
Not Completed, Attempted, Notified: 166

N = 1,526
Completed, Attempted, Notified: 1,410
Not Completed, Attempted, Notified: 116

N = 1,415
Completed, Attempted, Notified: 1,331
Not Completed, Attempted, Notified: 84

N = 1,623
Completed, Attempted, Notified: 1,546
Not Completed, Attempted, Notified: 77

N = 831
Completed, Attempted, Notified: 789
Not Completed, Attempted, Notified: 42

■ % Completed, Attempted, Notified     ■ % Not Completed, Attempted, Notified

*PCM started collecting this data beginning April 20, 2020. DC DOC experienced system outages due to DCNET service outages on April 20, 2020 for six hours between 1 and 7 PM and on April 21, 2020 for four hours between 8 AM and 12 PM.

1

**Ex   B**

# LEGAL CALLS CONT.



Number of Emergency Legal Calls Requested by Public and Private Attorneys
(April 20 - October 15, 2020)

**April 20 - October 15 2020**
Total # calls requested: 8,636
Total # calls CMs responsible for:  8,602
Average # of calls requested per day: 69
Calls completed, attempted, and/or notified: 91%

Average # of CMs physically reported to work: 13

Average # of calls requested per day: 64
Calls completed, attempted, and/or notified: 84%
Average # of CMs physically reported to work: 11

Average # of calls requested per day: 69
Calls completed, attempted, and/or notified: 92%
Average # of CMs physically reported to work: 13

Average # of calls requested per day: 77
Calls completed, attempted, and/or notified: 95%
Average # of CMs physically reported to work: 15

Average # of calls requested per day: 69
Calls completed, attempted, and/or notified: 89%
Average # of CMs physically reported to work: 14

Average # of calls requested per day: 67
Calls completed, attempted, and/or notified: 94%
Average # of CMs physically reported to work: 14

Average # of calls requested per day: 83
Calls completed, attempted, and/or notified: 95%
Average # of CMs physically reported to work: 16

Average # of calls requested per day: 50
Calls completed, attempted, and/or notified: 84%

■ PDS  ■ FPD  ■ Private

*Due to COVID-19, PCM began to track and analyze emergency legal call data on April 20, 2020.  DOC experienced system outages due to DCNET service outages on April 20, 2020 for six hours between 1 and 7 PM and on April 21, 2020 for four hours between 8 AM and 12 PM.

2

**Ex   C**



# Order Confirmation

Page: 1

**Billing Address:**
DF FirstNet WMS Order Type

12735 MORRIS ROAD

BLDG 200 STE 30
ALPHARETTA, GA  30004

**Shipping Address:**
DC OFFICE OF THE CHIEF
TECHNOLOGY Office
1901 D ST SE
DC Dept. of Corrections Central
Detenti
PONTI ANDREWS - RTS 10047
WASHINGTON, DC  20003-2534

| | |
|---|---|
| **WMS Order#:** 587640299 | **Entry Date:** 05/01/2020 |
| **Invoice#:** 587640299 | **Picked:** 05/04/2020 |
| **Your Order#:** 55-675000001203526 | **Ship ID:** 660902780 |
| **Customer PO#:** N101-OY-456747 | |

| Item# | Description | Phone # | QtyOrd | Qty Back Ord | ShipQty | Taxable Unit Value | Unit Price | Total Price |
|---|---|---|---|---|---|---|---|---|
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2025529830 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2026151639 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2026152845 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2026152916 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2026000372 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2026152667 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2026150385 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2026000175 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2026000659 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |



# Order Confirmation

Page: 2

| Item# | Description | Phone # | QtyOrd | Qty Back Ord | ShipQty | Taxable Unit Value | Unit Price | Total Price |
|---|---|---|---|---|---|---|---|---|
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2025529430 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6402B | PHO SON XP5S XP5800 BLK | 2026152916 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2026151639 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2026152845 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2026000372 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2026152667 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2026150385 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2026000175 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2026000659 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2025529430 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2025529830 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |



# Order Confirmation

Page: 3

| Item# | Description | Phone # | QtyOrd | Qty Back Ord | ShipQty | Taxable Unit Value | Unit Price | Total Price |
|-------|-------------|---------|--------|--------------|---------|-------------------|------------|-------------|
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 88879 | PRIORITY FREIGHT TAXED | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |



# Order Confirmation

Page: 4

**Payment Method**
BTM                    $999.90

| | | |
|---|---|---|
| **Shipping Sub Total** | | |
| **\*Down Payment** | | $0.00 |
| **Amount Financed** | $0.00 | |
| **Other Charges** | | $999.90 |
| **Sales Tax** | | $0.00 |
| **Federal Tax** | | $0.00 |
| **Paid Today** | $999.90 | |
| **Shipment Total** | | $999.90 |

**Order Comment:**

**Return Policy**
You can use the enclosed return label to exchange/refund one device per purchase up to 14 days from shipping date of device;
Corporate Responsibility Users (CRU's) under an AT&T business agreement have up to 30 days to return devices other than tablets.



# Order Confirmation

Page:  1

**Billing Address:**
DF FirstNet WMS Order Type

12735 MORRIS ROAD

BLDG 200 STE 30
ALPHARETTA, GA  30004

**Shipping Address:**
DC OFFICE OF THE CHIEF
TECHNOLOGY Office
1901 D ST SE
DC Dept. of Corrections Central
Detenti
PONTI ANDREWS - RTS 10047
WASHINGTON, DC  20003-2534

**WMS Order#:** 587640300
**Invoice#:** 587640300
**Your Order#:** 55-675000001203455
**Customer PO#:** N101-OY-456741

**Entry Date:** 05/01/2020
**Picked:** 05/04/2020
**Ship ID:** 660902840

| Item# | Description | Phone # | QtyOrd | Qty Back Ord | ShipQty | Taxable Unit Value | Unit Price | Total Price |
|---|---|---|---|---|---|---|---|---|
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2025772117 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2026151845 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2025683486 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2026150390 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2025507097 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2026000350 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2026000585 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2025529446 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2025682568 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |



# Order Confirmation

Page:  2

| Item# | Description | Phone # | QtyOrd | Qty Back Ord | ShipQty | Taxable Unit Value | Unit Price | Total Price |
|---|---|---|---|---|---|---|---|---|
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2025529642 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2025683532 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2025529893 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2025683083 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2026000432 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2025772759 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2026150588 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2026151802 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2025772313 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2025507923 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2025682918 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2026150342 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2025772347 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2026000736 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |



# Order Confirmation

Page: 3

| Item# | Description | Phone # | QtyOrd | Qty Back Ord | ShipQty | Taxable Unit Value | Unit Price | Total Price |
|-------|-------------|---------|--------|--------------|---------|--------------------|-----------|-------------|
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2025509215 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2025683469 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2026150659 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2025508675 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2026150174 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2026001085 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2025683607 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2025682063 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2026151851 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2025682110 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2025772887 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2026150287 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2025772685 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2025682371 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |



# Order Confirmation

Page: 4

| Item# | Description | Phone # | QtyOrd | Qty Back Ord | ShipQty | Taxable Unit Value | Unit Price | Total Price |
|-------|-------------|---------|--------|--------------|---------|--------------------|-----------|-----------|
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2025772960 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2026001473 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6376B | SIM VAR FIRSTNET TRIO FIRSTNET | 2026152365 | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 6402B | PHO SON XP5S XP5800 BLK | 2025507923 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2026151845 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2025683486 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2026150390 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2025507097 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2026000350 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2026000585 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2025529446 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2025682568 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2025529893 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2025529642 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2025683532 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2025683083 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2026000432 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |



# Order Confirmation

Page: 5

| Item# | Description | Phone # | QtyOrd | Qty Back Ord | ShipQty | Taxable Unit Value | Unit Price | Total Price |
|---|---|---|---|---|---|---|---|---|
| 6402B | PHO SON XP5S XP5800 BLK | 2025772759 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2026150588 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2026151802 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2025772313 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2025682918 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2026150342 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2025772347 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2026000736 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2025509215 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2025683469 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2026150659 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2025508675 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2025683607 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2026150174 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2026001085 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2025682063 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |



# Order Confirmation

Page: 6

| Item# | Description | Phone # | QtyOrd | Qty Back Ord | ShipQty | Taxable Unit Value | Unit Price | Total Price |
|---|---|---|---|---|---|---|---|---|
| | STICKER | | | | | | | |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |



# Order Confirmation

Page:  7

| Item# | Description | Phone # | QtyOrd | Qty Back Ord | ShipQty | Taxable Unit Value | Unit Price | Total Price |
|-------|-------------|---------|--------|--------------|---------|--------------------|------------|-------------|
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |



# Order Confirmation

Page:  8

| Item# | Description | Phone # | QtyOrd | Qty Back Ord | ShipQty | Taxable Unit Value | Unit Price | Total Price |
|---|---|---|---|---|---|---|---|---|
| | STICKER | | | | | | | |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84671 | COL FIRSTNET STICKER | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |



# Order Confirmation

| Item# | Description | Phone # | QtyOrd | Qty Back Ord | ShipQty | Taxable Unit Value | Unit Price | Total Price |
|---|---|---|---|---|---|---|---|---|
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |



# Order Confirmation

Page: 10

| Item# | Description | Phone # | QtyOrd | Qty Back Ord | ShipQty | Taxable Unit Value | Unit Price | Total Price |
|---|---|---|---|---|---|---|---|---|
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |



# Order Confirmation

Page:   11

| Item# | Description | Phone # | QtyOrd | Qty Back Ord | ShipQty | Taxable Unit Value | Unit Price | Total Price |
|-------|-------------|---------|--------|--------------|---------|--------------------|-----------|-------------|
| 84683 | COL WELCOMELETTER ALL FN SUB T | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |

**Payment Method**

BTM                    $3,999.60

| | |
|---|---|
| **Shipping Sub Total** | |
| ***Down Payment** | $0.00 |
| **Amount Financed** $0.00 | |
| **Other Charges** | $3,999.60 |
| **Sales Tax** | $0.00 |
| **Federal Tax** | $0.00 |

**Paid Today**              $3,999.60

**Shipment Total**                        $2,999.70

**Order Comment:**

**Return Policy**

You can use the enclosed return label to exchange/refund one device per purchase up to 14 days from shipping date of device;

Corporate Responsibility Users (CRU's) under an AT&T business agreement have up to 30 days to return devices other than tablets.



# FIRSTNET™
## Built with AT&T

# Order Confirmation

Page:  1

**Billing Address:**
DF FirstNet WMS Order Type

12735 MORRIS ROAD

BLDG 200 STE 30
ALPHARETTA, GA  30004

**Shipping Address:**
DC OFFICE OF THE CHIEF
TECHNOLOGY Office
1901 D ST SE
DC Dept. of Corrections Central
Detenti
PONTI ANDREWS - RTS 10047
WASHINGTON, DC  20003-2534

**WMS Order#:** 587640300
**Invoice#:** 587640300
**Your Order#:** 55-675000001203455
**Customer PO#:** N101-OY-456741

**Entry Date:** 05/01/2020
**Picked:** 05/04/2020
**Ship ID:** 660902840

| Item# | Description | Phone # | QtyOrd | Qty Back Ord | ShipQty | Taxable Unit Value | Unit Price | Total Price |
|-------|-------------|---------|--------|--------------|---------|---------------------|------------|-------------|
| 6402B | PHO SON XP5S XP5800 BLK | 2026151851 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2025682110 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2025772887 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2026150287 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2025772685 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2025682371 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2025772960 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2025772117 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 6402B | PHO SON XP5S XP5800 BLK | 2026001473 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |

 **FIRST**NET™

Built with AT&T

# Order Confirmation

Page: 2

| Item# | Description | Phone # | QtyOrd | Qty Back Ord | ShipQty | Taxable Unit Value | Unit Price | Total Price |
|---|---|---|---|---|---|---|---|---|
| 6402B | PHO SON XP5S XP5800 BLK | 2026152365 | 1 | 0 | 1 | $0.00 | $99.99 | $99.99 |
| 88879 | PRIORITY FREIGHT TAXED | | 1 | 0 | 1 | $0.00 | $0.00 | $0.00 |

**Payment Method**

$0.00

| | | |
|---|---|---|
| Shipping Sub Total | | |
| *Down Payment | | $0.00 |
| Amount Financed | $0.00 | |
| Other Charges | | $0.00 |
| Sales Tax | | $0.00 |
| Federal Tax | | $0.00 |

**Paid Today**  $0.00

**Shipment Total**  $999.90

**Order Comment:**

**Return Policy**

You can use the enclosed return label to exchange/refund one device per purchase up to 14 days from shipping date of device;

Corporate Responsibility Users (CRU's) under an AT&T business agreement have up to 30 days to return devices other than tablets.

## PROOF-OF-DELIVERY – VENDOR ACKNOWLEDGEMENT/ACCEPTENCE FORM

| Vendor Name | TECKNOMIC |
|---|---|
| Vendor Address | 1725 I Street, N.W., Suite 300, WASHINGTON DC 20006 |
| Vendor Phone Number | 202-829-2953 |

| Phone Number (10 Digit): | SAN Number: O-2005-FL001-03-71 |
|---|---|
| RTS Number: 100561 | 22Quantity: |
| ATC Name & Number:  PONTI ANDREWS | Serial Number: |
| Site Contact: | Model Number: |
| Site Location: | |

## Order Information and Details:

Please provide specific remarks regarding the work performed
or the equipment and devices delivered regarding this order.

Request for 50 Retro Bluetooth Handsets Tecknomic Quote 1041 Please Ship equipment to: Ponti Andrews - ATC DC Dept. of Corrections Central Detention Facility 1901 D St. SE Washington, DC 20003 202-52 3- 7100

### *I certify the above information is accurate:*
**(Technician or Company Representative)**

| _____ _____ | _____ | . ____ / /20 ____ |
|---|---|---|
| (Printed Name) | (Signature) | (Date) |

**Government Acceptance:**   **(Authorized Government Representative)**

| Banon Hsu | _____ | o9 13ᵈ/20 20 |
|---|---|---|
| (Printed Name) | (Signature) | (Date) |

Comments: _____
_____

**Ex 6**

U.S. Department of Justice
United States Marshals Service

## Prisoner in Transit Medical Summary

**1. IDENTIFYING INFORMATION**

Name (Last, First, MI): ██████████

Age: █   Gender: ████   DOB: ████████

USMS #: ████   Departure Date: 10/26/2020

Departed From: DC-DOC

Designated To: USMS

Mode of Transport (Check all that apply): ☐ Air   ☐ Ground

**3. CURRENT MEDICAL ISSUES**

Check all that apply to the prisoner and explain in the comments section:

☐ Hospitalizations within past month
☐ Seizure activity within past month
☐ Seizure disorder requiring medications
☐ Limited mobility (crutches, wheelchair)
☐ Has hard or air cast, splint or brace
☐ Prescription narcotic pain medications dispensed for travel
☐ Suicide watch/psychiatric decompensation within past month

☐ Contagious illness or quarantine within past month
☐ Cardiac chest pain within past month
☐ Stroke within past month
☐ Surgery within past month
☐ Diabetes requiring insulin or other medications

FEMALE PRISONERS: Is prisoner pregnant?

☐ NO   ☐ YES   If yes, how many weeks? N/A

**5. LIST ALLERGIES (Include drugs, foods, latex, etc.):**

NKDA

**2. TUBERCULOSIS SCREENING**

Tuberculosis Skin Test (TST) / PPD:

| Date Placed: | Date Read: | Size in mm: |
|---|---|---|
| 10-23-2020 | 10-25-2020 | 0mm |

Tuberculosis Blood Test / IGRA (if applicable):

☐ Positive   Date:
☐ Negative
☐ Indeterminate / Borderline _____

Chest x-ray done within past year (if indicated):

Date: _____   Results: _____

Prisoner is cleared for transfer:

☐ NO
☒ YES

**4. SICKLE CELL SCREENING**

Prisoner has a history of (check appropriate box):

☐ Sickle Cell Disease
☐ Sickle Cell Trait
☒ No History of Disease or Trait

If prisoner has disease or trait and is traveling by air, has JPATS Sickle Cell Protocol and Clearance been completed?

☐ NO   ☐ YES   Attach clearance to transfer summary

| **6a. OTHER MEDICAL PROBLEMS** | **6b. MEDICATIONS DISPENSED WITH PRISONER FOR TRANSPORT** (Should match medical problem if applicable. Include dosage, route, and frequency.) |
|---|---|
|  |  |

**7. COMMENTS** (If additional space is needed, write on back, attach separate sheet of paper, or check this box to create a second page: ☐ )

MANDATORY SYMPTOM SCREENING FOR COVID-19
PRIOR TO DEPARTURE FROM FACILITY

1. Temperature: 96.8   Date: 10/26/2020   Time: 05:50 PM
2. Complains of feeling feverish:   ☐ Yes   ☒ No
3. Presence of cough:   ☐ Yes   ☒ No
4. Difficulty breathing:   ☐ Yes   ☒ No

If temperature is 100.4F or greater OR answer is "Yes" to ANY other question, the prisoner is NOT CLEARED FOR TRANSFER until evaluated and cleared by a licensed independent practitioner who must complete Section 8 below as the "Certifying Health Authority".

Additional Comments:

*Cleared by MH*
██████████ *LICSW Oct 26, 2020*

**8. CERTIFYING HEALTH AUTHORITY**

...NER IS MEDICALLY CLEARED FOR TRAVEL.

Name (Print): ██████████████

Signature: ██████████████

Title: _____

Date: 10/26/20   Phone Number: ████

Form USM-553
Rev. 03/20

Page ___ of ___

*Not Cleared for Fed. Pending pt is on quarantine.*

**Central Detention Facility**
1901 D Street, SE   Washington, DC 20003
 Fax:

*November 4, 2020*
Page 1
TextNote

Home: 333876

██████████████

Male  DOB: ██████████          ████████

**10/26/2020 - TextNote: / Not Cleared for fed transfer.**
**Provider:** █████████- MD
**Location of Care: Central Detention Facility**

Inmate is not cleared for fed transfer
He is on restrict cell.

**Electronically Signed by** ██████████ **- MD on 10/27/2020 at 4:21 AM**

# APPENDI   B

# App  B, Ex  1

Case 1:20-cv-00849-CKK   Document 138-4   Filed 12/12/20   Page 3 of 40



**CDC** Centers for Disease Control and Prevention
CDC 24/7: Saving Lives, Protecting People™

# Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities

Updated Dec. 3, 2020        Print

This interim guidance is based on what is currently known about the transmission and severity of coronavirus disease 2019 (COVID-19) as of the date of posting, October 7, 2020.

The US Centers for Disease Control and Prevention (CDC) will update this guidance as needed and as additional information becomes available. Please check the CDC website periodically for updated interim guidance.

This document provides interim guidance specific for correctional facilities and detention centers during the outbreak of COVID-19, to ensure continuation of essential public services and protection of the health and safety of incarcerated and detained persons, staff, and visitors. Recommendations may need to be revised as more information becomes available.

**A revision was made 12/3/2020 to reflect the following:**

# COVID-19 (Coronavirus Disease)



**A revision was made 10/21/2020 to reflect the following:**

- Updated language for the close contact definition.

**A revision was made 10/7/2020 to reflect the following:**

- Updated criteria for releasing individuals with confirmed COVID-19 from medical isolation (symptom-based approach).
- Added link to CDC Guidance for Performing Broad-Based Testing for SARS-CoV-2 in Congregate Settings
- Reorganized information on Quarantine into 4 sections: Contact Tracing, Testing Close Contacts, Quarantine Practices, and Cohorted Quarantine for Multiple Close Contacts

**A revision was made 7/14/20 to reflect the following:**

- Added testing and contact tracing considerations for incarcerated/detained persons (including testing newly incarcerated or detained persons at intake; testing close contacts of cases; repeated testing of persons in cohorts of quarantined close contacts; testing before release). Linked to more detailed Interim Considerations for SARS-CoV-2 Testing in Correctional and Detention Facilities.

- Added recommendation to consider testing and a 14-day quarantine for individuals preparing for release or transfer to another facility.

- Added recommendation that confirmed COVID-19 cases may be medically isolated as a cohort. (Suspected cases should be isolated individually.)

- Reduced recommended frequency of symptom screening for quarantined individuals to once per day (from twice per day).

- Added recommendation to ensure that PPE donning/doffing stations are set up directly outside spaces requiring PPE. Train staff to move from areas of lower to higher risk of exposure if they must re-use PPE due to shortages.

- Added recommendation to organize staff assignments so that the same staff are assigned to the same areas of the facility over time, to reduce the risk of transmission through staff movements.

- Added recommendation to suspend work release programs, especially those within other congregate settings, when there is a COVID-19 case in the correctional or detention facility.

- Added recommendation to modify work details so that they only include incarcerated/detained persons from a single housing unit.

- Added considerations for safely transporting individuals with COVID-19 or their close contacts.

- Added considerations for release and re-entry planning in the context of COVID-19.

# Intended Audience

This document is intended to provide guiding principles for healthcare and non-healthcare administrators of correctional and detention facilities (including but not limited to federal and state prisons, local jails, and detention centers), law enforcement agencies that have custodial authority for detained populations (i.e., U.S. Immigration and Customs Enforcement and U.S. Marshals Service), and their respective health departments, to assist in preparing for potential introduction, spread, and mitigation of SARS-CoV-2 (the virus that causes Coronavirus Disease 2019, or COVID-19) in their facilities. In general, the document uses terminology referring to correctional environments but can also be applied to civil and pre-trial detention settings.

This guidance will not necessarily address every possible custodial setting and may not use legal terminology specific to individual agencies' authorities or processes.

**The guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions.** Facilities should contact CDC or their state, local, territorial, and/or tribal public health department if they need assistance in applying these principles or addressing topics that are not specifically covered in this guidance.

This guidance will not necessarily address every possible custodial setting and may not use legal terminology specific to individual agencies' authorities or processes.

Case 1:20-cv-00849-CKK   Document 138-4   Filed 12/12/20   Page 5 of 40

Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities   12/10/20, 6:14 PM

The guidance may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions. Facilities should contact CDC or their state, local, territorial, and/or tribal public health department if they need assistance in applying these principles or addressing topics that are not specifically covered in this guidance.

# Guidance Overview

The guidance below includes detailed recommendations on the following topics related to COVID-19 in correctional and detention settings:

✓ Operational and communications preparations for COVID-19

✓ Enhanced cleaning/disinfecting and hygiene practices

✓ Social distancing strategies to increase space between individuals in the facility

✓ Strategies to limit transmission from visitors

✓ Infection control, including recommended personal protective equipment (PPE) and potential alternatives during PPE shortages

✓ Verbal screening and temperature check protocols for incoming incarcerated/detained individuals, staff, and visitors

✓ Testing considerations for SARS-CoV-2

✓ Medical isolation of individuals with confirmed and suspected COVID-19 and quarantine of close contacts, including considerations for cohorting when individual spaces are limited

✓ Healthcare evaluation for individuals with suspected COVID-19

✓ Clinical care for individuals with confirmed and suspected COVID-19

✓ Considerations for people who are at increased risk for severe illness from COVID-19

# Definitions of Commonly Used Terms

**Close contact of someone with COVID-19** – Someone who was within 6 feet of an infected person for a cumulative total of 15 minutes or more over a 24-hour period* starting from 2 days before illness onset (or, for asymptomatic patients, 2 days prior to test specimen collection) until the time the patient is isolated.

*Individual exposures added together over a 24-hour period (e.g., three 5-minute exposures for a total of 15 minutes). Data are limited, making it difficult to precisely define "close contact;" however, 15 cumulative minutes of exposure at a distance of 6 feet or less can be used as an operational definition for contact investigation. Factors to consider when defining close contact include proximity (closer distance likely increases exposure risk), the duration of exposure (longer exposure time likely increases exposure risk), whether the infected individual has symptoms (the period around onset of symptoms is associated with the highest levels of viral shedding), if the infected person was likely to generate respiratory aerosols (e.g., was coughing, singing, shouting), and other environmental factors (crowding, adequacy of ventilation, whether exposure was indoors or outdoors). Because the general public has not received training on proper selection and use of respiratory PPE, such as an N95, the determination of close contact should generally be made irrespective of whether the contact was wearing respiratory PPE. At this time, differential determination of close contact for those using fabric face coverings is not recommended.*

**Cohorting** – In this guidance, cohorting refers to the practice of isolating multiple individuals with laboratory-confirmed COVID-19 together or quarantining close contacts of an infected person together as a group due to a limited number of individual cells. While cohorting those with confirmed COVID-19 is acceptable, cohorting individuals with suspected COVID-19 is not recommended due to high risk of transmission from infected to uninfected individuals. See Quarantine and Medical Isolation sections below for specific details about ways to implement cohorting as a harm reduction strategy to minimize the risk of disease spread and adverse health outcomes.

**Community transmission of SARS-CoV-2** – Community transmission of SARS-CoV-2 occurs when individuals are exposed to the virus through contact with someone in their local community, rather than through travel to an affected location. When community transmission is occurring in a particular area, correctional facilities and detention centers are more likely to start seeing infections inside their walls. Facilities should consult with local public health departments if assistance is needed to determine how to define "local community" in the context of SARS-CoV-2 spread. However, because all states have reported cases, all facilities should be vigilant for introduction of the virus into their populations.

**Confirmed vs. suspected COVID-19** – A person has **confirmed COVID-19** when they have received a positive result from a COVID-19 viral test (antigen or PCR test) but they may or may not have symptoms. A person has **suspected COVID-19** if they show symptoms of COVID-19 but either have not been tested via a viral test or are awaiting test results. If their test result is positive, suspected COVID-19 is reclassified as confirmed COVID-19.

**Incarcerated/detained persons** – For the purpose of this document, "incarcerated/detained persons" refers to persons held in a prison, jail, detention center, or other custodial setting. The term includes those who have been sentenced (i.e., in prisons) as well as those held for pre-trial (i.e., jails) or civil purposes (i.e., detention centers). Although this guidance does not specifically reference individuals in every type of custodial setting (e.g., juvenile facilities, community confinement facilities), facility administrators can adapt this guidance to apply to their specific circumstances as needed.

**Masks** – Masks cover the nose and mouth and are intended to help prevent people who have the virus from transmitting it to others, even if they do not have symptoms. CDC recommends wearing cloth masks in public settings where social distancing measures are difficult to maintain. Masks are recommended as a simple barrier to help prevent respiratory droplets from traveling into the air and onto other people when the person wearing the mask coughs, sneezes, talks, or raises their voice. This is called source control. If everyone wears a mask in congregate settings, the risk of exposure to SARS-CoV-2 can be reduced. Anyone who has trouble breathing or is unconscious, incapacitated, younger than 2 years of age or otherwise unable to remove the mask without assistance should not wear a mask (for more details see How to Wear Masks). **CDC does not recommend use of masks for source control if they have an exhalation valve or**

vent). Individuals working under conditions that require PPE should not use a cloth mask when a surgical mask or N95 respirator is indicated (see Table 1). Surgical masks and N95 respirators should be reserved for situations where the wearer needs PPE. Detailed recommendations for wearing a mask can be found here.

**Medical isolation** – Medical isolation refers to separating someone with confirmed or suspected COVID-19 infection to prevent their contact with others to reduce the risk of transmission. Medical isolation ends when the individual meets pre-established criteria for release from isolation, in consultation with clinical providers and public health officials. In this context, isolation does NOT refer to punitive isolation for behavioral infractions within the custodial setting. Staff are encouraged to use the term "medical isolation" to avoid confusion, and should ensure that the conditions in medical isolation spaces are distinct from those in punitive isolation.

**Quarantine** – Quarantine refers to the practice of separating individuals who have had close contact with someone with COVID-19 to determine whether they develop symptoms or test positive for the disease. Quarantine reduces the risk of transmission if an individual is later found to have COVID-19. Quarantine for COVID-19 should last for 14 days after the exposure has ended. Ideally, each quarantined individual should be housed in a single cell with solid walls and a solid door that closes. If symptoms develop during the 14-day period, and/or a quarantined individual receives a positive viral test result for SARS-CoV-2, the individual should be placed under medical isolation and evaluated by a healthcare professional. If symptoms do not develop during the 14-day period and the individual does not receive a positive viral test result for SARS-CoV-2, quarantine restrictions can be lifted. (NOTE: Some facilities may also choose to implement a "routine intake quarantine," in which individuals newly incarcerated/detained are housed separately or as a group for 14 days before being integrated into general housing. This type of quarantine is conducted to prevent introduction of SARS-CoV-2 from incoming individuals whose exposure status is unknown, rather than in response to a known exposure to someone infected with SARS-CoV-2.)

* The best way to protect incarcerated/detained persons, staff, and visitors is to quarantine for 14 days. Check your local health department's website for information about options in your area to possibly shorten this quarantine period.

**Social distancing** – Social distancing is the practice of increasing the space between individuals and decreasing their frequency of contact to reduce the risk of spreading a disease (ideally to maintain at least 6 feet between all individuals, even those who are asymptomatic). Social distancing strategies can be applied on an individual level (e.g., avoiding physical contact), a group level (e.g., canceling group activities where individuals would be in close contact), and an operational level (e.g., rearranging chairs in the dining hall to increase distance between them). Social distancing can be challenging to practice in correctional and detention environments; examples of potential social distancing strategies for correctional and detention facilities are detailed in the guidance below. Social distancing is vital for the prevention of respiratory diseases such as COVID-19, especially because people who have been infected with SARS-CoV-2 but do not have symptoms can still spread the infection. Additional information about social distancing, including information on its use to reduce the spread of other viral illnesses, is available in this CDC publication ⬛ [900 KB, 36 pages].

**Staff** – In this document, "staff" refers to all public or private-sector employees (e.g., contracted healthcare or food service workers) working within a correctional facility. Except where noted, "staff" does not distinguish between healthcare, custody, and other types of staff, including private facility operators.

**Symptoms** – Symptoms of COVID-19 include cough, shortness of breath or difficulty breathing, fever, chills, muscle pain, sore throat, and new loss of taste or smell. This list is not exhaustive. Other less common symptoms have been reported, including nausea and vomiting. Like other respiratory infections, COVID-19 can vary in severity from mild to severe, and

Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities | CDC
Case 1:20-cv-00849-CKK Document 138-4 Filed 12/12/20 Page 8 of 40
12/10/20, 6:14 PM

pneumonia, respiratory failure, and death are possible. COVID-19 is a novel disease, therefore the full range of signs and symptoms, the clinical course of the disease, and the individuals and populations at increased risk for severe illness are not yet fully understood. Monitor the CDC website for updates on symptoms.

# Facilities with Limited Onsite Healthcare Services

Although many large facilities such as prisons and some jails employ onsite healthcare staff and have the capacity to evaluate incarcerated/detained persons for potential illness within a dedicated healthcare space, many smaller facilities do not. Some of these facilities have access to on-call healthcare staff or providers who visit the facility every few days. Others have neither onsite healthcare capacity nor onsite medical isolation/quarantine space and must transfer ill patients to other correctional or detention facilities or local hospitals for evaluation and care.

The majority of the guidance below is designed to be applied to any correctional or detention facility, either as written or with modifications based on a facility's individual structure and resources. However, topics related to healthcare evaluation and clinical care of persons with confirmed and suspected COVID-19 infection and their close contacts may not apply directly to facilities with limited or no onsite healthcare services. It will be especially important for these types of facilities to coordinate closely with their state, local, tribal, and/or territorial health department when they identify incarcerated/detained persons or staff with confirmed or suspected COVID-19, in order to ensure effective medical isolation and quarantine, necessary medical evaluation and care, and medical transfer if needed. The guidance makes note of strategies tailored to facilities without onsite healthcare where possible.

Note that all staff in any sized facility, regardless of the presence of onsite healthcare services, should observe guidance on recommended PPE in order to ensure their own safety when interacting with persons with confirmed or suspected COVID-19 infection.

# COVID-19 Guidance for Correctional Facilities

Guidance for correctional and detention facilities is organized into 3 sections: Operational Preparedness, Prevention, and Management of COVID-19. Recommendations across these sections should be applied simultaneously based on the progress of the outbreak in a particular facility and the surrounding community.

- **Operational Preparedness.** This guidance is intended to help facilities prepare for potential SARS-CoV-2 transmission in the facility. Strategies focus on operational and communications planning, training, and personnel practices.
- **Prevention.** This guidance is intended to help facilities prevent spread of SARS-CoV-2 within the facility and between the community and the facility. Strategies focus on reinforcing hygiene practices; intensifying cleaning and disinfection of the facility; regular symptom screening for new intakes, visitors, and staff; continued communication with incarcerated/detained persons and staff; social distancing measures; as well as testing symptomatic and asymptomatic individuals in correctional and detention facilities. Refer to the Interim Guidance on Testing for SARS-CoV-2 in Correctional and Detention Facilities for additional considerations regarding testing in correctional and detention settings.
- **Management.** This guidance is intended to help facilities clinically manage persons with confirmed or suspected COVID-19 inside the facility and prevent further transmission of SARS-CoV-2. Strategies include medical isolation and care of incarcerated/detained persons with COVID-19 (including considerations for cohorting), quarantine and testing of close contacts, restricting movement in and out of the facility, infection control practices for interactions

with persons with COVID-19 and their quarantined close contacts or contaminated items, intensified social distancing, and cleaning and disinfecting areas where infected persons spend time.

# Operational Preparedness

Administrators can plan and prepare for COVID-19 by ensuring that all persons in the facility know the symptoms of COVID-19 and the importance of reporting those symptoms if they develop. Other essential actions include developing contingency plans for reduced workforces due to absences, coordinating with public health and correctional partners, training staff on proper use of personal protective equipment (PPE) that may be needed in the course of their duties, and communicating clearly with staff and incarcerated/detained persons about these preparations and how they may temporarily alter daily life.

# Communication and Coordination

✓ **Develop information-sharing systems with partners.**

- – Identify points of contact in relevant state, local, tribal, and/or territorial public health departments before SARS-CoV-2 infections develop. Actively engage with the health department to understand in advance which entity has jurisdiction to implement public health control measures for COVID-19 in a particular correctional or detention facility.

- – Create and test communications plans to disseminate critical information to incarcerated/detained persons, staff, contractors, vendors, and visitors as the pandemic progresses.

- – Communicate with other correctional facilities in the same geographic area to share information including disease surveillance and absenteeism patterns among staff.

- – Where possible, put plans in place with other jurisdictions to prevent individuals with confirmed or suspected COVID-19 and their close contacts from being transferred between jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, release, or to prevent overcrowding.

- – Stay informed about updates to CDC guidance via the CDC COVID-19 website as more information becomes known.

✓ **Review existing influenza, all-hazards, and disaster plans, and revise for COVID-19.**

- – Train staff on the facility's COVID-19 plan. All personnel should have a basic understanding of COVID-19, how the disease is thought to spread, what the symptoms of the disease are, and what measures are being implemented and can be taken by individuals to prevent or minimize the transmission of SARS-CoV-2.

- – Ensure that **separate** physical locations (dedicated housing areas and bathrooms) have been identified to 1) isolate individuals with confirmed COVID-19 (individually or cohorted), 2) isolate individuals with suspected COVID-19 (individually – do not cohort), and 3) quarantine close contacts of those with confirmed or suspected COVID-19 (ideally individually; cohorted if necessary). The plan should include contingencies for multiple locations if numerous infected individuals and/or close contacts are identified and require medical isolation or quarantine simultaneously. See Medical Isolation and Quarantine sections below for more detailed cohorting considerations.

- – Facilities without onsite healthcare capacity should make a plan for how they will ensure that individuals with

suspected COVID-19 will be isolated, evaluated, tested, and provided necessary medical care.

- − Make a list of possible social distancing strategies that could be implemented as needed at different stages of transmission intensity.
- − Designate officials who will be authorized to make decisions about escalating or de-escalating response efforts as the disease transmission patterns change.

✓ **Coordinate with local law enforcement and court officials.**

- ⊕  − Identify legally acceptable alternatives to in-person court appearances, such as virtual court, as a social distancing measure to reduce the risk of SARS-CoV-2
- − Consider options to prevent overcrowding (e.g., diverting new intakes to other facilities with available capacity, and encouraging alternatives to incarceration and other decompression strategies where allowable).

✓ **Encourage all persons in the facility to take the following actions to protect themselves and others from COVID-19. Post signs throughout the facility and communicate this information verbally on a regular basis. Sample signage and other communications materials are available on the CDC website.** Ensure that materials can be understood by non-English speakers and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf, blind, or have low-vision.

- ⊕  − **For all:**
  - ⊕ Practice good cough and sneeze etiquette: Cover your mouth and nose with your elbow (or ideally with a tissue) rather than with your hand when you cough or sneeze, and throw all tissues in the trash immediately after use.
  - ⊕ Practice good hand hygiene: Regularly wash your hands with soap and water for at least 20 seconds, especially after coughing, sneezing, or blowing your nose; after using the bathroom; before eating; before and after preparing food; before taking medication; and after touching garbage.
  - ⊕ Wear masks, unless PPE is indicated.
  - ⊕ Avoid touching your eyes, nose, or mouth without cleaning your hands first.
  - ⊕ Avoid sharing eating utensils, dishes, and cups.
  - ⊕ Avoid non-essential physical contact.
- − **For incarcerated/detained persons:**
  - ⊕ the importance of reporting symptoms to staff
  - ⊕ Social distancing and its importance for preventing COVID-19
  - ⊕ Purpose of quarantine and medical isolation
- − **For staff:**
  - ⊕ Stay at home when sick
  - ⊕ If symptoms develop while on duty, leave the facility as soon as possible and follow CDC-recommended steps for persons who are ill with COVID-19 symptoms including self-isolating at home, contacting a healthcare provider as soon as possible to determine whether evaluation or testing is needed, and contacting a supervisor.

# Personnel Practices

✓ **Review the sick leave policies of each employer that operates within the facility.**

- – Review policies to ensure that they are flexible, non-punitive, and actively encourage staff not to report to work when sick.
- – Determine which officials will have the authority to send symptomatic staff home.

✓ **Identify duties that can be performed remotely.** Where possible, allowing staff to work from home can be an effective social distancing strategy to reduce the risk of SARS-CoV-2

✓ **Plan for staff absences.** Staff should stay home when they are sick, or they may need to stay home to care for a sick household member or care for children in the event of school and childcare dismissals.

- – Identify critical job functions and plan for alternative coverage.
- – Determine minimum levels of staff in all categories required for the facility to function safely. If possible, develop a plan to secure additional staff if absenteeism due to COVID-19 threatens to bring staffing to minimum levels.
- – Review CDC guidance on safety practices for critical infrastructure workers (including correctional officers, law enforcement officers, and healthcare workers) who continue to work after a potential exposure to SARS-CoV-2.
- – Consider increasing keep on person (KOP) medication orders to cover 30 days in case of healthcare staff shortages.

✓ **Consider offering revised duties to staff who are at increased risk for severe illness from COVID-19.** Persons at increased risk may include older adults and persons of any age with serious underlying medical conditions including lung disease, moderate to severe asthma, heart disease, chronic kidney disease, severe obesity, and diabetes. See CDC's website for a complete list and check regularly for updates as more data become available.

- – Consult with occupational health providers to determine whether it would be allowable to reassign duties for specific staff members to reduce their likelihood of exposure to SARS-CoV-2.

✓ **Make plans in advance for how to change staff duty assignments to prevent unnecessary movement between housing units during a COVID-19**

- – If there are people with COVID-19 inside the facility, it is **essential** for staff members to maintain a consistent duty assignment in the same area of the facility across shifts to prevent transmission across different facility areas.
- – Where feasible, consider the use of telemedicine to evaluate persons with COVID-19 symptoms and other health conditions to limit the movement of healthcare staff across housing units.

✓ **Offer the seasonal influenza vaccine to all incarcerated/detained persons (existing population and new intakes) and staff throughout the influenza season.** Symptoms of COVID-19 are similar to those of influenza. Preventing influenza in a facility can speed the detection of COVID-19 and reduce pressure on healthcare resources.

✓ **Reference the Occupational Safety and Health Administration website** ☐ **for recommendations regarding worker health.**

✓ **Review CDC's guidance for businesses and employers** to identify any additional strategies the facility can use within its role as an employer, or share with others.

# Operations, Supplies, and PPE Preparations

✓ **Ensure that sufficient stocks of hygiene supplies, cleaning supplies, PPE, and medical supplies (consistent with the healthcare capabilities of the facility) are on hand and available and have a plan in place to restock as needed.**

- - Standard medical supplies for daily clinic needs
  - Tissues
  - Liquid or foam soap when possible. If bar soap must be used, ensure that it does not irritate the skin and thereby discourage frequent hand washing. Ensure a sufficient supply of soap for each individual.
  - Hand drying supplies, such as paper towels or hand dryers
  - Alcohol-based hand sanitizer containing at least 60% alcohol (where permissible based on security restrictions)
  - Cleaning supplies, including EPA-registered disinfectants effective against SARS-CoV-2 ☐ , the virus that causes COVID-19
  - Recommended PPE (surgical masks, N95 respirators, eye protection, disposable medical gloves, and disposable gowns/one-piece coveralls). See PPE section and Table 1 for more detailed information, including recommendations for extending the life of all PPE categories in the event of shortages, and when surgical masks are acceptable alternatives to N95s. Visit CDC's website for a calculator to help determine rate of PPE usage.
  - Cloth face masks for source control
  - SARS-CoV-2 specimen collection and testing supplies

✓ **Make contingency plans for possible PPE shortages during the COVID-19 pandemic, particularly for non-healthcare workers.**

- - See CDC guidance optimizing PPE supplies.

✓ **Consider relaxing restrictions on allowing alcohol-based hand sanitizer in the secure setting, where security concerns allow.** If soap and water are not available, CDC recommends cleaning hands with an alcohol-based hand sanitizer that contains at least 60% alcohol. Consider allowing staff to carry individual-sized bottles for their personal hand hygiene while on duty, and place dispensers at facility entrances/exits and in PPE donning/doffing stations.

✓ **Provide a no-cost supply of soap to incarcerated/detained persons, sufficient to allow frequent hand washing.** (See Hygiene section below for additional detail regarding recommended frequency and protocol for hand washing.)

- - Provide liquid or foam soap where possible. If bar soap must be used, ensure that it does not irritate the skin

and thereby discourage frequent hand washing, and ensure that individuals do not share bars of soap.

✓ If not already in place, employers operating within the facility should establish a respiratory protection program as appropriate, to ensure that staff and incarcerated/detained persons are fit-tested for any respiratory protection they will need within the scope of their responsibilities.

✓ Ensure that staff and incarcerated/detained persons are trained to correctly don, doff, and dispose of PPE that they will need to use within the scope of their responsibilities.

- - See Table 1 for recommended PPE for incarcerated/detained persons and staff with varying levels of contact with persons with COVID-19 or their close contacts.
  - Visit CDC's website for PPE donning and doffing training videos and job aids ⬛ [2.9 MB, 3 pages].

✓ Prepare to set up designated PPE donning and doffing areas outside all spaces where PPE will be used. These spaces should include:

- - A dedicated trash can for disposal of used PPE
  - A hand washing station or access to alcohol-based hand sanitizer
  - A poster demonstrating correct PPE donning and doffing procedures

✓ Review CDC and EPA guidance for cleaning and disinfecting of the facility.

# Prevention

Cases of COVID-19 have been documented in all 50 US states. Correctional and detention facilities can prevent introduction of SARS-CoV-2 and reduce transmission if it is already inside by reinforcing good hygiene practices among incarcerated/detained persons, staff, and visitors (including increasing access to soap and paper towels), intensifying cleaning/disinfection practices, and implementing social distancing strategies.

Because many individuals infected with SARS-CoV-2 do not display symptoms, the virus could be present in facilities before infections are identified. Good hygiene practices, vigilant symptom screening, wearing cloth face masks (if not contraindicated), and social distancing are critical in preventing further transmission.

Testing symptomatic and asymptomatic individuals and initiating medical isolation for suspected and confirmed cases and quarantine for close contacts, can help prevent spread of SARS-CoV-2.

# Operations

✓ Stay in communication with partners about your facility's current situation.

- - State, local, territorial, and/or tribal health departments
  - Other correctional facilities

✓ Communicate with the public about any changes to facility operations, including visitation programs.

✓ Limit transfers of incarcerated/detained persons to and from other jurisdictions and facilities unless necessary for medical evaluation, medical isolation/quarantine, clinical care, extenuating security concerns, release, or to prevent overcrowding.

- – If a transfer is absolutely necessary:
  - Perform verbal screening and a temperature check as outlined in the Screening section below, before the individual leaves the facility. If an individual does not clear the screening process, delay the transfer and follow the protocol for suspected COVID-19 infection – including giving the individual a cloth face mask (unless contraindicated), if not already wearing one, immediately placing them under medical isolation, and evaluating them for SARS-CoV-2
  - Ensure that the receiving facility has capacity to properly quarantine or isolate the individual upon arrival.
  - See Transportation section below on precautions to use when transporting an individual with confirmed or suspected COVID-19.

✓ Make every possible effort to modify staff assignments to minimize movement across housing units and other areas of the facility. For example, ensure that the same staff are assigned to the same housing unit across shifts to prevent cross-contamination from units where infected individuals have been identified to units with no infections.

✓ Consider suspending work release and other programs that involve movement of incarcerated/detained individuals in and out of the facility, especially if the work release assignment is in another congregate setting, such as a food processing plant.

✓ Implement lawful alternatives to in-person court appearances where permissible.

✓ Where relevant, consider suspending co-pays for incarcerated/detained persons seeking medical evaluation for possible COVID-19 symptoms, to remove possible barriers to symptom reporting.

✓ Limit the number of operational entrances and exits to the facility.

✓ Where feasible, consider establishing an on-site laundry option for staff so that they can change out of their uniforms, launder them at the facility, and wear street clothes and shoes home. If on-site laundry for staff is not feasible, encourage them to change clothes before they leave the work site, and provide a location for them to do so. This practice may help minimize the risk of transmitting SARS-CoV-2 between the facility and the community.

## Cleaning and Disinfecting Practices

✓ Even if COVID-19 has not yet been identified inside the facility or in the surrounding community, implement intensified cleaning and disinfecting procedures according to the recommendations below. These measures can help prevent spread of SARS-CoV-2 if introduced, and if already present through asymptomatic infections.

✓ **Adhere to CDC recommendations for cleaning and disinfection during the COVID-19 response.** Monitor these recommendations for updates.

- ○ – Visit the CDC website for a tool to help implement cleaning and disinfection.
  - – Several times per day, clean and disinfect surfaces and objects that are frequently touched, especially in common areas. Such surfaces may include objects/surfaces not ordinarily cleaned daily (e.g., doorknobs, light switches, sink handles, countertops, toilets, toilet handles, recreation equipment, kiosks, telephones, and computer equipment).
  - – Staff should clean shared equipment (e.g., radios, service weapons, keys, handcuffs) several times per day and when the use of the equipment has concluded.
  - – Use household cleaners and EPA-registered disinfectants effective against SARS-CoV-2, the virus that causes COVID-19 ⌇ as appropriate for the surface.
  - – Follow label instructions for safe and effective use of the cleaning product, including precautions that should be taken when applying the product, such as wearing gloves and making sure there is good ventilation during use, and around people. Clean according to label instructions to ensure safe and effective use, appropriate product dilution, and contact time. Facilities may consider lifting restrictions on undiluted disinfectants (i.e., requiring the use of undiluted product), if applicable.

✓ **Consider increasing the number of staff and/or incarcerated/detained persons trained and responsible for cleaning common areas to ensure continual cleaning of these areas throughout the day.**

✓ **Ensure adequate supplies to support intensified cleaning and disinfection practices, and have a plan in place to restock rapidly if needed.**

# Hygiene

✓ **Encourage all staff and incarcerated/detained persons to wear a cloth face mask as much as safely possible, to prevent transmission of SARS-CoV-2 through respiratory droplets that are created when a person talks, coughs, or sneezes ("source control").**

- ○ – Provide masks at no cost to incarcerated/detained individuals and launder them routinely.
  - – Clearly explain the purpose of masks and when their use may be contraindicated. Because many individuals with COVID-19 do not have symptoms, it is important for everyone to wear masks in order to protect each other: "My mask protects you, your mask protects me."
  - – Ensure staff know that cloth masks should not be used as a substitute for surgical masks or N95 respirators that may be required based on an individual's scope of duties. Cloth masks are not PPE but are worn to protect others in the surrounding area from respiratory droplets generated by the wearer.
  - – Surgical masks may also be used as source control but should be conserved for situations requiring PPE.

✓ **Reinforce healthy hygiene practices, and provide and continually restock hygiene supplies throughout the facility, including in bathrooms, food preparation and dining areas, intake areas, visitor entries and exits, visitation rooms and waiting rooms, common areas, medical, and staff-restricted areas (e.g., break rooms).**

Case 1:20-cv-00849-CKK   Document 138-4   Filed 12/12/20   Page 16 of 40

Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities / CDC                    12/10/20, 6:14 PM

✓ **Provide incarcerated/detained persons and staff no-cost access to:**

- - **Soap** – Provide liquid or foam soap where possible. If bar soap must be used, ensure that it does not irritate the skin, as this would discourage frequent hand washing, and ensure that individuals are not sharing bars of soap.
  - **Running water, and hand drying machines or disposable paper towels** for hand washing
  - **Tissues** and (where possible) no-touch trash receptacles for disposal
  - Face masks

✓ **Provide alcohol-based hand sanitizer with at least 60% alcohol where permissible based on security restrictions.** Consider allowing staff to carry individual-sized bottles to maintain hand hygiene.

✓ **Communicate that sharing drugs and drug preparation equipment can spread SARS-CoV-2 due to potential contamination of shared items and close contact between individuals.**

# Testing for SARS-CoV-2

Correctional and detention facilities are high-density congregate settings that present unique challenges to implementing testing for SARS-CoV-2, the virus that causes COVID-19. Refer to Testing guidance for details regarding testing strategies in correctional and detention settings.

# Prevention Practices for Incarcerated/Detained Persons

✓ **Provide cloth face masks (unless contraindicated) and perform pre-intake symptom screening and temperature checks for all new entrants in order to identify and immediately place individuals with symptoms under medical isolation. Screening should take place in an outdoor space prior to entry, in the sally port, or at the point of entry into the facility immediately upon entry, before beginning the intake process.** See Screening section below for the wording of screening questions and a recommended procedure to safely perform a temperature check. Staff performing temperature checks should wear recommended PPE (see PPE section below).

- - **If an individual has** symptoms of COVID-19:
    - Require the individual to wear a mask (as much as possible, use cloth masks in order to reserve surgical masks for situations requiring PPE). Anyone who has trouble breathing, or is unconscious, incapacitated or otherwise unable to remove the mask without assistance should not wear a mask.
    - Ensure that staff who have direct contact with the symptomatic individual wear recommended PPE.
    - Place the individual under medical isolation and refer to healthcare staff for further evaluation. (See Infection Control and Clinical Care sections below.)
    - Facilities without onsite healthcare staff should contact their state, local, tribal, and/or territorial health department to coordinate effective medical isolation and necessary medical care. See Transport section and coordinate with the receiving facility.
  - **If an individual is an asymptomatic close contact of someone with COVID-19:**
    - Quarantine the individual and monitor for symptoms at least once per day for 14 days. (See

Quarantine section below.)

- The best way to protect incarcerated/detained persons, staff, and visitors is to quarantine for 14 days. Check your local health department's website for information about options in your area to possibly shorten this quarantine period.
  - Facilities without onsite healthcare staff should contact their state, local, tribal, and/or territorial health department to coordinate effective quarantine and necessary medical care. See Transport section and coordinate with the receiving facility.

✓ **Consider strategies for testing asymptomatic incarcerated/detained persons without known SARS-CoV-2 exposure for early identification of SARS-CoV-2 in the facility.**

**Implement social distancing strategies to increase the physical space between incarcerated/detained persons (ideally 6 feet between all individuals, regardless of symptoms), and to minimize mixing of individuals from different housing units.** Strategies will need to be tailored to the individual space in the facility and the needs of the population and staff. Not all strategies will be feasible in all facilities. Example strategies with varying levels of intensity include:

- **Common areas:**
  - Enforce increased space between individuals in holding cells as well as in lines and waiting areas such as intake (e.g., remove every other chair in a waiting area).
- **Recreation:**
  - Choose recreation spaces where individuals can spread out
  - Stagger time in recreation spaces (clean and disinfect between groups).
  - Restrict recreation space usage to a single housing unit per space (where feasible).
- **Meals:**
  - Stagger meals in the dining hall (one housing unit at a time; clean and disinfect between groups).
  - Rearrange seating in the dining hall so that there is more space between individuals (e.g., remove every other chair and use only one side of the table).
  - Provide meals inside housing units or cells.
- **Group activities:**
  - Limit the size of group activities.
  - Increase space between individuals during group activities.
  - Suspend group programs where participants are likely to be in closer contact than they are in their housing environment.
  - Consider alternatives to existing group activities, in outdoor areas or other areas where individuals can spread out.
- **Housing:**
  - If space allows, reassign bunks to provide more space between individuals, ideally 6 feet or more in all directions. (Ensure that bunks are cleaned thoroughly if assigned to a new occupant.)
  - Arrange bunks so that individuals sleep head to foot to increase the distance between their faces.
  - Minimize the number of individuals housed in the same room as much as possible.

Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities    12/10/20, 6:14 PM

Case 1:20-cv-00849-CKK   Document 138-4   Filed 12/12/20   Page 18 of 40

- Rearrange scheduled movements to minimize mixing of individuals from different housing areas.
- **Work details:**
  - Modify work detail assignments so that each detail includes only individuals from a single housing unit.
- **Medical:**
  - If possible, designate a room near each housing unit to evaluate individuals with COVID-19 symptoms, rather than having them walk through the facility to be evaluated in the medical unit. If this is not feasible, consider staggering individuals' sick call visits.
  - Stagger pill line, or stage pill line within individual housing units.
  - Identify opportunities to implement telemedicine to minimize the movement of healthcare staff across multiple housing units and to minimize the movement of ill individuals through the facility.
  - Designate a room near the intake area to evaluate new entrants who are flagged by the intake symptom screening process before they move to other parts of the facility.

✓ **Note that if group activities are discontinued, it will be important to identify alternative forms of activity to support the mental health of incarcerated/detained persons.**

✓ **Provide up-to-date information about COVID-19 to incarcerated/detained persons on a regular basis.** As much as possible, provide this information in person and allow opportunities for incarcerated/detained individuals to ask questions (e.g., town hall format if social distancing is feasible, or informal peer-to-peer education). Updates should address:

- Symptoms of COVID-19 and its health risks
- Reminders to report COVID-19 symptoms to staff at the first sign of illness
  - Address concerns related to reporting symptoms (e.g., being sent to medical isolation), explain the need to report symptoms immediately to protect everyone, and explain the differences between medical isolation and solitary confinement.
- Reminders to use masks as much as possible
- Changes to the daily routine and how they can contribute to risk reduction

# Prevention Practices for Staff

✓ **When feasible and consistent with security priorities, encourage staff to maintain a distance of 6 feet or more from an individual with COVID-19 symptoms while interviewing, escorting, or interacting in other ways, and to wear recommended PPE if closer contact is necessary.**

✓ **Ask staff to keep interactions with individuals with COVID-19 symptoms as brief as possible.**

✓ **Remind staff to stay at home if they are sick.** Ensure staff are aware that they will not be able to enter the facility if they have symptoms of COVID-19, and that they will be expected to leave the facility as soon as possible if they develop symptoms while on duty.

✓ **Consider strategies for testing asymptomatic staff without known SARS-CoV-2 exposure** for early identification of SARS-CoV-2 in the facility.

Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities    12/10/20, 6:14 PM

Case 1:20-cv-00849-CKK   Document 138-4   Filed 12/12/20   Page 19 of 40

- — Follow guidance from the Equal Employment Opportunity Commission ⬀ when offering testing to staff. **Any time a positive test result is identified, relevant employers should:**
    - Ensure that the individual is rapidly notified, connected to appropriate medical care, and advised how to self-isolate.
    - Inform other staff about their possible exposure in the workplace but should maintain the infected employee's confidentiality as required by the Americans with Disabilities Act ⬀ .

✓ **Perform verbal screening and temperature checks for all staff daily on entry.** See Screening section below for wording of screening questions and a recommended procedure to safely perform temperature checks.

- — In very small facilities with only a few staff, consider self-monitoring or virtual monitoring (e.g., reporting to a central authority via phone).
- — Send staff home who do not clear the screening process, and advise them to follow CDC-recommended steps for persons who are ill with COVID-19 symptoms.

✓ **Provide staff with up-to-date information about COVID-19 and about facility policies on a regular basis,** including:

- — Symptoms of COVID-19 and its health risks
- — Employers' sick leave policy

✓ **If staff develop a fever or other symptoms of COVID-19 while at work,** they should immediately put on a mask (if not already wearing one), inform their supervisor, leave the facility, and follow CDC-recommended steps for persons who are ill with COVID-19 symptoms.

✓ **Staff identified as close contacts of someone with COVID-19 should self-quarantine at home for 14 days, unless a shortage of critical staff precludes quarantine.**

- — Staff identified as close contacts should self-monitor for symptoms and seek testing.
- — Refer to CDC guidelines for further recommendations regarding home quarantine.
- The best way to protect incarcerated/detained persons, staff, and visitors is to quarantine for 14 days. Check your local health department's website for information about options in your area to possibly shorten this quarantine period.
- — **To ensure continuity of operations, critical infrastructure workers (including corrections officers, law enforcement officers, and healthcare staff) may be permitted to continue work following potential exposure to SARS-CoV-2 , provided that they remain *asymptomatic* and additional precautions are implemented to protect them and others.**
    - **Screening:** The facility should ensure that temperature and symptom screening takes place daily before the staff member enters the facility.
    - **Regular Monitoring:** The staff member should self-monitor under the supervision of their employer's occupational health program. If symptoms develop, they should follow CDC guidance on isolation with COVID-19 symptoms.
    - **Wear a Mask:** The staff member should wear a mask (unless contraindicated) at all times while in the workplace for 14 days after the last exposure (if not already wearing one due to universal use of masks).

- **Social Distance:** The staff member should maintain 6 feet between themselves and others and practice social distancing as work duties permit.

- **Disinfect and Clean Workspaces:** The facility should continue enhanced cleaning and disinfecting practices in all areas including offices, bathrooms, common areas, and shared equipment.

✓ **Staff with confirmed or suspected COVID-19 should inform workplace and personal contacts immediately. These staff should be required to meet CDC criteria for ending home isolation before returning to work.** Monitor CDC guidance on discontinuing home isolation regularly, as circumstances evolve rapidly.

# Prevention Practices for Visitors

✓ **Restrict non-essential vendors, volunteers, and tours from entering the facility.**

✓ **If possible, communicate with potential visitors to discourage contact visits in the interest of their own health and the health of their family members and friends inside the facility.**

✓ **Require visitors to wear masks (unless contraindicated), and perform verbal screening and temperature checks for all visitors and volunteers on entry.** See Screening section below for wording of screening questions and a recommended procedure to safely perform temperature checks.

- Staff performing temperature checks should wear recommended PPE.
- Exclude visitors and volunteers who do not clear the screening process or who decline screening.

✓ **Provide alcohol-based hand sanitizer with at least 60% alcohol in visitor entrances, exits, and waiting areas.**

✓ **Provide visitors and volunteers with information to prepare them for screening.**

- Instruct visitors to postpone their visit if they have COVID-19 symptoms.
- If possible, inform potential visitors and volunteers before they travel to the facility that they should expect to be screened for COVID-19 (including a temperature check), and will be unable to enter the facility if they do not clear the screening process or if they decline screening.
- Display signage outside visiting areas explaining the COVID-19 symptom screening and temperature check process. Ensure that materials are understandable for non-English speakers and those with low literacy.

✓ **Promote non-contact visits:**

- Encourage incarcerated/detained persons to limit in-person visits in the interest of their own health and the health of their visitors.
- Consider reducing or temporarily eliminating the cost of phone calls for incarcerated/detained persons.
- Consider increasing incarcerated/detained persons' telephone privileges to promote mental health and reduce exposure from direct contact with community visitors.

✓ **Consider suspending or modifying visitation programs, if legally permissible. For example, provide access to virtual visitation options where available.**

- – If moving to virtual visitation, clean electronic surfaces regularly after each use. (See Cleaning guidance below for instructions on cleaning electronic surfaces.)
- – Inform potential visitors of changes to, or suspension of, visitation programs.
- – Clearly communicate any visitation program changes to incarcerated/detained persons, along with the reasons for them (including protecting their health and their family and community members' health).
- – If suspending contact visits, provide alternate means (e.g., phone or video visitation) for incarcerated/detained individuals to engage with legal representatives, clergy, and other individuals with whom they have legal right to consult.

NOTE: Suspending visitation should only be done in the interest of incarcerated/detained persons' physical health and the health of the general public. Visitation is important to maintain mental health. If visitation is suspended, facilities should explore alternative ways for incarcerated/detained persons to communicate with their families, friends, and other visitors in a way that is not financially burdensome for them.

# Management

If there is an individual with suspected COVID-19 inside the facility (among incarcerated/detained persons, staff, or visitors who have recently been inside), begin implementing Management strategies while test results are pending. Essential Management strategies include placing individuals with suspected or confirmed COVID-19 under medical isolation, quarantining their close contacts, and facilitating necessary medical care, while observing relevant infection control and environmental disinfection protocols and wearing recommended PPE.

Testing symptomatic and asymptomatic individuals (incarcerated or detained individuals and staff) and initiating medical isolation for suspected and confirmed cases and quarantine for close contacts, can help prevent spread of SARS-CoV-2 in correctional and detention facilities. Continue following recommendations outlined in the Preparedness and Prevention sections above.

# Operations

✓ **Coordinate with state, local, tribal, and/or territorial health departments.** When an individual has suspected or confirmed COVID-19, notify public health authorities and request any necessary assistance with medical isolation, evaluation, and clinical care, and contact tracing and quarantine of close contacts. See Medical Isolation, Quarantine and Clinical Care sections below.

✓ **Implement alternate work arrangements deemed feasible in the Operational Preparedness section.**

✓ **Suspend all transfers of incarcerated/detained persons to and from other jurisdictions and facilities (including work release), unless necessary for medical evaluation, medical isolation/quarantine, health care, extenuating security concerns, release, or to prevent overcrowding.**

✓ **Set up PPE donning/doffing stations as described in the Preparation section.**

✓ **If possible, consider quarantining all new intakes for 14 days before they enter the facility's general population** (separately from other individuals who are quarantined due to contact with someone who has COVID-19). This practice is referred to as **routine intake quarantine.**

✓ **Consider testing all newly incarcerated/detained persons before they join the rest of the population in the correctional or detention facility.**

✓ **Minimize interactions between incarcerated/detained persons living in different housing units, to prevent transmission from one unit to another.** For example, stagger mealtimes and recreation times, and consider implementing broad movement restrictions.

✓ **Ensure that work details include only incarcerated/detained persons from a single housing unit, supervised by staff who are normally assigned to the same housing unit.**

  ◦  – If a work detail provides goods or services for other housing units (e.g., food service or laundry), ensure that deliveries are made with extreme caution. For example, have a staff member from the work detail deliver prepared food to a set location, leave, and have a staff member from the delivery location pick it up. Clean and disinfect all coolers, carts, and other objects involved in the delivery.

✓ **Incorporate COVID-19 prevention practices into release planning.**

  ◦  – Consider implementing a release quarantine (ideally in single cells) for 14 days prior to individuals' projected release date.

  • The best way to protect incarcerated/detained persons, staff, and visitors is to quarantine for 14 days. Check your local health department's website for information about options in your area to possibly shorten this quarantine period.

    – Screen all releasing individuals for COVID-19 symptoms and perform a temperature check (see Screening section below.)

      • If an individual does not clear the screening process, follow the protocol for suspected COVID-19 – including giving the individual a mask, if not already wearing one, immediately placing them under medical isolation, and evaluating them for SARS-CoV-2 testing.

      • If the individual is released from the facility before the recommended medical isolation period is complete, discuss release of the individual with state, local, tribal, and/or territorial health departments to ensure safe medical transport and continued shelter and medical care, as part of release planning. Make direct linkages to community resources to ensure proper medical isolation and access to medical care.

      • Before releasing an incarcerated/detained individual who has confirmed or suspected COVID-19, or who is a close contact of someone with COVID-19, contact local public health officials to ensure they are aware of the individual's release and anticipated location. If the individual will be released to a community-based facility, such as a homeless shelter, contact the facility's staff to ensure adequate time for them to prepare to continue medical isolation or quarantine as needed.

✓ **Incorporate COVID-19 prevention practices into re-entry programming.**

  ◦  – Ensure that facility re-entry programs include information on accessing housing, social services, mental health services, and medical care within the context of social distancing restrictions and limited community business

operations related to COVID-19.

- Provide individuals about to be released with COVID-19 prevention information, hand hygiene supplies, and masks.
- Link individuals who need medication-assisted treatment for opioid use disorder to substance use, harm reduction, and/or recovery support systems ☑ . If the surrounding community is under movement restrictions due to COVID-19, ensure that referrals direct releasing individuals to programs that are continuing operations.
- Link releasing individuals to Medicaid enrollment and healthcare resources ☑ , including continuity of care for chronic conditions that may place an individual at increased risk for severe illness from COVID-19.
- When possible, encourage releasing individuals to seek housing options among their family or friends in the community, to prevent crowding in other congregate settings such as homeless shelters. When linking individuals to shared housing, link preferentially to accommodations with the greatest capacity for social distancing.

# Hygiene

✓ Continue to ensure that hand hygiene supplies are well-stocked in all areas of the facility (see above).

✓ Continue to emphasize practicing good hand hygiene and cough etiquette (see above).

# Cleaning and Disinfecting Practices

✓ Continue adhering to recommended cleaning and disinfection procedures for the facility at large (see above)._

✓ Reference specific cleaning and disinfection procedures for areas where individuals with COVID-19 spend time (see below).

# Management of Incarcerated/Detained Persons with COVID-19 Symptoms

NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities without onsite healthcare capacity or without sufficient space for medical isolation should coordinate with local public health officials to ensure that individuals with suspected COVID-19 will be effectively isolated, evaluated, tested (if indicated), and given care.

✓ Staff interacting with incarcerated/detained individuals with COVID-19 symptoms should wear recommended PPE (see Table 1).

✓ If possible, designate a room near each housing unit for healthcare staff to evaluate individuals with COVID-19 symptoms, rather than having symptomatic individuals walk through the facility to be evaluated in the medical unit.

✓ Incarcerated/detained individuals with COVID-19 symptoms should wear a mask (if not already wearing one, and unless contraindicated) and should be placed under medical isolation immediately. See Medical Isolation section below.

✓ Medical staff should evaluate symptomatic individuals to determine whether SARS-CoV-2 testing is indicated. Refer to CDC guidelines for information on evaluation and testing. See Infection Control and Clinical Care sections below as well. Incarcerated/detained persons with symptoms are included in the high-priority group for testing in CDC's recommendations due to the high risk of transmission within congregate settings.

- – If the individual's SARS-CoV-2 test is positive, continue medical isolation. (See Medical Isolation section below.)
- – If the SARS-CoV-2 test is negative, the individual can be returned to their prior housing assignment unless they require further medical assessment or care or if they need to be quarantined as a close contact of someone with COVID-19.

✓ Work with public health or private labs, as available, to access testing supplies or services.

# Medical Isolation of Individuals with Confirmed or Suspected COVID-19

NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities without onsite healthcare capacity, or without sufficient space to implement effective medical isolation, should coordinate with local public health officials to ensure that individuals with confirmed or suspected COVID-19 will be appropriately isolated, evaluated, tested, and given care.

✓ As soon as an individual develops symptoms of COVID-19 or tests positive for SARS-CoV-2 they should be given a mask (if not already wearing one and if it can be worn safely), immediately placed under medical isolation in a separate environment from other individuals, and medically evaluated.

✓ Ensure that medical isolation for COVID-19 is distinct from punitive solitary confinement of incarcerated/detained individuals, both in name and in practice.

Because of limited individual housing spaces within many correctional and detention facilities, infected individuals are often placed in the same housing spaces that are used for solitary confinement. To avoid being placed in these conditions, incarcerated/detained individuals may be hesitant to report COVID-19 symptoms, leading to continued transmission within shared housing spaces and, potentially, lack of health care and adverse health outcomes for infected individuals who delay reporting symptoms. Ensure that medical isolation is *operationally* distinct from solitary confinement, even if the same housing spaces are used for both. For example:

- Ensure that individuals under medical isolation receive regular visits from medical staff and have access to mental health services.
- Make efforts to provide similar access to radio, TV, reading materials, personal property, and commissary as would be available in individuals' regular housing units.
- Consider allowing increased telephone privileges without a cost barrier to maintain mental health and connection with others while isolated.

- Communicate regularly with isolated individuals about the duration and purpose of their medical isolation period.

✓ **Keep the individual's movement outside the medical isolation space to an absolute minimum.**

- – Provide medical care to isolated individuals inside the medical isolation space, unless they need to be transferred to a healthcare facility. See Infection Control and Clinical Care sections for additional details.
  - – Serve meals inside the medical isolation space.
  - – Exclude the individual from all group activities.
  - – Assign the isolated individual(s) a dedicated bathroom when possible. When a dedicated bathroom is not feasible, do not reduce access to restrooms or showers as a result. Clean and disinfect areas used by infected individuals frequently on an ongoing basis during medical isolation.

✓ **Ensure that the individual is wearing a mask if they must leave the medical isolation space for any reason, and whenever another individual enters.** Provide clean masks as needed. Masks should be washed routinely and changed when visibly soiled or wet.

✓ **If the facility is housing individuals with confirmed COVID-19 as a cohort:**

- – **Only individuals with laboratory-confirmed COVID-19 should be placed under medical isolation as a cohort. Do not cohort those with confirmed COVID-19 with those with suspected COVID-19, with close contacts of individuals with confirmed or suspected COVID-19, or with those with undiagnosed respiratory infection who do not meet the criteria for suspected COVID-19.**
  - – Ensure that cohorted groups of people with confirmed COVID-19 wear masks whenever anyone else (including staff) enters the isolation space. (Anyone who has trouble breathing, or is unconscious, incapacitated or otherwise unable to remove the mask without assistance should not wear a mask.)
  - – When choosing a space to cohort groups of people with confirmed COVID-19, use a well-ventilated room with solid walls and a solid door that closes fully.
  - – Use one large space for cohorted medical isolation rather than several smaller spaces. This practice will conserve PPE and reduce the chance of cross-contamination across different parts of the facility.

✓ **If possible, avoid transferring infected individual(s) to another facility unless necessary for medical care. If transfer is necessary, see** Transport **section for safe transport guidance.**

✓ **Staff assignments to isolation spaces should remain as consistent as possible, and these staff should limit their movements to other parts of the facility as much as possible.** These staff should wear recommended PPE as appropriate for their level of contact with the individual under medical isolation (see PPE section below) and should limit their own movement between different parts of the facility.

- – If staff must serve multiple areas of the facility, ensure that they change PPE when leaving the isolation space. If a shortage of PPE supplies necessitates reuse, ensure that staff move only from areas of low to high exposure risk while wearing the same PPE, to prevent cross-contamination. For example, start in a housing unit where no one is known to be infected, then move to a space used as quarantine for close contacts, and end in an isolation unit. Ensure that staff are highly trained in infection control practices, including use of recommended PPE.

✓ **Provide individuals under medical isolation with tissues and, if permissible, a lined no-touch trash receptacle.** Instruct them to:

- **Cover** their mouth and nose with a tissue when they cough or sneeze
- **Dispose** of used tissues immediately in the lined trash receptacle
- Wash hands immediately with soap and water for at least 20 seconds. If soap and water are not available, clean hands with an alcohol-based hand sanitizer that contains at least 60% alcohol (where security concerns permit). Ensure that hand washing supplies are continually restocked.

✓ **Maintain medical isolation at least until CDC criteria for discontinuing home-based isolation have been met. These criteria have changed since CDC corrections guidance was originally issued and may continue to change as new data become available. Monitor the sites linked below regularly for updates.** This content will not be outlined explicitly in this document due to the rapid pace of change.

- CDC's recommended strategy for release from home-based isolation can be found in the *Discontinuation of Isolation for Persons with COVID-19 Not in Healthcare Settings Interim Guidance*.
- Detailed information about the data informing the symptom-based strategy, and considerations for extended isolation periods for persons in congregate settings including corrections, can be found here.
- If persons will require ongoing care by medical providers, discontinuation of transmission-based precautions (PPE) should be based on similar criteria found here.

# Cleaning Spaces where Individuals with COVID-19 Spend Time

✓ **Ensure that staff and incarcerated/detained persons performing cleaning wear recommended PPE.** (See PPE section below.)

✓ **Thoroughly and frequently clean and disinfect all areas where individuals with confirmed or suspected COVID-19 spend time.**

- After an individual has been medically isolated for COVID-19, close off areas that they have used prior to isolation. If possible, open outside doors and windows to increase air circulation in the area. Wait as long as practical, up to 24 hours under the poorest air exchange conditions (consult CDC Guidelines for Environmental Infection Control in Health-Care Facilities for wait time based on different ventilation conditions) before beginning to clean and disinfect, to minimize potential for exposure to respiratory droplets.
- Clean and disinfect all areas (e.g., cells, bathrooms, and common areas) used by the infected individual, focusing especially on frequently touched surfaces (see list above in Prevention section).
- Clean and disinfect areas used by infected individuals on an ongoing basis during medical isolation.

✓ **Hard (non-porous) surface cleaning and disinfection**

- If surfaces are soiled, they should be cleaned using a detergent or soap and water prior to disinfection.
- Consult the list of products that are EPA-approved for use against the virus that causes COVID-19 ☑ . Follow the manufacturer's instructions for all cleaning and disinfection products (e.g., concentration, application method and contact time, etc.).

- If EPA-approved disinfectants are not available, diluted household bleach solutions can be used if appropriate for the surface. Unexpired household bleach will be effective against coronaviruses when properly diluted.
  - Use bleach containing 5.25%–8.25% sodium hypochlorite. Do not use a bleach product if the percentage is not in this range or is not specified.
  - Follow the manufacturer's application instructions for the surface, ensuring a contact time of at least 1 minute.
  - Ensure proper ventilation during and after application.
  - Check to ensure the product is not past its expiration date.
  - Never mix household bleach with ammonia or any other cleanser. This can cause fumes that may be very dangerous to breathe in.
- Prepare a bleach solution by mixing:
  - 5 tablespoons (1/3rd cup) of 5.25%–8.25% bleach per gallon of room temperature water

    OR
  - 4 teaspoons of 5.25%–8.25% bleach per quart of room temperature water
- Bleach solutions will be effective for disinfection up to 24 hours.
- Alcohol solutions with at least 70% alcohol may also be used.

✓ **Soft (porous) surface cleaning and disinfection**

- For soft (porous) surfaces such as carpeted floors and rugs, remove visible contamination if present and clean with appropriate cleaners indicated for use on these surfaces. After cleaning:
  - If the items can be laundered, launder items in accordance with the manufacturer's instructions using the warmest appropriate water setting for the items and then dry items completely.
  - Otherwise, use products that are EPA-approved for use against the virus that causes COVID-19 ⬀ and are suitable for porous surfaces.

✓ **Electronics cleaning and disinfection**

- For electronics such as tablets, touch screens, keyboards, and remote controls, remove visible contamination if present.
  - Follow the manufacturer's instructions for all cleaning and disinfection products.
  - Consider use of wipeable covers for electronics.
  - If no manufacturer guidance is available, consider the use of alcohol-based wipes or spray containing at least 70% alcohol to disinfect touch screens. Dry surfaces thoroughly to avoid pooling of liquids.

Additional information on cleaning and disinfection of communal facilities such can be found on CDC's website.

✓ **Food service items.** Individuals under medical isolation should throw disposable food service items in the trash in their medical isolation room. Non-disposable food service items should be handled with gloves and washed following food safety requirements. Individuals handling used food service items should clean their hands immediately after removing gloves.

✓ **Laundry from individuals with COVID-19 can be washed with other's laundry.**

- Individuals handling laundry from those with COVID-19 should wear a mask, disposable gloves, and a gown, discard after each use, and clean their hands immediately after.
- Do not shake dirty laundry. This will minimize the possibility of dispersing virus through the air. Ensure that individuals performing cleaning wear recommended PPE (see PPE section below).
- Launder items as appropriate in accordance with the manufacturer's instructions. If possible, launder items using the warmest appropriate water setting for the items and dry items completely.
- Clean and disinfect clothes hampers according to guidance above for surfaces. If permissible, consider using a bag liner that is either disposable or can be laundered.

# Transporting Individuals with Confirmed and Suspected COVID-19 and Quarantined Close Contacts

✓ Refer to CDC guidance for Emergency Medical Services (EMS) on safely transporting individuals with confirmed or suspected COVID-19. This guidance includes considerations for vehicle type, air circulation, communication with the receiving facility, and cleaning the vehicle after transport.

- If the transport vehicle is not equipped with the features described in the EMS guidance, at minimum drive with the windows down and ensure that the fan is set to high, in non-recirculating mode. If the vehicle has a ceiling hatch, keep it open.

✓ Use the same precautions when transporting individuals under quarantine as close contacts of someone with COVID-19.

✓ See Table 1 for the recommended PPE for staff transporting someone with COVID-19.

# Managing Close Contacts of Individuals with COVID-19

NOTE: Some recommendations below apply primarily to facilities with onsite healthcare capacity. Facilities without onsite healthcare capacity or without sufficient space to implement effective quarantine should coordinate with local public health officials to ensure that close contacts of individuals with COVID-19 will be effectively quarantined and medically monitored

## Contact Tracing

✓ To determine who is considered a close contact of an individual with COVID-19, see definition of close contact and the Interim Guidance on Developing a COVID-19 Case Investigation and Contact Tracing Plan [12 Kb, 1 page] for more information.

✓ Contact tracing can be a useful tool to help contain disease outbreaks. When deciding whether to perform contact tracing, consider the following:

- Have a plan in place for how close contacts of individuals with COVID-19 will be managed, including quarantine logistics.

Contact tracing can be especially impactful when:

Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities | CDC    12/10/20, 6:14 PM

Case 1:20-cv-00849-CKK   Document 138-4   Filed 12/12/20   Page 29 of 40

- There is a small number of infected individuals in the facility or in a particular housing unit. Aggressively tracing close contacts can help curb transmission before many other individuals are exposed.
- The infected individual is a staff member or an incarcerated/detained individual who has had close contact with individuals from other housing units or with other staff. Identifying those close contacts can help prevent spread to other parts of the facility.
- The infected individual is a staff member or an incarcerated/detained individual who has recently visited a community setting. In this situation, identifying close contacts can help reduce transmission from the facility into the community.

- Contact tracing may be more feasible and effective in settings where incarcerated/detained individuals have limited contact with others (e.g., celled housing units), compared to settings where close contact is frequent and relatively uncontrolled (e.g., open dormitory housing units).
- If there is a large number of individuals with COVID-19 in the facility, contact tracing may become difficult to manage. Under such conditions, consider broad-based testing in order to identify infections and prevent further transmission.
- Consult CDC recommendations for Performing Broad-Based Testing for SARS-CoV-2 in Congregate Settings for further information regarding selecting a testing location, ensuring proper ventilation and PPE usage, setting up testing stations and supplies, and planning test-day operations.

## Testing Close Contacts

✓ Testing is recommended for all close contacts [12 KB, 1 page] of persons with SARS-CoV-2 infection, regardless of whether the close contacts have symptoms.

- - Medically isolate those who test positive to prevent further transmission (see Medical Isolation section above).
  - Asymptomatic close contacts testing negative should be placed under quarantine precautions for 14 days from their last exposure.

## Quarantine for Close Contacts (who test negative)

✓ Incarcerated/detained persons who are close contacts of someone with confirmed or suspected COVID-19 (whether the infected individual is another incarcerated/detained person, staff member, or visitor) should be placed under quarantine for 14 days. (Refer to the Interim Guidance on Developing a COVID-19 Case Investigation and Contact Tracing Plan [12 KB, 1 page] for more information):

- - If a quarantined individual is tested again during quarantine and they remain negative, they should continue to quarantine for the full 14 days after last exposure and follow all recommendations of local public health authorities.
  - If an individual is quarantined due to contact with someone with suspected COVID-19 who is subsequently tested and receives a negative result, they can be released from quarantine. See Interim Guidance on Testing for SARS-CoV-2 in Correctional and Detention Facilities for more information about testing strategies in correctional and detention settings.

- The best way to protect incarcerated/detained persons, staff, and visitors is to quarantine for 14 days. Check your local health department's website for information about options in your area to possibly shorten this quarantine period.

Case 1:20-cv-00849-CKK   Document 138-4   Filed 12/12/20   Page 30 of 40

✓ **Quarantined individuals should be monitored for COVID-19 symptoms at least once per day including temperature checks.**

- — See Screening section for a procedure to perform temperature checks safely on asymptomatic close contacts of someone with COVID-19.
- — If an individual develops symptoms for SARS-CoV-2, they should be considered a suspected COVID-19 case, given a mask (if not already wearing one), and moved to medical isolation immediately (individually, and separately from those with confirmed COVID-19 and others with suspected COVID-19) and further evaluated. (See Medical Isolation section above.) If the individual is tested and receives a positive result, they can then be cohorted with other individuals with confirmed COVID-19.

✓ **Quarantined individuals can be released from quarantine restrictions if they have not developed COVID-19 symptoms and have not tested positive for SARS-CoV-2 for 14 days since their last exposure to someone who tested positive.**

✓ **Keep a quarantined individual's movement outside the quarantine space to an absolute minimum.**

- — Provide medical evaluation and care inside or near the quarantine space when possible.
- — Serve meals inside the quarantine space.
- — Exclude the quarantined individual from all group activities.
- — Assign the quarantined individual a dedicated bathroom when possible. When providing a dedicated bathroom is not feasible, do not reduce access to restrooms or showers as a result.

✓ **Restrict quarantined individuals from leaving the facility (including transfers to other facilities) during the 14-day quarantine period, unless released from custody or a transfer is necessary for medical care, infection control, lack of quarantine space, or extenuating security concerns.**

✓ **If a quarantined individual leaves the quarantine space for any reason, they should wear a mask (unless contraindicated) as source control, if not already wearing one.**

- — Quarantined individuals housed as a cohort should wear masks at all times (see cohorted quarantine section below).
- — Quarantined individuals housed alone should wear a mask whenever another individual enters the quarantine space.
- — Anyone who has trouble breathing, or is unconscious, incapacitated or otherwise unable to remove the mask without assistance should not wear a mask.

✓ **Meals should be provided to quarantined individuals in their quarantine spaces.** Individuals under quarantine should throw disposable food service items in the trash. Non-disposable food service items should be handled with gloves and washed with hot water or in a dishwasher. Individuals handling used food service items should clean their hands immediately after removing gloves.

✓ **Laundry from quarantined individuals can be washed with others' laundry.**

- ‣ Individuals handling laundry from quarantined persons should wear a mask, disposable gloves, and a gown, discard after each use, and clean their hands immediately after.
  - ‣ Do not shake dirty laundry. This will minimize the possibility of dispersing virus through the air.
  - ‣ Launder items as appropriate in accordance with the manufacturer's instructions. If possible, launder items using the warmest appropriate water setting for the items and dry items completely.
  - ‣ Clean and disinfect clothes hampers according to guidance above for surfaces. If permissible, consider using a bag liner that is either disposable or can be laundered.

✓ **Staff assignments to quarantine spaces should remain as consistent as possible, and these staff should limit their movements to other parts of the facility.** These staff should wear recommended PPE based on their level of contact with the individuals under quarantine (see PPE section below).

- ‣ If staff must serve multiple areas of the facility, ensure that they change PPE when leaving the quarantine space. If a shortage of PPE supplies necessitates reuse, ensure that staff move only from areas of low to high exposure risk while wearing the same PPE, to prevent cross-contamination.
  - ‣ Staff supervising asymptomatic incarcerated/detained persons under routine intake quarantine (with no known exposure to someone with COVID-19) do not need to wear PPE but should still wear a mask as source control.

# Cohorted Quarantine for Multiple Close Contacts (who test negative)

✓ **Facilities should make every possible effort to individually quarantine close contacts of individuals with confirmed or suspected COVID-19.** Cohorting multiple quarantined close contacts could transmit SARS-CoV-2 from those who are infected to those who are uninfected. Cohorting should only be practiced if there are no other available options.

✓ **In order of preference, multiple quarantined individuals should be housed:**

- ‣ **IDEAL:** Separately, in single cells with solid walls (i.e., not bars) and solid doors that close fully
  - ‣ Separately, in single cells with solid walls but without solid doors
  - ‣ As a cohort, in a large, well-ventilated cell with solid walls, a solid door that closes fully, and at least 6 feet of personal space assigned to each individual in all directions
  - ‣ As a cohort, in a large, well-ventilated cell with solid walls and at least 6 feet of personal space assigned to each individual in all directions, but without a solid door
  - ‣ As a cohort, in single cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells creating at least 6 feet of space between individuals. (Although individuals are in single cells in this scenario, the airflow between cells essentially makes it a cohort arrangement in the context of COVID-19.)
  - ‣ As a cohort, in multi-person cells without solid walls or solid doors (i.e., cells enclosed entirely with bars), preferably with an empty cell between occupied cells. Employ social distancing strategies related to housing in the Prevention section to maintain at least 6 feet of space between individuals housed in the same cell.
  - ‣ As a cohort, in individuals' regularly assigned housing unit but with no movement outside the unit (if an entire housing unit has been exposed – referred to as "quarantine in place"). Employ social distancing strategies related to housing in the Prevention section above to maintain at least 6 feet of space between individuals.

– Safely transfer to another facility with capacity to quarantine in one of the above arrangements. (See Transport) (NOTE – Transfer should be avoided due to the potential to introduce infection to another facility; proceed only if no other options are available.)

If the ideal choice does not exist in a facility, use the next best alternative as a harm reduction approach.

✓ **If cohorting close contacts is absolutely necessary, be especially mindful of** those who are at increased risk for severe illness from COVID-19. Ideally, they should not be cohorted with other quarantined individuals. If cohorting is unavoidable, make all possible accommodations to reduce exposure for the individuals with increased risk of severe illness. (For example, intensify social distancing strategies for individuals with increased risk.)

✓ **If single cells for isolation (of those with suspected COVID-19) and quarantine (of close contacts) are limited, prioritize them in rank order as follows to reduce the risk of further SARS-CoV-2 transmission and adverse health outcomes:**

- – Individuals with suspected COVID-19 who are at increased risk for severe illness from COVID-19
- – Others with suspected COVID-19
- – Quarantined close contacts of someone with COVID-19 who are themselves at increased risk for severe illness from COVID-19

✓ If a facility must cohort quarantined close contacts, **all cohorted individuals should be monitored closely for symptoms of COVID-19, and those with symptoms should be placed under** medical isolation **immediately.**

✓ **If an individual who is part of a quarantined cohort becomes symptomatic:**

- – **If the individual is tested for SARS-CoV-2 and receives a positive result:** the 14-day quarantine clock for the remainder of the cohort must be reset to 0.
- – **If the individual is tested for SARS-CoV-2 and receives a negative result:** the 14-day quarantine clock for this individual and the remainder of the cohort does not need to be reset. This individual can return from medical isolation to the quarantine cohort for the remainder of the quarantine period as their symptoms and diagnosis allow.
- – **If the individual is not tested for SARS-CoV-2:** the 14-day quarantine clock for the remainder of the cohort must be reset to 0.

✓ **Consider** re-testing **all individuals in a quarantine cohort every 3-7 days, and immediately place those who test positive under medical isolation.** This strategy can help identify and isolate infected individuals early and minimize continued transmission within the cohort.

✓ **Consider testing all individuals quarantined as close contacts of someone with suspected or confirmed COVID-19 at the end of the 14-day quarantine period, before releasing them from quarantine precautions.**

✓ **Do not add more individuals to an existing quarantine cohort after the 14-day quarantine clock has started.** Doing so would complicate the calculation of the cohort's quarantine period, and potentially introduce new sources of infection.

✓ Some facilities may choose to quarantine all new intakes for 14 days before moving them to the facility's general population as a general rule (not because they were exposed to someone with COVID-19). **Under this scenario, do not mix individuals undergoing routine intake quarantine with those who are quarantined due to COVID-19 exposure.**

# Management Strategies for Incarcerated/Detained Persons without COVID-19 Symptoms

✓ **Provide clear information to incarcerated/detained persons about the presence of COVID-19 within the facility, and the need to increase social distancing and maintain hygiene precautions.**

- – As much as possible, provide this information in person and allow opportunities for incarcerated/detained individuals to ask questions (e.g., town hall format if social distancing is feasible, or informal peer-to-peer education).
- – Ensure that information is provided in a manner that can be understood by non-English speaking individuals and those with low literacy, and make necessary accommodations for those with cognitive or intellectual disabilities and those who are deaf or hard-of-hearing, blind, or have low-vision.

✓ **If individuals with COVID-19 have been identified among staff or incarcerated/detained persons anywhere in a facility, consider implementing regular symptom screening and temperature checks in housing units that have *not* yet identified infections, until no additional infections have been identified in the facility for 14 days.** Because some incarcerated/detained persons are hesitant to report symptoms, it is very important to monitor for symptoms closely even though doing so is resource intensive. See Screening section for a procedure to safely perform a temperature check.

✓ **Consider additional options to intensify social distancing within the facility.**

# Management Strategies for Staff

✓ **Provide clear information to staff about the presence of COVID-19 within the facility, and the need to enforce universal use of masks (unless contraindicated) and social distancing and to encourage hygiene precautions.**

- – As much as possible, provide this information in person (if social distancing is feasible) and allow opportunities for staff to ask questions.

✓ **Staff identified as close contacts of someone with COVID-19 should be tested for SARS-CoV-2 and self-quarantine at home for 14 days, unless a shortage of critical staff precludes quarantine of those who are asymptomatic** (see considerations for critical infrastructure workers). Refer to the Interim Guidance on Developing a COVID-19 Case Investigation and Contact Tracing Plan ▣ [12 KB, 1 page] for more information about contact tracing.

- The best way to protect incarcerated/detained persons, staff, and visitors is to quarantine for 14 days. Check your local health department's website for information about options in your area to possibly shorten this quarantine period.

- Close contacts should self-monitor for symptoms and seek testing.
  - Refer to CDC guidelines for further recommendations regarding home quarantine.

✓ **Staff who have confirmed or suspected COVID-19 should meet CDC criteria for** ending home isolation **before returning to work.** Monitor CDC guidance on discontinuing home isolation regularly, as circumstances evolve rapidly.

# Infection Control

Infection control guidance below is applicable to all types of correctional and detention facilities. Individual facilities should assess their unique needs based on the types of exposure staff and incarcerated/detained persons may have with someone with confirmed or suspected COVID-19.

✓ **All individuals who have the potential for direct or indirect exposure to someone with COVID-19 or infectious materials (including body substances; contaminated medical supplies, devices, and equipment; contaminated environmental surfaces; or contaminated air) should follow infection control practices outlined in the** CDC Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings. **Monitor these guidelines regularly for updates.**

- Implement the above guidance as fully as possible within the correctional/detention context. Some of the specific language may not apply directly to healthcare settings within correctional facilities and detention centers, or to facilities without onsite healthcare capacity, and may need to be adapted to reflect facility operations and custody needs.
- Note that these recommendations apply to staff as well as to incarcerated/detained individuals who may come in contact with contaminated materials during the course of their work placement in the facility (e.g., cleaning).

✓ **Staff should exercise caution and wear** recommended PPE **when in contact with individuals showing COVID-19 symptoms.** Contact should be minimized to the extent possible until the infected individual is wearing a mask (if not already wearing one and if not contraindicated) and staff are wearing PPE.

✓ **Refer to** PPE section to determine recommended PPE for individuals in contact with individuals with COVID-19, their close contacts, and potentially contaminated items.

✓ **Remind staff about the importance of limiting unnecessary movements between housing units and through multiple areas of the facility, to prevent cross-contamination.**

✓ **Ensure that staff and incarcerated/detained persons are trained to doff PPE after they leave a space where PPE is required, as needed within the scope of their duties and work details. Ideally, staff should don clean PPE before entering a different space within the facility that also requires PPE.**

- If PPE shortages make it impossible for staff to change PPE when they move between different spaces within the facility, ensure that they are trained to move from areas of low exposure risk ("clean") to areas of higher exposure risk ("dirty") while wearing the same PPE, to minimize the risk of contamination across different parts of the facility.

# Clinical Care for Individuals with COVID-19

✓ **Facilities should ensure that incarcerated/detained individuals receive medical evaluation and treatment at the first signs of COVID-19 symptoms.**

- If a facility is not able to provide such evaluation and treatment, a plan should be in place to safely transfer the individual to another facility or local hospital (including notifying the facility/hospital in advance). See Transport section. The initial medical evaluation should determine whether a symptomatic individual is at increased risk for severe illness from COVID-19. Persons at increased risk may include older adults and persons of any age with serious underlying medical conditions, including chronic kidney disease, serious heart conditions, and Type-2 diabetes. See CDC's website for a complete list and check regularly for updates as more data become available to inform this issue.

- Based on available information, pregnant people seem to have the same risk of COVID-19 as adults who are not pregnant. However, much remains unknown about the risks of COVID-19 to the pregnant person, the pregnancy, and the unborn child. Prenatal and postnatal care is important for all pregnant people, including those who are incarcerated/detained. Visit the CDC website for more information on pregnancy and breastfeeding in the context of COVID-19.

✓ **Staff evaluating and providing care for individuals with confirmed or suspected COVID-19 should follow the CDC Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19) and monitor the guidance website regularly for updates to these recommendations.**

✓ **Healthcare staff should evaluate persons with COVID-19 symptoms and those who are close contacts of someone with COVID-19 in a separate room, with the door closed if possible, while wearing recommended PPE and ensuring that the individual being evaluated is wearing a mask.**

- If possible, designate a room near each housing unit to evaluate individuals with COVID-19 symptoms, rather than having symptomatic individuals walk through the facility to be evaluated in the medical unit.

✓ **Clinicians are strongly encouraged to test for other causes of respiratory illness (e.g., influenza).** However, presence of another illness such as influenza does not rule out COVID-19.

✓ **When evaluating and treating persons with symptoms of COVID-19 who do not speak English, use a language line or provide a trained interpreter when possible.**

# Recommended PPE and PPE Training for Staff and Incarcerated/Detained Persons

✓ **Ensure that all staff (healthcare and non-healthcare) and incarcerated/detained persons who will have contact with infectious materials in their work placements have been trained to correctly don, doff, and dispose of PPE relevant to the level of contact they will have with individuals with confirmed and suspected COVID-19. Ensure strict adherence to OSHA PPE requirements.**

- Ensure that staff and incarcerated/detained persons who require respiratory protection (e.g., N95 respirator)

Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities | CDC    12/10/20, 8:14 PM

Case 1:20-cv-00849-CKK   Document 138-4   Filed 12/12/20   Page 36 of 40

for their work responsibilities have been medically cleared, trained, and fit-tested in the context of an employer's respiratory protection program. If individuals wearing N95 respirators have facial hair, it should not protrude under the respirator seal, or extend far enough to interfere with the device's valve function (see OSHA regulations ☑ ).

- For PPE training materials and posters, visit the CDC website on Protecting Healthcare Personnel.

✓ Ensure that all staff are trained to perform hand hygiene after removing PPE.

✓ Ensure that PPE is readily available where and when needed, and that PPE donning/doffing/disposal stations have been set up as described in the Preparation section.

✓ Recommended PPE for incarcerated/detained individuals and staff in a correctional facility will vary based on the type of contact they have with someone with COVID-19 and their close contacts (see Table 1). Each type of recommended PPE is defined below. As above, note that PPE shortages are anticipated in every category during the COVID-19 response.

- N95 respirator
  N95 respirators should be prioritized when staff anticipate contact with infectious aerosols or droplets from someone with COVID-19. See below for guidance on when surgical masks are acceptable alternatives for N95s. Individuals working under conditions that require an N95 respirator should not use a cloth mask when an N95 is indicated.

- Surgical mask
  Worn to protect the wearer from splashes, sprays, and respiratory droplets generated by others. (NOTE: Surgical masks are distinct from cloth masks, which are not PPE but are worn to protect others in the surrounding area from respiratory droplets generated by the wearer. Individuals working under conditions that require a surgical mask should not use a cloth mask when a surgical mask is indicated.)

- Eye protection
  Goggles or disposable face shield that fully covers the front and sides of the face.

- A single pair of disposable patient examination gloves
  Gloves should be changed if they become torn or heavily contaminated.

- Disposable medical isolation gown or single-use/disposable coveralls, when feasible
  - If custody staff are unable to wear a disposable gown or coveralls because it limits access to their duty belt and gear, ensure that duty belt and gear are disinfected after close contact with an individual with confirmed or suspected COVID-19, and that clothing is changed as soon as possible and laundered. Clean and disinfect duty belt and gear prior to reuse using a household cleaning spray or wipe, according to the product label.
  - If there are shortages of gowns, they should be prioritized for aerosol-generating procedures, activities where splashes and sprays are anticipated, and high-contact activities that provide opportunities for transfer of pathogens to the hands and clothing of the wearer.

✓ Note that shortages of all PPE categories have been seen during the COVID-19 response, particularly for non-healthcare workers. Guidance for optimizing the supply of each category (including strategies to reuse PPE safely) can be found on CDC's website:

- Strategies for optimizing the supply of N95 respirators
    - Based on local and regional situational analysis of PPE supplies, **surgical masks are an acceptable alternative when the supply chain of respirators cannot meet the demand.** During this time, available respirators should be prioritized for staff engaging in activities that would expose them to respiratory aerosols, which pose the highest exposure risk.
  - Strategies for optimizing the supply of surgical masks
    - Reserve surgical masks for individuals who need PPE. Issue cloth masks to incarcerated/detained persons and staff as source control, in order to preserve surgical mask supply (see recommended PPE).

- Strategies for optimizing the supply of eye protection
- Strategies for optimizing the supply of gowns/coveralls
- Strategies for optimizing the supply of disposable medical gloves

# Table 1. Recommended Personal Protective Equipment (PPE) for Incarcerated/Detained Persons and Staff in a Correctional or Detention Facility during the COVID-19 Response

| Classification of Individual Wearing PPE | N95 respirator | Surgical mask | Eye Protection | Gloves | Gown/ Coveralls |
|---|---|---|---|---|---|
| **Incarcerated/Detained Persons** | | | | | |
| Asymptomatic incarcerated/detained persons (under quarantine as close contacts of someone with COVID-19) | Use cloth masks as source control (NOTE: cloth face coverings are NOT PPE and may not protect the wearer. Prioritize cloth masks for source control among all persons who do not meet criteria for N95 or surgical masks, and to conserve surgical masks for situations that require PPE.) | | | | |
| Incarcerated/detained persons who have confirmed or suspected COVID-19, or showing symptoms of COVID-19 | | | | | |
| Incarcerated/detained persons handling laundry or used food service items from someone with COVID-19 or their close contacts | | | | X | X |
| Incarcerated/detained persons cleaning an area where someone with COVID-19 spends time | Additional PPE may be needed based on the product label. See CDC guidelines for more details. | | | X | X |
| **Staff** | | | | | |
| Staff having direct contact with asymptomatic incarcerated/detained persons under | | Surgical mask, eye protection, and gloves as local supply and scope | | | |

| | | | | |
|---|---|---|---|---|
| quarantine as close contacts of someone with COVID-19* (but not performing temperature checks or providing medical care) | of duties allow. | | | |
| Staff performing temperature checks on any group of people (staff, visitors, or incarcerated/detained persons), or providing medical care to asymptomatic quarantined persons | X | X | X | |
| Staff having direct contact with (including transport) or offering medical care to individuals with confirmed or suspected COVID-19 (See CDC infection control guidelines). For recommended PPE for staff performing collection of specimens for SARS-CoV-2 testing see the Standardized procedure for SARS-CoV-2 testing in congregate settings. | X** | X | X | X |
| Staff present during a procedure on someone with confirmed or suspected COVID-19 that may generate infectious aerosols (See CDC infection control guidelines) | X | X | X | X |
| Staff handling laundry or used food service items from someone with COVID-19 or their close contacts | | | X | X |
| Staff cleaning an area where someone with COVID-19 spends time | Additional PPE may be needed based on the product label. See CDC guidelines for more details. | | X | X |

Classification of Individual Wearing PPE

\* A NIOSH-approved N95 respirator is preferred. However, based on local and regional situational analysis of PPE supplies, surgical masks are an acceptable alternative when the supply chain of respirators cannot meet the demand. During this time, available respirators should be prioritized for procedures that are likely to generate respiratory aerosols, which would pose the highest exposure risk to staff.

# Verbal Screening and Temperature Check Protocols for Incarcerated/Detained Persons, Staff, and Visitors

Guidance on Management of Coronavirus Disease 2019 in Correctional and Detention Facilities | CDC
Case 1:20-cv-00849-CKK   Document 138-4   Filed 12/12/20   Page 39 of 40
12/10/20, 6:14 PM

The guidance above recommends verbal screening and temperature checks for incarcerated/detained persons, staff, volunteers, and visitors who enter correctional and detention facilities, as well as incarcerated/detained persons who are transferred to another facility or released from custody. Below, verbal screening questions for COVID-19 symptoms and contact with known cases, and a safe temperature check procedure are detailed.

✓ **Verbal screening for symptoms of COVID-19 and contact with COVID-19 cases should include the following questions:**

- − *Today or in the past 24 hours, have you had any of the following symptoms?*
  - *Fever, felt feverish, or had chills?*
  - *Cough?*
  - *Difficulty breathing?*
- − *In the past 14 days, have you had close contact with a person known to be infected with the novel coronavirus (COVID-19)?*

✓ **The following is a protocol to safely check an individual's temperature:**

- − Wash hands with soap and water for at least 20 seconds. If soap and water are not available, use hand sanitizer with at least 60% alcohol.
- − Put on a surgical mask, eye protection (goggles or disposable face shield that fully covers the front and sides of the face), and a single pair of disposable gloves
- − Check individual's temperature
- − **If performing a temperature check on multiple individuals, ensure that a clean pair of gloves is used for each individual and that the thermometer has been thoroughly cleaned in between each check.** If disposable or non-contact thermometers are used and the screener did not have physical contact with an individual, gloves do not need to be changed before the next check. If non-contact thermometers are used, they should be cleaned with an alcohol wipe (or isopropyl alcohol on a cotton swab) between each individual.
- − Remove and discard PPE
- − Wash hands with soap and water for at least 20 seconds. If soap and water are not available, use hand sanitizer with at least 60% alcohol

✓ **If a physical barrier or partition is used to protect the screener rather than a PPE-based approach, the following protocol can be used.** (During screening, the screener stands behind a physical barrier, such as a glass or plastic window or partition, that can protect the screener's face and mucous membranes from respiratory droplets that may be produced when the person being screened sneezes, coughs, or talks.)

- Wash hands with soap and water for at least 20 seconds. If soap and water are not available, use hand sanitizer with at least 60% alcohol.
- Put on a single pair of disposable gloves.
- Check the individual's temperature, reaching around the partition or through the window. Make sure the screener's face stays behind the barrier at all times during the screening.
- **If performing a temperature check on multiple individuals, ensure that a clean pair of gloves is used for**

**each individual and that the thermometer has been thoroughly cleaned in between each check.** If disposable or non-contact thermometers are used and the screener did not have physical contact with an individual, gloves do not need to be changed before the next check. If non-contact thermometers are used, they should be cleaned with an alcohol wipe (or isopropyl alcohol on a cotton swab) between each individual.

- Remove and discard gloves.

Last Updated Dec. 3, 2020

Content source: National Center for Immunization and Respiratory Diseases (NCIRD), Division of Viral Diseases